1

1        IN THE UNITED STATES DISTRICT COURT

2          FOR THE DISTRICT OF COLORADO

3    Case No. 13-cr-00473-RM

4    _____

5    UNITED STATES OF AMERICA,

6        Plaintiff,

7    vs.

8    GARY SNISKY,

9        Defendant.

10   _____

11        Proceedings before CRAIG B. SHAFFER, United States

12   Magistrate Judge, United States District Court for the

13   District of Colorado, commencing at 2:34 p.m., November 25,

14   2013, in the United States Courthouse, Denver, Colorado.

15   _____

16        WHEREUPON, THE ELECTRONICALLY RECORDED PROCEEDINGS

17   ARE HEREIN TYPOGRAPHICALLY TRANSCRIBED...

18   _____

19                    APPEARANCES

20        PEGEEN RHYNE, Assistant United States Attorney,

21   appearing for the government.

22        LAFONDA TRAORE, Assistant Federal Public Defender,

23   appearing for the defendant.

24   _____

25           ARRAIGNMENT/DISCOVERY/DETENTION HEARING

2

1                    P R O C E E D I N G S

2              (Whereupon, the within electronically recorded

3    proceedings are herein transcribed, pursuant to order of

4    counsel.)

5              THE COURT: Okay.  Let's call 13-cr-473, United

6    States of America versus Gary Snisky.  I'll take appearances

7    of counsel.

8              MS. RHYNE: Good afternoon, Your Honor.  Pegeen

9    Rhyne for the United States.

10             MS. TRAORE: Good afternoon.  LaFonda Traore on

11   behalf of Mr. Snisky who is present and in custody.

12             THE COURT: All right.  This matter is on the

13   docket for an arraignment, discovery conference, and a

14   detention hearing.  Counsel, have you had sufficient time to

15   review the Indictment with your client and would you like me

16   to read it here in open court?

17             MS. TRAORE: Your Honor, I have reviewed the

18   Indictment with my client, at this time we would waive

19   further advisement, waive the reading of the Indictment and

20   enter not guilty pleas.

21             THE COURT: Okay.  And the record will reflect that

22   the defendant, through counsel, has entered a plea of not

23   guilty to the Indictment and each and every count of the

24   Indictment.

25             With respect to speedy trial deadlines, the 30-day

1    minimum is December 22nd, the 70-day deadline is January 30,

2    and if the defendant remains in custody, the 90-day deadline

3    would apply, and that is February 19.  The government will

4    produce   discovery   today,   the   defendant   will   produce

5    reciprocal discovery by December 10, and that brings us to

6    the question of detention.

7           Let me state for the record I have reviewed the

8    Pretrial Services Report, I will take judicial notice of the

9    information   in   that   report.    What's   the   government's

10   position on detention?

11          MS. RHYNE: Your Honor, we're seeking detention,

12   and I have a witness to present.

13          THE COURT: Okay.  Go ahead, please.

14          MS.   RHYNE:   Your   Honor,   the   government   calls

15   Special Agent Kate Funk.

16          THE COURT: Okay.  Special Agent, if you'd come on

17   up.

18          (Pause) If you'd raise your right hand.

19      SPECIAL AGENT KATE FUNK, GOVERNMENT WITNESS, SWORN

20          THE COURT: What I'd like you to do is if you would

21   state your full name and spell your last name.

22          THE WITNESS: Special Agent Kate E. Funk, the last

23   name is spelled F-U-N-K.

24          THE COURT: Okay.  Counsel.

25          MS. RYHNE: Thank you.

4

1                          DIRECT EXAMINATION

2       BY MS. RHYNE:

3       Q     Special Agent Funk, where do you work?

4       A     I work for the FBI.

5       Q     In what capacity?

6       A     On the White Collar Investigations Unit.

7       Q     Are you a special agent?

8       A     Yes, I am.

9       Q     And how long have you been a special agent with the

10      FBI?

11      A     Three years.

12      Q     In that capacity, are you assigned to the case to

13      investigate Gary Snisky?

14      A     I am.

15      Q     How long have you been on that investigation?

16      A     Approximately one year.

17      Q     Now, first focusing on the schemes that were indicted

18      in the Indictment in this case, between July 2011 and

19      January 2013 approximately how much money did Mr. Snisky

20      receive from investors who thought they were investing in a

21      program involving Ginnie Mae bonds?

22      A     Approximately $4 million.

23      Q     And what evidence has been reviewed to come up with

24      that figure?

25      A     Bank statements, investor statements, investor

                    AVERY/WOODS REPORTING SERVICE, INC.
          455 SHERMAN STREET, SUITE 250, DENVER, CO  80203
                303-825-6119       FAX 303-893-8305

5

1    interviews.

2    Q    And during that same time frame, how many bonds, if

3    any, did Mr. Snisky purchase with that investor money?

4    A    Mr. Snisky did not purchase any bonds during that time

5    period.

6    Q    Between approximately 2010 and January 2013

7    approximately how much money did Mr. Snisky receive from

8    investors who thought they were investing in a proprietary

9    trading program for the futures market?

10   A    Approximately $500,000.

11   Q    And was some of that money returned?

12   A    Some of that money was returned.

13   Q    Putting aside any money that was returned, was the

14   substantial portion of that money invested in any futures

15   trading market?

16   A    It was not.

17   Q    What type, if any, of trading was done through a

18   futures market affiliated with anything that Mr. Snisky was

19   running?

20   A    I'm sorry, can you repeat that question?

21   Q    Yeah, it was a bad one.

22        What, if any, type of trading was done in the

23   futures trading market affiliated with any company run by

24   Mr. Snisky?

25   A    There was no trading, futures trading.

6

```
 1     Q    Was there any test trading?
 2     A    There was some test trading done.
 3     Q    And was there --
 4     A    Very small amounts.
 5     Q    Pardon me.
 6          Was there any trading in a simulated environment?
 7     A    There was.
 8     Q    How did we learn about that type of training --
 9    trading?
10     A    From Richard Greeott who worked for Mr. Snisky.
11     Q    In what capacity did Mr. Greeott work for Mr. Snisky?
12     A    He was what Mr. Snisky termed as an -- his IT guy, but
13    he worked essentially on that proprietary trading model.
14     Q    And did he have an independent contractor status with
15    Mr. Snisky's companies?
16     A    He did.
17     Q    Did Mr. Greeott indicate whether or not the algorithm
18    that was supposedly the basis for this futures trading
19    program was ever fully developed?
20     A    He said that it was not fully developed.
21     Q    Did the government serve any seizure warrants at around
22    the same time as the search warrant in this case?
23     A    We did.
24     Q    First of all, when was the search warrant conducted?
25     A    January of 2013.
```

AVERY/WOODS REPORTING SERVICE, INC.
455 SHERMAN STREET, SUITE 250, DENVER, CO  80203
303-825-6119      FAX 303-893-8305

7

1    Q    And approximately how much money was the government
2    able to seize by virtue of those seizure warrants?
3    A    Approximately $2 million.
4    Q    And was there any other real property that was also
5    encumbered by these seizure warrants?
6    A    Yes, we were looking at the property at 710 Tenacity
7    where they were doing business.
8    Q    And who was doing business?
9    A    Where Mr. Snisky was doing business.
10   Q    Now, as for the rest -- the remainder of the money that
11   was not seized by the government, did Special Agent Ron
12   Loecker of the IRS analyze bank records affiliated with Mr.
13   Snisky for the time period approximately January -- excuse
14   me -- 2010 through January 2013?
15   A    He did.
16   Q    And what types of expenditures did Mr. Snisky use the
17   investor money for?
18   A    He purchased his building at 710 Tenacity.  He also
19   spent a considerable amount of money refurbishing the
20   building and purchasing furniture and things of that sort.
21   He also spent the money on various personal expenses such as
22   meals, his home mortgage, and also commissions paid to
23   brokers.
24   Q    Did you learn during the course of this investigation
25   that -- actually, let me back up for a minute.  What company

8

1        name was Mr. Snisky using during the time period July 2011
2        through January 2013?
3        A        Arete.
4        Q        And what type of business did that purport to be in?
5        A        It was a private placement offering.
6        Q        And who owned and operated that company?
7        A        Gary did, Mr. Snisky.
8        Q        Did he run a different named company prior to July of
9        2011?
10       A        He did.
11       Q        What was the name of that company?
12       A        Colony Capital.
13       Q        And who owned and operated that?
14       A        Mr. Snisky.
15       Q        Did you learn during the course of this investigation
16       that Colony Capital was investigated by the Colorado
17       Department of Regulatory Agencies?
18       A        We did.
19       Q        And approximately when did -- do you understand that
20       is often referred to as DORA?
21       A        DORA, yes.
22       Q        Approximately when did DORA begin its investigation
23       of Colony Capital and Mr. Snisky?
24       A        It was mainly from 2009 through 2010.
25       Q        After DORA began its investigation, what happened to

9

1     Colony Capital?

2     A     It was dissolved, and Arete, the company Arete was set

3     up.

4     Q     Were many of the investors who originally invested

5     under Colony Capital returned?  Excuse me, were many of them

6     compensated with their funds that they had invested?

7     A     They were.

8     Q     Were many still not --

9     A     Yes.

10    Q     -- paid back?

11    A     Yes, there were a few that were not paid back.

12    Q     Now, you mentioned that a search warrant was conducted

13    in this investigation in January of 2013.  Was Mr. Snisky

14    interviewed on the day of the search warrant?

15    A     He was.

16    Q     During that interview did he admit that he had not

17    purchased any Ginnie Mae bonds with investor money?

18    A     He did.

19    Q     Now, I'd like you to focus on California.  Have you

20    learned that after the search warrant was executed in this

21    case Mr. Snisky was involved in setting up another company

22    in California?

23    A     He was.

24    Q     What was the name of that company?

25    A     Aion Financial.

1    Q    Were you familiar with that name?

2    A    Yes, Mr. Snisky had a bank account in the name Aion.

3    Q    And that was before the search warrant was executed.

4    A    That's right.

5    Q    What type of business does Aion purport to be in?

6    A    It's a private placement investment company.

7    Q    How did you first learn about Aion Financial?

8    A    We learned about it actually through the DORA

9    investigation, a person that had been approached by Mr.

10   Snisky, as well as Aion Financial employees, was pitched an

11   investment, and when he Googled the name Gary Snisky, he

12   found out about the complaints on the DORA investigation.

13   Q    And did DORA provide you with the name of that person

14   who was pitched by --

15   A    They did.

16   Q    -- Mr. Snisky?

17        I'm going to ask you to wait till I finish my

18   questions.

19        And what's the name of that person?

20   A    Brent Blaine.

21   Q    Did you contact Mr. Blaine?

22   A    I did.

23   Q    What did he tell you about his interactions with Mr.

24   Snisky in connection with the pitch that he was made?

25   A    He was pitched a real estate flipping investment

1    opportunity.   During that pitch Mr. Snisky provided two

2    referrals to Mr. Blaine to show up his deal -- his past

3    dealings in the real estate business.

4    Q    And did Mr. Blaine tell you who those two referrals

5    were?

6    A    He did.

7    Q    What were their names?

8    A    Mohammed Mahdavi and Jonathan Corral.

9    Q    And did Mr. Blaine tell you whether or not someone on

10   his behalf contacted those referrals?

11   A    His cousin Allen Blaine contacted those referrals.

12   Q    And what did Mr. Blaine -- sorry, what was the first

13   gentleman's --

14   A    Brent Blaine was the --

15   Q    What -- what did Brent Blaine report had been

16   represented by those two referrals?

17   A    Mr. Mahdavi had told Mr. Blaine that he did 2- to $3

18   million dollars in real estate investments with Snisky over

19   the last approximately year and a half.

20   Q    And what did Mr. Corral say according to Mr. Brent

21   Blaine?

22   A    That he had done $5 million in investment deals with

23   Mr. Snisky over the last few years.

24   Q    And to be clear, those representations were made to the

25   cousin?

1    A    That's correct.

2    Q    Did you interview Jonathan Corral?

3    A    I did.

4    Q    What did he tell you about his role in acting as a

5    reference for Mr. Blaine -- excuse me, Mr. Snisky's real

6    estate business?

7    A    He said that he did speak to Mr. Blaine, Mr. Allen

8    Blaine, and told him he did $5 million in -- or actually, he

9    did not recall the amount but said it could have been $5

10   million in deals with Mr. Snisky.

11   Q    Did he tell you whether or not that was a lie?

12   A    He did, he said he had never done any business with Mr.

13   Snisky.

14   Q    Did he tell you why he said -- made that lie to Mr.

15   Blaine?

16   A    Because Mr. Snisky had told him that he'd be calling

17   and to make him look good.

18   Q    Did Mr. Blaine invest after hearing about those

19   referrals from his cousin?

20   A    He did not.

21   Q    Is that when he called DORA?

22   A    That's right.

23   Q    Did you learn that someone else actually did provide

24   money to Mr. Snisky in connection with real estate

25   investment?

1    A    Yes, Jonathan Corral provided $5,000 to Mr. Snisky,

2    as well as a Santiago Orvananos provided Mr. Snisky $15,000.

3    Q    And to be clear, Jonathan Corral is the man who gave

4    that false representation?

5    A    That's correct.

6    Q    Focusing on Mr. Santiago Orvananos --

7    A    Yes.

8    Q    -- what did he tell you about his dealings with Mr.

9    Snisky?

10   A    He met with Mr. Snisky several times and he was looking

11   to invest in the flipping of real estate in the San Diego

12   area, and he provided Mr. Snisky $15,000 in incidental --

13   for incidentals and travel expenses related to finding those

14   homes on his behalf.

15   Q    Did Mr. Orvananos tell you whether or not he had an

16   agreement with Mr. Snisky that that $15,000 would be

17   returned if appropriate properties weren't found for their

18   mutual investment?

19   A    They had a verbal agreement that Mr. Snisky would

20   provide that money back if he did not find properties that

21   were suitable for investment purposes.

22   Q    And approximately during what time frame was Mr.

23   Orvananos dealing with Mr. Snisky?

24   A    It was the summer -- August of 2013.

25   Q    And according to Mr. Orvananos, were suitable

14

1      properties found by Mr. Snisky or his affiliates in order

2      for them to jointly invest?

3      A    No.

4      Q    And did he ask for his money back?

5      A    He did.

6      Q    Did he get it back?

7      A    He did not.

8      Q    Please tell me what happened.

9      A    Mr. Snisky invited him to come up to the offices in

10     Irvine for Aion Financial and did a -- provided him with a

11     pitch of the private placement that they were offering

12     there.  Mr. Orvananos felt that it was more really to show

13     that he had a legitimate business running and was to buy

14     time.

15     Q    Who else was present during that meeting at Aion

16     Financial's offices?

17     A    Kim Davis, Jess Booth, and Brian Hill were also there,

18     as well as Jonathan Corral.

19     Q    Do you recognize those people as being here in the

20     courtroom today?

21     A    I do.

22     Q    Okay.  Where are they seated?

23     A    They're seated back in the second and third row.

24     Q    In the galley?

25     A    Yes.

1    Q    And who made a presentation to Mr. Orvananos during

2    that meeting?

3    A    Mr. Snisky lead the -- a portion of the meeting, as

4    well as Brian Hill discussed some of the real estate

5    opportunities.

6    Q    And was there a PowerPoint presentation that was given

7    along with this presentation?

8    A    There was.

9    Q    Was Mr. Orvananos provided with a physical copy of that

10   PowerPoint before he left the meeting?

11   A    He was.

12   Q    Why?

13   A    He requested it.

14   Q    Did he provide you with a copy?

15   A    He did.

16   Q    And did he tell you who specifically gave it to him at

17   the meeting?

18   A    Mr. Snisky gave him the copy.

19   Q    In addition to the real estate that you've discussed,

20   was there another component of this presentation?

21   A    Yes, it was a proprietary trading model.

22   Q    Based on what?

23   A    Ginnie Mae bonds.

24   Q    Okay.  Have you reviewed a copy of the PowerPoint

25   presentation that Mr. Orvananos received?

AVERY/WOODS REPORTING SERVICE, INC.
455 SHERMAN STREET, SUITE 250, DENVER, CO  80203
303-825-6119     FAX 303-893-8305

1     A     I did.

2     Q     Were there aspects of that PowerPoint presentation

3     that appeared to be very similar to the presentations that

4     were given during the scheme charged in this Indictment in

5     this case?

6     A     Yes, they included the Ginnie Mae bonds.

7     Q     And specifically, what phrase was used to describe the

8     security of the Ginnie Mae bonds?

9     A     Backed by the full faith and credit of the U.S.

10    government.

11    Q     Was that phrase used over and over in this case?

12    A     It was.

13    Q     And was there also a Ginnie Mae prospectus that

14    purported to be part of this PowerPoint presentation?

15    A     There was.

16    Q     And what type of information did that purport to give?

17    A     Interest rate, term, things like that.

18    Q     And did it also include that information about the

19    backing --

20    A     Yes.

21    Q     -- of the full faith and credit of the United States

22    government?

23    A     Yes.

24    Q     Was there any reference to Bloomberg on that

25    presentation?

17

1    A    Yes.

2    Q    And what did it say about Bloomberg?

3    A    It said that they were using Bloomberg to do the

4    trades, and it also included some screenshots, pictures of

5    Ginnie Mae bonds on Bloomberg.

6    Q    And how was Bloomberg used in the investigation that

7    led to the Indictment in this case?

8    A    Mr. Snisky often spoke to investors about his access

9    to Bloomberg, being a Bloomberg trader allowed him access to

10   private placement offerings that others would not have

11   access to.

12   Q    Did he represent it as being one of the things that

13   only the financial elite had access to?

14   A    He did.

15   Q    Did he also refer to himself as being an institutional

16   trader?

17   A    He did.

18   Q    And how did he explain that to the people he was

19   speaking to?

20   A    Uhm --

21   Q    What did he say about being an institutional trader?

22   A    That it allowed him to move -- allowed him access to

23   Bloomberg, allowed him to make markets, things of that

24   nature.

25   Q    And did it allow him access to different types of

1    investments that the quote-unquote little man never had

2    access to?

3    A    That's right, those would be those private placement

4    offerings.

5    Q    In this PowerPoint presentation that you reviewed was

6    there a reference to the institutional status that Aion

7    would have?

8    A    It did reference that.

9    Q    Did it also reference the ability to create these

10   proprietary models?

11   A    Yes.

12   Q    Did it also reference algorithms, trading algorithms?

13   A    Yes.

14   Q    And how is that similar to the case we've indicted in

15   this case?

16   A    It was the same type of investment description that was

17   marketed to the investors at Arete.

18   Q    So how -- remind me how was the algorithm used during

19   the presentation for this case.  How was it described to

20   investors?

21   A    It was described as something that was internally

22   developed, kind of a proprietary thing that Mr. Snisky had

23   developed that would pay a principal and interest in advance

24   on a Ginnie Mae bond.

25   Q    I'm asking about the algorithm.  Did that relate to the

19

1    Ginnie Made bond or the futures trading market?

2    A    It related to the Ginnie Mae bonds.

3    Q    Are you certain?

4    A    When it came to the Aion Financial it was in the Ginnie

5    Mae bonds.

6    Q    Okay.  In this case did -- I'm sorry, so when I say "in

7    this case," I'm referring to the Indictment.

8    A    Okay.

9    Q    Did it refer to the --

10   A    Oh.

11   Q    -- futures trading program or the Ginnie Mae bonds?

12   A    In the Arete investment it related to the futures

13   trading model.

14   Q    And in that regard, was it touted as how they made most

15   of their money?

16   A    It was.

17   Q    Okay.  After this meeting that Mr. Orvananos had with

18   Gary Snisky, did Mr. Orvananos chose to invest in any of

19   these other offerings that Mr. Snisky was describing?

20   A    No.

21   Q    Was he still asking for his money back?

22   A    He was.

23   Q    Has he received his money back?

24   A    No.

25   Q    Did you also interview some of the other people who are

AVERY/WOODS REPORTING SERVICE, INC.
455 SHERMAN STREET, SUITE 250, DENVER, CO  80203
303-825-6119    FAX 303-893-8305

1       in this courtroom today about Aion Financial?

2       A     Yes.

3       Q     Who did you interview?

4       A     We interviewed Jess Booth, Kim Davis, and Brian Hill.

5       Q     And what did they say about Mr. Snisky's role in Aion

6       Financial?

7       A     That he was working as a consultant and bringing in

8       that proprietary trading model.

9       Q     And what did he say -- what did they say specifically

10      about the bond investment model being brought to Aion?

11      A     That that was going to be developed by Snisky and he

12      was essentially in charge of that.

13      Q     Overall during this interview did these three

14      individuals appear cooperative during the interview?

15      A     They were -- they were confrontational during the

16      interview.

17      Q     Separate from the -- and let me ask, did you interview

18      these three individuals jointly?

19      A     Jess Booth was interviewed first, just on his own, and

20      then there was an interview a few days later with all three

21      individuals.

22      Q     When you interviewed Jess Both on his own, did you ask

23      him about Eco Lifestyle Development?

24      A     Well, we didn't ask him specifically about Eco Life,

25      but he did say that Mr. Snisky was working under that

1    company name as a consultant.

2    Q    And did he describe what Mr. Snisky's duties were

3    under that company name as a consultant?

4    A    That he was working for Aion Financial.

5    Q    Did he describe any job duties that were independent

6    of Aion Financial that had something to do specifically with

7    the business function of Eco Life?

8    A    No, he did not.

9    Q    And was he cooperative during that interview?

10   A    I would describe him as confrontational as well.

11   Q    In fact, was the interview discontinued because he was

12   no longer being cooperative?

13   A    It was.

14   Q    Have you interviewed a man named Jonathan Lackey in

15   connection with this case?

16   A    I have.

17   Q    Who is he?

18   A    He is a physician in Irvine, California, that was an

19   investor in Colony Capital.

20   Q    And when did he invest?

21   A    In 2009.

22   Q    And approximately how much did he invest?

23   A    250,000.

24   Q    What did he initially believe that money was being

25   invested in?

22

1    A    He was investing in a bond initially.

2    Q    What type of bond?

3    A    It was a collateralized mortgage obligation.

4    Q    And so was this an offering, as far as you know, that

5    predated the Ginnie Mae bond offering that you described?

6    A    I believe so.

7    Q    And what was he told about the status of his investment

8    a few months after he invested?

9    A    He was told that his money was rolled into a futures

10   trading program and that was maintained in a separate

11   TradeStation account at Colony Capital.

12   Q    Was he also told that the original CMO bond was sold at

13   a considerable loss?

14   A    He was.

15   Q    Did he ask for paperwork to back that up?

16   A    He did.

17   Q    Was it ever provided?

18   A    It was not.

19   Q    After the search warrant was executed in this case,

20   did Dr. Lackey continue to hear from Mr. Snisky?

21   A    He did.

22   Q    What did Mr. Snisky tell him about the investigation?

23   A    He told him that it was all a big misunderstanding.

24   Q    And what did he tell -- excuse me, what did Gary Snisky

25   tell me Mr. -- Dr. Lackey about the status of his invested

1    money?

2    A    That it was all there and he was going to receive his

3    money back.

4         MS. RHYNE: Your Honor, I have an exhibit.  May I

5    approach the witness and the Court?

6         THE COURT: Sure.  Why don't you show it to me

7    first.

8         (Pause in the proceedings)

9         THE COURT: Okay.

10   Q    (By Ms. Rhyne) Special Agent Funk, do you recognize

11   Exhibit 1?

12   A    I do.

13   Q    What is it?

14   A    It is an affidavit signed by Mr. Lackey.

15   Q    And how did you receive this affidavit?

16   A    He provided me with a copy of this.

17   Q    Did he explain to you the circumstances that led up to

18   him signing this?

19   A    He did.  He had met with Mr. Snisky in August of 2013,

20   and Mr. Snisky had requested that he sign this.

21   Q    Did he -- did Mr. Snisky explain why he wanted this

22   affidavit?

23   A    He did, he said that it would help clear up the federal

24   investigation.

25   Q    Did you also participate in interviewing a woman named

AVERY/WOODS REPORTING SERVICE, INC.
455 SHERMAN STREET, SUITE 250, DENVER, CO  80203
303-825-6119     FAX 303-893-8305

24

1     Cheryl Paxton?

2     A     I did.

3     Q     Who is she?

4     A     She is an investor also that started in the Colony

5     Capital investment opportunity.

6     Q     And approximately when did she begin her investment?

7     A     It was in January of 2010.

8     Q     And during the course of her investment approximately

9     how much did she invest?

10    A     Approximately 500,000.

11    Q     And initially, what did she think she was investing in?

12    A     She was originally invested in a bond.

13    Q     And again, did that bond predate the Ginnie Mae

14    offering that you've described earlier?

15    A     It did.

16    Q     And after that original bond -- first of all, let me

17    ask, did she describe who was her personal financial

18    advisor?

19    A     I don't believe so, she worked directly with Gary.

20    Q     Okay.  And did she indicate whether or not Gary had

21    said -- told her that that money that had been invested in

22    the CMO bond was rolled into a different bond program?

23    A     Yes, it was rolled into the Arete program.

24    Q     The Ginnie Mae bond?

25    A     Yes.

1    Q    And did she also indicate that at some point she
2    believed her money was rolled into a third -- yet a third
3    investment?
4    A    She also believed her investment was rolled into the
5    purchase of the property at 710 Tenacity.
6    Q    And did she have documents that were signed between
7    herself and Mr. Snisky indicating that there was some sort
8    of partnership between the two of them to purchase that
9    property?
10   A    There was, there was a company created called Cherpax.
11   That was an agreement between her and Mr. Snisky.
12   Q    And -- first, did Special Agent Ron Loecker analyze the
13   bank records to determine what money was actually used to
14   purchase the building at 710 Tenacity?
15   A    He did.
16   Q    And whose money was used?
17   A    It was pooled investor funds.
18   Q    So was it specific to Ms. Paxton in any way?
19   A    It was not.
20   Q    And were any of those other investors aware that their
21   money was being used to purchase real estate?
22   A    I don't believe so.
23   Q    Now, was Ms. Paxton initially reluctant to speak to
24   the investigators, including yourself, in this case?
25   A    She was.

1    Q    Can you explain that?  I mean, describe that?

2    A    When I first contacted her shortly after the search

3    warrant was executed, she did not want to talk with me.  She

4    did take down my name and number, but she did not want to

5    talk or cooperate.

6    Q    Eventually was she served with a grand jury subpoena?

7    A    She was.

8    Q    After that, did she request a meeting?

9    A    She did.

10   Q    And did she come to that meeting with an attorney?

11   A    She did.

12   Q    Were you present at that meeting?

13   A    I was not.

14   Q    Did you read a report of that meeting?

15   A    I did.

16   Q    And during that meeting did she indicate whether or

17   not she still believed her investment was secure?

18   A    She did.

19   Q    And based on what?

20   A    Conversations with Mr. Snisky.

21   Q    And did she believe she had an actual piece of property

22   that secured the money in her investment?

23   A    She believed her investment was secured by the property

24   at 710 Tenacity.

25   Q    And was that building subject to one of the seizure

1    warrants that was executed in this case?

2    A    It was.

3    Q    And did Ms. Paxton forward to you an e-mail in which

4    she described -- had taken notes of an earlier conversation

5    that she had had with Mr. Snisky in August of 2013?

6    A    She did.

7    Q    What did she report to you about that conversation in

8    that e-mail?

9    A    She said that Mr. Snisky had said that the lien on the

10   property at 710 Tenacity was off the property and he was

11   planning to list it that day in her name -- or in the name

12   Cherpax, the company he had set up for her.

13   Q    And what did he represent that would mean for her?

14   A    That she would get the proceeds from the sale.

15   Q    And at that time, August of 2013, do you know whether

16   or not Mr. Snisky was specifically aware that that building

17   was subject to forfeiture proceedings by the government in

18   this case?

19   A    He was aware of that.

20   Q    Did you also -- excuse me, did investigators also

21   attempt to interview Melinda Michael in this case?

22   A    We did.

23   Q    And was she cooperative with investigators?

24   A    She was very hesitant to speak with us.

25   Q    Based on what?

1    A    She wanted to wait until after the investigation was

2    resolved to do anything.  She had received a promissory note

3    from her investment advisor, Brenda Ridley, and felt that

4    her investment was secured by that.

5    Q    And approximately -- during what phase did Ms. Michael

6    invest with either Colony Capital or Arete?

7    A    She invested with Colony Capital.

8    Q    So earlier on?

9    A    Yes.

10   Q    And who is Brenda Ridley?

11   A    Brenda Ridley was an -- well, she was said to be an

12   investment advisor, I don't believe that she was registered

13   at the time, and she brought a number of investors to Mr.

14   Snisky.

15   Q    Is Ms. Ridley also involved in this California

16   investment operation that's currently going on through Aion?

17   A    She is.

18   Q    What is her role?

19   A    She is the registered investment advisor working with

20   qualified funds for Aion Financial.

21   Q    But she was also previously involved in the Arete --

22   A    She was.

23   Q    -- and Colony Capital days?

24   A    Yes.

25   Q    To your knowledge, under Colony Capital was there a

1    specific offering that related to flipping homes in the real

2    estate business?

3    A    Not to my knowledge.

4    Q    And to your knowledge was Richard Greeott ever a

5    partner in that company?

6    A    No, he was not.

7                MS. RYHNE: I have no further questions.

8                THE COURT: Ms. Traore?

9                     CROSS-EXAMINATION

10   BY MS. TRAORE:

11   Q    Good afternoon.

12   A    Good afternoon.

13   Q    So if I understand correctly, there are actually two

14   separate investigations, something that happened from July

15   2011 to January 2013, and that ended in a search warrant

16   being executed, is that correct?

17   A    Yes, there -- well, I mean, I think they're all a part

18   of the same investigation, but that's the Arete time frame.

19   Q    The Arete time frame.

20                And then there was a separate -- or something that

21   occurred, maybe it's overlapping from 2010 to 2013?

22   A    That's correct.

23   Q    Okay.  And is that Arete as well?

24   A    That's Colony Capital.

25   Q    That's Colony Capital.

1          Where you involved with the -- was there an

2   execution of a search warrant somewhere in January 2013?

3   A    There was.

4   Q    And where was that?

5   A    At 710 Tenacity in Longmont.

6   Q    Okay.  And that's when a lien was placed on that

7   property, after that search warrant was executed?

8   A    That's correct, yes.

9   Q    And where you involved in that search warrant --

10  A    I was.

11  Q    -- execution?  Okay.

12         Were there any arrests made after the execution of

13  that search warrant?

14  A    There was not.  I mean, with the exception of the

15  recent arrest, obviously.

16  Q    Right --

17  A    Okay.

18  Q    -- but --

19  A    Right, at the time of the search warrant, no.

20  Q    Right, at the time of the search warrant, no.

21  A    Yeah.

22  Q    Okay.  So the overlap in that, the July 2011 to

23  January 2013, for lack of a better description, was the

24  Arete investigation?

25  A    That's right.

1    Q    And then the overlapping part was 2010 to 2013, the

2    Colony Capital --

3    A    That's right.

4    Q    -- investigation.

5         And at the time of the -- that the search warrant

6    was executed at 710 Tenacity, has that building been closed

7    since then?  I don't -- I don't know if it's a building

8    that's --

9    A    Yeah, it's -- well, their business location was the

10   first floor of the building, and then there's, I believe,

11   residential units above that which are still occupied, but

12   I believe the first floor has been closed down.

13   Q    Okay.  Now, the Richard Greeott who has been mentioned,

14   was he involved in the Arete investigation?

15   A    He was.

16   Q    Okay.  And he has been arrested and charged.  When did

17   that occur?

18   A    It was in the summer of this year, July.  I believe it

19   was July of 2013, but his Information may have been filed in

20   August/September of this year.

21   Q    Okay.  Now, you indicated -- let me just look at my

22   notes -- that there was money given by investors to buy some

23   Ginnie Mae bonds.

24   A    Yes.

25   Q    And when was that?

1    A    The Ginnie Mae bonds were from 2011 through 2012.

2    Well, actually through January of 2013.

3    Q    Okay.  So that was part of the Arete investigation?

4    A    That's right.

5    Q    And then as part of the Colony Capital there has been

6    some investors and some people getting invest because they

7    knew about something about DORA, is that correct?

8    A    That's right.

9    Q    Okay.  Prior to this investigation starting in July of

10   2000 -- no, I guess it started in 2010, were you familiar

11   with Mr. Snisky at all in any other capacity?

12   A    No.

13   Q    Was Mr. Snisky present at the 710 Tenacity building

14   when the search warrant was executed?

15   A    He was.

16   Q    Did he know -- if you know -- before the search warrant

17   was executed that there was an investigation going on?  Did

18   he know --

19   A    I don't think so.

20   Q    Okay.  But he certainly knew after the search

21   warrant --

22   A    Yes.

23   Q    -- was executed?

24        And so since January 2013 when the search warrant

25   was executed, he has not fled the jurisdiction, he's been

1   either here in Colorado or in California, is that correct?

2   A    I don't know about his travel, to be honest, from

3   January through today.

4   Q    Okay.  As far as your investigation, you haven't kept

5   track of his whereabouts to see if he was going to abscond

6   or any of that type --

7   A    That's correct.

8   Q    -- of investigation?  Okay.

9        Are you aware that in April of this year he and

10  his family traveled to Mexico for a family vacation?

11  A    No, I did not know that.

12  Q    Okay.  And there hasn't been, even though there was an

13  investigation, no travel restrictions placed on him.  You

14  didn't ask the government to do some sort of travel

15  restrictions for Mr. Snisky, is that correct?

16  A    That's correct.

17  Q    Okay.  And you haven't -- you or your agency have not

18  involved in any surveillance of him to keep track of his

19  movements, where he's going.

20  A    That's correct.

21  Q    And Mr. Snisky and his family, his wife and three

22  children, they live in Longmont, is that correct?

23  A    Yes.

24  Q    And they've been here since 1996 or so?

25  A    I'm -- I don't recall when he moved here.

34

1    Q    Okay.  Now, you mention there was some phrase that was

2    being used in a PowerPoint presentation that said "backed by

3    the full faith and credit by the U.S. government."  What --

4    A    Yes.

5    Q    -- did that mean?  I'm sorry, I cut you off.

6    A    I think what it really means with the bond itself is

7    that it's a very low risk investment, and I think by talking

8    to investors about that they felt that their investment was

9    low risk.

10         THE COURT: If I could just interrupt.  The bond --

11   Mr. Snisky was telling potential investors these bonds were

12   backed by the full faith and credit of the government.  My

13   question is -- and again, I'm sure -- I don't know if you

14   answered this question.  Were any such bonds ever purchased?

15         THE WITNESS: No.

16         MS. TRAORE: I have no further questions, Your

17   Honor.

18         THE COURT: Ms. Rhyne, any redirect?

19         MS. RHYNE: No, Your Honor.  Thank you.

20         THE COURT: All right.  Thank you.

21         Does the government have any other evidence or

22   testimony it would like me to consider?

23         MS. RHYNE: No, Your Honor.

24         THE COURT: Does the defendant have anything to

25   present?

1          MS. TRAORE: Your Honor, just a -- just a minute.

2          THE COURT: Sure.

3          (Pause in the proceedings)

4          MS. TRAORE: Your Honor, we do not have any

5     evidence to present, but we would just like to be heard at

6     the end.

7          THE COURT: Sure.  Well, I think we're pretty much

8     there.  Go ahead.

9          MS. RHYNE: Thank you, Your Honor.

10         The reason the government is asking for detention

11    is because we believe that Mr. Snisky is an ongoing danger

12    to the community and that he will attempt to obstruct

13    justice should he be released.

14         Focusing first on the danger to the community, Mr.

15    Snisky has proven himself to be a serial defrauder.  He

16    started with Colony Capital, and when he got wind of the

17    DORA investigation he closed that company down, paid many of

18    those investors back, and rolled others into his new

19    company.  He then began the indictment -- excuse me, the

20    scheme that led to the Indictment in this case, which does

21    take into account the Colony Capital conduct as well, but it

22    was a bond scheme plus the futures trading scheme as alleged

23    in the Indictment, and we'd ask the Court to take judicial

24    notice of the Indictment in this case.

25         After the search warrant of this case in January,

1    where Mr. Snisky was present, he was aware -- he spoke to

2    the investigators, and he actually spoke to investigators

3    later as well, he was well aware of the ongoing nature of

4    this investigation, he then goes to California and begins

5    yet a third scheme, which doesn't appear to have gotten

6    substantially off the ground, but not for a lack of effort.

7    In this new scheme he's pitching a fraudulent real estate

8    deal where he's giving out the names of people who have not

9    done any business with him and asking them to say falsely

10   they have a history of successful business in the real

11   estate market.  We also see a PowerPoint presentation where

12   he has rolled out yet again a very similar presentation

13   regarding Ginnie Mae bonds that prove to be fraudulent in

14   this case, so I think he will, if remain -- if he remains

15   out of custody, find a way to hatch another scheme.  He

16   seems to be undeterrable.  Most people would have been

17   scared by the DORA investigation and gone straight.  Most

18   people would have been scared by the IRS, the FBI, and the

19   Postal Service serving a search warrant in your place of

20   business and cleaned up their acts.  He has not been

21   deterred, he has continued with his fraudulent activity.

22        Equally disturbing are his efforts to reach out to

23   the investors who he thought he could influence and alter

24   their testimony or willingness to speak to the government.

25   I think the most egregious are his interactions with Dr.

1    Lackey, in telling Dr. Lackey that his money was secure,
2    that it would be returned to him, these are lies.  The
3    government has seized what money was left.  Mr. Snisky had
4    no access to that and no ability to promise what would be
5    returned to them, and what we seized was less than 50
6    percent of what people invested, so the idea that he could
7    promise that monies would be returned in full to any
8    investor is an outright lie, and knowing that he asked Mr.
9    Lackey to sign the affidavit that is Exhibit 1, again, it
10   seems a deliberate attempt to create favorable evidence on
11   his  behalf  that  he  could  use  during  any  subsequent
12   investigation, and obviously I don't think Mr. -- Dr. Lackey
13   would have signed that affidavit if he understood the true
14   status  of  his  investment  and  what  Mr. Snisky  had  been
15   telling him was false.

16       Similar  --  similarly  with  Cheryl  Paxton,  Mr.
17   Snisky's ongoing assurances to her that her money was safe
18   and secured by this property that Mr. Snisky knew very well
19   was being forfeited by the government, and even as late as
20   August of 2013 telling her that she would get her money back
21   when  that  property  was  sold  and  that  it  would  be  sold
22   quickly because the lien had been removed from it, again,
23   completely false and I believe specifically designed to keep
24   Ms. Paxton from speaking to the government.  And it had been
25   successful  except  that  the  government  has  the  ability  to

1    subpoena people to the grand jury, and we had every
2    intention of putting Ms. Paxton in the grand jury but she
3    requested the meeting to see if that was truly necessary.

4            And finally, we have Melinda Michael who, to this
5    day, has not fully sat down and talked to us because she
6    believes her money is still safe of a promissory note.
7    Again, this is pretty strong evidence of Mr. Snisky's
8    attempts, either directly or through his affiliate, Brenda
9    Ridley, to influence witnesses, and victims in particular,
10   and their willingness to come forward to the government.

11           I also would note that in the Presentence Report
12   it appears that he's been less than truthful with the
13   Probation Office.   He indicates that he has current
14   employment with a company named Eco Lifestyle Development,
15   and Jess Booth is the purported owner of that company, and
16   he indicated that the role that Mr. Snisky played with Eco
17   was parallel to the role he played with Aion, so clearly
18   that's not a real job, that is his part and parcel to the
19   current scheme.   Mr. Booth was not cooperative with
20   investigators when they asked him about Mr. Snisky and his
21   role, and I think that being proffered to the Court as
22   suitable employment is a farce.

23           Also, Mr. Snisky indicated that the company Colony
24   Capital actually was in a -- the business of offering real
25   estate investment to flip homes for resale, and that is not

1    what the investigation in this case bears out, that there
2    was actually bonds and trading opportunities being offered
3    through that company, and specifically he tries to elevate
4    Mr. Greeott's status to his partner in that company, and
5    that's not true, he was never a partner in that company, he
6    was an independent contractor who serviced Mr. Snisky's IT
7    needs, so I don't think he's been honest with the Probation
8    Office.

9            I'm also concerned because the types of dangers
10   that we've described to the Court -- both through defrauding
11   additional people and perhaps reaching out and trying to
12   tamper with witnesses -- are not the types that can be
13   impeded by any conditions set by this Court.   Home
14   confinement won't really do it.  As long as he's got a phone
15   and an ability to talk to other people, he can defraud them
16   and he can influence them, and I believe he will, and that's
17   why we're asking for detention in this case, Your Honor.

18           And certainly if the gov -- excuse me, if the
19   Court is inclined to give some sort of release, we don't
20   think that the conditions recommended by Pretrial Services
21   are adequate, probably in large part because they were not
22   aware of the evidence the government would be presenting
23   today.

24           THE COURT: Counsel?

25           MS. TRAORE: Your Honor, we are seeking the release

1     of Mr. Snisky.   I have reviewed the Pretrial Services

2     Report.  First off, and no one has really talked about it,

3     but I certainly do not think that he is a flight risk, and

4     I don't think that that is an issue here.   He has been

5     living in Longmont since 1996, he is married, his wife is

6     present here.  They have three children together, they are

7     well-established here in Colorado.  He does have a passport,

8     at present that passport is at their house.   He does not

9     have any trouble with -- if the Court were to release him to

10    surrender his passport.

11          As to his employment, Mr. Booth is here, he states

12    that Mr. Snisky does, in fact, work at Eco Lifestyle, and he

13    is doing business consulting in his business, he works here

14    in Colorado, and sometimes he has to go to California.  Mr.

15    Snisky, if the Court were to release him, would not have any

16    trouble with confining his stay here in Colorado to continue

17    working for the business.

18          He also --

19          THE COURT: What -- I'm still not completely clear.

20    What exactly does he do for this business?  I mean, being a

21    consultant is much like being a vice president of a bank, it

22    means almost nothing.

23          MS. TRAORE: (Inaudible).

24          THE DEFENDANT: Certain things such as review of

25    projects, analystic work within that, understand with the

1    numbers how the project is working, what's going on, what

2    kind of -- what would it take to facilitate a project,

3    things of that nature within Eco Lifestyle which is in waste

4    management and clean fuel.

5        MS. TRAORE: Your Honor, and most -- I think more

6    to the point of these charges and the allegations that are

7    here, it does not involve him soliciting money from invest

8    -- from other investors, it does not involve him handling

9    any money within the company, it does not involve him making

10   any type of pitches to other investors for any money in his

11   role as a consultant with Eco.

12       I think -- I have looked at the Pretrial Services

13   Report, and with the conditions at least that they are

14   recommending, and certainly for what it appears that the

15   government says that they are concerned with, how from their

16   perspective there was a search warrant executed in January

17   of 2013, and from their perspective they say that Mr. --

18   it's alleged that Mr. Snisky has continued in these other

19   investment ventures; however, no arrest was made after the

20   execution of the search warrant, in fact, up until he got

21   arrested in November, so if they were concerned about

22   whatever it was that they think he was doing and whether it

23   was illegal, certainly he's been out of custody and never

24   was in custody for almost 11 months.

25       So I think there are -- and I looked at the

42

1    recommendation by the Pretrial Services Report, and I think
2    there are conditions that can be imposed, and I'm
3    specifically looking at the conditions listed in numbers 23
4    through 30, that his behavior could be monitored, and that
5    would -- so that he is not involved in any solicitation of
6    business, being involved in any investing, being involved in
7    pitching any ideas, not involved in any financial
8    transactions, not making another company, and not to
9    commingle personal and business funds, and I think that
10   certainly seems to have -- seems to be the focus of the
11   government's request that he be -- that he remains in
12   custody, and I think that these conditions can allay those
13   fears.

14          And as to the affidavit that was presented as to
15   Exhibit No. 1, I mean certainly the agent testified that
16   this particular person, Mr. Lackey, said that Mr. Snisky
17   asked him to sign this, but, you know, there was no
18   testimony as to who drafted this, who looked at it, you
19   know.  You know, as far as we know this is something Mr.
20   Lackey did, he went and got it notarized.  We don't know who
21   drafted it, who said what to whom about it.

22          So I would ask the Court that certainly there are
23   conditions that can be imposed to allow him to be released,
24   and I would say most if not all of the people charged with
25   these types of crimes are released on bond while their cases

1    are pending, and I would ask you to do that and impose the

2    conditions    that    the    Pretrial    Services    officer    has

3    recommended.

4            THE COURT: Ms. Rhyne, do you want to respond?  And

5    specifically, I'd be interested in your assessment, if, in

6    fact, defense counsel's correct and there was a search

7    warrant executed some 11 months ago.  Do you want to explain

8    to me how locking this gentleman up is going to address a

9    situation where apparently he was free to continue to

10   conduct whatever business he's doing for 11 months.

11           MS. RHYNE: Oh, I do, Your Honor.

12           Back in January we have the decision to make, do

13   we go in with the search and seizure warrants when we know

14   there is still money left, that he has not managed to spend

15   it all, can see save some investor money, and we said yes,

16   our investigation is nowhere near complete, in fact, it was

17   fairly preliminary for a large white collar case, and we

18   decided we had probable cause for both the search and

19   seizure warrants, and we went in there and we got a very

20   substantial amount of money seized and put away safely for

21   these -- these victims, but we were not ready to indict, and

22   it wasn't because we didn't believe Mr. Snisky was a danger,

23   it was because the government needs to get its ducks in a

24   row.  We need to serve grand jury subpoenas on the various

25   bank accounts, we need the time for that to come back, we

44

1    need to, at that point, interview most of the victims in

2    this case.  There was a substantial amount of --

3              THE COURT: No, and I'm not disputing for a second

4    the government's need and/or desire to continue its

5    investigation, I think that's completely appropriate, but

6    you have to concede that during that same 11-month period

7    Mr. Snisky was free to do whatever Mr. Snisky was going to

8    do, so the government made -- and I'm not criticizing the

9    government, but the government made a conscious decision,

10   the government said we have to balance risks versus reality,

11   and we make the balancing calculation and arrive at the

12   following conclusion, that's essentially what the government

13   did.

14             MS. RHYNE: Yes.

15             THE COURT: Ironically, isn't that exactly what I

16   have to do?

17             MS. RHYNE: Your Honor, it has been my experience

18   that when white collar defendants understand they're being

19   investigated, they lay low, they keep their noses clean

20   during the pendency of the investigation and hope for the

21   best.  I frankly was shocked to find out that Mr. Snisky had

22   moved his fraudulent activity to California, it's not

23   typical.  We don't come here and have detention hearings in

24   most white collar cases, we're doing it in this case because

25   Mr. Snisky has proven that he cannot be deterred, and I

1   think that's where the balance goes and in favor of

2   detention in this particular case.

3          Eleven months ago we did the best we could to

4   recover the most we could for victims while still putting

5   together the type of case that would be expected in federal

6   court and, in that meantime, frankly I did not expect him to

7   continue his fraudulent conduct, I was surprised, and that's

8   why we're asking for detention.  In addition to it's during

9   that time and only frankly very recently that we've gotten

10  answers from these other three victims as to why they hadn't

11  previously wanted to talk to us, so we didn't really learn

12  about the full extent of what I consider to be witness

13  tampering until recently.  So that is something that has,

14  you know, been part of the ongoing investigation, it's not

15  as though we knew all of that in January and we decided to

16  sit on our hands.

17          THE COURT: Okay.

18          MS. RHYNE: May I -- may I just --

19          THE COURT: No, please, sure.  Go ahead.  I'm

20  sorry.

21          MS. RHYNE: Specifically, if the Court is inclined

22  to release, I object strenuously to any business arrangement

23  that allows Mr. Snisky to continue to work for the people

24  who are involved in Aion Financial, specifically that he

25  should not be allowed to be a quote-unquote consultant who

AVERY/WOODS REPORTING SERVICE, INC.
455 SHERMAN STREET, SUITE 250, DENVER, CO  80203
303-825-6119      FAX 303-893-8305

1    quote-unquote reviews projects to see whatever projects
2    might happen, that's not a real job that -- you know, it's
3    frankly something that any amount of conduct could be hidden
4    through those vague descriptions, and our concern is the
5    fact that Jess Booth is involved in Aion where he is
6    apparently, Mr. Snisky is apparently perpetrating his
7    current fraudulent scheme, or at least was before he was
8    arrested. I can't tell the Court what Ms. Davis, Mr. Booth,
9    and Mr. Hill know. I don't know if they are knowing
10   participants in this latest scheme or if they've been duped
11   by Mr. Snisky as well, but I do not believe that any one of
12   them should be providing employment to Mr. Snisky because it
13   provides too great an opportunity for him to hide his actual
14   employment activities since none of the three of them were
15   cooperative with the authorities when they were interviewed
16   about what Mr. Snisky's activities actually were.

17           And frankly, it's not sufficient that Mr. Snisky
18   not solicit money. I think he's tried to set things up this
19   time around that he's just this consultant and other people
20   are supposedly soliciting money, so frankly I don't think he
21   should be in a line of work where soliciting money is being
22   done by anyone. I think that he is just not trustworthy
23   enough to be even anywhere near that type of conduct. But
24   again, because of the danger, both to other potential
25   investor victims and to witnesses in this case that he

47

1    should reach out and try to influence him, we are asking for

2    detention.

3            THE COURT: All right.  I mean, here's the problem

4    that I have.  I -- I will say that I am, to a great extent,

5    troubled by the evidence presented.  I'm not suggesting for

6    a second that I'm oblivious to Agent Funk's testimony.  The

7    difficulty I have is I also have to be mindful, at least at

8    this stage in the proceeding, there's a presumption of

9    innocence, and I'm not discounting for a second the fervor

10   of the government's presentation, I'm not discounting for a

11   second the thoroughness of Ms. Funk's presentation, but I

12   think I also have to candidly acknowledge that there is a

13   presumption of innocence, and as the good folks in Alabama

14   used to tell me, it doesn't matter how thin you pour the

15   pancake, there's always two sides.

16           MS. RHYNE: There --

17           THE COURT: And I, at best, have only heard one

18   side of this story and seen one side of this pancake.

19           MS. RHYNE: I appreciate the Court's concern.  As

20   I look at the statutory construction of 3142 regarding

21   detention hearings, there is the final prong that says

22   nothing in this section shall be construed as modifying or

23   limiting the presumption of innocence.

24           THE COURT: Right.

25           MS. RHYNE: So that exists, and it's a factor, but

1    immediately before that it talks about what the court

2    considers in evaluating whether someone should be detained,

3    and the court is allowed to consider the weight of the

4    evidence against the person --

5                THE COURT: Right, and I'm not discounting that,

6    that's what I just said.  I understand the government's

7    presented lots of evidence, but to some extent the

8    government is also asking me to place a great deal of weight

9    on inference.

10               So, for instance, Agent Funk says she interviewed

11   some people and they weren't particularly cooperative.

12   Well, to some extent cooperation is very much in the eye of

13   the beholder.  I have lawyers in my courtroom all the time

14   who I would perhaps characterize as not particularly

15   cooperative, but I don't necessarily hold that against them.

16               The problem, though, is that -- Mr. Snisky, the

17   conditions that are being recommended, I can't endorse.  You

18   scare me.   To be perfectly honest, you scare me

19   significantly.  I'm not going to release you on these

20   conditions, because I don't think these conditions would be

21   adequate.  Because I am very concerned that whatever I do

22   here you're not going to appreciate the significance of what

23   I'm doing, and so the problem that I have is I'm trying to

24   figure out some way that I can strike an appropriate

25   balance.   There is a presumption -- this is not a

49

1       presumption case.  There is a presumption that conditions of

2       release are appropriate.  There is a presumption of

3       innocence that I can't ignore.  To the extent that I can

4       fashion conditions that are responsive to the government's

5       concerns, yet still consistent with the spirit of the

6       statue, that's what I'm charged to do, and I think I can do

7       that.

8              Now, I will say that, for instance, I'm not

9       particularly inclined to allow Mr. Snisky to travel to

10      California to work for Eco Development.  I still -- I'm

11      still not convinced that I understand what Eco Development

12      does, I'm not convinced at this point that I even know that

13      Eco Development is a legitimate ongoing concern, and I

14      haven't heard any evidence presented by the defendant to

15      allay my concerns, even though the Eco Development people,

16      as I understand it, are sitting in my courtroom.  I suppose

17      silence does speak.

18             THE DEFENDANT: Well, am I allowed --

19             THE COURT: Sir, don't talk.  You're not helping

20      yourself, and you certainly don't want to talk if your

21      lawyer is sitting there.

22             The concern that I've also got is a $25,000

23      unsecured bond gives me no sense of confidence at all.  I am

24      inclined, Ms. Rhyne, to believe that conditions of release

25      can be set; however, I would require a property bond in the

1    amount of $50,000, ten percent to be post -- I mean, I would

2    require a property bond in the amount of $50,000, is that

3    possible to do?

4            I mean, the concern that I've got is this is a

5    defendant -- yes, his family lives here, he's renting

6    property from his uncle.   I don't view that as a

7    particularly strong tie to the community.   That's the kind

8    of tie you can pick up and leave in a heartbeat.   I need

9    some greater confidence that this gentleman is going to pay

10   attention to whatever I tell him to do, and these

11   conditions, in my opinion, are inadequate to give me that

12   degree of confidence.   I want to know that Mr. Snisky

13   worries more about me than any other thing in the world.

14   These conditions don't help me.

15           MS. TRAORE: Your Honor, I have one question on the

16   $50,000 property bond --

17           THE COURT: Uh-huh.

18           MS. TRAORE: -- because I had this in another case

19   and we ended up trying to get it modified because it was a

20   little -- so would you want the $50,000, or would you accept

21   10 percent of that to be posted?

22           THE COURT: I would want -- see, the problem I have

23   is this:   If I -- if I get any impression from the

24   government's presentation, cash isn't satisfactory.   If I

25   credit the government's presentation, this gentleman thinks

AVERY/WOODS REPORTING SERVICE, INC.
455 SHERMAN STREET, SUITE 250, DENVER, CO  80203
303-825-6119      FAX 303-893-8305

1     that he can raise cash, simply by going and reaching out to

2     third parties.  Cash is fungible.  What I want is some

3     property posted by some person that Mr. Snisky cares enough

4     about that he's going to be mindful of the ramifications of

5     what his actions may cause to that person.  That's what I

6     want.  I want somebody close enough to Mr. Snisky who they

7     say I trust this person, this person I believe will be

8     compliant, and I trust that to the point where I'm willing

9     to put my property at stake, because I don't know that Mr.

10    Snisky's going to pay much attention to me, but I sure as

11    heck hope that he pays attention to whatever family member

12    posts property.

13          MS. TRAORE: Okay.

14          THE COURT: Because, as I say, the government's

15    allegations clearly suggest -- or at least allege, I should

16    strike that.  Clearly allege that Mr. Snisky can go to

17    investors and convince them to part with their money.  So

18    for me to have Mr. Snisky post a cash bond frankly doesn't

19    give me any confidence at all.

20          MS. TRAORE: Even if it was structured where the

21    money -- where there was a paper trail where the money was

22    coming from, equity out of the property, I guess that was my

23    question, and that was poorly --

24          THE COURT: I would prefer to have -- honestly, in

25    this case, I want a property bond.

1          MS. TRAORE: Okay.

2          THE COURT: Now, obviously the statute does not

3    allow me to impose a property bond which is so onerous that

4    it can never be met, that I cannot do, but I would require,

5    at a minimum, a property bond.

6          MS. TRAORE: Would you consider a property bond of

7    lower than $50,000 is my question?

8          THE COURT: I know, but this is not an auction.

9          MS. TRAORE: I know, but --

10         THE COURT: And we're not selling cars here.

11         MS. TRAORE: I just think a $50,000 property bond

12   is onerous, and I would ask the Court to consider a $15,000

13   property bond.

14         THE COURT: Well, I'm not inclined to say 15.  I

15   would consider a $25,000 property bond, but again, I don't

16   want to leave you with the impression I'm running some sort

17   of an auction where we're haggling.

18         MS. TRAORE: I understand.

19         THE COURT: I would -- I would not -- I would

20   require the defendant's travel to be restricted to the state

21   of Colorado, he may not leave the state of Colorado without

22   authorization from the court before he leaves.   The

23   defendant would be required to report to his supervising

24   officer on a schedule that the supervising officer

25   establishes.  I would require that the defendant maintain

1      employment in a non-financial sector job, and I would
2      require that the employment be pre-approved by the
3      supervising officer. I would require that the defendant may
4      not have any contact, direct or indirect, with any witnesses
5      in this case, potential victims in the case, and the
6      defendant may not have any contact with potential investors
7      in any other enterprise.

8              MS. RHYNE: I would just ask to clarify that that
9      indirect conduct --

10             THE COURT: Direct or indirect, all of this is
11     indirect.

12             MS. RHYNE: -- does not include through the defense
13     counsel, that defense counsel may in fact reach out to these
14     people if so inclined.

15             THE COURT: Say again?

16             MS. RHYNE: I'm sorry, I want to make sure that Ms.
17     Traore is allowed to reach out to these people that her
18     client --

19             THE COURT: Oh, of course.

20             MS. RHYNE: -- is not allowed to reach out to.

21             THE COURT: Oh, no, that's fine. Of course, of
22     course.

23             The defendant must surrender any passport that he
24     has, and the defendant may not obtain any replacement
25     passports or other international travel document. The

54

1    defendant may not possess any firearms, destructive devices
2    or other dangerous weapons.  The defendant must refrain from
3    the excessive use of alcohol.  I guess my question -- I'll
4    give it, I don't know that it's particularly onerous.  The
5    defendant must refrain from using or unlawfully possessing
6    any controlled substance.  He may only possess those
7    substances with a prescription from a licensed medical
8    practitioner, and obviously a Medical Marijuana Card will
9    not suffice as a prescription.  The defendant may not act as
10   an informant for any law enforcement agency without prior
11   permission from the court.  The defendant must report as
12   soon as possible to the supervising officer any contact he
13   has with law enforcement personnel; however, I'm also going
14   to expand that.  The defendant must not only contact his
15   supervising officer with respect to any contact he has with
16   law enforcement personnel, he must also report immediately
17   or as soon as possible any contact he has with regulatory
18   authorities.  So, for instance, if he has contact with DORA
19   or anyone one else.  Law enforcement -- frankly, law
20   enforcement agencies is a somewhat amorphous concept, I'm
21   interested in regulatory agencies as well.
22          As I said, the defendant's employment must be
23   approved in advance by the supervising officer.  The
24   defendant must provide verification of any income or funds
25   received.  The defendant shall provide access to any

1    financial records requested by the supervising officer.  The

2    defendant may not commingle personal and business funds.

3    The defendant may not register any business entities without

4    prior disclosure to the supervising officer.  The defendant

5    shall not contact any financial transactions through the

6    financial account of any business entity not previously

7    disclosed to the supervising officer, or through any other

8    individuals' financial account.  The defendant shall notify

9    third parties of risks that may be occasioned by his

10   personal history or characteristics, and shall permit the

11   probation officer to make such notifications and to confirm

12   the defendant's compliance for this notification

13   requirement.  And finally, the defendant may not solicit any

14   investors or funding for any real estate project.

15          MS. RHYNE: Would the Court consider adding that

16   Mr. Snisky be required to discontinue any affiliation with

17   Aion Financial?

18          THE COURT: Ms. Traore?

19          MS. TRAORE: Your Honor, I think the conditions

20   that you've set concerning investors and finances, I think

21   that would take care of his association with Aion.

22          MS. RHYNE: Your Honor, my concern is that Aion

23   appears to be rolling out the quote-unquote proprietary

24   model that Mr. Snisky has authored, and to the extent that

25   he might still converse with him on the phone claiming not

1    to be conducting any financial transactions might still be

2    participating in that business venture which I believe is a

3    fraudulent scheme.

4            THE COURT: If I impose as a condition that he may

5    not have any contact, direct or indirect, with any potential

6    investors to the extent he's working with Ion, isn't that a

7    potential indirect contact?

8            MS. RHYNE: As long as it's spelled out that way.

9    I'm just concerned that Ms. -- that the people running Ion

10   may still want his advice about how to roll out this program

11   and --

12           THE COURT: And if -- and if it turns out -- I

13   mean, here's the problem.  If he violates any conditions of

14   his bond, he could potentially forfeit the property bond.

15           MS. RHYNE: Yes, and go to jail.

16           THE COURT: Exactly right.  So at some point I have

17   to presume that the conditions I've set are going to work.

18           MS. RHYNE: Certainly, Your Honor.

19           THE COURT: And if I say he can have no contact,

20   direct  or  indirect,  with  any  investors  or  potential

21   investors, I think I've got it covered.

22           MS. RHYNE: Thank you, Your Honor.

23           THE COURT: So, Ms. Traore, I obviously can't

24   release your client until the property bond is posted.  Can

25   you -- can your client post that bond?  Because I will tell

1       you, that I would honestly require as the minimum.

2               MS. TRAORE: Your Honor, I think that he will have

3       to speak with relatives and try to get that worked out, and

4       I believe in the last case where I had a property bond it

5       took my client a couple of days to get everything --

6               THE COURT: Right.

7               MS. TRAORE: -- in place.

8               THE COURT: And that's what I would expect.  Once

9       -- once your client and his family members can identify --

10      and let me say that the property bond cannot be posted by

11      any  individual  with  whom  Mr.  Snisky  has  a  business

12      relationship.  Because to the extent that the government has

13      some  concerns  --  and  again,  I'm  not  here  to  say  the

14      government's concerns are legitimate or otherwise, but to

15      the extent that Mr. Snisky has an ongoing relationship with

16      -- with businesses or individuals, that the government has

17      some concerns with respect to legitimacy, I don't want to be

18      in a situation that those very people post the bond, that

19      doesn't give me much confidence.

20              Again,  essentially  what  I'm  doing  here,  Mr.

21      Snisky, is I'm imposing conditions that I hope will cause

22      you, cause you to stop and think, that's really what I'm

23      trying to do.  These are conditions that I want you to take

24      seriously, that you view serious.  And I don't want -- I'm

25      not looking for a situation where you leave here with the

1    misguided notion that any of this is a frivolous exercise on

2    my part, I don't do that.

3            So until all conditions of release are satisfied,

4    Mr. Snisky, I'm afraid you'll have to remain in custody.

5    Once I'm notified that the property bond has been satisfied,

6    then I'll be more than happy to release you on those

7    conditions, but for now, unless somebody has something

8    further, I'm going to remand you back to the custody of the

9    United States Marshal.

10            MS. RHYNE: I have nothing further, Your Honor.

11   Thank you.

12            THE COURT: Thank you.

13

14            (Whereupon, the within hearing was then in

15   conclusion at 3:43 p.m. on November 26, 2013.)

16

17            I certify that the foregoing is a correct

18   transcript, to the best of my knowledge and belief, from the

19   record of proceedings in the above-entitled matter.

20

21    /s/ Bonnie Nikolas                January 22, 2014

22     Signature of Transcriber                Date

23

24

25


                    AVERY/WOODS REPORTING SERVICE, INC.
           455 SHERMAN STREET, SUITE 250, DENVER, CO  80203
                303-825-6119      FAX 303-893-8305

59

```
 1                    ** WITNESS INDEX **

 2                                            PAGE

 3    SPECIAL AGENT KATE FUNK

 4    Direct Examination by Ms. Rhyne              4

 5    Cross-Examination by Ms. Traore             29

 6

 7                    ** EXHIBIT INDEX **

 8                                  INTRODUCED   RECEIVED

 9    Government Exhibit 1                23         --

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

AVERY/WOODS REPORTING SERVICE, INC.
455 SHERMAN STREET, SUITE 250, DENVER, CO  80203
303-825-6119      FAX 303-893-8305