IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Criminal Case No. 13-cr-00473-RM

UNITED STATES OF AMERICA,

        Plaintiff,

v.

GARY SNISKY,

        Defendant.

_____

**GOVERNMENT'S NOTICE OF INTENTION TO OFFER EVIDENCE PURSUANT TO RULE 404(B) OF THE FEDERAL RULES OF EVIDENCE**
_____

The UNITED STATES OF AMERICA, by and through John F. Walsh, United States Attorney for the District of Colorado, and Pegeen D. Rhyne, Assistant United States Attorney, hereby provides notice that it intends to offer the evidence described below. The government believes that some of this evidence is inextricably intertwined with the evidence in this case. However, out of an abundance of caution, the government is including all of this evidence as part of its formal notice pursuant to Federal Rule of Evidence 404(b). This evidence is relevant evidence of plan, preparation, knowledge, intent, and absence of mistake or accident under Rule 404(b).

The defendant is charged in the instant case with 13 counts of mail fraud and 5 counts of engaging in monetary transactions in criminally derived property exceeding $10,000.

## I.      Factual Background

Between at least 2009 and sometime in 2011, defendant Gary Snisky operated in Colorado a company called Colony Capital, LLC ("Colony Capital"), which purported to be a private equity firm offering investment opportunities in bonds, futures trading, and other offerings.   Sometime in 2011, defendant Snisky shut down Colony Capital and formed a company in Longmont, Colorado called Arete, LLC ("Arete"), which also purported to be a private equity firm offering investment opportunities in bonds, futures trading, and other offerings. Beginning in late 2009, as a paid independent contractor, co-conspirator Richard Greeott ("Greeott")[1] began doing website development work for Colony Capital. From late 2009 through at least January 17, 2013, Greeott continued performing information technology work for Colony Capital and then Arete as an independent contractor.   Beginning in approximately mid-2010, defendant Snisky asked Greeott to develop a fully-automated trading system for trading in the futures market.   In approximately late 2010, Greeott began developing an algorithm that would be the basis for the requested fully-automated trading system.   Greeott's initial efforts in developing the algorithm were not successful, and the trading system failed.   By approximately mid-2011, however, Greeott believed that he had developed an algorithm for trading in the futures market that he was ready to test in a simulated environment.   Greeott tested the algorithm for several months in a simulated environment.   Eventually, Greeott began testing the algorithm by trading small amounts of money in small, but real, futures contracts.   By the end of

---

[1]    Richard Greeott was charged in *United States v. Greeott*, 13-cr-00375-PAB.

2012, Greeott was still testing the algorithm by making small trades in a Trade Station account, which was closed by Trade Station in late December 2012.  At all times, the algorithm was still in a developmental phase.  Additionally, at no time did Greeott, defendant Snisky, or anyone else at Colony Capital or Arete trade a significant amount of money using Greeott's algorithm, nor did Colony Capital or Arete make any real profit using Greeott's algorithm.

      Beginning in at least July 2011 and continuing through at least January 17, 2013, however, defendant Snisky and Greeott agreed to falsely lead investors, potential investors, and financial advisors to believe that Greeott's algorithm was being used by Colony Capital, and later Arete, to profitably trade in the futures market in order to falsely bolster Colony Capital's, and later Arete's, appearance of success and overall financial stability.  Defendant Snisky believed that investors were more likely to invest in any of Colony Capital's, and later Arete's, multiple investment offerings if they believed that as a company Colony Capital, and later Arete, was more financially profitable than it truly was.  Even when pitching the investment offering related to Ginnie Mae bonds described below, defendant Snisky falsely told investors, potential investors, and financial advisors that Arete made its "real money" by trading futures using Greeott's algorithm.

      Between at least July 2011 and January 17, 2013, defendant Snisky took investors, potential investors, and financial advisors to Greeott's work station within Colony Capital's, and later Arete's, offices to observe Greeott's trading station, which included a computer system with three monitors that displayed data that purportedly related to trading in the futures market.  While these investors,

potential investors, and financial advisors were at his trading station, Greeott intentionally made statements that he knew falsely suggested that he was currently trading "live" in the futures markets and that he had a history of trading profitably in the futures market.   In fact, most of the time when these investors, potential investors and financial advisors came to his station, Greeott was trading in a simulated environment and Greeott did not have a history of profitably trading in the futures market.

In approximately July 2011, K.K., S.K., and A.W.,[2] went to Colony Capital's office located at 450 Main Street, Longmont, Colorado to discuss investing their money with Colony Capital for the purpose of trading in the futures market. During this meeting, defendant Snisky provided to K.K., S.K. and A.W. a document that falsely represented that Colony Capital had been trading in the futures market with a past performance of earning on its investments approximately 22% per year for the past two years.   During this meeting, defendant Snisky took K.K., S.K., and A.W. to Greeott's trading station.   Despite the fact that Greeott was trading in a simulated environment and did not yet believe that his algorithm was even close to working successfully, Greeott falsely led K.K., S.K., and A.W. to believe that he was successfully trading "live" in the futures market.   Soon after this meeting, K.K. invested $178,164.99 with Colony Capital for the purpose of trading in the futures market.   In August 2011 and in October 2011, S.K. invested $25,000 and $23,912.44, respectively, with Colony Capital for the purpose of trading in the

---

[2] For privacy reasons, persons other than defendant Snisky and charged co-conspirator Greeott will be referred to by their initials.

futures market.   Later, when A.W.'s wife decided to invest and K.K. decided to invest more money in the futures trading program, defendant Snisky informed them that his company was now operating under the name Arete.   As a result, K.K. and A.W.'s wife invested money with Arete for the purpose of trading in the futures market.   Despite the fact that the futures trading program was never truly operational or profitable at Colony Capital or Arete, K.K., S.K., and A.W.'s wife received false account statements indicating that their money was being successfully traded in the futures market and that their accounts had earned profits.   Between July 2011 and March 2012, defendant Snisky received a total of $371,346.26 in investor money that was supposed to be traded in the futures market; however, defendant Snisky returned $50,000 to investor J.T., who had demanded his $50,000 principal investment back in late 2012.

   Between approximately July 2011 and January 2013, defendant Snisky's primary focus was to offer investors, potential investors, and financial advisors the purported opportunity to invest money in what defendant Snisky called Arete's "proprietary value model," which was based on using the investors' money to purchase Ginnie Mae bonds (hereinafter referred to as the "Bond Program"). Defendant Snisky described this investment "model" to several financial advisors and potential investors as safe because Ginnie Mae bonds were backed by the "full faith and credit of the United States."   Starting in approximately July 2011, defendant Snisky offered a 10-year investment model for the Bond Program, which promised the investor a 10% upfront bonus and an annual return of 7%. Under the 10-year model, an investor could not withdraw any money for the first

five years; starting in the sixth year, the investor could only withdraw interest. Prior to April of 2012, defendant Snisky began offering a 5-year investment model for the Bond Program, which promised a 6% annual return on the invested money.

When defendant Snisky met with financial advisors, investors, or potential investors regarding the Bond Program and the futures trading program, he frequently described himself as an "institutional trader" who was "on Bloomberg." Defendant Snisky represented that this made him part of an elite group of people who could "make markets" and who had access to lucrative opportunities to which ordinary investors did not have access.  Defendant Snisky often showed financial advisors, investors, or potential investors his impressive-looking Bloomberg terminal, pulled up screen shots regarding Ginnie Mae bonds, and implied that he either had or would be purchasing the displayed bond or something similar.  In fact, defendant Snisky was not an "institutional trader."  Additionally, while defendant had a Bloomberg terminal simply because he paid the substantial monthly fee required obtain one, defendant Snisky never used his Bloomberg terminal to purchase or trade anything or to "make markets."

Defendant Snisky also falsely told financial advisors, investors and potential investors that he could make additional money for the Bond Program by having funds invested in the Bond Program participate in the "overnight lending program." Defendant Snisky explained to financial advisors, investors and potential investors that banks were required to have a certain amount of revenue on hand and, if they did not, they could borrow overnight the required amount from other institutions for a small interest fee.  Defendant Snisky falsely stated that he had the ability to

participate in this overnight lending program.   In fact, at all times relevant to the Indictment, defendant Snisky never participated in the "overnight lending program" and did not have the ability to do so.

Between approximately August 2011 and January 2013, defendant Snisky received a net of approximately $4,180,540.81 in investor money that was supposed to be invested in Ginnie Mae bonds.   However, defendant Snisky did not use any of this investor money to purchase Ginnie Mae bonds.   In fact, defendant Snisky never purchased any Ginnie Mae bonds.   Despite this, defendant Snisky caused false investment account statements to be mailed to investors in the Bond Program falsely showing that their money had been invested as promised and was earning a profit as promised.

On January 17, 2013, a search warrant and a number of seizure warrants were executed. On March 5, 2013, an asset forfeiture complaint *in rem* was filed against a number of accounts and assets controlled by defendant Snisky and his associates.   Despite the fact that defendant Snisky had received well over $4,000,000 from investors and no bonds were purchased, federal authorities found less than $2,000,000 remaining in the accounts controlled by Snisky and his associates.   Snisky spent the remainder of the money on personal expenses, restaurants, purchasing and furnishing the first floor of 710 Tenacity, Longmont, CO, and other things unrelated to the investments he offered.

On January 17, 2013, defendant Snisky was interviewed by federal agents regarding the Bond Program and the futures trading program.   Additionally, on July 2, 2013, defendant Snisky was again interviewed by federal agents and AUSA

Rhyne about the Bond Program and the futures trading program he offered through Colony Capital and Arete.

## II.  Proffered Items of Evidence

### a. False Representations to C.P. Regarding Purchase and Ownership of 710 Tenacity

In 2010, C.P. began using defendant Snisky as her financial planner. Initially, at defendant Snisky's direction, C.P. invested approximately $480,000 in a CMO bond offering through Colony Capital.   After that, C.P. made some additional contributions and some withdrawals.   Subsequently, defendant Snisky told C.P. that he was selling the CMO bond and putting her money into a Ginnie Mae bond, which C.P. understood defendant Snisky had already purchased with her funds.

In October 2011, defendant Snisky began talking to C.P. about moving some of C.P.'s funds to invest in real estate through a partnership they had formed called Cherpax, LLC.   Per the "Cherpax, LLC Operating Agreement," C.P. was a 90% partner and was to provide 100% of the funding in the form of $484,500 being moved from C.P.'s other investments with defendant Snisky for the purpose of purchasing real property.   "Arete-One LLC" (aka defendant Snisky) was a 10% partner, was the appointed the general manager, and was to provide "Intellectual Property & Management Value."   These discussions about investing in real estate specifically included Cherpax, LLC purchasing the property at 710 Tenacity, Longmont, the first floor of which was in fact purchased for $390,000 on or about November 3, 2011.   After the purchase, defendant Snisky used this property as

8

Arete's offices.

Defendant Snisky provided C.P. with a variety of official looking corporate documents which led C.P. to believe that Cherpax, LLC owned the property at 710 Tenacity. A review of bank records, however, reveals that defendant Snisky did not use money provided by C.P. or money rolled over from C.P.'s investments to purchase 710 Tenacity. Instead, Snisky used money obtained from investors in the Bond Program to purchase 710 Tenacity. Additionally, after the purchase of 710 Tenacity, Snisky had title placed in the name Oak Investments, LLC.

On January 17, 2013, the search warrant and a number of seizure warrants were executed in this case. On March 5, 2013, an asset forfeiture complaint *in rem* was filed naming 710 Tenacity as one the defendant properties to be seized. On March 8, 2013, a *Lis Pendens* was filed against 710 Tenacity in Boulder County, which identified the property as being involved in civil litigation. Despite all of this, between February 2013 and July 2013, defendant Snisky spoke to C.P. a number of times and told her that he did not know what the federal investigation was about but that she did not need to worry because she would receive her invested funds back when he sold 710 Tenacity.

### b. Subsequent Ginnie Mae Bond Pitch in California

Shortly after the search and seizure warrants were executed in January 2013, defendant Snisky began soliciting money in California. In April 2013, S.O. met with defendant Snisky, who was operating under an entity called Sasha, to discuss investing money in flipping discounted real estate. After S.O. signed a memorandum of understanding ("MOU") with Sasha, S.O. provided $15,000

9

upfront fee for incidentals and travel expenses.  According to S.O., defendant Snisky agreed to refund the $15,000 if appropriate properties were not found for their investment project.  After the $15,000 was provided, S.O. only received one email regarding proposed properties; S.O. deemed the proposed properties unsuitable because they were not discounted and would not allow for a profit to be made.[3]

After four months passed with no progress made in finding suitable properties, S.O. requested that Snisky return the $15,000.  Instead, in October 2013, defendant Snisky requested S.O. to come to the offices of Aion Financial in Irvine, California.  In early November 2013, S.O. went to Aion Financial's offices where defendant Snisky made a pitch to S.O. regarding investment opportunities, including a Ginnie Mae bond program investment "opportunity" that was very similar to the Bond Program in the charged scheme.  In a PowerPoint presentation that S.O. provided to the government, defendant Snisky stated, "The Bond and the coupon is protected and guaranteed by **the Full Faith & Credit of the United States Government**."  [Attached hereto as Exhibit 1 is the PowerPoint presentation, pg. 26 (emphasis in the original)].  The PowerPoint presentation included a Ginnie Mae Prospectus and a number of what appear to be screen shots regarding a Ginnie Mae bond from a Bloomberg terminal.  [*See* Ex 1 at pp. 27-28].  The PowerPoint presentation further stated that "Arete Ltd."

---

[3] The government provides the information regarding the real estate deal by way of background to the Court.  The government anticipates presenting to the jury little background leading up to Snisky's November 2013 presentation that included many of the same hallmarks as the charged mail fraud scheme.

10

was a Registered Investment Advisory firm managed by Aion Financial Management, LLC and that Arete Ltd. provided Aion with, among other things, "Institutional Status," "Bloomberg Institutional Presence," and "In-House Proprietary Trade Environment (Algorithmic Trading)."   [*See* Ex 1 at pg. 36].

### III.     Snisky's False Representations to C.P. Regarding 710 Tenacity Are Inextricably Intertwined with the Evidence in this Case

The Tenth Circuit has described the difference between intrinsic and extrinsic evidence as follows:

> Intrinsic evidence is directly connected to the factual circumstances of the crime and provides contextual or background information to the jury. Extrinsic evidence, on the other hand, is extraneous and not intimately connected or blended with the factual circumstances of the charged offense...Because Rule 404(b) only limits evidence of 'other' crimes, those extrinsic to the charged crime - evidence of acts or events that are part of the crime itself, or evidence essential to the context of the crime, does not fall under the other crimes limitations of Rule 404(b).

*United States v. Parker*, 553 F.3d 1309, 1314-1315 (10th Cir. 2009); *see also United States v. Lambert*, 995 F.2d 1006, 1007-08 (10th Cir. 1993).   If the evidence is intrinsic to the charges in this case, then Rule 404(b) is irrelevant to the admissibility analysis, which is governed by Rules 401-403.

Defendant Snisky's use of money invested in the Bond Program to purchase the first floor of 710 Tenacity is direct evidence of the mail fraud scheme charged in this case because it demonstrates that Snisky did not invest, or intend to invest, the money as promised.   The fact that defendant Snisky devised a cover story to explain where the money came from demonstrates that he knew he was misusing investor money and that he intended to deceive people in order to hide

that fact. Additionally, after C.P. became aware of the federal investigation and spoke to defendant Snisky about it, defendant Snisky continued to falsely reassure C.P. that her money was secured by her purported ownership interest in 710 Tenacity, which could be sold to reimburse her. Defendant Snisky made these statements even after he knew the property was subject to forfeiture in this case. Defendant Snisky made these additional false statements to lull C.P. into believing that she was not a victim of the charged mail fraud, causing it too to be direct evidence in this case.

Because this evidence is integral to explaining how defendant Snisky spent $390,000 of investor money, how he hid the true source of that money, and to explain how he continued to reassure C.P. that she was not a victim of fraud in order to discourage her from cooperating with federal authorities, it is inextricably intertwined with the evidence in this case.

## IV.    The Proffered Evidence Should Be Admitted Under Rule 404(B) To Prove Motive, Plan, Knowledge, Intent, And Lack Of Mistake Or Accident

Rule 404(b) permits the admission of "evidence of other crimes, wrongs, or acts" if it is offered to prove "motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." Fed. R. Evid. 404(b); *see also United States v. Tan*, 254 F.3d 1204, 1207 (10th Cir. 2001). The rule "is considered to be an inclusive rule, admitting all evidence of other crimes or acts except that which tends to prove only criminal disposition.'" *United States v. Burgess*, 576 F.3d 1078, 1098 (10th Cir. 2009). In *Huddleston v. United States*,

485 U.S. 681, 688-89 (1988), the Supreme Court observed that, in drafting Rule 404(b), Congress was concerned that restrictions not be placed on the admission of this type of evidence.

Courts consider four factors in weighing the admissibility of evidence under Rule 404(b): (1) whether the evidence is offered for a proper purpose, (2) relevancy, (3) the probative value of the evidence is not substantially outweighed by its prejudicial effect, and (4) a limiting instruction is given if the defendant so requests.  *Huddleston*, 485 U.S. at 691-92; *Burgess*, 576 F.3d at 1098.

### a. False Representations to C.P. Regarding Purchase and Ownership of 710 Tenacity

With respect to the first *Huddleston* requirement, the false representations to C.P. regarding the purchase and ownership of 710 Tenacity are being offered for the proper purpose of proving defendant Snisky's intent, preparation, plan, and knowledge.  As stated above, the fact that defendant Snisky manufactured a cover story to hide his misuse of investor funds intended for the Bond Program to purchase the first floor of 710 Tenacity demonstrates his intent to deceive, his knowledge regarding his fraudulent conduct, and his preparation and plan to carry out this aspect of his fraud scheme.  Additionally, defendant Snisky's patently false lulling statements to C.P. regarding the ownership of 710 Tenacity and, therefore, the security of C.P.'s invested funds demonstrates his intent to continue deceiving her to cover up his fraud and the absence of any mistake.  This continued deception belies any claim that defendant Snisky simply made innocent mistakes of judgment or fact during the scheme.

13

With respect to the second *Huddleston* requirement, *i.e.* relevance, defendant Snisky's false statements to C.P. regarding 710 Tenacity are relevant to the issue of whether Snisky acted during the scheme with the intent to defraud. This will be the central issue at trial.

### b. Subsequent Ginnie Mae Bond Pitch in California

With respect to the first *Huddleston* requirement, defendant Snisky's sales pitch to S.O. in November 2013 of a Ginnie Mae Bond program that appears to be the same in all material respects as the Bond Program offered in the charged scheme is being offered for the proper purpose of proving defendant Snisky's intent, knowledge, and absence of mistake or accident.

On January 17, 2013, defendant Snisky was served with a search warrant (though not the sealed affidavit) which referenced an investigation into mail fraud, wire fraud, money laundering, and securities fraud. On the same day, defendant Snisky was questioned by federal agents regarding the Bond Program, among other things. On July 2, 2013, defendant Snisky was again interviewed at the United States Attorney's Office with his attorney present. On that occasion, Snisky was again questioned about the Bond Program, including why he had not purchased any Ginnie Mae bonds and what had happened to the additional $2,000,000 dollars that had been spent prior to the execution of the seizure warrants. Based on these interactions, defendant Snisky had ample notice that the Bond Program he offered was a fraud. If defendant Snisky's conduct during the scheme somehow could be attributed to a mistake or accident, he would have ceased offering the Bond Program immediately as a result of the investigation in

this case.  Defendant Snisky's persistence in offering substantially the same bond program in another jurisdiction in November 2013 demonstrates that his conduct during the charged scheme was not a result of any mistake or accident.

With respect to the second *Huddleston* requirement, *i.e.* relevance, defendant Snisky's persistence in pitching this Ginnie Mae bond program after being placed on notice of its fraudulent nature by the search warrant and two interviews by federal authorities in this case is relevant to the issue of whether Snisky acted during the scheme with the intent to defraud rather than by mistake or accident.   As noted above, defendant Snisky's intent will be the central issue at trial.

### V.	None of the Evidence Proffered by the United States Is Inadmissible Pursuant to Rule 403

The Tenth Circuit has provided the following long-standing guidance to trial courts on the meaning and application of Rule 403:

> Relevant evidence is inherently prejudicial; but it is only *unfair* prejudice, *substantially* outweighing prohibitive value, which permits exclusion of relevant matter Rule 403.   Unless trials are to be conducted on scenarios, on unreal facts tailored and sanitized for the occasion, the application of Rule 403 must be cautious and sparing. Its major function is limited to excluding matter of scant or cumulative prohibitive force, dragged in by the heels for the sake of its prejudicial effect...It is not designed to permit the court to 'even out' the weight of the evidence, to mitigate a crime, or to make a contest where there is little or none.

*United States v. Naranjo*, 710 F.2d 1465, 1469 (10th Cir. 1983).   Because, as the Tenth Circuit observed, all relevant evidence is inherently prejudicial, it is only unfairly prejudicial evidence that Rule 403 seeks to exclude.   Fortunately, the

Supreme Court has defined unfair prejudice as, "the capacity of some concededly relevant evidence to lure the fact finder into declaring guilt on a ground different from proof specific to the offense charged. 'Unfair prejudice' within its context means an undue tendency to suggest a decision on an improper basis, commonly, but not necessarily, an emotional one.'"   *Old Chief v. United States*, 519 US 172, 180 (1997). The Tenth Circuit had phrased the test this way:

> To be inadmissible under Rule 403, the evidence must do more than damage the Defendant's position at trial, it must 'make a conviction more likely because it provokes an emotional response in the jury or otherwise tends to affect adversely the jury's attitude toward the defendant wholly apart from its judgment as to his guilt or innocense (sic) of the crime charged.'

*Burgess*, 576 F.3d at 1099 (internal citations omitted).

None of the evidence the government seeks to introduce will cause a jury to decide this case on anything but the proof specific to this charge.   It is all related to defendant Snisky's intent to defraud during the charged scheme.   Such evidence does not lend itself to provoking an emotional response in the jury "wholly apart" from the defendant's guilt or innocence.   Accordingly, the proffered evidence should not be excluded under a Rule 403 analysis.

\\\

\\\

## VI.     Conclusion

Because the government provides this notice pursuant to Federal Rule of Evidence 404(b)(2), it is not seeking an *in limine* ruling on these issues.

        JOHN F. WALSH
        United States Attorney


        By: *Pegeen D. Rhyne*
        PEGEEN D. RHYNE
        Assistant U.S. Attorney
        United States Attorney's Office
        1225 17th Street, Suite 700
        Denver, Colorado 80202
        (303) 454-0100
        (303) 454-0409 (fax)
        Pegeen.Rhyne@usdoj.gov
        Attorney for Government

**CERTIFICATE OF SERVICE**

I hereby certify that on this 28th day of August, 2014, I electronically filed the foregoing **GOVERNMENT'S NOTICE OF INTENTION TO OFFER EVIDENCE PURSUANT TO RULE 404(B) OF THE FEDERAL RULES OF EVIDENCE** with the Clerk of the Court using the CM/ECF system which will send notification of such filing to any and all counsel of record.

<u>s/Grazy Banegas</u>
Grazy Banegas
Legal Assistant
United States Attorney's Office
1225 17th Street, Suite 700
Denver, CO 80202
303 454-0100
Fax: 303 454-0402
grazy.banegas@usdoj.gov