# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLORADO

Criminal Case No. 13-cr-00473-RM

UNITED STATES OF AMERICA,

        Plaintiff,

v.

GARY SNISKY,

        Defendant,

## GOVERNMENT'S *JAMES* PROFFER

        The United States of America, by District of Colorado United States Attorney JOHN F. WALSH, through Assistant United States Attorney Pegeen D. Rhyne hereby respectfully files this *James* Proffer. This proffer demonstrates the existence of an uncharged conspiracy to commit the mail fraud scheme charged in the Indictment in this case. This proffer further demonstrates the duration of this conspiracy and the participants in the conspiracy.

        The proffer also includes a *James* Log, which contains a preliminary list of out-of-court statements in furtherance of the conspiracy which the government intends to offer at trial.

        The government may attempt to offer at trial additional statements, not currently in the government's possession or of which the government is not currently aware, which may be discovered in the course of trial preparation. If such statements are discovered pre-trial, the government will request leave to file a supplemental list of additional

out-of-court statements it intends to offer at trial.

The government's *James* Log does not include statements that the government intends to offer into evidence under rules other than Rule 801(d)(2)(E), including statements made by co-conspirators that were false and, therefore, not offered for the "truth of the matter asserted." *See United States v. Lewis*, 594 F.3d 1270, 1284 (10th Cir. 2010). Likewise, the government did not include in its *James* Log any false documents created or amended by co-conspirators because: (1) the government will not offer such documents "for the truth of the matter asserted"; and (2) such documents are "verbal acts" rather than statements within the meaning of *James*.

Additionally, some of the statements that are included in the *James* Logs are also admissible under alternate theories of admissibility.

The letters designated as "Basis for Admission" are those enumerated and fully set forth in this *James* Proffer at pages 6-8.

## THE LAW CONCERNING RULE 801(d)(2)(E)

According to the Federal Rules of Evidence, "[a] statement is not hearsay if [it] is offered against a party and is . . . a statement by a coconspirator of a party during the course of and in furtherance of the conspiracy." Fed. R. Evid. 801(d)(2)(E). Statements are admissible pursuant to Rule 801(d)(2)(E) if a court finds, by a preponderance of the evidence, three things: (1) that a conspiracy existed; (2) that the declarant and the defendants against whom the statement is offered were members of the conspiracy; and (3) that the statement was made in the course of and in furtherance of the conspiracy. *United States v. Lopez-Gutierrez*, 83 F.3d 1235, 1242 (10th Cir. 1996).

In making these determinations, a court is not bound by the Rules of Evidence. *See* Fed.R.Evid. 104(a), 1101(d)(1).   "[T]he district court has the discretion to consider any evidence, not subject to a privilege, including both the alleged co-conspirator statements and any other hearsay evidence, whether or not that evidence would be admissible at trial."   *United States v. Owens*, 70 F.3d 1118, 1124 (10th Cir. 1995).

A.     Proving the Existence of the Conspiracy

To determine the first factor, whether a conspiracy existed, a court may consider the hearsay statement itself along with independent factors tending to establish the conspiracy.   *Bourjaily v. United States*, 483 U.S. 171, 181 (1987); *United States v. Hernandez*, 829 F.2d 988, 995 (10th Cir. 1987).   To satisfy the requirements for admission under Rule 801(d)(2)(E), there must be "substantial evidence," including the hearsay statements themselves, that a combination or conspiracy existed. *See United States v. Bucaro*, 801 F.2d 1230, 1232 (10th Cir. 1986).   "Substantial evidence" does not mean direct evidence.   The combination or common plan may be inferred from circumstantial evidence.   *Bucaro*, 801 F.2d 1230 at 1232; *United States v. Andrews*, 585 F.2d 961, 964 (10th Cir. 1978).   In *United States v. Petersen*, 611 F.2d 1313, 1330 n. 1, (10th Cir. 1979) the Tenth Circuit defined the required evidentiary showing as "more than a scintilla."   The court stated:

> It is such evidence as a reasonable mind would accept as adequate to support a conclusion. Substantial evidence is less than the weight of the evidence. The possibility of drawing two inconsistent conclusions from the evidence. . . does not prevent the existence of the requisite elements from being supported by substantial evidence.

*Id.*; *Bucaro*, 801 F.2d at 1232.

The government is not required to show that a formal or explicit agreement existed, *United States v. Dumas*, 688 F.2d 84, 86 (10th Cir. 1982), but it must provide evidence of four things: (1) an agreement between two or more people to break the law; (2) knowledge by those people of the essential objectives of the conspiracy; (3) knowing and voluntary participation in the conspiracy; and (4) interdependence among the conspirators, *United States v. Eads*, 191 F.3d 1206, 1210 (10th Cir. 1999).  The element of illegality of the conspiracy's purpose need not be demonstrated by independent evidence but may be proven by the conspirators' own statements.  *Bucaro*, 801 F.2d at 1232.

B.   Connection of the Declarant and the Defendant to the Conspiracy

To determine the second factor, the connection of the declarant and the defendant to the conspiracy, a court may presume that a defendant is a knowing participant in a conspiracy when he acts in furtherance of the conspiracy's objective.  *See United States v. Tranakos*, 911 F.2d 1422, 1430 (10th Cir. 1990).  Only "slight evidence" is needed to make this determination.  *United States v. Medoza-Salgado*, 964 F.2d 993, 1005-06 (10th Cir. 1992).

Once a defendant joins a conspiracy, statements made by co-conspirators even before the defendant joined are admissible against that defendant.  *United States v. Brown*, 943 F.2d 1246, 1255 (10th Cir. 1991).  The government is not required to prove that a conspirator knows all other conspirators.  *United States v. Yehling, 456 F.3d* 1236, 1240 (10th Cir. 2006), *citing United States v. Small*, 423 F.3d 1164 (10th Cir. 2005)*; Brown,* 943 F.2d at 1250.  Accordingly, the government is not required to prove that a

defendant knew the co-conspirator who made an 801(d)(2)(E) statement. Nor is the government required to prove that a conspirator knew of or participated in every aspect of the conspiracy. *Eads*, 191 F.3d at 1210. A co-conspirator statement is also admissible even if the declarant is uncharged, *United States v. Davis*, 766 F.2d 1452, 1454, 1458 (10th Cir. 1985), or if it was made outside the presence of the defendant(s) against whom it is being offered, *United States v. Cotton*, 646 F.2d 430, 433 (10th Cir. 1981).

The defendant bears the burden of showing withdrawal from a conspiracy once it has been shown that he participated in it. *United States v. Cherry*, 217 F.3d 811, 817-18 (10th Cir. 2000) (defendant must show that "he or she has done some act to disavow or defeat the purpose of the conspiracy.")

C.  <u>Statements Were Made During the Course of and in Furtherance of the Conspiracy</u>

In determining the third factor, that the statement was made during the course of and in furtherance of the conspiracy, several rules apply. First, the focus is on whether the declarant's intent in making the statement was to advance the conspiracy, not whether the statement actually advanced the conspiracy. *United States v. Perez*, 989 F.2d 1574, 1578 (10th Cir. 1993). To determine this, the court must examine the nature of the statement and its context. *Id.* at 1579. Second, there is no requirement that the statement be made by one conspirator to another. *United States v. Williamson*, 53 F.3d 1500, 1519 (10th Cir. 1995). Third, a statement may be admissible, even if subject to alternative interpretation, if a reasonable interpretation of the statement is consistent with an intent to promote the conspiracy. *Garlington v. O'Leary*, 879 F.2d 277, 284 (7th Cir.

1989).   Examples of statements made in furtherance of a conspiracy include but are not limited to:

    a.    Statements which in any way promote the objective(s) of a conspiracy. *United States v. Peveto*, 881 F.2d 844, 852 (10th Cir. 1989).

    b.    Statements which reveal the existence of a conspiracy.  *United States v. Garcia*, 994 F.2d 1499, 1505 (10th Cir. 1993); *United States v. Mayberry*, 896 F.2d 1117, 1121 (8th Cir. 1990).

    c.    Statements to new or prospective members of a conspiracy which explain the conspiracy.  *United States v. Turner*, 871 F.2d 1574, 1581 (11th Cir. 1989); *United States v. Monroe*, 866 F.2d 1357, 1363 (11th Cir. 1989);

    d.    Statements which are intended to recruit potential co-conspirators or to otherwise induce others to assist in carrying out the objectives of the conspiracy.  *United States v. Lujan*, 936 F.2d 406, 411 (9th Cir. 1991); *United States v. Heinemann*, 801 F.2d 86, 95 (2d Cir. 1986).

    e.    Statements which explain important events in the conspiracy.  *United States v. Massa*, 740 F.2d 629, 638 (8th Cir. 1984);

    f.    Statements which are designed to give directions to facilitate the objectives of the conspiracy.  *Id.*;

    g.    Statements which are designed to advise co-conspirators of the progress of the conspiracy and keep them abreast of activities associated with the conspiracy.  *United States v. Smith*, 833 F.2d 213, 219 (10th Cir. 1987); *United States v. Simmons*, 923 F.2d 934, 945 (2nd Cir. 1991); *United States*

                    *v. Gibbs*, 739 F.2d 838, 845 (3rd Cir. 1984);

h.     Statements which are intended to assure the listener of a conspirator's ability to consummate a particular transaction.  *United States v. Echeverry*, 759 F.2d 1451, 1457 (9th Cir. 1985);

i.     Statements which are designed to gain the trust of other conspirators or potential conspirators, to reassure trustworthiness, or to allay suspicions or fears.  *Williamson*, 53 F.3d at 1519; *Gomez*, 810 F.2d at 953;

j.     Statements which are intended to control damage to the conspiracy. *United States v. Doerr*, 886 F.2d 944, 951 (7th Cir. 1989); *United States v. Van Daal Wyk*, 840 F.2d 494, 499 (7th Cir. 1988);

k.     Statements which prompt the listener to respond in a way that facilitates carrying out the activities of the conspiracy.  *United States v. Rahme*, 813 F.2d 31, 35 (2d Cir. 1987);

l.     Statements which conceal the objective of the conspiracy.  *Doerr*, 886 F.2d at 951;

m.     Statements which are intended to enhance a co-conspirator's usefulness to the conspiracy.  *United States v. Tarantino*, 846 F.2d 1384, 1412 (D.C. Cir. 1988);

n.     Statements designed to gain the trust of co-conspirators or potential co-conspirators, to reassure trustworthiness, or to allay suspicions or fears. *Smith*, 833 F.2d at 219; *Williamson*, 53 F.3d 1500; *United States v. McLernon*, 746 F.2d 1098 (6th Cir. 1984); *United States v. Posner*, 764 F.2d

  1535 (11th Cir. 1985); *United States v. Mealy*, 851 F.2d 890 (7th Cir. 1988).

o. Statements which set in motion acts that are an integral part of the conspiracy. *United States v. Paris*, 827 F.2d 395, 400 (9th Cir. 1987).

p. Statements which constitute "puffing," *United States v. Krevsky*, 741 F.2d 1090, 1095 (8th Cir. 1984), or "boasting," *United States v. Johnson*, 872 F.2d 612, 615 (5th Cir. 1989); *United States v. Santiago*, 837 F.2d 1545, 1549 (11th Cir. 1988), in promotion of the conspiracy.

q. Statements which indicate payments made or demands for payment to accomplish activities of the conspiracy. *United States v. Esacove*, 943 F.2d 3 (5th Cir. 1991).

r. Statements to co-conspirators or potential co-conspirators indicating potential investigation, apprehension or punishment. These statements could include concerns about informants, threats or physical action taken against persons who would cooperate with law enforcement authorities. *United States v. Arias-Villanueva*, 998 F.2d 1491 (9th Cir. 1993); *United States v. Simmons*, 923 F.2d 934, 945 (2d Cir. 1991); *United States v. McNeese*, 901 F.2d 585 (7th Cir. 1990); *United States v. Triplett*, 922 F.2d 1174 (5th Cir. 1991).

Although not all of these examples may have relevance to this case, the size of this list is illustrative of the broad interpretation given to statements in furtherance of a conspiracy.

If the Court finds that Richard Greeott was not a knowing participant in the conspiracy, Greeott should be considered an agent of defendant Snisky. As an agent, his statements and acts are admissible against all knowing participants in the conspiracy or scheme. *United States v. Krohn*, 573 F.2d 1382, 1386-87 (10th Cir. 1978).

## THE EVIDENCE IN THE PRESENT CASE

### A.     Duration of, Members of, and Type of Conspiracy

#### 1.     Duration of Conspiracy

The evidence in this case will show that this conspiracy began in or about July 2011, and continued until January 2013. Defendant Snisky's mail fraud scheme, however, predates the conspiracy and began in 2010.

#### 2.     Members of Conspiracy

The government will show that Richard Greeott ("Greeott"), who was charged and pled guilty in related case *United States v. Richard Greeott*, 13-cr-00375-PAB, worked with defendant Snisky and conspired to mislead investors regarding Cornerstone and Arete's success in trading in the futures market and Arete's bond program. A further description of Greeott's role is set forth below.

### B.     Evidence Supporting the Conspiracy

Set forth below is the statement of facts from Greeott's plea agreement regarding the conspiracy to commit mail fraud charge to which he pled guilty. The government submits these facts are sufficient to establish the conspiracy in this case for purposes of the Court's review. This proffer is not meant to be, nor is it, a complete recounting of all the government's proof.

"Between at least 2009 and sometime in 2011, [Gary Snisky] operated in Colorado a company called Colony Capital, LLC ("Colony Capital"), which purported to be a private equity firm offering investment opportunities in bonds, futures trading, and other offerings. Sometime in 2011, [Gary Snisky] shut down Colony Capital and formed a company in Longmont, Colorado called Arete, LLC ("Arete"), which also purported to be a private equity firm offering investment opportunities in bonds, futures trading, and other offerings.

Beginning in late 2009, as a paid independent contractor, [Greeott] began doing website development work for Colony Capital. From late 2009 through at least January 17, 2013, [Greeott] continued performing information technology work for Colony Capital and then Arete as an independent contractor. During that time, [Greeott] worked full time, and exclusively, for Colony Capital and then Arete. Beginning in approximately mid-2010, [Gary Snisky] asked [Greeott] to develop a fully-automated trading system for trading in the futures market. In approximately late 2010, [Mr. Greeott] began developing an algorithm that would be the basis for the requested fully-automated trading system. [Gary Snkisy] agreed that [Greeott] could keep the intellectual property rights to the algorithm that [Greeott] was developing. Based on this agreement, [Greeott] believed that he would eventually be made a partner in Colony Capital and later in Arete.

[Greeott's] initial efforts in developing the algorithm were not successful, and the trading system failed. By approximately mid-2011, however, [Greeott] believed that he had developed an algorithm for trading in the futures market that he was ready to test in a simulated environment. [Greeott] tested the algorithm for several months in a simulated environment. Eventually, [Greeott] began testing the algorithm by trading small amounts

of money in small, but real, futures contracts.   By the end of 2012, [Greeott] was still testing the algorithm by making small trades in a Trade Station account, which was closed by Trade Station in late December 2012.   At all times, the algorithm was still in a developmental phase.   Additionally, at no time did [Greeott], [Gary Snisky], or anyone else at Colony Capital or Arete trade a significant amount of money using [Greeott's] algorithm, nor did Colony Capital or Arete make any real profit using [Greeott's] algorithm.

Beginning in at least July 2011 and continuing through at least January 17, 2013, however, [Gary Snisky] and [Greeott] agreed to falsely lead investors, potential investors, and financial advisors to believe that [Greeott's] algorithm was being used by Colony Capital, and later Arete, to profitably trade in the futures market in order to falsely bolster Colony Capital's, and later Arete's, appearance of success and overall financial stability. [Greeott] and [Gary Snisky] believed that investors were more likely to invest in any of Colony Capital's, and later Arete's, multiple investment offerings if they believed that as a company Colony Capital, and later Arete, was more financially profitable than it truly was. Even when pitching the investment offering related to Ginnie Mae bonds described below, [Gary Snisky] falsely told investors, potential investors, and financial advisors that Arete made its "real money" by trading futures using [Greeott's]   algorithm.

Between at least July 2011 and January 17, 2013, [Gary Snisky] took, and caused others to take, investors, potential investors, and financial advisors to [Greeott's] work station within Colony Capital's, and later Arete's, offices to observe [Greeott's] trading station, which included a computer system with three monitors that displayed data that purportedly related to trading in the futures market.   While these investors, potential

11

investors, and financial advisors were at his trading station, [Greeott] intentionally made statements that he knew falsely suggested that he was currently trading "live" in the futures markets and that he had a history of trading profitably in the futures market.   In fact, most of the time when these investors, potential investors and financial advisors came to his station, as [Greeott] well knew, [Greeott] was trading in a simulated environment and [Greeott] did not have a history of profitably trading in the futures market.

In approximately July 2011, K.K., S.K., and A.W., went to Colony Capital's office located at 450 Main Street, Longmont, Colorado to discuss investing their money with Colony Capital for the purpose of trading in the futures market.   During this meeting, [Gary Snisky] provided to K.K., S.K. and A.W. a document that falsely represented that Colony Capital had been trading in the futures market with a past performance of earning on its investments approximately 22% per year for the past two years.   During this meeting, [Gary Snisky] took K.K., S.K., and A.W. to [Greeott's] trading station.   Despite the fact that [Greeott] was trading in a simulated environment and did not yet believe that his algorithm was even close to working successfully, [Greeott] falsely led K.K., S.K., and A.W. to believe that he was successfully trading "live" in the futures market.   Soon after this meeting, K.K. invested $178,164.99 with Colony Capital for the purpose of trading in the futures market.   In August 2011 and in October 2011, S.K. invested $25,000 and $23,912.44, respectively, with Colony Capital for the purpose of trading in the futures market.   Later, when A.W.'s wife decided to invest and K.K. decided to invest more money in the futures trading program, [Gary Snisky] informed them that his company was

now operating under the name Arete.   As a result, K.K. and A.W.'s wife invested money with Arete for the purpose of trading in the futures market.   Despite the fact that the futures trading program was never truly operational or profitable at Colony Capital or Arete, K.K., S.K., and A.W.'s wife received false account statements indicating that their money was being successfully traded in the futures market and that their accounts had earned profits.   Between July 2011 and March 2012, [Gary Snisky] received a total of $371,346.26 in investor money that was supposed to be traded in the futures market; however, [Gary Snisky] returned $50,000 to investor J.T., who had demanded his $50,000 principal investment back in late 2012.

Between approximately July 2011 and January 2013, as [Greeott] knew, [Gary Snisky's] primary focus was to offer investors, potential investors, and financial advisors the purported opportunity to invest money in what [Gary Snisky] called Arete's "proprietary value model," which was based on using the investors' money to purchase Ginnie Mae bonds (hereinafter referred to as the "Bond Program").   [Greeott] was aware that [Gary Snisky] was describing this investment "model" to several financial advisors and potential investors as safe because Ginnie Mae bonds were backed by the "full faith and credit of the United States."   Starting in approximately July 2011, [Gary Snisky] offered a 10-year investment model for the Bond Program, which promised the investor a 10% upfront bonus and an annual return of 7%.   Under the 10-year model, an investor could not withdraw any money for the first five years; starting in the sixth year, the investor could only withdraw interest.   Prior to April of 2012, [Gary Snisky] began offering a 5-year investment model for the Bond Program, which promised a 6% annual return on the

13

invested money.   During 2012, [Greeott] attended a several meetings with financial advisors and one meeting attended by investors.   During these meetings, [Gary Snisky] described the Bond Program, and [Greeott] operated a power point presentation about the Bond Program.   While [Greeott] initially thought that [Gary Snisky] was using investor money to purchase Ginnie Mae bonds as promised, by no later than the end of 2011, [Greeott] learned that [Gary Snisky] had not purchased any Ginnie Mae bonds.   Despite learning this, [Greeott] continued to support [Gary Snisky's] efforts to bring into the Bond Program additional investor money through January 17, 2013, by running the power point presentation about the Bond Program during meetings with investors and financial advisors, revising documentation related to the Bond Program that was provided to financial advisors and investors, and falsely bolstering the overall appearance of Arete's financial success.

   Between approximately August 2011 and January 2013, [Gary Snisky] received a net of approximately $4,180,540.81 in investor money that was supposed to be invested in Ginnie Mae bonds.   However, [Gary Snisky] did not use any of this investor money to purchase Ginnie Mae bonds.   In fact, [Gary Snisky] never purchased any Ginnie Mae Bonds.   Despite this, [Gary Snisky] caused false investment account statements to be mailed to investors in the Bond Program falsely showing that their money had been invested as promised and was earning a profit as promised.

In the ordinary course of business, investors in both the Bond Programs and the futures market program received from Colony Capital and Arete multiple mailings via the United States Postal Service regarding their investments, including welcome letters and account statements."

JOHN F. WALSH
United States Attorney

By: s/:Pegeen D. Rhyne
PEGEEN D. RHYNE
Assistant U.S. Attorney
United States Attorney's Office
1225 17th Street, Suite 700
Denver, Colorado 80202
(303) 454-0100
(303) 454-0409 (fax)
Pegeen.rhyne@usdoj.gov
Attorneys for the Government

## CERTIFICATE OF SERVICE

I hereby certify that on this 29th day of August, 2014, I electronically filed the foregoing **GOVERNMENT'S *JAMES* PROFFER** with the Clerk of the Court using the CM/ECF system which will send notification of such filing to any and all counsel of record.

s/Grazy Banegas
Grazy Banegas
Legal Assistant
United States Attorney's Office
1225 17th Street, Suite 700
Denver, CO 80202
303 454-0100
Fax: 303 454-0402
grazy.banegas@usdoj.gov
