```
 1            IN THE UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF COLORADO
 2
   Criminal Action No. 13-cr-473-RM
 3
   UNITED STATES OF AMERICA,
 4
        Plaintiff,
 5
   vs.
 6
   GARY SNISKY,
 7
        Defendant.
 8
   _____
 9
                      REPORTER'S TRANSCRIPT
10                       Motions Hearing

11 _____

12         Proceedings before the HONORABLE RAYMOND P. MOORE,

13 Judge, United States District Court for the District of

14 Colorado, occurring at 9:30 a.m., on the 3d day of September,

15 2014, in Courtroom A601, United States Courthouse, Denver,

16 Colorado.

17                         APPEARANCES

18         PEGEEN RHYNE, Assistant U.S. Attorney, 1225 17th
   Street, Suite 700, Denver, Colorado, 80202, appearing for the
19 plaintiff.
           ROBERT PEPIN, Assistant Federal Public Defender, 633
20 17th Street, 10th Floor, Denver, Colorado, 80202, appearing for
   the defendant.
21

22 Proceeding Recorded by Mechanical Stenography, Transcription
    Produced via Computer by Tammy Hoffschildt, 901 19th Street,
23       Room A251, Denver, Colorado, 80294, (303) 292-1088

24

25
```

**PROCEEDINGS**

1

2

3       (In open court at 9:29 a.m.)

4           THE COURT: Please be seated.  13-cr-473, United

5   States versus Gary Snisky.  Take appearances.

6           MS. RHYNE: Good morning, Your Honor.  Pegeen Rhyne,

7   for the United States.

8           THE COURT: Good morning.

9           MR. PEPIN: Robert Pepin, appearing on behalf of

10  Mr. Snisky, who is here and not in custody.

11          THE COURT: And good morning to both of you, as well.

12          We're here for motions hearing.  There are a number of

13  motions.  Frankly, what I want to do, is since we have one

14  motion that requires testimony, let's probably deal with that

15  first, so that the witnesses can do whatever it is they are

16  going to do.  They may choose to stay, they may leave, but at

17  least we can advance and get that behind us, before dealing

18  with the non-evidentiary motions.

19          So Ms. Rhyne, I'm assuming -- it's a Motion To

20  Suppress filed by Mr. Snisky, but I see that you have

21  witnesses, and I am assuming you're amenable to proceeding?

22          MS. RHYNE: I am, Your Honor.

23          THE COURT: Would you call your witness?

24          MS. RHYNE: Yes, Your Honor.  And the Defense has

25  asked that the second witness wait in the witness room.  We

SPECIAL AGENT FUNK – Direct

1  have no objection to that.

2          THE COURT:  That's fine.

3          MS. RHYNE:  The Government calls Special Agent Kate

4  Funk.

5      (**SPECIAL AGENT FUNK** was sworn.)

6          THE WITNESS:  I do.

7          THE COURTROOM DEPUTY:  Please have a state.  State

8  your full name and spell your last name, please.

9          THE WITNESS:  My name is Kate Funk, last name spelled

10  F U N K.

**DIRECT EXAMINATION**

11

12  BY MS. RHYNE:

13  Q   Special Agent Funk, where do you work?

14  A   I work for the F.B.I. in Denver.

15  Q   Since when?

16  A   Since June 2010.

17  Q   Were you assigned to the investigation of Gary Snisky?

18  A   I was.

19  Q   As part of that investigation, did you participate in a

20  search warrant that was executed in Longmont, Colorado?

21  A   I did.

22  Q   What was the address of that search warrant?

23  A   710 Tenacity.

24  Q   And what day was it executed on?

25  A   January 17th, 2013.

SPECIAL AGENT FUNK – Direct

1    *Q*   What time did you first approach 710 Tenacity?

2    *A*   It was a few minutes before 8:10 a.m.

3    *Q*   And at that particular time, what was your most immediate

4    goal?

5    *A*   Our goal was to interview David Sorrells and Gary Snisky.

6    *Q*   Who was with you?

7    *A*   I.R.S. Ron Loecker, I.R.S. Michael Queisert, and Postal

8    Inspector Barnett.

9    *Q*   How were the four of you dressed?

10    *A*   We were in business dress.

11    *Q*   Were any of you in raid jackets?

12    *A*   We were not.

13    *Q*   Were any of you in tactical gear?

14    *A*   No.

15    *Q*   Did any of you have your weapon drawn or displayed?

16    *A*   No.

17    *Q*   Aside from the four of you approaching the building that

18    morning, were there other agents in the general vicinity

19    waiting to participate in the search warrant or other

20    activities?

21    *A*   There were.

22    *Q*   And where were those agents waiting or stationed?

23    *A*   There were two F.B.I. agents waiting in close proximity to

24    the building in order to perform surveillance on the building,

25    and the remaining members were at a staging area several blocks

SPECIAL AGENT FUNK – Direct

1    away.

2    *Q*    The two that were closer to the building for surveillance

3    purposes, to your knowledge, were they visible to the occupants

4    of the building?

5    *A*    They were not.

6    *Q*    What happened when the four agents you described arrived at

7    the door of 710 Tenacity that morning?

8    *A*    We knocked on the door.

9    *Q*    And what happened next?

10   *A*    I believe it was Gary Snisky that opened the door.

11   *Q*    Did anyone introduce the group of agents to Mr. Snisky?

12   *A*    Ron Loecker introduced the four of us by name and by title.

13   *Q*    And was anyone with Mr. Snisky when he opened the door?

14   *A*    David Sorrells was close by.  Mr. Snisky.

15   *Q*    And when you say close by, what do you mean?

16   *A*    I was also in the entryway, within several feet.

17   *Q*    What happened after Special Agent Loecker introduced the

18   four of you to Mr. Snisky?

19   *A*    Ron asked Mr. Snisky if we could talk to both him and

20   David Sorrells, separately.

21   *Q*    And how did Mr. Snisky respond to that?

22   *A*    He said that that was no problem.

23   *Q*    What was his tone as he responded to that?

24   *A*    He was very congenial.

25   *Q*    Did he do anything to indicate where these interviews

1   should take place?

2   A    Yes.   He directed David Sorrells and the two I.R.S. agents

3   to one conference room, kind of a smaller conference room and

4   then directed us, myself and Postal Inspector Barnett to a

5   larger conference room with him.

6   Q    Can you describe the conference room that Mr. Snisky led

7   you to?

8   A    It was a relatively large conference room for a building of

9   that size.   It had a large conference table, seating probably

10  eight to ten people, with a large wall of windows.

11  Q    Where did everyone sit?

12  A    Mr. Snisky sat at the head of the table, I sat to his

13  immediate right, and Postal Inspector Robert Barnett sat to my

14  right.

15  Q    And were you the one sitting closest to Mr. Snisky?

16  A    I was.

17  Q    Approximately how many feet were there between you and

18  Mr. Snisky when you were seated?

19  A    I would estimate about three feet.

20  Q    What time did the interview begin?

21  A    Approximately 8:10 a.m.

22  Q    Who took the lead in questioning Mr. Snisky that morning?

23  A    I did.

24  Q    Were you noticeably pregnant at that time?

25  A    I was.

SPECIAL AGENT FUNK – Direct

1   *Q*   How many months into your pregnancy were you?

2   *A*   Approximately six months.

3   *Q*   At any point during your interview, did you or

4   Inspector Barnett draw or display your weapons?

5   *A*   We did not.

6   *Q*   Did you touch Mr. Snisky in any way?

7   *A*   I did not.

8   *Q*   Did you prevent Mr. Snisky from leaving the room or the

9   building?

10  *A*   I did not.

11  *Q*   Did you tell Mr. Snisky he was not free to leave?

12  *A*   No.

13  *Q*   During the interview, did anyone prevent him from using the

14  phone, if he chose to?

15  *A*   No.

16  *Q*   At some point during the interview did Mr. Snisky ask

17  something to the effect of, What is this all about?

18  *A*   He did.

19  *Q*   Approximately how far into the interview was that?

20  *A*   I would estimate somewhere between 40 minutes and an hour

21  into the interview.

22  *Q*   And how did you respond to that question?

23  *A*   I told Mr. Snisky that we were going to be executing a

24  federal search warrant that day at his business.

25  *Q*   Did you give him anything?

SPECIAL AGENT FUNK - Direct

1    A   I did give him a copy of the search warrant.

2    Q   And did you give him a copy of the affidavit?

3    A   I did not.

4    Q   Why not?

5    A   It was sealed at that time.

6    Q   Prior to that, prior to the moment you gave Mr. Snisky a

7    copy of the warrant, had any other agents entered the premise

8    in order to execute the search warrant?

9    A   No.

10   Q   Had any agents locked the doors to the premise?

11   A   No.

12   Q   Based on your review of the surveillance log that day, did

13   other people enter 710 Tenacity while you were conducting your

14   interview of Mr. Snisky?

15   A   Yes.

16   Q   Who?

17   A   Michelle and Richard Greeott entered, as well as

18   Alison Leary entered the facility.

19   Q   To your knowledge, did any one of those three people leave

20   during the time you were interviewing Mr. Snisky?

21   A   Michelle Greeott left.

22   Q   After you provided the search warrant to Mr. Snisky, who

23   notified other agents that it was okay for them to come and

24   execute the search?

25   A   I believe I did that.

SPECIAL AGENT FUNK - Direct

1  Q   Approximately when did the search warrant commence or the

2  execution of the search warrant?

3  A   Approximately 9:20 a.m.

4  Q   In addition to the four agents you have already identified,

5  how many other agents came to 710 Tenacity that morning for the

6  purpose of conducting the search warrant?

7  A   I remember there were nine other agents assisting with the

8  search warrant.

9  Q   And did the search begin while you were still interviewing

10  Mr. Snisky?

11  A   It did.

12  Q   What could you hear or see from inside the conference room

13  where you were conducting the interview with Mr. Snisky?

14  A   You could hear voices and maybe photographs at that time.

15  Q   Were there loud noises?

16  A   No.

17  Q   Did it sound like much of a ruckus outside?

18  A   No.

19       THE COURT:  Hold on a minute.  You said something I

20  didn't understand, it was, What could you hear or see?  And you

21  said you could hear voices, and maybe I misheard you, but I

22  have it as you could hear voices and maybe photographs.

23       THE WITNESS:  Sorry.  The clicking of the camera and

24  photographs being taken.

25       THE COURT:  Okay.  All right.

SPECIAL AGENT FUNK - Direct

1       Q    (By Ms. Rhyne) Could you see anything?

2   A   I had my back to the door, and I don't recall if the door

3   was open.  I don't know what Mr. Snisky could see from his

4   position.

5   Q   Okay.  Going back to when you gave Mr. Snisky a copy of the

6   search warrant, did you say anything -- excuse me -- did you

7   say anything to him, at that time, about whether or not he was

8   free to leave?

9   A   I told Mr. Snisky that he was not under arrest.

10  Q   And what did he say in response to receiving the search

11  warrant?

12  A   He said that he wanted Alison Leary, whom he had previously

13  explained was the company attorney, to join in on the remainder

14  of the interview.

15  Q   How did you respond to that request?

16  A   I said that was no problem.

17  Q   What happened next?

18  A   Mr. Snisky -- Alison Leary's office was right next door to

19  the conference room, and I believe either myself or Rob Barnett

20  or both of us accompanied Mr. Snisky to talk to Alison, see if

21  she was willing to sit in, and then escort them back into the

22  conference room.

23  Q   And did Ms. Leary join the interview room?

24  A   She did.

25  Q   Where did she sit?

SPECIAL AGENT FUNK – Direct

1  A   She sat to Mr. Snisky's left and across the table from me.

2  Q   Toward the end of the interview did you request that

3  Mr. Snisky provide a written statement about some of the things

4  that he had told you that morning?

5  A   I did.

6  Q   How did he respond?

7  A   He said that was no problem.  He would be happy to do that.

8  Q   Did he further amend that response?

9  A   He did.  I -- I asked Mr. Snisky to provide specific

10  details that he had already -- we already discussed during the

11  interview in that statement, and at that time he said he would

12  prefer to speak with an attorney before providing a written

13  statement.

14  Q   Approximately what time did your interview of Mr. Snisky

15  conclude that morning?

16  A   Approximately 9:30 a.m.

17  Q   At what time -- excuse me.  At that time, did you tell

18  Mr. Snisky what his options were, regarding staying or leaving

19  the premise?

20  A   I told Mr. Snisky that he could leave if he would like or

21  he could stay, but if he chose to stay he would need to stay in

22  the conference room.

23  Q   How did he respond?

24  A   He said that was no problem and that he would like to stay.

25  Q   Did anyone stay with Mr. Snisky in the conference room?

SPECIAL AGENT FUNK – Direct

1   *A*   Alison Leary stayed with him for some portion of the time

2   after our interview ended.

3   *Q*   And was there an agent tasked with monitoring where

4   Mr. Snisky was during the the execution of the search warrant?

5   *A*   There was.  We did watch to make sure that Mr. Snisky did

6   not leave the room.

7   *Q*   After the interview concluded, what role did you play in

8   the search warrant?

9   *A*   I provided guidance to the agents as to what to take, what

10  was included in Attachment B, things of that nature.

11  *Q*   At any point during the search warrant did you observe any

12  agents drawing or displaying their weapons?

13  *A*   I did not.

14  *Q*   How long did the search warrant last?

15  *A*   It ended somewhere just after 2 p.m. that day.

16  *Q*   To your knowledge, did Mr. Snisky go to the restroom during

17  the search warrant?

18  *A*   He did.

19  *Q*   How do you know that?

20  *A*   Um, I believe the agent that was standing outside the door

21  let me know that he needed to use the restroom and then

22  escorted Mr. Snisky to the restroom, and I was standing in the

23  hallway and they passed by me.

24  *Q*   So you observed him being escorted to the restroom?

25  *A*   I did.

SPECIAL AGENT FUNK - Direct

1    Q   Did that agent touch or restrain Mr. Snisky in any way?

2    A   No.

3              MS. RHYNE:   I have no further questions.

4                        **CROSS-EXAMINATION**

5    BY MR. PEPIN:

6    Q   Special Agent Funk?

7    A   Yes.

8    Q   That's your title, right, special agent?

9    A   That's right.

10   Q   So you completed a Memorandum of Interview concerning your

11   contact with Mr. Snisky on January 17th, 2013, didn't you?

12   A   The memorandum was actually written by Rob Barnett, the

13   Postal Inspector, but I reviewed it.

14             THE COURT:   Ma'am, could I ask you to do me a favor

15   and pull that microphone over more in that direction.   There

16   you go.   That's good.   Thank you.

17             THE WITNESS:   I'm sorry.

18        Q    (By Mr. Pepin) So the Memorandum of Interview was --

19   there was a Memorandum of Interview completed --

20   A   Yes.

21   Q   -- right?   And it is referred to, first, in the place of

22   interview, 710 Tenacity, Longmont, Colorado, right?

23   A   Yes.

24   Q   Do you have a copy of it up there?

25   A   I do.

SPECIAL AGENT FUNK – Cross

1   Q   Okay.  Is that what you are looking at?

2   A   Yes.

3   Q   The date of the interview January 17th, 2013, right?

4   A   Yes.

5   Q   And it indicates the time is 08:10?

6   A   Yes.

7   Q   That's 8:10 in the morning, right?

8   A   Yes.

9   Q   And that would be the time the interview started, I assume,

10  since it's supposed to have gone for awhile, right?

11  A   That was the start time of the interview.

12  Q   And then it indicates the two of you, Kate -- F.B.I.

13  Special Agent Kate Funk and Postal Inspector Robert Barnett,

14  right?

15  A   Yes.

16  Q   And Mr. Barnett is the person who actually wrote the

17  report, you say?

18  A   That's correct.

19  Q   And you reviewed it?

20  A   I did.

21  Q   Now, you reviewed the report, so you know that it does not

22  talk about the plan to go to 710 Tenacity that morning, right?

23  A   That's correct.

24  Q   It doesn't talk about the -- any meeting you would have had

25  with the other agents, planning your moving to that location on

SPECIAL AGENT FUNK – Cross

1   that day, right?

2   A   That's correct.

3   Q   It does not talk about the number of agents who were

4   involved?

5           MS. RHYNE:  Objection relevance.

6           MR. PEPIN:  It's relevant, Your Honor, to the --

7           THE COURT:  Overruled.  Overruled.  Go ahead.

8           MR. PEPIN:  Thank you.

9       Q   (By Mr. Pepin) It doesn't talk about the number of

10  agents involved, right?

11  A   That's correct.

12  Q   It doesn't even say that four agents approached the

13  building, initially, does it?

14  A   It does not.

15  Q   It doesn't talk about your -- when you got to the building,

16  for instance?

17  A   No.

18  Q   Or that you basically were waiting to -- for Mr. Snisky and

19  Mr. Sorrells, right?

20  A   That's correct.

21  Q   And it doesn't talk about the staging or anything like

22  that?

23  A   No.

24  Q   Doesn't talk about who was wearing what?

25  A   No.

SPECIAL AGENT FUNK - Cross

1   Q   Doesn't talk about whether or not you all were armed?

2   A   That's correct.

3   Q   Doesn't talk about whether you displayed badges?

4   A   No.

5   Q   Doesn't talk about the number of agents who were at the

6   front door when you knocked on the front door?

7   A   That's correct.

8   Q   And doesn't identify who those four would have been?

9   A   No.

10  Q   It doesn't talk about the nature of your -- as you

11  characterize it -- knock at the door, does it?

12  A   No.

13  Q   Do you remember being outside the building and seeing

14  Mr. Sorrells and Mr. Snisky enter 710 Tenacity in Longmont,

15  Colorado?

16  A   I do.

17  Q   And how long would you say they were in the building before

18  you and your other -- three other agents approached the

19  building behind them?

20  A   Within a few minutes.

21  Q   You were basically following them right into the building,

22  weren't you?

23  A   Within a few minutes, yes.

24  Q   And so -- well, let me ask you this.  When you say a few

25  minutes, do you mean that you sat, watched, waited for a few

1   minutes, and then approached?

2   A    I believe it was more getting everyone to the same place to

3   knock on the door, rather than to wait specifically for --

4   Q    So the four of you who were approaching the building,

5   Mr. Queisert?

6   A    Queisert.

7   Q    I'm wanting to make him into a kitchen utensil I'm afraid.

8   Queisert, Mr. Barnett, you, and Mr. Loecker?

9   A    Yes.

10  Q    Were you all in separate vehicles?

11  A    I was in a vehicle with Rob Barnett and I am not sure about

12  Ron and Mike.

13  Q    So in any event, the four of you had to get together to

14  approach the -- the front door of 710 Tenacity?

15  A    That's correct.

16  Q    Did you recognize, or under -- I'm sorry, did you

17  understand 710 Tenacity to be a business address?

18  A    I did.

19  Q    And when you approached that business, did you attempt to

20  open the door, before you knocked?

21  A    We did not.

22  Q    So you knocked on the door without trying it?

23  A    Yes.

24  Q    And the knock was, in fact, a hard knock on the door,

25  wasn't it?

SPECIAL AGENT FUNK - Cross

1   A   Actually don't recall how hard the knock was.

2   Q   Do you know who did the knock?

3   A   I believe it was I.R.S. Agent Ron Loecker.

4   Q   If someone were to characterize the knock on the door as a

5   boom, boom, would that be inaccurate?

6   A   I don't recall it being a boom, boom knock.

7   Q   The -- the idea was to get the attention of whoever was in

8   that building, right?

9   A   Yes.

10  Q   So they would come to the door?

11  A   Yes.

12  Q   And the -- do you have any idea how many square feet that

13  building has?

14  A   I would be guessing at roughly maybe 2,000 square feet.

15  Q   When you approached the front door, did you have any idea

16  where Mr. Snisky or Mr. Sorrells were, within that building?

17  A   No.

18  Q   The idea was to get the attention of whoever was in that

19  building, wherever they were, right?

20  A   The idea was to have someone answer the door.

21  Q   You wanted them to hear the knock so they would answer the

22  door?

23  A   Yes.

24  Q   You did not know where, within that 2,000-foot building,

25  they were, right?

SPECIAL AGENT FUNK – Cross

1    A    That's correct.

2    Q    And the idea was to make them or have it so they could hear

3    you and so they would -- they would come to the door, right?

4    A    That's correct.

5    Q    When you -- the front of the building, this front of the

6    door, could you look in the door and see Mr. Sorrells or

7    Mr. Snisky?

8    A    No.

9    Q    Is there a window there at that door?

10   A    I don't recall, but I -- if there was one it was a small

11   one.

12   Q    So things like whether or not there's a window at the door,

13   whether you could see them or what you can recall about all of

14   this approaching the building, those are the kinds of things

15   that had you put in a report you could tell us, right?

16   A    Potentially, yes.

17   Q    Well, if you put it in the report you can read your report

18   and then you would tell us, right?

19   A    Yes.

20   Q    You say you remember that Mr. Snisky came to the door?

21   A    Yes.

22   Q    Have you always remembered that it was Mr. Snisky who came

23   to the door?

24   A    Yes.

25   Q    Have you ever talked to Ms. Rhyne saying that you thought

SPECIAL AGENT FUNK - Cross

1   that it was Mr. Snisky or Sorrells who came to the door?

2   A   I believe they were both in the entryway, but I believe it

3   was Mr. Snisky that opened the door.

4   Q   You -- you have talked to Ms. Rhyne about what happened, at

5   the time that you went to this office on January 17th, 2013,

6   right?

7   A   I did.

8   Q   And that conversation was -- well, certainly wasn't right

9   after January 17th, 2013, was it?

10   A   We might have had a conversation right after, but we also

11   had a conversation prior to this hearing.

12   Q   You had a conversation after the Motion to Suppress

13   Statements was received by Ms. Rhyne, right?

14   A   Yes.

15   Q   And she was talking to you, specifically, about what

16   happened that morning, right?

17   A   Yes.

18   Q   And that conversation was a year and a half after the

19   January 17, 2013 search at 710 Tenacity, right?

20   A   Yes.

21   Q   As far as you know, now all of those officers -- so we've

22   got -- is -- you said there were nine plus four, so 13 of you?

23   A   Yes.

24   Q   Of all of those 13 officers, none of you wrote a report

25   concerning the plan of going to the building, right?

SPECIAL AGENT FUNK - Cross

1   A   No.  Well, I mean we have an internal OPS plan.

2   Q   You have an internal OPS plan?

3   A   Yes.

4   Q   Is internal OPS plan something that would be available?

5   A   Yes.

6   Q   As far as you know have you provided it to Ms. Rhyne?

7   A   I think so.  I don't recall.

8   Q   In terms of of the approach of the building, everything we

9   have been talking about just the last four minutes, as far as,

10  you know, did Mr. Barnett, Mr. Loecker or Mr. Queisert write a

11  report?

12  A   Regarding?

13  Q   Regarding the approach of the building and the first

14  contact with Mr. Snisky?

15  A   There was a surveillance log that detailed that we

16  approach -- the four of us approached the building, with the

17  time.

18  Q   When you say surveillance log, are you referring to what's

19  been -- well, I think you may have what's up there as

20  Government's Exhibit No. 2?

21  A   That is correct.

22  Q   So the surveillance log, what it does is it says times,

23  correct?

24  A   That's correct.

25  Q   So the way it describes your approach to the building, it

SPECIAL AGENT FUNK - Cross

1    says under 805, Special Agents Kate Funk, Ron Loecker, Mike

2    Queisert and Rob Barnett enter office.  Right?

3    *A*    Yes.

4    *Q*    So that's the detail that's provided concerning the entry

5    of the office, right?

6    *A*    That's correct.

7    *Q*    And it does not make any reference to your contact with

8    Mr. Snisky or Sorrells?

9    *A*    That's right.

10   *Q*    It doesn't say who was the one who actually entered the

11   door?

12   *A*    That's correct.

13   *Q*    You never wrote a note about who was actually the one who

14   entered the door -- or answered the door?

15   *A*    Right.

16   *Q*    When Mr. Snisky or Mr. Sorrells or whoever you remember

17   entered the door -- or answered the door, do you recall what

18   you first said to him or to them?

19   *A*    Um, I believe we introduced ourselves, Ron introduced the

20   four of us, and we said we wanted to speak with them

21   separately.

22   *Q*    Now let me ask you, when you were approaching a situation

23   like this, is there any concern about your security?

24   *A*    A very small concern.

25   *Q*    Well, is there ever a time that you enter a situation where

SPECIAL AGENT FUNK - Cross

1   you are going to be trying to interview someone, or where you

2   are going to be asking questions of a target where security is

3   not at least some concern?

4   A   There's a small concern.

5   Q   And that concern is because you really never know what --

6   how a person might react to what's going on, right?

7   A   Correct.

8   Q   Now, for instance, you have described Mr. Snisky as asking

9   you, sometime later, what -- What's going on?  Why are you

10  asking these questions, or something like that, right?

11  A   Yes.

12  Q   He could have asked that as you were at the front door,

13  right?

14  A   I don't think he asked that at the front door.  He could

15  have, yes.

16  Q   And if he had, you would have said we are here to execute a

17  search warrant, right?

18  A   I don't know what I would have said to him.

19  Q   When he did ask, you said, We are here to execute a search

20  warrant?

21  A   That's correct.

22  Q   People react in all sorts of ways to that sort of

23  information, don't they?

24  A   Yes.

25  Q   And certainly you would be on your guard, generally,

SPECIAL AGENT FUNK – Cross

1   wouldn't you?

2   A    Yes.

3   Q    Is there ever a time that you work in your capacity as an

4   F.B.I. agent where you are not -- and I will say outside your

5   office, on your guard?

6   A    I'm -- I'm most of the time on my guard.

7   Q    Okay.  Does that mean that you, every opportunity you have,

8   take control of a scene?

9   A    Um, I don't think that's a fair statement.

10  Q    You took control of this one though, didn't you?

11  A    Um, I don't know what you mean by took control.

12  Q    Well, you approached -- you and at least one other agent

13  approached Mr. Snisky, um, immediately, to get fairly close to

14  him so that you could make sure that the situation was

15  controlled, didn't you?

16  A    Are you talking about proximity to him?

17  Q    Well, we will start with proximity.  Yes.

18  A    I don't think we invaded Mr. Snisky's personal space.  I

19  think we maintained a professional distance from him.

20  Q    What is a professional distance?

21  A    Several feet.

22  Q    Several as in 15, several as in three?

23  A    Two to three.

24  Q    Two to three.

25  Q    And you say you maintained that distance?

SPECIAL AGENT FUNK - Cross

1   A   Yes.

2   Q   When -- so you maintained a distance, this professional

3   distance, of two to three feet and you told them that you

4   wanted to talk to them?

5   A   Yes.

6   Q   Did you tell them what you wanted to talk to them about?

7   A   At some point I told Mr. Snisky, and I can't recall if it

8   was in the hallway or once we got to the conference room, that

9   they were concerned about some of the bank transactions.

10  Q   And you specifically did not tell him, at that point, that

11  you were intending to execute a search warrant?

12  A   I did not.

13  Q   The idea was if you told him you were going to execute a

14  search warrant, he may not talk to you?

15  A   I wanted him to be comfortable enough to talk to me.

16  Q   And you thought a search warrant might make him

17  uncomfortable?

18  A   Yes.

19  Q   So you wanted him to be comfortable enough to talk to you,

20  so that he could -- well, what you were really hoping he would

21  do is incriminate himself?

22  A   I was hoping he was going to tell me what was going on with

23  his business.

24  Q   You had a definite opinion as to what was going on at his

25  business, right?

SPECIAL AGENT FUNK - Cross

1   A   Absolutely.

2   Q   In fact, at some point during that interview, um, you got

3   frustrated with Mr. Snisky?

4   A   Yes, I did.

5   Q   Why did you get frustrated?  Or what made you frustrated

6   with Mr. Snisky?

7   A   I was asking him direct questions, to which he was not

8   responding with a direct answer.

9   Q   What kind of direct questions were you asking, that he did

10  not respond directly?

11  A   Questions such as, have you purchased bonds on behalf of

12  your investors.

13  Q   Okay.  And you didn't feel that he answered you directly?

14  A   Correct.

15  Q   And is that the only question that you asked, that -- that

16  you were frustrated?

17  A   There were a number of questions that were asked to

18  Mr. Snisky.  I can't recall exactly which questions he did not

19  respond to directly.

20  Q   But whatever ones he didn't respond to directly, you got

21  frustrated?

22  A   Yes.

23  Q   And do you recall if it was the first question or the 50th

24  question or the fifth question?

25  A   Somewhere in ten/fifteen minutes into the interview, I felt

SPECIAL AGENT FUNK - Cross

1   that Mr. Snisky was not being upfront about the transactions

2   related to his business.

3   Q   So you -- you were there -- obviously, you weren't being

4   upfront with him about what you had in mind that day, right?

5   You were hiding from him the fact that there was a search

6   warrant?

7   A   I did not tell him there was a search warrant.

8   Q   Well, how was he going to find out unless you told him?

9        MS. RHYNE:  Objection, argumentative.

10       THE COURT:  I will allow her.  Go ahead.

11       Q    (By Mr. Pepin) How is he going to find out, unless

12   you told him?

13   A   Correct.  He would have not known.

14   Q   He would have not known.  So which means you were hiding

15   that from him?

16       MS. RHYNE:  Asked and answered.

17       THE COURT:  Can we move on?  I get the point.

18       Q    (By Mr. Pepin) So how many times did you ask

19   questions that he gave you answers that frustrated you?

20   A   I would guess probably five to ten questions.

21   Q   And that started, sounds like, early in this interchange?

22   A   Correct.

23   Q   How did you exhibit your frustration?

24   A   I probably said something along the lines of, That was not

25   my question.  Here is my question.  You didn't answer my

1    question.   Things of that nature.

2    *Q*   And I want to make it clear here, probably already is, but

3    you did not tell Mr. Snisky, as you went into the building and

4    then ended up in different room -- a room with him separated

5    from Mr. Sorrells, you didn't tell him that he didn't have to

6    answer any of your questions?

7    *A*   No.

8    *Q*   And you didn't tell him, at that point, that he was free to

9    go?

10   *A*   No.

11   *Q*   All right.   You didn't tell him that -- you didn't read him

12   his *Miranda* rights, that's for sure, right?

13   *A*   No, I did not.

14   *Q*   All right.   And at the time that you went with Mr. Snisky,

15   into the conference room where you and Mr. Barnett were

16   interrogating him, that was done to separate him from

17   Mr. Sorrells?

18   *A*   Yes.   We wanted to talk to Mr. Snisky alone.

19   *Q*   And Mr. Sorrells was taken into another room, right?

20   *A*   They went into a different room, yes.

21   *Q*   Well, they went into, as in, the agents said, Let's go into

22   this room?

23   *A*   Mr. Snisky directed them to the room to use.

24   *Q*   And he directed you to your room then --

25   *A*   Yes.

SPECIAL AGENT FUNK - Cross

1   Q    -- that's what you are saying?  Okay.  So at what -- what

2   clue did you give to Mr. Snisky that he had any choice, at all,

3   in this matter?

4   A    When you say clue?

5   Q    What did you -- you didn't tell him he didn't have to talk

6   to you.  There were four agents who came in, first thing in the

7   morning, right?  Said you wanted to talk to him, right?

8   A    Yes.

9   Q    Showed him your badges, right?

10  A    Yes.

11  Q    And said you wanted to be separated from -- him and

12  Mr. Sorrells, right?

13  A    We asked to be separated.

14  Q    May we please be separated, is that what you said or

15  something --

16  A    Something along the lines of, We would like to speak with

17  you separately.

18  Q    Okay.  And along -- during all of that period of time,

19  what -- in what you said or did, what suggested, in any way,

20  that he had any choice?

21  A    It was his business place.

22  Q    The fact that it was his business place made it his choice

23  as to whether or not he could talk to you?

24  A    I never told him he had to talk to us.  I asked to talk to

25  him.

                                                                                            30

SPECIAL AGENT FUNK - Cross

1   Q    Now, as you are talking to him, were you the one asking

2   questions or was Mr. Barnett the one asking questions?

3   A    I asked the majority of the questions.

4   Q    Did Mr. -- Mr. Barnett wrote this memorandum of interview,

5   that we see in Government's Exhibit No. 1, correct?

6   A    Yes.

7   Q    That's the one he reviewed?

8   A    Yes.

9   Q    Did Mr. Barnett tell you, at some point during the morning,

10  that when you were with Mr. Snisky, that Mr. Snisky had gone to

11  get coffee?

12  A    I don't recall that.

13  Q    Do you recall Mr. Barnett ever telling you that when

14  Mr. Snisky came back from going next door to get coffee,

15  Mr. Barnett was upset that Mr. Snisky had left the building?

16  A    I don't recall that.

17  Q    He didn't --

18  A    I'm sorry, just a question, was this during the interview

19  or after the interview ended?

20  Q    At anytime?

21  A    I don't recall that at any time.

22  Q    Do you recall when the agents came to the building, the

23  other agents came to the building, Mr. Snisky pointing out

24  where various places were and offices were, to you or your

25  agents?

SPECIAL AGENT FUNK - Cross

1  *A*   He did not indicate to me where things were.  I don't know

2  what he said to other agents.

3  *Q*   Do you know about a time that Mr. Snisky had gone to get

4  coffee?  Did you ever hear anything about that, at all?

5  *A*   I did not.

6  *Q*   When -- and was there a time, during the time you were

7  asking him questions, Mr. Snisky questions, that anyone left

8  the room?  Any of the three of you?

9  *A*   Sorry.  Can you ask that question again?

10 *Q*   While you were asking the questions of Mr. Snisky, was

11 there some time where that was interrupted, and -- any of the

12 three of you left the room?

13 *A*   Only to get Alison Leary to join the interview.

14 *Q*   Now, while you were talking with Mr. Snisky -- let me

15 rephrase that, please.

16        Did the interrogation of Mr. Snisky continue after the

17 other agents started to have -- or came into the building to

18 search it?

19 *A*   We continued to interview Mr. Snisky after the agents

20 entered the building to execute the search warrant.

21 *Q*   How long?

22 *A*   Somewhere between -- I'm sorry.  At the time of the

23 execution of the search warrant, when it started it was 9:20

24 a.m., and my interview with Mr. Snisky ended at 9:30 a.m., so

25 roughly ten minutes.

SPECIAL AGENT FUNK – Cross

1   Q   So –– from –– you talked about this log in, people coming

2   and going from the building.  You said that Michelle Greeott

3   came?

4   A   Yes.

5   Q   And then left at some point?

6   A   Yes.

7   Q   The agents who –– someone was watching when she came?

8   A   Correct.

9   Q   And someone took her name?

10  A   Yes.

11  Q   And then when she left, um, someone took –– kept record of

12  that?

13  A   That's correct.

14  Q   Did Mr. Snisky know that she had come and gone?

15  A   I don't think so, because I didn't know she had come and

16  gone, and I was with Mr. Snisky at the time.

17  Q   So any freedom of movement, in and out of the building by

18  other people, was not something that Mr. Snisky would have

19  known about?

20  A   I think he knew Alison Leary arrived, because he asked for

21  her to join in on the interview, but yet she had not knocked on

22  the door or anything like that.  I think he heard her in the

23  office next door.

24  Q   So there was some sound in the office next door that he

25  could have interpreted as her being there?

SPECIAL AGENT FUNK - Cross

1  A    I believe so.

2  Q    Did you hear that, as well?

3  A    I did.

4  Q    Okay.  In terms of whether or not Ms. Leary were free to

5  go, he would have had no information about that?

6  A    He would not, yes.

7  Q    He would not know to what degree the building was

8  controlled by you or your agents?

9  A    Right.

10  Q    And in fact, your agents were watching and keeping record

11  of everyone who came and went?

12  A    Yes.

13  Q    Now, this -- you are getting frustrated with Mr. Snisky

14  during the first part of the -- these -- this questioning,

15  that's not something that was put in either yours or -- I guess

16  it would be in Mr. Barnett's memorandum of interview, was it?

17  A    No.

18  Q    And since you reviewed Mr. Barnett's memorandum of

19  interview, does that mean you would have had the opportunity to

20  supplement it with information you might consider important?

21  A    Yes.

22  Q    And doesn't appear that you did that, with regard to your

23  frustration?

24  A    That's correct.

25  Q    Would you consider -- him not -- well, him not answering

SPECIAL AGENT FUNK – Cross

1   the questions to your satisfaction, is something that you

2   expressed to him?

3   *A*   Yes.

4   *Q*   And you expressed it to him, sounds like, multiple times?

5   *A*   Yes.

6   *Q*   And at -- how would he respond when you said you are not

7   answering my questions?

8   *A*   Um ... he provided an answer that still was not responsive

9   to my direct question.

10  *Q*   Wasn't satisfactory to you?

11  *A*   It was not an answer to the question.

12  *Q*   Well, were you satisfied?

13  *A*   No.

14  *Q*   Well, then it was not satisfactory to you, right?

15  *A*   That's true.

16  *Q*   Prior to going to 710 Tenacity, at -- on January 17th, did

17  you know who Alison Leary was?

18  *A*   I did.

19  *Q*   Did you know that she was a lawyer?

20  *A*   I believe I did know she was a lawyer.

21  *Q*   Did you know that she was a lawyer who did not practice

22  criminal law?

23  *A*   I did not know that.

24  *Q*   Did you know one way or the other?

25  *A*   No.

SPECIAL AGENT FUNK - Cross

1    Q    Did she introduce yourself (sic) to her (sic) when she came

2    into the room with Mr. Snisky as his attorney?

3    A    No.

4    Q    Was there any discussion about her being there to represent

5    him as a criminal lawyer?

6    A    No.

7    Q    Did she interject, at any time, during the -- these

8    questions that you were asking?

9    A    No.

10   Q    Did Mr. Snisky pull her aside and consult with her during

11   the questioning?

12   A    I don't think so.

13   Q    With regard to keeping a record about what happened there,

14   that morning, who had the responsibility of recording the names

15   of the agents?

16   A    The names of the agents executing the search warrant?

17   Q    Uh-huh.

18   A    There's a team leader that's associated with the search

19   that would have kept the names of the team.

20   Q    Who is the team leader?

21   A    I believe it was Dan Limon.

22   Q    And were --

23   A    I'm sorry.  Let me back up.  I don't know.  It was either

24   Dan Limon or Stephanie Benitez.

25   Q    Did you leave the room at any time during the course of

SPECIAL AGENT FUNK - Cross

1   this -- of your interrogation of Mr. Snisky, to discuss what he

2   was saying with Mr. Barnett?

3   A   I don't recall.

4   Q   How about with any other agent, Mr. Loecker, or anyone like

5   that?

6   A   I know I had a discussion with Mr. Loecker, at some point.

7   I don't know if it was at the end of the interview or while we

8   were asking Alison Leary to join us.

9   Q   Now, as far as you knew, Mr. Snisky was surprised to see

10   you that morning?

11   A   I think so.

12   Q   You had no -- you certainly hadn't given him any indication

13   that you were coming, at least not intentionally?

14   A   No.

15   Q   Had you ever met Mr. Snisky prior to that day?

16   A   No.

17   Q   You mentioned that you did not point or -- excuse me.  Did

18   not display your firearms.  I assume you were armed?

19   A   I was.

20   Q   As far as you know, were all of the other agents armed?

21   A   Yes.

22   Q   And --

23   A   As far as I know.

24   Q   And your personal weapon, was it -- I know you weren't

25   displaying it as in holding it or drawing it, but was it in a

SPECIAL AGENT FUNK - Cross

1   holster at your side or some kind of a bag or how did you have

2   it?

3   A   It was either on my ankle, most likely, because I was

4   pregnant at the time, or on my waist covered by my jacket.

5   Q   Maybe a silly question, how does a pregnant woman reach a

6   pistol on your ankle?

7   A   You lift your leg up.

8   Q   Was any part of the interrogation of Mr. Snisky recorded,

9   video wise?

10  A   No.

11  Q   Audio?

12  A   No.

13  Q   Was any part of this of your initial approach of the

14  building recorded by video?

15  A   No.

16  Q   How about by audio?

17  A   No.

18  Q   F.B.I., you all now are required to videotape or audiotape

19  questioning of suspects?

20  A   I'm not the expert on this, but I believe there's a new

21  D.O.J. policy regarding custodial interviews.

22  Q   I see.  Only custodial interviews?

23  A   That's the -- the requirement, from what I understand, with

24  some exceptions, and then encouragement for other interviews.

25        MR. PEPIN:  Thank you, Your Honor.  No further

SPECIAL AGENT FUNK - Cross

1    questions.

2              *THE COURT:*  Before you begin, I just have one.

3              *THE WITNESS:*  Sure.

4              *THE COURT:*  Were you wearing, pants or a skirt?

5              *THE WITNESS:*  I was wearing pants.

6              *THE COURT:*  Okay.

7                          **REDIRECT EXAMINATION**

8    *BY MS. RHYNE:*

9    *Q*   When you first were at the door and it was opened by

10   Mr. Snisky, what was his demeanor when he greeted you?

11   *A*   I would say pleasant.  He was --

12   *Q*   Go ahead.  Were you finished?

13   *A*   He was welcoming.

14   *Q*   Does that demeanor change at any point, during your

15   interaction with him, throughout the interview?

16   *A*   I think at some point when the questions became more

17   direct, he became nervous and danced around the questions.

18   *Q*   And how far into the interview was that, would you

19   estimate?

20   *A*   Five to ten minutes.

21   *Q*   Okay.  At any point did he seem alarmed and scared?

22   *A*   No.

23   *Q*   Did he ever indicate that he didn't want to talk to you?

24   *A*   No.

25   *Q*   Now, I want to talk about this was -- Mr. Pepin had asked

SPECIAL AGENT FUNK – Redirect

1    you about an internal OPS plan.  Was there a 70-page report

2    that contained details of the search that morning?

3    A    There was.

4    Q    What is that report called?

5    A    I think it's the E.R.T., Evidence Recovery Team case book.

6    Q    And were you with me in my office yesterday when we

7    confirmed that was in discovery?

8    A    Yes.

9    Q    Now, with respect to Mrs. Greeott, I want to make sure I

10   didn't misunderstand.  Mr. Pepin asked you if, when she left

11   the building, somebody took her name.  Do you know if someone

12   actually stopped her to ask her name or whether they just knew

13   her name and made a note of it?

14   A    She, at some point, came back to the search.  I don't know

15   if it was as a result of a discussion with an agent or what the

16   circumstances were, but I know that she came, she left, and

17   then she came back.

18   Q    But are you aware of her being stopped, as she left the

19   building, so she could give her name to law enforcement?

20   A    I don't know.

21   Q    Okay.  And then with respect to this series of questions

22   about Mr. Snisky going to get coffee.  Do I understand

23   correctly that if that happened at all, it did not happen

24   during the interview that you were present for?

25   A    That's correct.

SPECIAL AGENT FUNK — Redirect

1          MS. RHYNE:  I have no further questions.

2          THE COURT:  May this witness be excused?

3          MR. PEPIN:  I have no objection, Your Honor.

4          MS. RHYNE:  Yes.

5          THE COURT:  Call your next witness.

6          MS. RHYNE:  Your Honor, the Government calls

7   Ron Loecker.

8          MS. RHYNE:  Is there any objection to Special Agent

9   Funk staying?

10          THE COURT:  No.

11          THE COURTROOM DEPUTY:  Please come forward and be

12   sworn, sir.  Raise your right hand.

13      (**Special Agent Loecker** was sworn.)

14          THE WITNESS:  I do.

15          THE COURTROOM DEPUTY:  Please have a seat and state

16   your full name and spell your last name, please.

17          THE WITNESS:  Name is Ronald Loecker.  Last name is

18   spelled L O E C K E R.

19                         **DIRECT EXAMINATION**

20   BY MS. RHYNE:

21   Q   Special Agent Loecker, where do you work?

22   A   I'm a special agent with the I.R.S., Criminal

23   Investigations here in Denver, Colorado.

24   Q   Since when?

25   A   I have been in Denver since 2011.  I have been with I.R.S.

Special Agent Loecker - Direct

1  criminal investigations since 2001.

2  Q   Were you assigned to the investigation of Gary Snisky?

3  A   I was.

4  Q   And were you part -- excuse me -- a participant in the

5  search warrant that was executed at 710 Tenacity on January

6  17th, 2013?

7  A   Yes, ma'am.

8  Q   What time of day did you first approach the building that

9  morning?

10  A   I believe it was a few minutes after 8.

11  Q   Who was with you?

12  A   It was I.R.S. Special Agent Mike Queisert, F.B.I. Special

13  Agent Kate Funk, and Postal Inspector Rob Barnett.

14  Q   How were the four of you dressed?

15  A   We were in suits.

16  Q   Did any of you wear raid jackets?

17  A   No.

18  Q   Did any of you wear tactical gear?

19  A   No, ma'am.

20  Q   Did any of the four of you have your weapons drawn or

21  displayed?

22  A   No, ma'am.

23  Q   And as you first approached the building, what was your

24  immediate goal?

25  A   To interview Mr. Snisky and Mr. Sorrells.

Special Agent Loecker – Direct

1    *Q*   What happened when you arrived at the door of 710 Tenacity?

2    *A*   I believe I knocked on the door and Mr. Snisky answered it.

3    *Q*   How hard did you knock on the door?

4    *A*   I guess a typical loud knock; just a normal knock.

5    *Q*   Okay.  And what happened after you knocked on the door?

6    *A*   I believe I advised Mr. Snisky that we had some questions

7    for him and he invited us in.

8    *Q*   Okay.  I may have missed, did you already indicate who

9    opened the door?

10    *A*   Mr. Snisky opened the door.

11    *Q*   And was anybody with him when he opened the door?

12    *A*   Mr. Sorrells.

13    *Q*   What was Mr. Snisky's tone when he invited you in the

14    building?

15    *A*   Jovial, conversational.

16    *Q*   Did you introduce or did anyone introduce the group of

17    agents to the two gentlemen?

18    *A*   I believe I introduced myself and Kate.  I don't remember

19    if I introduced the other two.  As we were standing –- my

20    recollection is we were standing closest to the door.

21    *Q*   And what happened after Mr. Snisky invited you in the

22    building?

23    *A*   Mr. Snisky, sort of, indicated that we should follow him

24    towards the conference room.  It was at that point that I

25    advised Mr. Snisky that I was hoping to speak with him and

Special Agent Loecker - Direct

1   Mr. Sorrells separately, and so Special Agent Funk and

2   Inspector Barnett headed down the hallway with Mr. Snisky,

3   while Mr. Sorrells and I and Special Agent Queisert went to a

4   different conference room.

5   Q   Who was it that indicated which conference room should be

6   used?

7   A   Mr. Snisky and Sorrells, I believe, had just a very brief

8   conversation, You want to go sit over there and I will sit over

9   here, off we went.

10  Q   Okay.  And as the other two agents and Mr. Snisky parted,

11  who was leading the way?

12  A   My memory would be Mr. Snisky, because he was out in front

13  already.

14  Q   And you were part of the two people who interviewed

15  Mr. Sorrells; is that correct?

16  A   Yes, ma'am.

17  Q   Approximately how long did that interview last?

18  A   So we started 12 minutes or whatever it was after 8, and by

19  about 8:50 I could hear that Mr. Greeott was next door working

20  on his computer, and I wanted to transition over to do that

21  interview, so I left Mr. Sorrells at about 8:50 and began an

22  interview of Mr. Greeott, at about that time.

23  Q   Did you request any agents come to the building to assist

24  you with that interview of Mr. Greeott?

25  A   I did.

Special Agent Loecker - Direct

1   Q   Who was that?

2   A   It was Rob Spivey, Special Agent Rob Spivey with the F.B.I.

3   Q   Other than Special Agent Spivey responding to your request,

4   had any other agents entered the premise, at that time?

5   A   No.

6   Q   Had anyone locked the doors to the premises?

7   A   No.

8   Q   And to your knowledge, did anyone, other than Mr. Greeott,

9   enter the building at that time or before that time?

10  A   I don't think I was aware of it at the time, I later

11  learned Mr. and Mrs. Greeott came together.

12  Q   Where did you interview Mr. Greeott?

13  A   In his office.

14  Q   At some point later in the morning, did you ask to speak --

15  excuse me -- ask Mr. Snisky some questions?

16  A   I did.

17  Q   Approximately what time?

18  A   About quarter to 12.

19  Q   And where did you go to find Mr. Snisky?

20  A   In the same conference room that he had been in, as I

21  understood it, the entire morning.

22  Q   Was anyone with him?

23  A   Um, yeah, the attorney, Ms. Leary.

24  Q   And where were they located inside the conference room?

25  A   At the conference table.

Special Agent Loecker - Direct

1   Q   Were they seated?

2   A   They were.

3   Q   Was anyone restrained?

4   A   No.

5   Q   Where did you position yourself in order to ask your

6   questions?

7   A   Across from him at the table.

8   Q   How long did you ask Mr. Snisky questions?

9   A   Approximately 15 minutes.

10  Q   What was the tone of your voice?

11  A   Conversational.

12  Q   And what was the tone of Mr. Snisky's voice?

13  A   The same.

14  Q   At any time while you were in the conference room with

15  Mr. Snisky, did you have your weapon drawn or displayed?

16  A   No.

17  Q   Did you touch Mr. Snisky in any way?

18  A   I don't believe so.

19  Q   Did you tell him he was not free to leave the building?

20  A   No.

21          MS. RHYNE:   I have no further questions.

22                     **CROSS-EXAMINATION**

23  BY MR. PEPIN:

24  Q   Will you tell me once and for all how you pronounce your

25  last name.

Special Agent Loecker - Cross

1  A   You bet.  It's Loecker.

2  Q   Loecker.  There were four of you approaching the building

3  at 710 Tenacity that first time that you went to the door,

4  right?

5  A   Yes, sir.

6  Q   You have mentioned that you heard Mr. Greeott in the office

7  next door to the conference room, where you were talking to

8  Mr. Sorrells, right?

9  A   Yes, sir.

10 Q   How did you know that was Mr. Greeott's office and that

11 that would have been him in there rummaging around?

12 A   Well, we had previously done an undercover operation at the

13 office and so I knew, generally, the layout.

14 Q   So you knew -- oh, go ahead.

15 A   I'm sorry.  And the doors to that conference room were

16 glass.  So I could also see out.  So if I remember right, I

17 looked back and saw him coming down the hallway, going into

18 that room.

19 Q   So you saw him, but you also knew the general layout of

20 building?

21 A   Yes, sir.

22 Q   You knew where the conference rooms were?

23 A   Yes, sir.

24 Q   The -- had you actually gone into the building for the

25 undercover?

Special Agent Loecker - Cross

1    A    No.

2    Q    Before -- as you were planning this execution of the search

3    warrant, was there a diagram of the building available that you

4    and the other agents discussed or used in your discussions in

5    planning?

6    A    I can't remember one way or the other.  That would be

7    normal, but I just don't remember that.

8    Q    That would be normal?

9    A    Yeah.

10   Q    The -- the approach to the building of this -- this was you

11   four, you have described, going up to the front door, after

12   seeing Mr. Snisky and Mr. Sorrells entering the building?

13   A    Yes, sir.

14   Q    In fact, you all had been waiting for approximately an hour

15   prior to that time?

16   A    We were there prior.  I don't remember if it was an hour or

17   not, but prior, yes.

18   Q    If the log suggested 7 o'clock is when you got there, do

19   you think that would be accurate enough or do you need to be

20   refreshed further on that?

21   A    You know, it was before that.  I really don't remember one

22   way or another.

23   Q    I think in front of you there should be Government's

24   Exhibit 1 and 2.  They maybe attached together; 2 will be the

25   one I'm going to ask you about?

Special Agent Loecker - Cross

1    A    You bet.

2    Q    Have you seen that before?

3    A    Yes.

4    Q    Is that a log that is completed by, it looks like,

5    Agent Spivey and Scott --

6    A    Yeah.

7    Q    Or Nielsen.  I'm sorry.

8    A    Yes.

9    Q    And does that indicate 7 o'clock a.m. was the time

10   surveillance was initiated?

11   A    I just wanted to be clear, I am not sure if I was there at

12   that time.  I don't know if that was your question or not.

13   Q    Fair enough.  As far as you knew, were other people there

14   surveilling the --

15   A    Yes.

16   Q    -- the -- the address, prior to the time you got there?

17   A    Yes, sir.

18   Q    Did you go by yourself or did you go in -- in company of

19   someone, when you went to the business address?

20   A    Well, I mean, the four of us approach the door together --

21   Q    I'm sorry, that was an inartful question.  When you went to

22   the actual scene, were you riding in a car with someone else or

23   were you riding by yourself?

24   A    I believe I was by myself.

25   Q    As -- but you had been waiting for Mr. Snisky to arrive?

Special Agent Loecker - Cross

1   *A*   Yes.

2   *Q*   Did you know Mr. Sorrells was going to be there, as well?

3   *A*   Yes.

4   *Q*   Did you know they were going to be coming together?

5   *A*   No.

6   *Q*   When they went into the building, your intention was to

7   basically follow them in, or to go and meet them, since they

8   were in the building; is that right?

9   *A*   Yes.

10   *Q*   Did you know where they had gone to, in the building?

11   *A*   No.

12   *Q*   You said that you had some familiarity, because of previous

13   work done with the office building.  So you had some sense of

14   what the size was?

15   *A*   Yes.

16   *Q*   You didn't know where they were in the building?

17   *A*   Correct.

18   *Q*   And your knock at the door was designed to get the

19   attention of one of the two of them, so they could come open

20   the door?

21   *A*   Yes, sir.

22   *Q*   You did not open the door yourself?

23   *A*   No.

24   *Q*   You still don't know, to this day, whether it was locked?

25   *A*   No, I don't know.

Special Agent Loecker - Cross

1   *Q*   And it's your recollection that Mr. Snisky is the person

2   who opened the door?

3   *A*   Yes, sir.

4   *Q*   Now, were you the person who was there -- you had done the

5   knocking, were you the one right there as the door was opened?

6   *A*   As my memory is, I was lead, if you will.  Doing the

7   knocking and did the initial, Hi, my name is, with Mr. Snisky.

8   *Q*   And you say that's your memory, but let's be clear, you

9   didn't write any of that down?

10  *A*   That's right.

11  *Q*   And that, of course, we know, January 17th, 2013?

12  *A*   Yeah.  That was the day, yes.

13  *Q*   So the door gets open, it's Mr. Snisky, and the way you

14  remember it is, you basically were just having a friendly

15  conversation?

16  *A*   Yeah.

17  *Q*   You -- he was outgoing; jovial, you said?

18  *A*   Yeah.  He was, Oh, come on in, we will talk, generally how

19  I remember him saying.  Very, welcoming.  And -- I would say

20  not exactly typical of our conversations, when we're doing an

21  interview of a subject.

22  *Q*   So he was welcoming?

23  *A*   Yes.

24  *Q*   Pleasant?

25  *A*   Yes.

Special Agent Loecker - Cross

1   Q   Friendly?

2   A   Yes.

3   Q   And when you say jovial, I'm afraid what comes to mind for

4   me is jolly old elf; is that what you mean?

5   A   I don't know about that.  He was -- he was not concerned

6   about our presence, I guess is what I mean.  Just, You want to

7   talk, let's talk, come on in.

8   Q   Okay.  And then you end up splitting up, and that was

9   really -- he suggested where you go?

10  A   As I remember it, Mr. Snisky sort of had taken a couple of

11  steps down the hallway towards the one conference room, and at

12  that point I kind of realized he was sort of expecting everyone

13  to follow him together, and as we had hoped to interview them

14  separately is when I said if you don't mind I would like to

15  have Mr. Sorrells interviewed separately, if we can find a

16  different room.  And again, my memory is those two quickly

17  glanced, said something, Use that conference room and I will

18  use that one, and off we went.

19  Q   And so you -- I think the way the question was put to you,

20  was something like, Mr. Snisky did not ask if he could leave

21  and I said, No he did not.  Something like that?

22  A   That topic never came up, him staying/leaving, in front of

23  me anyway.

24  Q   And you, of course, did not tell him that he was free to

25  go?

Special Agent Loecker - Cross

1   A   I did not.

2   Q   You didn't tell him that you had a search warrant you were

3   about to serve on his place?

4   A   I did not.

5   Q   Nor did any of the other four of you who were there -- or

6   three of you who were there at that time?

7   A   You talking about the initial -- at 8 o'clock, or whatever,

8   when we initially made entry, that is right, no one said that.

9   Q   Your first contact with Mr. Snisky, I guess, ever, right?

10  A   Yes.

11  Q   You did not inform him that you were going to do a search

12  warrant?

13  A   No.

14  Q   Did you inform him that you were investigating criminal

15  charges?

16  A   No.

17  Q   Did you inform him that he did not have to answer any

18  questions?

19  A   No.

20  Q   That he was free to go?

21  A   I didn't say that, no.

22  Q   And no one did?

23  A   Well, I can't speak what other people did outside of my

24  presence.  If you are talking about those two minutes that we,

25  sort of, got into individual conference rooms, no, no one said

Special Agent Loecker - Cross

1    that.

2    *Q*   Okay.  And so as Mr. Snisky is going down the hallway with

3    the other two agents, as far as you know, he didn't know that

4    he was being investigated for a crime?

5    *A*   Yes.

6          *MR. PEPIN:*  I don't have -- no.  I'm sorry.

7    *Q*   So, prior to the time that you went and spoke to

8    Mr. Snisky, at approximately 11:45, had you had any other

9    interaction with him, apart from that very first meeting?

10   *A*   I don't believe so, no.  I was tied up in different

11   interviews all morning.

12   *Q*   And when you went in to talk to him, you went in not by

13   yourself but with Mr. Queisert, as well?

14   *A*   Yes, sir.

15   *Q*   The -- you had some specific questions you wanted to ask

16   him?

17   *A*   Yeah.  I had some financial-related questions, transactions

18   out of the bank account.

19   *Q*   I'm sorry?

20   *A*   Transactions from his bank account.

21   *Q*   Had those been generated by conversations that you were

22   having with people during the course of the morning?

23   *A*   No.  I had a list of transactions that I was interested in

24   knowing more about.  I may have asked Mr. Sorrells and/or

25   Mr. Greeott about whose the names were on a couple payees,

Special Agent Loecker - Cross

1   whatnot, but it was my intent to ask Mr. Snisky, you know, he

2   was the signer on the bank account, the transactor of those

3   transactions, as I believed anyway, so my intent was to ask him

4   about those transactions.

5   Q   Did you speak with Special Agent Funk about her

6   conversations with Mr. Snisky, prior to the time you went down

7   there and talked to him?

8   A   I knew that he knew he was speaking, so I knew he had -- he

9   had not invoked his Fifth or anything like that, and so that

10  was -- and then we spoke briefly on the list -- I had given

11  that list, financial transactions, to, I think it was,

12  Rob Barnett, Inspector Barnett.  They touched on some.  I got a

13  very brief overview of what Mr. Snisky's answers were to those

14  questions of what these transactions were about, and I wanted

15  to followup on a couple more.

16  Q   And did you talk to Mr. Barnett, then, about those?

17  A   I believe it was Agent Barnett that I spoke with.

18  Q   When you spoke with Mr. Barnett, would that have been after

19  he was done interrogating Mr. Snisky or during it?

20  A   Um, it would have certainly have been after it started,

21  that's obvious.  I don't remember if they took a break.  We

22  spoke and he went back in.  I don't know, because again, I

23  was -- until I finished up with my interviews, I was -- it had

24  to have been at the end, I guess, as I'm thinking this through.

25  I was tied up with interviews, I came out, I think I spoke with

Special Agent Loecker - Cross

1  Rob for a couple minutes and then decided to go in and speak

2  with Mr. Snisky.

3  Q  Did Mr. Barnett tell you where Mr. Snisky was, at -- at the

4  time that he spoke with you -- let me rephrase that, please.

5        When Mr. Barnett spoke with you, did he tell you where

6  Mr. Snisky was at that time?

7  A  I don't remember.  I mean, I knew -- I was aware that he

8  was still in the conference room.  So I don't remember if Rob

9  had to tell me that or not.

10 Q  How do you know that he was -- Mr. Snisky was still in the

11 conference room?

12 A  As I remember I could see either through the -- the

13 courtyard area over into the conference room.  Maybe I just

14 assumed that, because there was activity over there, and I just

15 thought he was still there.  I don't remember if Rob said he

16 was or not.

17 Q  Did Special Agent Barnett mention Mr. Snisky leaving the

18 office building at any time?

19 A  No.

20 Q  Did he say anything about Mr. Snisky going, getting coffee

21 next door at a coffee shop called Vic's?

22 A  I don't remember that, no.

23 Q  Did he say anything about his reaction when he couldn't

24 find Mr. Snisky for a few moments?

25 A  No.

Special Agent Loecker - Cross

1    *Q*    I'm talking about Mr. Barnett?

2    *A*    I don't remember that, no.

3    *Q*    Did he say anything about his confronting Mr. Snisky about

4    where he had gone?

5    *A*    No.

6    *Q*    How about him actually physically grabbing ahold of

7    Mr. Snisky's arm and leading him back to the conference room?

8    *A*    He definitely didn't say anything like that.

9    *Q*    So you went in and spoke with Mr. Snisky.  You said it was

10   for about 15 minutes?

11   *A*    Yes, sir.

12   *Q*    Did you find yourself frustrated with the way he was

13   answering your questions?

14   *A*    No, sir.

15        *MR. PEPIN:*  I don't have any other questions,

16   Your Honor.  Thank you.

17        *MS. RHYNE:*  I have just just one, because I'm

18   concerned, perhaps, and I want to make sure the record was

19   clear.

20                        **REDIRECT EXAMINATION**

21   *BY MS. RHYNE:*

22   *Q*    A few moments ago, when you made a reference to Mr. Snisky,

23   did you say he was talking and therefore, you knew he had not

24   invoked his Fifth?

25   *A*    Yeah.  I was aware he had not invoked his Fifth, had been

Special Agent Loecker - Redirect

1   speaking with agents, and so therefore, the reason I got the

2   lowdown from Rob was -- was the financial questions that I

3   wanted to ask, had they been asked.

4   Q   But I was just trying to make sure, you didn't say he had

5   invoked.  You said he had not invoked?

6   A   He definitely had not invoked his Fifth.

7           MS. RHYNE:  No further questions.

8           THE COURT:  May the witness be excused?

9           MR. PEPIN:  No objection, Your Honor.

10          MS. RHYNE:  No objection.

11          THE COURT:  What is it you would have me do with

12   Exhibits 1 and 2?

13          MS. RHYNE:  Throw them away.

14          THE COURT:  No.  I mean, they have been looked at by

15   some of the witnesses, why don't you offer them, and then we

16   will go from there.

17          You can step down.  I'm sorry.

18          MS. RHYNE:  I'm happy to offer them, Your Honor.  The

19   only purpose I had them up there is to refresh recollection,

20   but at this point the Government offers Exhibit 1 and 2.

21          THE COURT:  And I will receive them.  It's a hearing,

22   I will take them for what they are worth.  I would ask that

23   Government counsel retain the originals, throughout the

24   completion of the proceeding and any subsequent appeals, if it

25   comes to that.

Special Agent Loecker - Redirect

1        THE COURT:  All right.  Mr. Pepin -- well, I suppose I

2   should go with Ms. Rhyne.  I assume you have no further

3   witnesses?

4        MS. RHYNE:  I have no further witnesses, Your Honor.

5        THE COURT:  All right.  Mr. Pepin.

6        MR. PEPIN:  Thank you, Your Honor.  I'm going to call

7   Gary Snisky to the stand.

8        THE COURTROOM DEPUTY:  Raise your right hand, please.

9      (**Gary Snisky** was sworn.)

10        THE WITNESS:  I do.

11        THE COURTROOM DEPUTY:  Please have a seat and state

12   your full name and spell your last name, please.

13        THE WITNESS:  Gary Snisky, S N I S K Y.

14                     **DIRECT EXAMINATION**

15   BY MR. PEPIN:

16   Q   Good morning, Mr. Snisky.  You settled there?

17   A   Yes, sir.

18   Q   Mr. Snisky, I would like to -- first off, you, of course,

19   are the person who is one of the people questioned by agents,

20   January 17th, 2013, at your office at 710 Tenacity, right?

21   A   Correct.

22   Q   Let me ask you, do you -- did you keep some sort of

23   specific record of the times that things happened to you that

24   morning?

25   A   No, I did not.

Gary Snisky - Direct

1   Q   Did you -- do you remember that morning?

2   A   Some of it, yes.

3   Q   When you went to -- did you go to your business?  Let me

4   start there.  Did you go to your business?

5   A   Yes.

6   Q   And what is that address?

7   A   710 Tenacity, Longmont, Colorado.

8   Q   Who did you go with?

9   A   David Sorrells.

10  Q   And did you ride separately or together?

11  A   No, we rode together.

12  Q   And how did that happen?  Was he staying with you?

13  A   He was staying at a hotel in Longmont, and I went in the

14  morning to pick him up.

15  Q   At the time that you went to pick him up, did you have any

16  idea that you were going to be seeing federal agents that

17  morning?

18  A   No, sir.

19  Q   When you -- what was going to be going on that day, as far

20  as you knew, in your business?

21  A   Him and I were going to have a meeting in the morning in

22  regards to two things, one --

23  Q   You don't have to identify what they were.  You were going

24  to have meetings?

25  A   Yes.

Gary Snisky – Direct

1   Q   You -- when you got to your office, I mean, you did arrive

2   at some point, did you not?

3   A   Yes.

4   Q   Did -- how did you go in?  Front door?  Backdoor?

5   A   Parked in the front and walked through the front door,

6   opened the door and walked through it.  Yes.

7   Q   At the time that you went into your office building, did

8   you see anyone you thought might be police or agents or anyone

9   like that?

10  A   No.

11  Q   Did you suspect anything was different than any other day

12  when you had walked to your office and go in the front door, as

13  you went in?

14  A   No.

15  Q   Do you know whether or not you locked the front door to

16  your office behind you?

17  A   It automatically locks.

18  Q   So as you walked into the office, do you recall where you

19  were when you first had some sense that someone was wanting to

20  speak with you?

21  A   Yes.  When you walk into the office there is, on your

22  left-hand side a counter, that's maybe about 5 feet.  You have

23  to go past that, continue to your left, there's a half door

24  that has to be opened, for you to walk down either of the

25  hallways.  The hallways are in a rectangular shape.  I was

Gary Snisky – Direct

1   approximately halfway down that hallway, going towards an

2   office I used in the back on the right-hand side, when there

3   was a -- not a knock.  It sounded like metal on metal.  It was

4   loud and quite grabbing of your attention.  There is no doubt

5   about that.

6   Q   How have you described that to me, in terms of the sound?

7   A   I take a metal pipe and hit the metal door and that's what

8   you heard.

9   Q   So -- as you were walking down the -- the hallway, you said

10  you heard this sound.  Where was David Sorrells in relationship

11  to you?  In front of you or behind you?

12  A   David was behind me and stayed in that first open area when

13  you first walk in, along that counter, and where that half door

14  is, that waiting area, if you would.  He was in that area

15  there.

16  Q   And so as you heard this sound, what was your response?

17  A   I turned around and looked at him and said, What the heck

18  was that?  And he said, I don't know, but that was one heck of

19  a knock at the door.  I says, Well, let's get the door and see

20  what that was, and he went right to the door.  Now, it's

21  happening at the same time, I'm walking back, he is right

22  there, so the space could be from here to that Dell monitor,

23  and I am walking back to it.  I have got to get past that half

24  front door, make a -- bear to the right.  The door had been

25  opened and everyone was opening at that point.

Gary Snisky – Direct

1   Q   Are you saying that you were near the front door at the

2   time that the door was opened or are you -- how far were you

3   saying you were from there when it was opened?

4   A   At least 10 feet.

5   Q   When you say the distance to the Dell monitor, is that --

6   what you are referring to approximately 10 feet?

7   A   Correct.  Because I had to turn around, come all the way

8   back.  It's not a large amount of space, but at least 10 feet.

9   Yes.

10  Q   So as you turn around, move back and David Sorrells opened

11  the door, you say?

12  A   Right.  You just have to turn the knob once.  The knob is

13  turned, it has to be opened, and then you just enter.  It's a

14  very large door.

15  Q   Does it open in, like pull towards, or does it go out,

16  towards the outside?

17  A   Once you unlatch it, those would open it, would pull

18  towards you, from outside.  So you pull towards you from

19  outside.

20  Q   Okay.  So Mr. Sorrells was the person who actually

21  physically opened the door and then what happened?

22  A   Well, by this time now I'm walking back, so I'm in that

23  common area, and there are -- the agents come through the door,

24  and we meet right -- right in -- middle space of that opening,

25  maybe 4 or 5 feet in from the door, of the main door, and 4 or

Gary Snisky - Direct

1  5 feet from where that half door by the counter is, we meet

2  right there.

3  Q   Now, you heard, I assume, Agent Funk testify that she got

4  within 2 to 3 feet of you.  Does that sound right to you?

5  A   Definitely 2 feet.  They are in your space, your personal

6  space.  There's no doubt about it.

7  Q   What was the demeanor you noticed as you were approached?

8  A   It was stern, upright, and in your space.

9  Q   And so what was said to you, in this case, or what did you

10  say?

11  A   Well, I said, Good morning.  May I help you?  And

12  Mr. Loecker, I think, was the one that responded and introduced

13  himself as someone that was there to speak with me, and -- and

14  was from the Treasury Department.

15  Q   Now, did you have a sense that this was -- did it feel to

16  you like a friendly exchange, basically coffee-shop greeting or

17  cocktail-party exchange?

18  A   Um, no.  You have someone directly in front of you, and you

19  have one to your left, and you have one -- someone to your

20  right.  So you are kind of getting boxed in.  No doubt about

21  it.

22  Q   Go ahead.

23  A   No, that's it.  You are not going anywhere.

24  Q   Who was doing the talking then?

25  A   At that point, Mr. Loecker.

Gary Snisky – Direct

1    Q   And what did -- when he asked you -- well, what did he ask

2    you?

3    A   Well he come in, I believe he introduced himself as someone

4    with the Treasury, they were there to ask myself and I -- I

5    don't remember him saying Mr. Sorrells, but definitely ask

6    myself some questions.  He wanted to ask them of me separate

7    from David Sorrells, and that he -- he knew the layout of the

8    building because he looked at me and said, I -- I could see

9    where David was and he says, Well, we can have one of you here,

10   and someone else in another room, and I said, Well, we can put

11   David in this room here, and I can walk us to another

12   conference room that we can sit in.

13   Q   Now were you feeling, at that time, as if you were being

14   asked questions or whether you were being given orders or what?

15   A   Well, it was dictatorial.  It's telling me we are going to

16   have a conversation.  We're going to have David in this room

17   where can we speak with you, as well.  And look, they're --

18   they are right there.  I'm not trying to be dismissive, I just

19   said, Okay, yes, whatever you wish.

20   Q   And so where did you go from there?

21   A   I would have turned around, we would have gone past that

22   half door, made a left, walked down the hallway, and on the

23   left-hand side would have been another conference room.

24   Q   Did you feel that you had no choice but to go with them, at

25   that point?

Gary Snisky - Direct

1    *A*    No.

2    *Q*    How about this idea of you being asked questions.  Did you

     feel that you had a choice?

4    *A*    No.

5    *Q*    Did anyone tell you that you don't have to talk to them?

6    *A*    No.

7    *Q*    Did you get any idea, at that point, that they were

8    investigating you for a criminal offense?

9    *A*    No.

10   *Q*    Did you ask them what this was about?

11   *A*    At a point when Ms. Funk -- Mrs. Funk was asking me

12   questions, yes, I did ask.

13   *Q*    Do you remember at what point during the questioning?

14   *A*    To me it -- it was rather early.  We went into that room,

15   we did sit down, I sat at the head, she did sit to my right,

16   and she began asking me some questions I do not remember what,

17   exactly, but to say you were there to ask me about an account,

18   and then it was accounts, plural, I didn't understand, and

19   said -- I did ask what this was about.  Yes.

20   *Q*    And did -- did you get a sense, at that point, that you

21   were free to leave?

22   *A*    Oh no.

23   *Q*    Did you ever leave the building?

24   *A*    Oh yes I did.

25   *Q*    So how -- how do you recall the questioning going,

1   generally.  Not what you responded, not what you said, but just

2   the kinds of questions that you were asked and statements made

3   to you in the room?

4   A   They were direct and with the connotation of I was

5   definitely doing something wrong.

6   Q   Did anyone ever use the word Ponzi?

7   A   Yes, they did.

8   Q   Do you recall who said that?

9   A   I believe Mr. Barnett.

10  Q   Was Mrs. Funk in the room at the time?

11  A   She was.  He was to my right and she was to my left.

12  Q   Now do you remember when that was?

13  A   To me it all happen at once, so I believe it was within the

14  first five/ten minutes we were actually discussing things,

15  because it caused my response to be, What is this truly about,

16  is, I believe were, my exact words.

17  Q   So was there any discussion or reference to shutting you

18  down or anything like that?

19  A   Yes.  When Mr. Barnett said something of the nature, This

20  is -- You are running a Ponzi scheme, and you are being shut

21  down, when I asked what this was about.

22  Q   Now, after reference to a Ponzi scheme, or reference to a

23  search warrant, did they ask you about a search warrant or

24  mention a search warrant at some point?

25  A   They did.  After I asked what this was in reference, what

Gary Snisky – Direct

1    was actually happening, yes, they did provide me -- Ms. Funk

2    provided me a two-page document that was a search warrant,

3    correct.

4    Q    Now did you feel after that that you were free to leave?

5    A    Oh definitely not.

6    Q    Now, did you ever -- were you ever told -- do you remember

7    being told that you can go if you want to?

8    A    Later in the day, yes, that's correct.  Later in the

9    morning.

10   Q    So let me ask you about -- at some point, when the other

11   agents were coming in to -- to search the building.  Do you

12   remember that happening?

13   A    Yes.

14   Q    And where were you when that happened?

15   A    Well, once it was acknowledged that they were coming in for

16   this -- the search warrant was acknowledged, agents started to

17   come in, yes, and you could see them through -- in that

18   conference room a lot of the wall or a large part of wall is

19   glass, so you can see them.  So you could see they were coming

20   to the building.  Yes.

21   Q    And did you have any interaction with those agents?

22   A    Um, very small amounts.  When I was in the conference room,

23   and they came into the room, at one point actually pointed out

24   some things that they may be interested in.

25   Q    Who did you point out things they might be interested in?

Gary Snisky - Direct

1   A   There was one gentleman that came into the room, he was

2   taking pictures, he had black cargo pants on, black boots,

3   midway up his waist, belt with his gear, and he had the camera,

4   something else around his neck, maybe a tag of some sort, and

5   then he was taking pictures of things, and I thought it was

6   important he didn't see these white boards and I thought they

7   were important so I pointed them out.

8   Q   So was that while you were in the room then or outside of

9   this conference room?

10   A   No.  I was inside the conference room, and I wasn't leaving

11   it, and I wasn't moving out of that room.  I was -- I was told

12   to stay there, so I wasn't going to go anywhere.

13   Q   So when you said that at some point you left the building,

14   at what point was that?  Do you know what time?

15   A   Well it had -- it had to be before 9, because Alison was

16   not in the room as of yet.  What happened was, Mr. Barnett

17   asked for a tour of the area, I took him on that tour, showed

18   him -- I walked around the -- the office, through its hallways

19   pointing out what office was what.  Who sat in that office.  He

20   also asked me to see the basement, if there was a basement.  I

21   did take him to the basement.  Went down there, showed him.

22   There was really nothing down there, just open and empty space,

23   a couple of old boxes, went back upstairs, showed him where the

24   two different lavatory rooms were, and that there was like a

25   utility room, and under that was also a -- like a crawl space.

1    He wanted to know about that, I showed him that.  And continued

2    through the little kitchenette area, and it was at that point I

3    looked at him and I said, Well, that's the tour, the lay of the

4    land.  I says, I would really like to get a cup of coffee, and

5    actually said to him, Would you like one as well, and he said,

6    No, I said, Okay, I'm going to get myself a cup of coffee.

7          At that point I don't remember exactly where he went,

8    I just exited the building, went to Vic's.

9    Q   Where is Vic's in relationship to your building?

10   A   If you walk out of the building, it is to the left, two

11   stores down, must be within 25 yards, at most.

12   Q   Is Vic's a coffee shop?

13   A   It is a coffee shop -- or was.  Sorry.

14   Q   Okay.

15   A   Went to Vic's, did get a cup of coffee, I don't know if it

16   took three to five minutes and started heading back to the

17   building, and when I was heading back to the building I saw the

18   agents, incidentally, the same one I saw in the room taking the

19   pictures in the conference room later in the day, they were

20   walking along the building, the space between the end of the

21   building, I guess that would be the west side, a walkway, and

22   then other buildings begin, and there were at least three to

23   four agents walking down that way.  It was obvious they were

24   looking for the front door, because they were going -- their

25   heads are moving from center to right center to right, while

Gary Snisky - Direct

1   they are walking north.  So they are looking east to see the

2   building, and I went over and around and said to them, No, you

3   are looking for this building.  The entrance is here.  I walked

4   a little bit further, just to be sure there were no other

5   agents in the back of the building, and I came back to the

6   building and actually held the door for some of them and they

7   came in.

8   Q   How did you know they were agents?

9   A   Well, black cargo pants, you have a belt with utilities on

10  them, including a weapon, you have tags around your neck, and I

11  mean I'm -- I have never seen that around Longmont before, in

12  Prospect Newtown, so.

13  Q   How many of those people that you saw were dressed that

14  way?

15  A   All the agents that came in, other than the four original,

16  I believe were dressed all similar.

17  Q   So you went back in the -- your office there at 710

18  Tenacity?

19  A   Correct.

20  Q   And when you went back in, did you see Mr. Barnett?

21  A   Oh I saw him.  He was definitely looking for me and came

22  right towards me in a very brisk-walking manner and said to me,

23  Where did you go?  And I said, I went to get coffee.   Along

24  the way he comes to me, positions himself then to my left,

25  takes his right arm and puts it up underneath my left bicep and

Gary Snisky - Direct

1   tricep here and holds me, begins to guide me back and just says

2   we have got to go back to the conference room.  He had ahold of

3   me that way, because to get through that half door you would

4   use your left hand then to open it, walk me back to that room,

5   and seen that I went back in there and sat down, and I looked

6   at him and I said, I told you I was getting coffee, I offered

7   to get you one.  He said, We didn't know where you were at.

8   What you may be up to.  We did not know you were leaving the

9   building.  Okay.  That's it.  All right.  So I wasn't moving

10  again after that.

11  Q   When -- do you know when that was?

12  A   Again, that had to be rather early.  The reason I say that

13  is it when Alison Leary did come to the office, I believe she

14  was in for 9 o'clock, she wasn't there as of yet.  So I

15  remember when she did arrive, I had asked could she be in here

16  with me, and it was okay that she could, and I remember her

17  walking in and saying, What is going on what's with all of

18  these people, and I said, I don't know.  Other than what I knew

19  at that time.

20  Q   Did you have your telephone with you during part of the

21  morning or all of the morning?

22  A   I did.

23  Q   Is there any time that you tried to look -- use the phone

24  or looked at the phone and you were asked questions about that?

25  A   Yes.  At some point, I did have my phone in my hand, and I

Gary Snisky – Direct

 1   had no contact with anyone, I didn't tell my wife, or anything,

 2   what was happening yet, and I believe while I had it in my hand

 3   I believe it was Mr. Loecker said to me, What are you doing

 4   with your phone?  Who are you calling?  Or made reference to

 5   what I was doing with my phone, and I just put it down and said

 6   nothing, lifted my hands like that, said, Nothing, nothing, I'm

 7   not doing anything.

 8   Q   Did -- did there come a time where you left the office that

 9   day?

10   A   Later in the day, when all of it was completed, I did leave

11   the office with Alison Leary.  Yes.

12   Q   You had -- you said with Alison Leary?

13   A   Yes.  She stayed with me the entire time.

14   Q   Is Alison Leary an attorney?

15   A   She is.

16   Q   And did -- do you know what sort of law Alison Leary

17   practices?

18   A   Um, it -- um ... think of the word.  Compliance.  She had

19   worked at mortgage-lending compliance before becoming an

20   attorney, so it would have been general compliance-type

21   contracts, things of that nature.

22   Q   To your knowledge, had she ever practiced criminal law?

23   A   No.

24   Q   And have you -- had you ever consulted with her concerning

25   issues involving criminal law?

Gary Snisky – Direct

1   *A*   No.

2   *Q*   Did you consult with her concerning the fact that you were

3   being questioned by these agents that morning?

4   *A*   No.

5   *Q*   Did you ask her what you should do or whether you should

6   ask questions -- or whether you should answer any specific

7   questions or anything along those lines?

8   *A*   No.

9   *Q*   Is there a way you can describe your emotional condition,

10   during that morning, after being confronted by these officers

11   and questioned?

12   *A*   Well, your emotions are all over the place.  You are not

13   sure exactly what's going on or why, at first, and everyone is,

14   obviously, in your space and taking all of your things.  So

15   your emotions are all over.  You worry about your family.  You

16   worry about your wife, your three daughters.  Your emotions are

17   just everywhere.

18   *Q*   So --

19   *A*   Up and down.

20   *Q*   You mentioned people being in your space.  The fact that

21   you were being questioned after having four agents come into

22   your office, did that give you a sense of comfort that you were

23   in -- in your offices, that it was somehow better and easier

24   for you because of that?

25   *A*   No.

Gary Snisky – Direct

1    *Q*   Why not?

2    *A*   Well, it's your –– it's your personal space.  It's your

3    personal work area.  It's –– you feel violated.

4         *MR. PEPIN:*  I don't have any further questions.  Thank

5    you, Your Honor.

6                    **CROSS-EXAMINATION**

7    *BY MS. RHYNE:*

8    *Q*   Mr. Snisky, you indicated that when you heard a knock on

9    the door, you thought it was a loud boom, like metal on metal;

10   is that right?

11   *A*   Correct.

12   *Q*   What is your door made of at 710 Tenacity?

13   *A*   Metal.

14   *Q*   Did you see anything metal in the agents' hands when they

15   came in the building?

16   *A*   No.

17   *Q*   What –– to what do you attribute this loud metal-on-metal

18   sound?

19   *A*   Well, it just sounded that way.  My father owned gas

20   stations, I grew up at them my whole life.  When I took a metal

21   pipe and hit it against something like a tire rim or something

22   of that nature, you know, metal on metal.

23   *Q*   Do you dispute the fact that Special Agent Loecker used his

24   hand to knock on the door?

25   *A*   No, I do not.

Gary Snisky – Cross

1    Q    Somehow that generated a metal-on-metal sound?

2    A    To me, it was metal on metal, what they actually utilized I

3    could not see.  The door was closed.

4    Q    Now, you mentioned that your front door locks automatically

5    at your office; is that correct?

6    A    Correct.

7    Q    And you claim that you were halfway back into the office

8    space when David Sorrells opened the door; is that right?

9    A    Correct.  He would have unlatch -- he unlatched it.

10   Q    And did he invite everyone in?

11   A    Oh, I don't know that.

12   Q    How many feet away were you?

13   A    When I turned around, I was coming back, I was at least 10

14   feet away.

15   Q    Ten feet away.  You couldn't hear what he was saying?

16   A    Well, no.  He opened the door or unlatched the door, the

17   door was pulled open and you could just see four people coming

18   in.  So I was concentrating on the four people.  I said hello

19   and --

20   Q    Is it your testimony that four people came in uninvited?

21   A    The answer would be yes, because I didn't have the

22   opportunity, other than that, to meet them, in that space, at

23   that time.

24   Q    And no one -- they came in without being encouraged to come

25   in by either you or Mr. Sorrells, is that your testimony?

Gary Snisky - Cross

1   A   I don't recall any -- any other of -- I just don't recall.

2   Q   Do you recall Mr. -- Special Agent Loecker introducing the

3   agents to you and Mr. Sorrells?

4   A   I do remember him telling me who he was.  Yes, and I may

5   have introduced Ms. Funk.  I don't remember.

6   Q   And your recollection is that he used the word that he is

7   with Treasury?

8   A   I believe he said I'm with the Treasury Department, yes.

9   Q   Didn't say I.R.S.?

10  A   I thought I heard Treasury Department, but that's what I

11  recall.

12  Q   And how soon were they right up in your face?

13  A   Well, if I was taking three or four steps coming towards

14  that front door, they are taking three or four steps in, maybe

15  three seconds.

16  Q   And was everybody in your face, or did anybody stay in

17  Mr. Sorrells' vicinity?

18  A   I didn't -- I did not see what was happening with

19  David Sorrells.  I could just tell it was obviously one in

20  front of me, to my right and to my left, and very close.

21  Q   And who were the agents who were very close to you?

22  A   I remember Mr. Loecker and Agent Funk.  I do not remember

23  who was to my left.

24  Q   And where was Ms. Funk positioned?

25  A   I believe she was to my right.

Gary Snisky - Cross

1    Q    And where was Special Agent Loecker positioned?

2    A    In front of me.

3    Q    And how many feet were each of them from you?

4    A    About 2 feet.

5    Q    And that caused you to feel that they were in your face?

6    A    Well, yes.

7    Q    And that caused to you feel that you were, quote/unquote,

8    boxed in?

9    A    Oh yes.

10   Q    And they were being dictatorial, at this time; is that

11   right?

12   A    Yes, definitely.

13   Q    And you felt you had absolutely no choice but to talk to

14   them?

15   A    You do not have any choice but to talk to them, at that

16   point.  Yes.

17   Q    Well, I'm asking you what you felt?

18   A    That I had no choice but to speak to them.

19   Q    Now, why is that?  Why didn't you say, for example, I don't

20   want to talk to you?

21   A    I did not say that, no.

22   Q    Why?

23   A    Well, because you want to cooperate with authority.

24   Q    That's true.  Well, excuse me, let me take that back.  You

25   wanted to cooperate, right?

Gary Snisky - Cross

1   A   At any time authority is in your space, I do want to

2   cooperate.  Yes.

3   Q   And you felt that you could tell them a convincing story

4   and make this problem go away, right?

5   A   No.  It's not a problem that was going away.  I didn't know

6   what the problem was, at that time.

7   Q   In fact, during the first half of the interview, you gave

8   your version of the events, which would have been very

9   exculpatory, correct?

10  A   I told them what I thought was happening, they asked me

11  some questions, I tried to answer them.

12  Q   In the most favorable fashion for yourself, correct?

13  A   I -- yes.

14  Q   And you wanted to give them that story, didn't you?

15  A   I'm not sure what the story is, without specifics, but I

16  did try to answer their questions.

17  Q   For example, you wanted to tell them that you ran a company

18  that was offering Ginnie Mae bonds?

19  A   Yes.

20  Q   You wanted to tell them your company fell within Reg. D of

21  the SEC's regulations?

22  A   Correct.  We filed for Reg. D, and was accepted.  Yes.

23  Q   You wanted to tell them that you used personal

24  relationships to find higher net worth or credit investors?

25  A   Within the confines of Reg. D.  Yes.

Gary Snisky - Cross

1   Q   There were a lot of things that you wanted to tell these

2   investigators, correct?

3   A   Not a want, it's a response to a question that is being

4   asked that I thought was to be answered.

5   Q   You had a version of the events that you wanted to tell

6   them?

7         MR. PEPIN:   I think -- Your Honor, she -- he has

8   answered that.   It wasn't want, that it was in response to the

9   questions, and I think it's done.

10        THE COURT:   Can you move on?

11        MS. RHYNE:   Certainly.

12    Q     (By Ms. Rhyne) Do you recall leading them to the

13   conference rooms that should be used for these interviews?

14   A   I recall leading them to the one I was in.   Yes.

15   Q   Do you recall telling Mr. Sorrells where he should be

16   interviewed?

17   A   I did not have to, Mr. Loecker made clear that the first

18   room he saw, and he went like this to me, as he is facing me,

19   and the door is behind me, he says, We could use this

20   conference room here, and I said, Yes, Mr. Sorrells can be in

21   there.   His stuff is already there.   Then I will walk you down

22   to the larger conference room.   Yes.

23   Q   So your testimony is that was not your decision, it was

24   Mr. Loecker's?

25   A   It was -- it seemed to me they already knew that that room

Gary Snisky - Cross

1   was there and they wanted to use it, and I didn't think

2   anything of it.  David's computer was already in there.  His

3   laptop, I think.

4   Q   Is it your testimony that you were not the one to direct

5   them --

6   A   Yes.

7   Q   -- which conference room to use?

8   A   Yes.

9   Q   Now, you mentioned that after the questioning began, you

10  asked, What is this all about?

11  A   At some point I did, yes.

12  Q   Why did you feel comfortable asking that question at that

13  point?

14  A   Wasn't comfortable.  It was when I heard certain terms

15  being used and I didn't understand.

16  Q   Well why, for example, didn't you ask at the door?

17  A   I didn't.  I didn't think I had a choice.

18  Q   But several minutes later you felt you had the choice?

19  A   Well, there's a barrage of questions coming at you, and I

20  just thought, This isn't about asking me about an account.

21  This is something else.  So I asked, This isn't what you are

22  claiming it is.  It is definitely something else.  What is it?

23  Q   And you indicated that Mr. Barnett, Inspector Barnett,

24  indicated that you were running a Ponzi scheme?

25  A   At some point, yes, the word Ponzi was used.  Yes.

Gary Snisky - Cross

1    Q   Do you know what a Ponzi scheme is?

2    A   From Mr. Ponzi and the history of it, yes.

3    Q   Doesn't that including the fraudster actually giving money

4    to investors in the form of interest, in order to encourage

5    other investors to put their money in the program?

6    A   I don't have the -- the exact definition in front of me.  I

7    can just say he used the word, and it definitely grabbed my

8    attention.

9    Q   Well, you weren't running a Ponzi, were you?

10        MR. PEPIN:  Objection, Your Honor, that is outside of

11   the scope.

12        THE COURT:  Sustained, sustained, sustained.

13        Q    (By Ms. Rhyne) You indicated that you did not feel

14   free to leave?

15   A   That's correct.

16   Q   Starting when did you not feel free to leave?

17   A   When I came back from getting a cup of coffee.

18   Q   Okay.  What about when the agents first came into the

19   building, did you feel free to leave then?

20   A   No.  If -- if I had, I would have asked.  I definitely did

21   not.

22   Q   So from the beginning you didn't feel free to leave, until

23   what point in time did you feel free to leave?

24   A   Never felt free to leave.  When Mr. Barnett and I were done

25   walking through the building, I made reference to, We have a

1    coffee maker in the kitchen and no more coffee, and I said, I

2    would like to have a cup of coffee, and he said, Okay, you can

3    have a cup of coffee.  I said, Can I go get a cup of coffee?

4    Yes?  And I also asked him, Would you like a cup of coffee?  He

5    said, No, and kind of laughed, and I went to get a cup of

6    coffee.

7    Q    Let me walk back through the timeframe.  You indicate that

8    you gave Mr. Barnett a tour of your building?

9    A    Correct.

10   Q    Was this during the interview, before the interview or

11   after the interview?

12   A    I'm not sure what you mean by interview.  They are with me

13   the entire day and questions were asked the entire time, during

14   some of the questions asked, we did, being myself, Mr. Barnett

15   and I believe Ms. Funk, at some points, did leave the

16   conference room, and then come back into the conference room.

17   Yes.

18   Q    So let me try and help you with the timeframe.  You have

19   heard Special Agent Funk testify that she began interviewing

20   you with Inspector Barnett, at approximately 8:10 in the

21   morning.  Do you recall that happening?

22   A    Correct.

23   Q    Is that consistent with your memory?

24   A    Correct.

25   Q    And she indicated that that interview concluded at

Gary Snisky - Cross

1   approximately 9:30 a.m.  So it lasted about an hour and 20

2   minutes.  Is that consistent with your testimony -- excuse me

3   your memory?

4   A   I believe so, yes.

5   Q   Was it during that one-hour-and-20-minute period that you

6   gave Mr. Barnett a tour of the building?

7   A   At some point within that timeframe we had -- we must have.

8   The reason I say that is, Alison Leary was not in the room with

9   us, as of yet, and if she arrived at 9 a.m., and came into the

10  room, had to be prior to that.

11  Q   So you believe this hour-and-20-minute interview was

12  interrupted so you could give Mr. Barnett a tour of the

13  building?

14  A   Well, I was asked to provide --

15  Q   Yes or no?

16  A   Yes.

17  Q   And how long did that tour take?

18  A   Maybe -- good ten minutes, because we did go to the

19  basement, as well.

20  Q   So at least a ten-minute tour, after which time you wanted

21  to get coffee?

22  A   I had just asked -- yes.

23  Q   And Mr. Barnett let you leave the building to get coffee?

24  A   I'm not sure he thought I was leaving, but yes.

25  Q   So you were allowed?  No one restrained you?

Gary Snisky - Cross

1   *A*   Not until I came back.

2   *Q*   Why did you come back?

3   *A*   Because it was my responsibility to, I thought.

4   *Q*   Was anybody following you to the coffee shop?

5   *A*   I didn't -- I couldn't tell that.  No.

6   *Q*   Did anyone order you to come back to the building?

7   *A*   No.

8   *Q*   After you left the building, did you still feel that you

9   were boxed in?

10  *A*   Can you -- no.

11  *Q*   Did you feel that someone would come arrest you at the

12  coffee shop if you didn't return?

13  *A*   No.

14  *Q*   Did anyone threaten to do that?

15  *A*   No.

16  *Q*   So you came back to the building, because you wanted to?

17  *A*   Correct.

18  *Q*   At approximately what time was that?

19  *A*   Again, that had to be before 9 o'clock, because Alison

20  wasn't there yet, so I would have to say somewhere between 8:30

21  and 8:45.

22  *Q*   Okay.  So during this hour-and-20-minute interview, where

23  you felt you didn't have any choice but to speak to the

24  investigators, you took a break to give Mr. Barnett a

25  ten-minute tour of the building, and you left the building to

Gary Snisky - Cross

1   go get coffee?

2   A    That did -- yes.

3   Q    And it's still your testimony that you felt you had no

4   choice but to answer questions when you returned?

5   A    Absolutely.

6   Q    It's also your testimony that Mr. Barnett asked about a

7   crawl space?

8   A    He did ask about all of the space involved.  He did ask

9   about the basement, which I took him to.  I showed him all

10  areas that I could, and when you open up that door, the double

11  doors for this utility room/closet, there is a square on the

12  floor with a handle, and he wanted to make sure what that was.

13  Yes.  So I told him.

14  Q    And you -- how long were you gone getting coffee?

15  A    It had to be around five minutes, maybe.

16  Q    And it was while you were still outside of the building

17  that you were holding open doors for other agents to enter the

18  building?

19  A    It was within the walk back that I did see the agents

20  walking, and I did call to them to let them know they were

21  going in the wrong direction, and yes, as we came back, I

22  opened the door, because it opens towards you, held it, they

23  walked in and I followed behind them, at which then Mr. Barnett

24  made it very clear to me --

25  Q    You have answered the question, Mr. Snisky.

Gary Snisky - Cross

1        When you were opening the door were you being

2  congenial to these agents?

3  A    Yes.

4  Q    Because that's your demeanor that you like to put on,

5  right?

6  A    I want to be safe in an environment that I'm threatened in,

7  so I was very cordial.

8  Q    And you were very congenial when the agents first entered

9  the building, weren't you?

10 A    I don't know who they are, so yes, Good morning, how are

11 you, is congenial, yes.

12 Q    When they asked you, We would like to talk to you, you

13 said, Yes, of course, no problem, in a very welcoming tone?

14 A    Okay -- yes.

15 Q    Now we will get back to when you entered the morning, you

16 claim that Mr. Barnett saw you, and despite the fact that he

17 let you leave, he appeared now upset that you had gone?

18 A    He was definitely looking for me.  He did not know I was

19 leaving the building.

20 Q    Okay.  And he briskly came up to you and demanded where you

21 went; is that your testimony?

22 A    Yes.

23 Q    And then he grabbed your arm?

24 A    Yes.  Underneath the left arm, bicep and triceps, to lead.

25 Q    And what happened next?

Gary Snisky - Cross

1    A    I was led back to the conference room and along the way it

2    was explained they didn't know where I was, wanted to make sure

3    I wasn't up to anything or doing anything, and I said, No, I

4    told you I was getting a cup of coffee.

5    Q    And what happened once you were back in the conference

6    room?

7    A    I sat down and was just sitting there.

8    Q    Did your interview continue?

9    A    Yes.  It continued most of the day.

10   Q    Well, I'm focusing on the part that you heard Special Agent

11   Funk testify about that she was participating in and that

12   concluded approximately 9:30 a.m.  Did she and Inspector

13   Barnett interview you after you returned to the conference

14   room?

15   A    Conversation continued, yes.

16   Q    And at what point in time did Ms. Leary join the

17   conversation?

18   A    I believe when she did arrive and I did hear her, I asked

19   if she could come into the room.

20   Q    Wasn't that after you had been informed there was a search

21   warrant that was going to be executed that day?

22   A    Yes.

23   Q    And so how was it that you left the building and observed

24   other people coming in to participate in the search warrant,

25   before you had been given a copy of the search warrant?

Gary Snisky - Cross

1  A   The -- I'm not sure what you are saying.  The search

2  warrant was given to me and people were coming in and out and

3  that was happening.

4  Q   Well, your testimony is that you went for coffee before

5  Ms. Leary came to the building; is that right?

6  A   Yes.

7  Q   And that would have been before 9 o'clock, you said, right?

8  A   I believe -- yes.

9  Q   And already, during that trip for coffee, you were seeing

10 other people dressed in this camo, you know, cargo-pant attire

11 that you described entering the building?

12 A   Yes.

13 Q   Your testimony is that happened before you were given the

14 search warrant, correct?

15 A   No.  I didn't say that, no.

16 Q   So when were you given the search warrant?

17 A   I -- if I'm -- my recollection is I asked -- when I first

18 asked what was happening, Ms. Funk did tell me that a search

19 warrant was being executed on the property and gave me a --

20 provided me copy for it.

21 Q   That was before you went for coffee?

22 A   I can't recollect exactly.  No.  But it had to be because

23 the agents were already coming into the building.

24 Q   But you don't recall?

25 A   I do not recall.

Gary Snisky - Cross

1   Q   And you don't -- in response to getting that search

2   warrant, do you recall specifically asking for Ms. Leary to be

3   invited into the interview?

4   A   I had always wanted Ms. Leary in to the interview as soon

5   as she arrived.

6   Q   The question is, do you recall, specifically, asking, at

7   that time, that she be invited into the interview?

8   A   No.

9   Q   Do you deny that that happened?

10  A   I don't recall that exact -- that -- that exact way of it

11  happening.

12  Q   So how do you recall Ms. Leary entering the interview room?

13  A   I just remember hearing her voice and asking for her.

14  Q   And when do you believe that happened?

15  A   When she first arrived and I could hear her.

16  Q   How much of the interview remained, after she had joined

17  you with Special Agent Funk and Inspector Barnett?

18  A   She was with me the rest of the day, so I couldn't tell you

19  exactly what was left with Ms. Funk, but she was there with me

20  for the remainder of the day.

21  Q   And no one denied you the ability to have Ms. Leary come

22  into the room?

23  A   No.

24  Q   Now, you mentioned this incident of pulling out your phone.

25  When did that happen?

Gary Snisky – Cross

1    A   I couldn't recall what time during the day.  It had to be

2    early, because this was all happening and I wanted my wife to

3    know, so I couldn't tell you, but it had to be early.

4    Q   Was it before 9:30 or after 9:30?

5    A   Oh, it had to be before 9:30.

6    Q   Was it before you went for coffee or after you went for

7    coffee?

8    A   That I don't know.

9    Q   Did you call your wife from the coffee shop?

10   A   No, I did not.

11   Q   Why not?

12   A   I didn't have my phone with me.

13   Q   Did someone take your phone?

14   A   No.  I left it on the table, in plain sight.

15   Q   Oh, did you ask anybody in the coffee shop if you could

16   borrow their phone?

17   A   No.

18   Q   Did anybody prevent from you doing that?

19   A   No.

20   Q   In fact, did anybody prevent from you driving home to

21   inform your wife that you were under a search warrant or being

22   interviewed by the authorities?

23   A   No.

24   Q   Okay.  Mr. Snisky, you are a man who often tells lies in

25   order to get out of a tight spot, correct?

Gary Snisky – Cross

1          THE COURT:  Sustained.

2          MR. PEPIN:  Object.  Thank you.

3          MS. RHYNE:  Your Honor, goes to his credibility.

4          THE COURT:  Sustained.

5          MS. RHYNE:  I have no further question -- you know

6    what, I do have further questions.

7          Q    (By Ms. Rhyne) Other than this supposed incident

8    where Mr. Barnett grabbed you under the arm and led you back

9    into the conference room, did anyone else touch you that day?

10   A    No.

11   Q    Were you ever handcuffed?

12   A    No.

13   Q    Were you ever told that you were not free to go home?

14   A    No.  I was told not to leave the building.

15   Q    And when was that, exactly?

16   A    When I came back from the coffee shop.

17   Q    You were told not to leave the building.

18   A    Mr. Barnett made it clear, Please do not leave the

19   building.  We need to know where you are at at all times.

20   Q    Do you recall Special Agent Funk specifically telling you

21   you were free to leave or you could stay?

22   A    Later in the morning, yes.

23   Q    At approximately --

24   A    About noontime.

25   Q    9:30 in the morning, do you recall her telling you that?

Gary Snisky - Cross

1   A   No, I do not.

2   Q   Do you believe that did not happen?

3   A   I cannot say that.

4   Q   One way or the other?

5   A   I cannot say that.

6   Q   Did anyone threaten you while they were there?

7   A   No.

8   Q   Did anyone physically punish you in any way?

9   A   They had me sit in a room, is pretty much punishment in my

10  eyes; that's my opinion.

11  Q   Was Ms. Leary prevented from leaving the building?

12  A   Not that I'm aware of.

13  Q   Were you threatened with any particular charges if you

14  refused to answer questions?

15  A   No.

16          MS. RHYNE:  I have no further questions.

17          THE COURT:  How long, ballpark, Mr. Pepin?

18          THE DEFENSE:  A minute.

19          THE COURT:  Okay.

20                    **REDIRECT EXAMINATION**

21  BY MR. PEPIN:

22  Q   I asked you, when you first started testifying, whether or

23  not you had kept some sort of log regarding all of these

24  different times.  I think your answer was no?

25  A   No.

Gary Snisky – Redirect

1   Q   So do you know exactly when everything happened?

2   A   No.

3   Q   Do you have some sense as to -- let me rephrase that.

4       Had you gone for coffee and then ran away, left, do

5   you have any sense as to what the response by the law

6   enforcement agents in your office might have been?

7   A   Yes.

8   Q   And?

9   A   They would have been at my door at my home.

10      MR. PEPIN:  No further questions, Your Honor.

11      THE COURT:  All right.  Let me take a brief, and I

12  mean brief, recess till 11:25.  I just want to give my reporter

13  a chance to rest her fingers.  So we will -- and then I will

14  take argument on this, briefly.  I'm sorry.  I'm assuming that

15  Mr. --

16      MR. PEPIN:  Yes.

17      THE COURT:  -- Mr. Snisky is done with his testimony

18  and he may be excused from the witness stand?

19      MS. RHYNE:  Yes, Your Honor.

20      THE COURT:  All right.  We will be in recess.

21      THE COURTROOM DEPUTY:  All rise.  Court is in recess.

22      (Recess at 11:18 a.m.)

23      (In open court at 11:24 a.m.)

24      THE COURT:  Please be seated.  Ms. Rhyne.

25      MS. RHYNE:  Your Honor, I believe it's Mr. Pepin's

Gary Snisky - Redirect

1   motion.

2           *THE COURT:* Fine.  Mr. Pepin.

3           *MR. PEPIN:* Thank you, Your Honor.  I'm going to keep

4   this brief.  You have heard the testimony.  The basic structure

5   of this is that Gary Snisky was confronted by four police -- or

6   excuse me, four law enforcement agents, whether they were

7   wearing suits or otherwise, they came to his apartment -- or

8   his -- his business at the early morning hours, immediately

9   after Mr. Snisky went to work.  He had no sooner walked in the

10  door, there was a banging at the door, I believe that it was

11  likely loud and hard, intended to get the attention of the

12  people who were inside, no matter where they were in the

13  building, so that they would respond to the front door.

14          I'm not going to try and turn that into a complete

15  banter, or something, about this, but I think the basic thing

16  that we see, based upon that and just everything here is that

17  law enforcement wants to paint this as everybody was -- that

18  they came up, basically knocked on the door, if they had gotten

19  away with it, they likely would have said tapped on the door,

20  that the door got opened, that they all had a nice friendly

21  conversation, that there was no control of the building, there

22  was no control of the situation, it was just a jovial

23  Mr. Snisky, happy to see everybody, and who plopped everybody

24  down in the rooms that he wanted them to be in.  When the

25  reality would almost certainly be that there was a loud knock

1    to get attention, to get people to the door, and then an

2    immediate confrontation so that the situation would be

3    controlled, likely so that Mr. Snisky wouldn't feel he had a

4    choice, because they certainly didn't tell him he had a choice,

5    and, of course, there was no advisement that he could leave,

6    there was no advisement that he didn't have to talk to them,

7    and then they paired up and two agents per person were plopped

8    down into conference rooms.  If -- once Mr. Snisky knew he

9    needed a second conference room, he, of course, knew the

10   building, the fact that he would lead the way to that is hardly

11   dispositive of this issue.

12           He then sits down and is asked a series of questions.

13   He didn't keep a log of when things happened.  And -- except

14   for when they got there and the like, neither did the agents,

15   or what really was happening, or how, really, it was happening.

16   We -- Mr. Snisky has to talk about this since -- this situation

17   with regard to going and getting coffee and the like exactly

18   when that happened, his memory is that it happened fairly

19   early.  His reason for thinking that is because it's before

20   Alison Leary comes.  He didn't keep a log of it.  Of course

21   that wouldn't quite be his charge.  He wouldn't be in a

22   position of recording anything.  He wouldn't be in a position

23   of having the materials there to do that.  He wouldn't have

24   several people who could be keeping notes and the like.

25           He, in fact, was the target, and the point, of course,

1    was to keep him as off guard and as open as possible, until

2    such time as he suspected something was up.  And I think -- I

3    may be wrong, but I think in counsel's motion, the way she

4    describes it, until he suspected there was an issue, and then

5    asked a question about it, and that's when they talked about --

6    they got into the search-warrant issue.

7         So we have a controlled atmosphere that he didn't feel

8    he had a right -- a right to leave.  At some point during that,

9    he goes and simply gets a cup of coffee next door, the notion

10   that he would, at that point, sprint away, and hide from the

11   police or go someplace else, is, really, I don't know, just

12   silly, yet did he have the ability to leave?  Of course,

13   apparently he always had the ability to leave.  He wasn't

14   handcuffed and he wasn't locked in a room.  But what he thought

15   the situation was is a whole different matter.

16        And you know, I know that there is this discussion,

17   and you see it throughout the cases and the like, that there's

18   a difference between a conversation or a series of questions or

19   an interrogation in a -- in someone's home or their place of

20   business, and that that is less intrusive, and that it's less

21   controlling, and that a person has a better opportunity to feel

22   the comforts of their own stuff.  And I think that Mr. Snisky

23   put it very well, and that's that, probably has exactly the

24   opposite affect.  Someone storming into your place of comfort,

25   taking it, intruding into it as their own and -- and getting

1    into your business, and then when they are asking you

2    questions, if they don't like the way you are responding,

3    confronting you and saying that you are not asking -- or

4    answering the questions the way you were supposed to, and doing

5    that numerous times; all of that.  Wondering what you are doing

6    when you pick up your phone.  Telling you, you have to go back

7    in this conference room.  Actually putting a hand under your

8    arm and leading you back in there, when you didn't think that

9    you had been doing anything wrong.  All of this contributes to

10   the atmosphere that is police dominated, law-enforcement

11   dominated, and that's what this was.

12          Four agents, to start with, dominating the situation.

13   Eventually 13 completing the domination.  Mr. Snisky not being

14   in a position where he knows where other people are; meaning,

15   Greeotts come and go, if they come and go, that that's going

16   on.  He knows that Mrs. Leary comes.  Doesn't know anything

17   about her ability to be free to leave.  And that entire

18   package, throughout all of these statements, both sets that are

19   described here, lends itself to a situation of custodial

20   perception that a reasonable person would believe that they

21   would not be free to leave that scenario.  And he wasn't

22   advised of his rights in that context, and he should have been

23   advised of his rights in that context, and so, without that

24   advisement, these statements should not be allowed.  We would

25   ask that the Court suppress them.

1          THE COURT:  Ms. Rhyne.

2          MS. RHYNE:  Thank you, Your Honor.  First, I also want

3    to make sure, because I thought the motion was a little

4    internally inconsistent, that the only statements Mr. Snisky is

5    seeking to suppress today are those that were made on September

6    17 -- excuse me -- January 17th, 2013, and not the subsequent

7    ones made with his attorney present; is that right?

8          THE COURT:  That's my understanding of the motion.

9          MR. PEPIN:  I did not file a motion concerning the one

10   where he went with Ms. Krupa and sat down with you and

11   everybody else.  No, I did not.

12         MS. RHYNE:  Thank you.

13         So the first question is whether or not Mr. Snisky was

14   in custody, and therefore was required to be given his *Miranda*

15   rights, and the facts demonstrate, clearly, he was not.  And

16   this is not a question of whether or not Mr. Snisky was happy

17   that day, was he comfortable that day; the question was, was

18   his freedom of action curtailed to the degree associated with

19   formal arrest?  And formal arrest includes being handcuffed,

20   being placed in the back of a police car, have someone hold on

21   to you at all times, and you are not allowed to wander off for

22   coffee in the middle of an interview.

23         We don't have that here.  Now, while Mr. Pepin tried

24   to paint the -- the entrance of the building and the tone of

25   the agents as of one of domineering, and hoping to keep

1    Mr. Snisky off kilter.  That's not what the testimony was.

2    Special Agent Funk specifically said it was her goal to keep

3    him comfortable, because then he might choose to talk to her.

4    She wasn't trying to intimidate him.  And I think that's what

5    the evidence demonstrates.

6          Mr. Snisky, obviously, paints a different picture, but

7    his testimony was internally inconsistent, and I submit that it

8    was not worthy of any credibility at all.  First, he says that

9    they approached in a stern dictatorial tone, they -- that he

10   was not free to leave, he felt boxed in, but then about 40

11   minutes later he accidentally wanders off for coffee -- not

12   accidentally on his part, but it makes sound like that agents

13   somehow lost sight of him, wasn't sure where he was.  Did he go

14   to the kitchen for coffee or leave the building?  But that

15   doesn't happen when someone is under the equivalent

16   circumstance of arrest.  Someone is holding onto you and

17   handcuffing you at all times.  That is absolutely inconsistent

18   with his statement that he didn't feel free to leave, because

19   he did leave.  And from Mr. Pepin's argument, I think he would

20   have the Court believe that even while he was in the coffee

21   shop, he didn't feel free to leave, because, gosh, there might

22   be consequences for that, and there's no case authority to

23   support that position.  Obviously, if you did leave, you felt

24   free to leave, and Mr. Snisky testified that he did.

25          He also claims that Special Agent Loecker told him to

1 put his phone away, at some point, before 9 o'clock.  But we

2 know that isn't possible, because Mr. Loecker wasn't in the

3 room with him before 9 o'clock.  He was interviewing

4 Mr. Sorrells.  So again, his testimony wasn't just mixing up

5 times, he was creating events that didn't happen and they

6 didn't hold up under Cross-examination.

7 What did happen in this case is that the agents came

8 to Mr. Snisky's office, and it isn't just a conversation about

9 being in a place that isn't police dominated that allows for an

10 inference to favor the fact that there is no custodial

11 situation happening, it's case law.  We have *United States vs.*

12 *Ritchie*, at 35 F.3d, 1477, at page 1485, Tenth Circuit, 1994

13 case.  And we also have *United States vs. Revels*, 510, F.3d,

14 1269, at page 1275, a Tenth Circuit case from 2007, both

15 indicating that where someone is at a location that is

16 controlled by the defendant, it is less likely that he will be

17 intimidated and feel that he has truly no choice but to

18 cooperate and feels that he is in the equivalent of a custodial

19 situation.

20 In the *Revels* case we see facts that can overcome that

21 type of presumption.  In the *Revels* case, the police went to

22 the defendant's home, they handcuffed her, placed her face down

23 on the floor while they secured her residence for a search

24 warrant.  Nothing approaching that happened in this

25 circumstance, even under Mr. Snisky's less-than-credible

1    testimony.  At worst, he was abruptly grabbed by the arm, if

2    you lend credibility to that testimony.  And that does not come

3    close to approaching a situation where the ordinary and

4    objective person would feel they have been placed in custody.

5         Instead, we have him behaving in a jovial manner,

6    inviting the agents in, directing them to which conference

7    rooms they should sit.  No weapons were displayed or drawn at

8    any time.  During most of the interview, no other people were

9    present as far as other agents, so this idea in the motion that

10   they swept in and started searching the place while the

11   interviews were happening, just didn't happen.  It was probably

12   about 75 percent into the interview that he became aware of the

13   search warrant, and became aware that there were other agents

14   who were going to come into the premise and search it.  So none

15   of that can contribute to any sort of police-dominated thought

16   or atmosphere.

17        After Mr. Snisky asked what this was about, he was

18   given a copy of the search warrant.  He was specifically told

19   by Special Agent Funk that he was not under arrest.  He was

20   also permitted to invite Alison Leary into the interview, and

21   she did come into the interview and sat for the remainder of

22   the interview.  Again, these are not factors that would support

23   the finding of him being in a custodial situation.

24        The interviews were short.  The first one lasted an

25   hour and 20 minutes, the second lasted 15 minutes.  The second

1    one, again, he was present with Ms. Leary in the conference

2    room.  He was there by choice, as he had been previously told

3    he could leave the building.  No guns were drawn, and the tone

4    was conversational.

5            So clearly he was not in custody, and I think the same

6    factors -- or the same facts that I just recited support the

7    fact that his statement was voluntary.  There's simply no facts

8    to show that there was any police coercion to the degree that

9    his will would have been overborne, and that is a condition

10   precedent for finding that his statements were not voluntary as

11   set forth by the Supreme Court in *Berkemer vs. McCarty*, I

12   believe.

13           Also, in addition to that fact not being present,

14   which is required and therefore a fatal flaw to the Defendant's

15   argument, he also appears to be an adult of above-average

16   intelligence.  He was never detained.  He was not subject to

17   threats or punishments, and he had a person present when he

18   requested her to be so.

19           So there are no factors to show that his statements

20   were not voluntary.  We would ask the Court to deny the motion.

21           *THE COURT:*  All right.  Realistically, I have two

22   stories that are incompatible.  I have two agents presenting

23   testimony that they arrived, that they were, if you would,

24   professional in their approach.  They asked to speak to him, he

25   was willing.  I don't want to make too much of jovial, but he

1    was conversational, he was comfortable, he was willing, he

2    dictate -- or directed them to the appropriate places to have

3    the conversations, he answered the questions willingly, he

4    didn't seem at ease -- or ill at ease.  When he asked for

5    someone to come in, they came in.  He was not told -- he was

6    not intimidated.  He was not told he couldn't leave.  He was

7    not told he was under arrest or anything of that nature.

8           On the other hand, I have a story that is,

9    essentially, one of -- if -- somewhere between intimidating

10   circumstances and coercive circumstances, starting with the

11   heavy banging on the door, they let themselves in, they direct

12   where these interviews are going to be.  At some point he is

13   concerned they are, quote, in his space, unquote.  There is a

14   physical returning of him to the conference room during the

15   course of these interviews.  He felt he had no choice.  There

16   were agents wandering around in -- not the interviewing agents,

17   but there were other agents wandering around with, let's say,

18   serious outfits, not suits and ties, but black jackets with

19   gear and -- black jackets -- black outfits with gear, cargo

20   pants, boots, et cetera.

21          At the end of the day, it's probably not the case that

22   I could rule that -- either way, whichever story was correct,

23   there was a singular outcome.  I have to make a determination,

24   and my determination is that I do not believe Mr. Snisky.  I

25   don't believe him and find him incredible for a number of

1    reasons.  Probably the most compelling is that his version of

2    events is simply nonsensical.

3           Agents arrived to interview you, they go to a

4    conference room and instead of conducting the interview, they

5    are taking tours, and they are there to interview you, but they

6    pay insufficient attention to you, to where you wander off out

7    of the building, and do so and then you come back, and even

8    though you are intimidated and coerced, you're helping the

9    agents find the front door, holding it open for them.

10          Admittedly, it was after this, when taken by the arm

11   that it supposedly rang true.  But honestly, when he became

12   intimidated and coerced in his story vacillates.  From the

13   outset they let themselves in and were in his space, and kind

14   of had him boxed in, and he didn't feel he could do much, other

15   than go along with things, and yet at other points in time he

16   can take out his phone, but then he leaves his phone, he needs

17   to make a call, but he doesn't make a call.  He is intimidated,

18   but is he not intimidated.

19          It simply is a story that, if accepted, perhaps would

20   support the notion of some objective and certainly subjective

21   belief in custodial arrangement, but I find the testimony to be

22   incredible and don't believe it.  Instead I put stock in the

23   testimony of the agents.  At least it was a -- when compared to

24   Mr. Snisky's -- a rational, logical account of what would

25   happen where the things that purportedly did happen made sense

1    in connection with the things that happened before it.

2          I understand Mr. Pepin's point that Mr. Snisky does

3    not have a log of exactly when things happened, but he was very

4    clear that he needed to and was intending to put this in the

5    middle of the interview, where he is going out for coffee and

6    all of the rest of it, and it just doesn't make any sense.

7          I find that he was not in custody for all of the

8    reasons that Ms. Rhyne has indicated.  As additional reasons,

9    the fact that it was in his place of employment.  The fact that

10   there was no show of force; that there were no weapons

11   displayed; that people were allowed in; that there was, at

12   least professional conversation on both sides, nothing by way

13   of intimidation.

14         At the end of it, I find that it was not a custodial

15   situation.  I find that the statements were, in fact,

16   voluntary, I find that he was not in custody, therefore did not

17   have a Sixth Amendment concern, even though that was raised in

18   the motion, but not touched upon here today and the motion is

19   denied.

20         Now, let's get to the others.  *James* hearing.  If I'm

21   setting this up right, essentially, the -- Mr. Snisky wanted

22   the *James* hearing, the Government wanted to do a proffer, and a

23   *James* log, and said give us a date to do it, and then on its

24   own decided, Hey, how about now, and so then gave me a *James*

25   proffer and log.  Am I correct in that?

1          MS. RHYNE:  I don't believe in waiting for deadlines

2    if one can do it ahead of time.  But yes, you are correct.

3          THE COURT:  All right.  And the same thing occurred

4    with respect to the 404(b) motion, which was, Hey, it's early.

5    We don't know.  Oh, here is our 404(b) notice.  Let me -- am I

6    correct again?

7          MS. RHYNE:  Yes.  In fairness, there were some number

8    of weeks that passed in between those two events, but yes.

9          THE COURT:  I understand that.  I'm not -- I'm not --

10   I'm simply calling you someone who changed your approach.

11         MS. RHYNE:  Yes.

12         THE COURT:  Not someone who was toying with Defense

13   Counsel or the Court.

14         I suppose then with respect to the 404(b) motion,

15   which is Number 47, I will deny that as moot, because you have

16   got the 404(b) notice now.  And let me just be clear, I'm

17   assuming he has gotten the totality of the 404(b) that you

18   intend to forward with, because I don't want to deny it as moot

19   and then find out that was one of two shoes to drop.

20         MS. RHYNE:  I'm not aware of any other shoe to drop.

21         MR. PEPIN:  That was my question, Your Honor.

22         THE COURT:  Okay.  Are you satisfied with that answer?

23         MR. PEPIN:  I don't know how it would be anything

24   else.  So, yes.

25         THE COURT:  So I will deny that as as moot.

1          With respect to the *James*, I will take that under

2     advisement.  What I mean by that is this, you have given me a

3     *James* log and proffer.  It is not an overwhelming number of

4     statements.  I'm not going to ask Mr. Pepin, at this juncture,

5     to respond.  What I will say, I will give you until 9-22, to

6     lodge any objection, take any position you wish to take, with

7     respect to the matters that have been proffered as potential

8     co-conspirator statements, and then we will go forward with the

9     final resolution after I see what the position of the -- of the

10    parties is.

11         MR. PEPIN:  That's what I was going to ask for,

12    Your Honor.  Thank you.

13         THE COURT:  All right.  The *James* motion, by the way,

14    is Number 43.

15         There is a Motion for 806 Impeachment, and

16    Co-conspirator Impeachment, where I agree with and accept

17    Defense Counsel's position, which is, if there are

18    co-conspirators, you have the right to impeach them.  If there

19    is information that would enable you to impeach them, that

20    should be provided to you.  I don't know where we stand,

21    because at the time that the motion was filed, really, what was

22    out there, at least from my perspective, in terms of the

23    universe of potential impeaching -- potential co-conspirators,

24    you never know.  Now, we know.  We're looking at, apparently,

25    the one co-conspirator, and I don't know whether impeachment

1    material has been provided already, with respect to this

2    individual or is this something that needs to be scheduled.

3    Where were we?

4         MS. RHYNE:  Your Honor, Mr. Greeott will also be a

5    witness at trial.  So we have been turning over everything

6    about him, as it comes into our possession.

7         MR. PEPIN:  Your Honor, as far as I know, that's

8    right.  What -- what I worry more about in these circumstances

9    are situations where there are other investigations or other

10   things that might be pressing upon potential witnesses, which

11   would have the potential to cause them to want to be more

12   cooperative, rather than less cooperative.

13        So let me suggest, for instance, you have heard the

14   name Mr. Sorrells, as he was there the day that this arrest

15   happened.  He has not been charged.  I -- it's a little bit

16   puzzling to me that he is not considered some sort of

17   unindicted co-conspirator, but apparently not.  Apparently

18   there's not going to be any attempt to use any of his comments

19   to any other person, which is also a little surprising to me,

20   but I'm glad to hear it.  Glad to know that things are narrowed

21   a bit.  But in terms of the range of potential impeachment

22   material that might be out there, it's my understanding, for

23   instance, that there have been investigations of him, by the

24   SEC during the course or shortly before this happened,

25   particularly involving something called Zeek, and that I don't

1   know what the status of that is, but I can't help but think

2   that his cooperation in this matter, his protestations that he

3   didn't know anything or many of the things that he may or may

4   not actually have known, his basic cooperation with the

5   Government, may well be motivated by things associated with

6   those kinds of investigations, and I -- if there is anything

7   like that, I may not know about it, and I think it should be

8   provided to me.

9        THE COURT:  Well, I have got a couple of responses,

10  and then I will hear from Ms. Rhyne.

11       I mean, I don't know what the Government intends to

12  put on at trial.  I do know what the motion was.  The motion

13  was for impeachment, with respect to co-conspirator statements.

14  If she has taken the position he is not a co-conspirator, that

15  may or may not open other questions, which is, Is he a witness?

16  I don't know the answer to that.  If is he a witness, is he

17  subject to impeachment material -- material on the *Giglio*?  Of

18  course he is.  But if he is not a co-conspirator, whatever is

19  going on with respect to him, goes beyond the motion.

20       Ms. Rhyne?

21       MS. RHYNE:  I agree, Your Honor, and in addition to

22  that I want to make perfectly clear, Mr. Pepin has referenced

23  things within the possession of the SEC.  We are not the SEC.

24  We do not have custody, control or possession of things in

25  their possession, and we do not intend to turn over their

1    files.  So if he has queries with the SEC he is barking up the

2    wrong door (sic).

3         MR. PEPIN:  Yet, I have been given some SEC files.

4    Somehow there was access to some of them involving several of

5    these witnesses, including exhibits attached in depositions,

6    and I am happy to have them, don't get me wrong, but it makes

7    me wonder just how far the protection between -- or the -- the

8    barrier between one entity and another really extends.

9         MS. RHYNE:  If things come into my possession and they

10   are discoverable under my obligations I turn them over.  That

11   does not mean that I have access to an entirely different

12   building, a different agency and we have not been working

13   jointly on this investigation.  We have had parallel

14   investigations and never have we commingled our files.

15        THE COURT:  All right.  I think I'm saying something

16   that doesn't need to be said, which is, if there's *Giglio* that

17   comes -- that the Government is aware of, I want it disclosed

18   to the Defendants, and I want it -- and I want that to happen

19   in advance of trial.

20           Now, I'm not going to put dates on things.  It's silly

21   to do that*.*  *Giglio* can arrive at any moment in time.

22   Information can be become available to the Government at any

23   moment in time.  So for me to sit down and say, Well, give all

24   *Giglio* material promptly.  What I am saying is, essentially,

25   that, is that I would like the material -- not like -- I want

1    potential *Giglio* material provided... when is the trial?  It's

2    January ...

3              MS. RHYNE:  Twelfth.

4              THE COURT:  When is the pretrial?

5              MR. PEPIN:  December something.

6              MS. RHYNE:  I don't recall.

7              MR. PEPIN:  I'm not sure off the top of my head.

8              THE COURT:  By the pretrial.

9              MS. RHYNE:  Okay.

10             THE COURT:  And all that I mean by that is, I don't

11   want to be holding -- I don't want to get into a scenario where

12   a witness testifies, Ms. Rhyne walks across the aisle, hands

13   Mr. Pepin a piece of paper, Mr. Pepin stands up and and says,

14   Oh my, I need a continuance, and we go back and forth with that

15   kind of a deal.

16             I recognize that there is at least a possibility that

17   things can come to the Government's attention in -- after the

18   trial prep conference.  Okay.  And so I'm not -- I'm not -- I'm

19   not going to try and create some general order, other than to

20   say I would like any such additional material to be provided

21   promptly and in advance of trial.  But if there is *Giglio* that

22   the Government is aware of, that has not already been

23   disclosed, what I want it to be disclosed by is by the time of

24   the pretrial conference.  So that we can have a -- not -- a

25   trial preparation conference.  So that we can have a meaningful

1    discussion about whatever that may arise by virtue of those

2    disclosures or needs for continuance or needs for investigation

3    or what have you.

4         MS. RHYNE:  Certainly.  Your Honor, the only thing I

5    need clarification regarding, because I guarantee to the Court

6    when it touches my hands, it is soon out the door to Mr. Pepin.

7    The question is, if it doesn't touch my hands.  I know for a

8    fact that the SEC has been investigating an --

9         THE COURT:  I'm not ordering you to go conduct an

10   investigation.  I'm also not going to sit there and say that

11   something comes to your attention, and you, say, I don't know,

12   you put your hands behind your back and say, Don't touch my

13   hands, don't touch my hands.

14        MS. RHYNE:  Certainly.

15        THE COURT:  Obviously, that kind of game playing

16   wouldn't be tolerated, and I'm not suggesting that you two

17   would engage in it.  I'm being clear, I think, in saying I'm

18   not ordering any kind of investigation by you, but

19   simultaneously, you don't get to be the three monkies, see no

20   evil, hear no evil, speak no evil, and just not let something

21   touch your hand and have that be an adequate response, if

22   there's information that's known or available to your office or

23   your agents and it's not disclosed.

24        MS. RHYNE:  Certainly.

25        THE COURT:  Fair enough?

1          *MS. RHYNE:*  Yes.

2          *THE COURT:*  All right.

3          *MR. PEPIN:*  Your Honor, can I -- I just want to

4    mention something.  I -- I have been -- I just want to make it

5    clear, my motion was not just a request involving 801(d)(2)(e),

6    co-conspirator statements.  It really had to do with the number

7    of potential -- and I am not trying to reopen this whole can of

8    worms.  You have made your ruling with regard to this, and I am

9    satisfied with it.  It wasn't just co-conspirator statements.

10   We are talking about (c) (d) and (e), Rules 803, 804 and 807.

11   So in essence, if things come in that are not involved with the

12   live testimony, I still to get impeach?

13         *THE COURT:*  You are right.  I was too narrow.  In a

14   very hyper technical way, you asked for -- what you are talking

15   about are co-conspirator statements or hearsay statements, you

16   get to impeach the hearsay declarants as well.  Of course,

17   Mr. Sorrells could potentially fall into neither of those

18   categories, was my point.  He could take the stand and

19   therefore not be a hearsay speaker, take the stand and not be a

20   co-conspirator, under the way this was lined up.

21         So even expanding the motion, my point was simply,

22   there are areas of ground that are not necessarily covered by

23   it.

24         *MR. PEPIN:*  Understood, Your Honor.  I understand

25   that.

1      THE COURT:  But I think my ruling covers --

2      MR. PEPIN:  Well, I agree.  That's why I said that.  I

3  just had -- when you initially made the comment, I scratched my

4  head, so I was afraid maybe I had done it.

5      THE COURT:  No.  Fair enough.

6      MR. PEPIN:  Thank you.

7      THE COURT:  All right.  Experts.  Which is Number 46,

8  and if -- Ms. Rhyne, bring me up to speed, while I'm flipping

9  through my folder, as to what your position was, which was

10 essentially, if I'm remembering, We haven't made up our mind

11 yet?

12     MS. RHYNE:  Yeah.  We are leaning against it,

13 Your Honor.  I have not made that final conclusion, but I'm

14 leaning against no experts.  I think I proposed in my response

15 that we would like until September 22d to make the final

16 decision, and therefore the final disclosure, and that then

17 Mr. Pepin could have until, hopefully, sometime in October to

18 make any disclosures he would make.

19     THE COURT:  Okay.  9-22 for the Government to provide

20 notice of its experts.  Mr. Pepin, I don't know where you are

21 on -- in terms of experts, but let's say October 13th.

22     MR. PEPIN:  Okay.

23     THE COURT:  So granted as stated on the record, with

24 respect to that.

25     That leaves us with bill of particulars, surplusage

 1   and duplicity.  Does anyone want to argue anymore on either or

 2   any of them?

 3         MR. PEPIN:  I -- well, not with regard to the bill of

 4   particulars.

 5         THE COURT:  Ms. Rhyne?

 6         MS. RHYNE:  No, Your Honor.

 7         THE COURT:  That's denied.  It seeks theory, and

 8   frankly, her response gives you, I think, the information you

 9   were looking for, in any event.  But technically, the motion is

10   denied and that is number...

11         MS. RHYNE:  Forty nine.

12         THE COURT:  Forty nine.  Duplicity?

13         MR. PEPIN:  Your Honor, I'm not going to make any

14   further argument.  I would note, if I don't file this motion,

15   then I can't raise it later.

16         THE COURT:  I understand.  Denied without prejudice.

17         MR. PEPIN:  Thank you.

18         THE COURT:  And that is Number 44.  And lastly, I have

19   got a Surplusage Motion, which is at ECF Number 48.

20         MR. PEPIN:  Your Honor, I -- I have laid out

21   everything that I think is surplusage, and I guess I should say

22   this about all things that are filed.  I can't always say it to

23   the degree that I feel it at this point, but this broadens -- I

24   mean the language here, I mean I -- I guess I'm saying I mean

25   it when I say, this seems to expand this way beyond where the

1    charges are.

2           I understand -- and looking at some of these other

3    responses, I understand that counsel really is wanting to bring

4    in what I consider to be the kitchen sink and then some.  We

5    will be challenging a lot of that area and a lot of those

6    admissions at some point along the way here, with regard to --

7    and in the form of motions in limine, um, and the like.  I

8    guess I understand the response as being, We wait and see how

9    everything plays out, before we decide whether or not we're

10   going to give all of this to the jury.  My concern is that they

11   will get it with the first reading of the Indictment.  I -- my

12   belief is that this should be -- the information in the

13   Indictment should be limited to the specific fraud we're

14   talking about, because that's what all of the charges involve,

15   and it is -- it's this Arete -- basically Arete from then on

16   charge, beginning -- when that opens up and this particular

17   bond program is involved.

18          All this other stuff is before and may or may not, I

19   guess, I don't see how it is connected, but I know Ms. Rhyne

20   thinks that it is.  We think that it should be -- that the --

21   that the language should be struck, and I guess that's all I

22   can say about this, at this point.

23          *MS. RHYNE:*  Your Honor, the law simply doesn't support

24   Mr. Pepin's view that the mailings dictate the scope of the

25   fraud or the scheme to defraud.  Here we have very concisely

1    alleged a scheme to defraud that began under Colony Capital,

2    Mr. Snisky changed that company name to Arete, told some of the

3    current investors/victims at Colony Capital, We are simply

4    changing the name, everything else is business as usual, and

5    then continued with his fraud.  Some of it was the same.

6    Specifically, we have evidence that the futures trading scheme

7    began -- or aspect of the scheme began under Colony Capital.

8    It's not quite clear when the Ginnie Mae bond nature of the

9    scheme began.  But he certainly rolled victims from investments

10   he started under Colony Capital into the Ginnie Mae bond

11   program.  So it is a continuing story.  We wouldn't be able to

12   present the evidence about the scheme without telling the

13   entire story, and it is properly charged and shouldn't be

14   struck.

15          THE COURT:  Denied without prejudice.

16          All right.  I think I have covered all of the motions.

17   Have I?

18          MR. PEPIN:  I think so, Your Honor.

19          MS. RHYNE:  Yes.

20          THE COURT:  Then where we are is there may be some

21   disclosure made by the Government on September 22 to the

22   Defendants with respect to experts.  Beyond that, I will look

23   for a response from the defendant as to James, and then we will

24   go from there.  For whatever it's worth, I'm not commenting on

25   either the 404(b) or anything else that was said, but I do

1  appreciate motions in limine.  At least it let's me try to

2  under -- get an ability to understand in a more reasonable

3  timeframe what a particular position is, and so, you know, I

4  appreciate them.  The likelihood that I grant them, of course,

5  is small, because the facts that develop at trial, tend to

6  dictate what is or isn't relevant, and so I don't want to

7  mislead anyone that my eagerness to receive them should be

8  interpreted as an intention to grant them or deny them or

9  anything else.

10        All right.  Anything further on behalf of the

11  Government?

12        *MS. RHYNE:*  No.  Thank you, Your Honor.

13        *THE COURT:*  Anything further on behalf of Mr. Snisky?

14        *MR. PEPIN:*  No thank you, Your Honor.

15        *THE COURT:*  All right.  We will be in recess.

16        *THE COURTROOM DEPUTY:*  All rise.  Court is in recess.

17        (Recess at 12:03 p.m.)

18                              **INDEX**

19  **Item**                                                     **Page**

20  ITEM                                                         PAGE

21  WITNESSES

22    SPECIAL AGENT FUNK

23          Direct Examination By Ms. Rhyne              3

24          Cross-examination By Mr. Pepin              13

25          Redirect Examination By Ms. Rhyne          38

1    Special Agent Loecker

2          Direct Examination By Ms. Rhyne                40

3          Cross-examination By Mr. Pepin                 45

4          Redirect Examination By Ms. Rhyne              56

5    Gary Snisky

6          Direct Examination By Mr. Pepin                58

7          Cross-examination By Ms. Rhyne                 74

8          Redirect Examination By Mr. Pepin              92

9                     PLAINTIFF'S EXHIBITS

10   Exhibit       Offered  Received  Refused  Reserved  Withdrawn

11

12   1 & 2                   58

13

14                   **REPORTER'S CERTIFICATE**

15       I certify that the foregoing is a correct transcript from

16   the record of proceedings in the above-entitled matter.  Dated

17   at Denver, Colorado, this 20th day of September, 2014.

18

19                                    *S/Tamara Hoffschildt*
                                      Tamara Hoffschildt
20

21

22

23

24

25