```
 1          IN THE UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF COLORADO
 2
    Criminal Action No. 13-cr-473-RM-1
 3
    UNITED STATES OF AMERICA,
 4
         Plaintiff,
 5
    vs.
 6
    GARY SNISKY,
 7
         Defendant.
 8  _____
```

## REPORTER'S TRANSCRIPT
### SENTENCING HEARING

_____

Proceedings before the HONORABLE RAYMOND P. MOORE, Judge, United States District Court for the District of Colorado, occurring at 1 p.m., on the 18th day of June, 2015, in Courtroom A601, United States Courthouse, Denver, Colorado.

## APPEARANCES

PEGEEN RHYNE, Assistant U.S. Attorney, 1225 17th Street, Suite 700, Denver, Colorado, 80202, appearing for the Government.

ROBERT PEPIN, Assistant Federal Public Defender, 633 17th Street, 10th Floor, Denver, Colorado, 80202, appearing for the Defendant.

TAMMY HOFFSCHILDT, Official Reporter
901 19th Street, Denver, Colorado 80294
Proceedings Reported by Mechanical Stenography
Transcription Produced via Computer

1          **P R O C E E D I N G S**

2          (In open court at 12:58 p.m.)

3              *THE COURT:*  Please be seated.  13-cr-473, United

4     States versus Gary Snisky.  Take appearances, please.

5              *MS. RHYNE:*  Good afternoon, Your Honor.  Pegeen Rhyne

6     for the United States.

7              *THE COURT:*  Good afternoon to you.

8              *MR. PEPIN:*  You were saying good afternoon to her.

9     Robert Pepin, appearing on behalf of Mr. Snisky.  He is present

10    with me at counsel table as is Rivka Morgan-Sherman, from our

11    office.

12             *THE COURT:*  And to you and your table, as well.

13             *MR. PEPIN:*  Thank you, Your Honor.

14             *MS. RHYNE:*  Pardon me, Your Honor.  Just for the

15    Court's planning purposes, I was advised by victim

16    Kate Kingery, she would like to speak at today's proceedings.

17    I don't see her in the audience yet, but I do expect her to

18    arrive.

19             *THE COURT:*  Okay.  We're here today for sentencing,

20    following the earlier plea to, I believe it was, Counts 2 and

21    14.  In any event, it was two counts of the Indictment.  One

22    Mail-Fraud Count and the other Engaging In Monetary

23    Transactions.

24             Before proceeding to sentencing, at this point, I

25    formally accept the *Plea Agreement* pursuant to which the plea

1   of guilty was made in February of 2015.

2          Mr. Pepin, have you received a copy of the *Presentence*

3   *Investigation Report* prepared in this matter, including all

4   addenda, had sufficient time to review the same, as well as to

5   review the materials with Mr. Snisky?

6          *MR. PEPIN:*  I have.

7          *THE COURT:*  Ms. Rhyne, is the same true of you?

8          *MS. RHYNE:*  Yes, Your Honor.

9          *THE COURT:*  There have been a number of documents that

10  have been filed.  Let's just clean up some things, first.  With

11  respect to guidelines, may I assume that the Government orally

12  moves for the acceptance of the third point, for the acceptance

13  of responsibility?

14         *MS. RHYNE:*  Yes, Your Honor.  Thank you.

15         *THE COURT:*  That motion is granted.  Now, beyond that

16  what we have is there was a *Response To The Presentence*

17  *Investigation Report* filed by Mr. Snisky, as well as a *Motion*

18  *For A Statutory Sentence and/or a Downward Departure*, as well

19  as, and I am going to lump this into -- into one group,

20  materials in support.  And the reason I say that is, there were

21  two or three clusters of letters, including one that came in, I

22  believe this morning, or at least I saw this morning, and I

23  just want you to be aware that I have seen each of those,

24  without -- even though I'm not separating them out as separate

25  submissions, I have seen each of those and read all of the

1   letters that were submitted to me.

2   My further understanding is that the Government filed

3   a number of things, one was a *Sentencing Statement*, and the

4   other was a *Response In Opposition To The Defendant's Motion*

5   *For Statutory Sentence and/or Downward Departure*.

6   At least to set the framework of this proceeding in

7   place.  Have I omitted anything that's been filed on behalf of

8   the Government?

9   MS. RHYNE:  No, Your Honor.

10   THE COURT:  Or on behalf of Mr. Snisky?

11   MR. PEPIN:  No, sir.

12   THE COURT:  Now, before getting into some of the

13   details here, my understanding, based on all of the materials

14   that have been filed, is that there is no objection that has

15   been filed to the guideline calculations, as set forth in the

16   *Presentence Investigation Report*, correct?

17   MS. RHYNE:  Only to the extent that I guess I would

18   call it a form over substance, the extent that we preempted

19   that by filing our *Sentencing Statement* indicating we would be

20   asking for higher guideline calculation and acknowledging there

21   were not sufficient facts in the *Plea Agreement* to support that

22   higher calculation, yet I don't object to them being calculated

23   based on the facts in the Plea Agreement, but I object to them

24   being the final results.  I think after today's proceedings, we

25   will have established the basis for the higher guideline

1    calculation.

2         THE COURT:  We'll deal with that in a moment.

3         Do you have any objections, whether they be form or

4    substance?

5         MR. PEPIN:  No, nothing.

6         THE COURT:  All right.  Then let's turn to Ms. Rhyne.

7    Look, I suppose there's some things that I need to say.  First

8    is, the way I do things is not a mystery, and, in fact, I

9    require and ask that the parties stipulate to facts, and if

10   there are matters -- and I use those facts to determine the

11   guideline range, and if there are matters that are contested,

12   put that into the *Plea Agreement*, and then we will see and then

13   we will decide.

14        I say -- you characterize your preemptive filing as an

15   objection, I don't.  I look at it as -- I was going to ask you

16   what -- What are you doing with this?  But a *Presentence Report*

17   comes in, there's no objection made as to that report, and --

18   and so I'm not sure that it's even fair to say that the

19   Government -- some document filed by the Government in advance

20   of the *Presentence Investigation Report*, constitutes an

21   objection to that report.  In fact, I don't think it does.

22        Now, having said that, you want to put your people on,

23   I will listen to your people, because I do think that I can

24   consider any evidence with respect to sentencing, but if you

25   are asking me to consider this as some kind of a guideline

1    calculation, I'm not going down that road.  I mean, I just

2    don't understand how you could fairly characterize some filing

3    before a Presentence Report, coupled with absolute silence,

4    after that report, as being -- as being construable as an

5    objection.

6         MS. RHYNE:  Your Honor, if I may?  First, going back

7    in time.  In January, when Mr. Snisky pled guilty, I was not

8    aware of the Court's procedure of not allowing the pre-- excuse

9    me -- the probation officer doing additional investigation.  So

10   that was a surprise to me.  Perhaps that was my own error, but

11   so be it, it was a surprise to me.

12        When I filed my *Sentencing Statement*, it was my notice

13   to both Mr. Snisky and the probation office and the Court that

14   we intended to present this evidence, and intended to support

15   the guideline calculation as set forth in the *Plea Agreement*.

16   When I read the PSR it acknowledged our position on all of

17   that.  So I didn't acknowledge -- I didn't read the PSR as

18   being inconsistent with our position.  It said*, Based on the*

19   *facts in the Plea Agreement we can't arrive at that conclusion*,

20   *but the Government says it's going to present evidence*.  Given

21   that that's exactly what had been presented, I didn't see that

22   it was something that I needed to contradict.

23        THE COURT:  Well, look, here's where I'm sitting and

24   scratching my head, ten or more victims, they found ten or more

25   victims.  Why would I want to hear evidence on whether there

1    were ten or more victims?  It's not being contested.

2         *MS. RHYNE:*  Your Honor, the one area that's still --

3         *THE COURT:*  There is one.

4         *MS. RHYNE:*  Yes.

5         *MS. RHYNE:*  I'm happy to narrow my focus.

6         *THE COURT:*  And then, if I understand you correctly,

7    at the end of the day what you want to do is move it up from

8    90 -- from 78 to 97, up to 97 to 128, so that you can ask for

9    the 97 that you could ask for anyway.  Huh?

10        *MS. RHYNE:*  Your Honor, I believe that the facts that

11   are going to present, accurately describe the scheme that

12   Mr. Snisky founded and led.  I think it's appropriate to put

13   those facts before the Court.  It is often the case that it is

14   much easier to ask for a sentence at the low end of the

15   guidelines than to ask the Court to go to the high end of the

16   guidelines.  So I don't see it as not having a meaningful

17   impact on the sentencing, overall.

18        I certainly could be wrong with this Court and this

19   Judge, but overall, I think something that the Government would

20   seek to do in order to protect what it thinks is the best

21   sentence recommendation.

22        *THE COURT:*  Okay.  And what I'm telling you is, I

23   suppose in this case, as well as any other case, the guidelines

24   are something that I don't trivialize.  They have to be looked

25   at.  They have to be considered.  They are one of the factors.

1    I do that.  Is it a driving factor?  No.  It's a starting

2    place.  And after that, frankly, it would be more palatable, to

3    me, if the Government, if they wanted a higher number, just

4    simply ask for that higher number.  If they wanted a lower

5    number, just ask for that lower number.  I'm not going to ever

6    say, *Well you are asking for the bottom of the range.  You are*

7    *asking for the top of the range.  Somehow that makes a*

8    *difference to me.*

9          So I think we are just watching time pass, but

10   frankly, the same could be said about my lecture.  So let's

11   just get on with it.

12         *MS. RHYNE:*  Thank you, Your Honor.  May I call my

13   witness?

14         *THE COURT:*  Yes.

15         *MS. RHYNE:*  The Government calls Special Agent

16   Holly Anderson.

17         *THE COURTROOM DEPUTY:*  Raise your right hand, please.

18      (**Special Agent Andersen** was sworn.)

19         *THE WITNESS:*  I do.

20         *THE COURTROOM DEPUTY:*  Please have a seat.

21         State your full name and spell your last name for the

22   court reporter, please.

23         *THE WITNESS:*  Holly Anderson, A N D E R S E N.

24

25

Special Agent Andersen – Direct

1          **DIRECT EXAMINATION**

2     *BY MS. RHYNE:*

3     Q   Special Agent Andersen, where do you work?

4     A   The Federal Bureau of Investigation.

5     Q   In what position?

6     A   Special agent.

7     Q   How long have you been assigned to this case?

8     A   Since March or April 2013.

9     Q   Can you turn to Exhibit 2, please?  What is Exhibit 2?

10    A   This is a list of brokers that Gary Snisky used, and the

11    corresponding investors that the brokers brought into the

12    program.

13    Q   And the first box indicates Gary Snisky in bold and

14    underlined.  What does that indicate?

15    A   He directly brought the investors underneath his name in.

16    Q   And are you saying that all of the names listed below the

17    people in bold and underlined font are investors brought in

18    through that particular broker?

19    A   All of the names not in bold are investors brought in by

20    the broker above it.

21    Q   Can you explain how Mr. Snisky used these brokers in the

22    course of his fraud scheme?

23    A   Mr. Snisky trained these investors on the bond program.  He

24    went through the details of the investment and told them how to

25    present this information to potential investors.

1  Q   Was that training formal or informal?

2  A   It was very formal.  Most of the brokers came from out of

3  state.  They were trained in groups.  Mr. Snisky had, kind of,

4  their schedule plan of while they were in town visiting.

5  Q   And did Mr. Snisky give those brokers any instruction on

6  who they should present this bond program or future training

7  program to?

8  A   Yes.  They were instructed to only present this -- this

9  program to exiting clients.

10  Q   Okay.  Now, in the box under David Sorrells, was there

11  names Paul Buroker and Kathyrin Carmack?

12  A   Yes.  They actually were introduced to the program through

13  Todd Carmack, who was working for David Sorrells.

14  Q   And who, among these brokers, brought in investors who

15  exclusively went into the futures-trading program rather than

16  the bond program?

17  A   Arne Warpness.

18  Q   How did you learn about the futures-trading program?

19  A   He learned about the futures-trading program from

20  Gary Snisky.  At the time Arne Warpness was working as an

21  independent contractor for Gary Snisky.

22  Q   And where was he physically present?

23  A   450 Main Street in Longmont.

24  Q   What was that?

25  A   It was Gary Snisky's office.

Special Agent Andersen – Direct

1   Q   Can you turn to Exhibit 3, please.  What is Exhibit 3?

2   A   This is a list of entity names for bank accounts that were

3   controlled or used by Gary Snisky.

4   Q   And how many bank accounts were used by Mr. Snisky, between

5   2010 and 2013?

6   A   Forty-six.

7   Q   And how many banks were those accounts located?

8   A   Six different banks.

9        THE COURT:  Aren't we drifting towards sophisticated

10  means?

11       MS. RHYNE:  We are, Your Honor, but I believe this is

12  an important component.

13       THE COURT:  All right.

14  Q   Have you spoken is to Special Agent Ron Loecker about this?

15  A   Yes.

16  Q   About what, in particular?

17  A   The complexity of the tracing of the funds in this case.

18  Q   What did he do in regards to that?

19  A   Given the number of bank accounts, and how the money flowed

20  to numerous banks, he had to take additional steps to trace the

21  funds to their original source, and to figure out where the

22  funds ended up.

23  Q   So did he perform the financial analysis in this case?

24  A   Yes.

25  Q   Did he indicate to you it was significantly more complex to

Special Agent Andersen - Direct

1   track and trace the funds with this number of accounts?

2   A   Yes.  Much more difficult than the average case.

3   Q   When did the search warrant happen in this case?

4   A   January 17th, 2013.

5   Q   And how were you aware of that?

6   A   I was told by co-case agent Kate Funk, who was at the

7   search.

8   Q   Are you familiar with the recorded conference call with

9   defendant Snisky and victims Kate Kingery, Stan Kingery and

10  Eileen Warpness, that occurred on February 28th, 2013?

11  A   Yes.

12  Q   Have you listened to that recording?

13  A   Yes.

14  Q   During that recording, what did Gary Snisky, generally,

15  tell these victims about their money?

16  A   He told the victims that their money was sitting in a bank

17  account, but that he couldn't access it.

18  Q   Did he tell them whether half of it had been spent already?

19  A   No.

20  Q   What did he infer?

21  A   That they would get their funds back.

22  Q   All of them?

23  A   Yes.

24  Q   Did he mention anything about the building at 710 Tenacity

25  during that conversation?

Special Agent Andersen – Direct

1   A   Yes.

2   Q   What did he say?

3   A   He mentioned that he owned his office building, and that he

4   could repay them through the sale of that building.

5   Q   Did you also participate in an interview with victim Cheryl

6   Paxton in July of 2013?

7   A   Yes.  And did you also review communications from

8   Ms. Paxton and her attorney subsequent to that interview?

9   A   Yes.

10  Q   According to Ms. Paxton what had Gary Snisky been telling

11  her about her money in 2013?

12  A   He told Ms. Paxton not to worry, that she would get her

13  money back through the sale of the 710 Tenacity building, that

14  she practically owned the building.

15  Q   That's what he told her?

16  A   Yes.

17  Q   And to your knowledge, was there sufficient equity in the

18  710 Tenacity building to repay Ms. Paxton, Ms. Kingery,

19  Mr. Kingery and Ms. Warpness?

20  A   No.

21  Q   Have you reviewed interview memos regarding interviews with

22  victim Jonathan Lackey?

23  A   Yes.

24  Q   According to Dr. Lackey, what statements did Gary Snisky

25  make to him about his in -- getting his invested money back?

1  A   Gary Snisky told him numerous times that his money was in a

2  separate account, and that it would be returned back to him.

3  Q   When did he make those statements to Dr. Lackey?

4  A   In August and October of 2013.

5  Q   And did he make further statements in November of 2013?

6  A   Yes.  In November of 2013, Gary Snisky told Dr. Lackey that

7  his money was in a Colony Capital account, and that he couldn't

8  move the funds, because they were frozen.

9  Q   Have you also interviewed (sic) memoranda of interviews --

10 excuse me -- with Santiago Orvananos?

11 A   I reviewed the memorandums, yes.

12 Q   And what did he say about his involvement with Gary Snisky?

13 A   He had a business relationship with Gary Snisky.  Santiago

14 Orvananos paid Gary Snisky $15,000 to find discounted

15 properties that Mr. Orvananos could buy and then flip and get a

16 profit out of.

17 Q   And first, approximately when did this business

18 relationship emerge between Mr. Snisky and Mr. Orvananos?

19 A   During the 2013.

20 Q   And where was Mr. Orvananos located?

21 A   In California.

22 Q   What did Mr. Orvananos believe that Mr. Snisky would do for

23 him, in exchange for this $15,000?

24 A   Mr. Snisky was to provide a list of distressed properties

25 for Mr. Orvananos.

Special Agent Andersen - Direct

1   *Q*  Did Mr. Orvananos indicate whether or not Mr. Snisky came

2   through with that promise?

3   *A*  Yes.  Mr. Orvananos was unsatisfied with the list that

4   Mr. Snisky provided.  He said that the list did not -- they

5   were not discounted properties, and they did not allow for a

6   profit, and he asked for his $15,000 to be returned.

7       *MR. PEPIN:*  Your Honor, if I could -- excuse me.  I'm

8   going -- I guess I'm going to object.  I thought that the point

9   we were talking about here was whether or not there were a

10   certain number of people in the scheme that's been alleged here

11   and which has been pled guilty to that -- such that we could

12   determine whether or not it was an extensive matter.  Now we

13   are talking about something far afield.  I think is really

14   meant to throw dirt on Mr. Snisky.

15       *THE COURT:*  Well, I hear you.  I think to some extent

16   it's true.  What I'm presuming is that Ms. Rhyne is going after

17   your letter in support from -- I don't remember.

18       *MR. PEPIN:*  Jess Booth.

19       *THE COURT:*  Yes, that would be it, but if I'm wrong --

20       *MS. RHYNE:*  Well there's that, Your Honor, and the

21   very strong and repetitious theme that him committing the

22   scheme to which he pled guilty was simply an accident of him

23   being subject to his own enthusiasm and getting carried away.

24       *MR. PEPIN:*  Your Honor, I'm sorry --

25       *THE COURT:*  I'm going to sustain the objection.

Special Agent Andersen – Direct

1          MS. RHYNE:  Your Honor, I believe this is relevant to

2     the 3553 factors, that he moved from one fraud to the next, and

3     that is relevant.

4          THE COURT:  I'm going to sustain the objection.

5          MS. RHYNE:  Certainly, Your Honor.  No further

6     questions.

7          MR. PEPIN:  Could I have just a minute, please,

8     Your Honor?

9          THE COURT:  Yes.

10                         **CROSS-EXAMINATION**

11    BY MR. PEPIN:

12    Q    A couple of questions, Your Honor.

13         Special Agent -- it's Andersen with an E, right?

14    A    Yes.

15    Q    You said that there was an agent who was working on the

16    bank accounts and was tracking funds and the like in the bank

17    accounts; is that right?

18    A    Yes.  IRS Special Agent Ronald Loecker.

19    Q    And that because of the various accounts, he was having a

20    hard time tracking where the money went and the like?

21    A    It was more difficult than an average case.

22    Q    And more difficult than an average case -- than an average

23    case that was what like this or?  What do you mean by *an*

24    *average case*?

25    A    When he -- when we discussed it, he just said average case.

Special Agent Andersen – Cross

1   I don't know specifically what he meant by average case.

2   Q   Okay.  Did -- I know you were involved in this

3   investigation at the beginning.  Did you say sometime in 2013,

4   early part of 2013?

5   A   Yes, approximately March or April.

6   Q   And I know you interviewed some people as part of the

7   investigation.  Did you interview anybody about the bank

8   accounts, in particular?

9   A   I did not.

10   Q   So in terms of this list of accounts that we see on

11   Government's Exhibit 3, do you have any personal knowledge as

12   to when they were open, for instance?

13   A   I discussed some of the details of the different bank

14   accounts when they were opened and closed, with Agent Loecker.

15   Q   Okay.  So do you know, for instance, these A, B, C, E, F

16   and L squared accounts, know anything about those?

17   A   I don't know the details of those.

18   Q   You don't anything about whether or not they were

19   associated with this whole Zeke problem?

20   A   No.

21   Q   Was there a particular account that you can identify as one

22   that you have more information than you have about the Zeke

23   accounts, here?

24   A   Not regarding the Zeke accounts.

25   Q   I mean about another account or other specific accounts,

Special Agent Andersen – Cross

1    that you have more information, yourself, about?

2    A   I can tell you the banks, like U.S. Bank or Wells Fargo,

3    approximately when accounts at those banks were open, but I

4    don't know the names of the specific accounts at each bank.

5    Q   Okay.  So, like, for instance, you said U.S. Bank was one

6    bank that was associated with this?

7    A   Yes.

8    Q   And the -- you're familiar with, approximately, when that

9    account was -- or accounts at U.S. Bank were closed?

10   A   Yes.

11   Q   And do you know why they were closed?

12   A   I don't know the specifics of why they were closed.

13   Q   Do you know that it wasn't Mr. Snisky who wanted them to be

14   closed, but was asked by the bank to close them?  Did you know

15   that?

16   A   I'm not sure.

17   Q   Okay.  So in terms of the actual closing, movement of funds

18   through different bank accounts and the like, you don't have

19   any detail about that?

20   A   Only the general summary of it.

21   Q   Which is what you have already given?

22   A   Yes.  I could tell you the order of the banks the money

23   flowed through, but that's about it.

24        MR. PEPIN:  That's about it.  Okay.  I don't have any

25   other questions, Your Honor.

 1              *MS. RHYNE:*  Nothing further.  Thank you.

 2              *THE COURT:*  You may step down.  Thank you.

 3              *MS. RHYNE:*  And Your Honor, just to let the Court

 4      know, Ms. Kingery is here and available.

 5              *THE COURT:*  I'm assuming that's who you were sending

 6      up smoke signals to earlier.

 7              All right.  Do you have any other witnesses?

 8              *MS. RHYNE:*  I do not.  Thank you.

 9              *THE COURT:*  Mr. Pepin, do you?

10              *MR. PEPIN:*  No witnesses, Your Honor.

11              *THE COURT:*  All right.  Then, let me deal with the --

12      well, before I do that, I just as soon deal with Mr. Pepin's

13      objections to the *Presentence Investigation Report*.  You filed

14      a lot of objections, that's unfair -- you filed a number of

15      objections, many of them, none of them have anything to do with

16      guidelines.  All but one having to do with factual matters that

17      you thought needed to be corrected, because of some minor or

18      perhaps not so minor mischaracterization of the information

19      provided to probation.  And again I'm not suggesting that you

20      suggested that they were trying to get it wrong.  It just

21      didn't come out right.

22              *MR. PEPIN:*  Right.

23              *THE COURT:*  And my understanding from reading the

24      addendum is that all of those factual matters were taken into

25      account and folded into the final presentence investigation

1    report.  So I guess I am asking you, with respect to all of the

2    factual objections that you had, is there anything further that

3    you consider to be outstanding, that needs to be addressed by

4    me?

5              MR. PEPIN:  I don't, Your Honor.  You are right, they

6    were accounted for in the second --

7              THE COURT:  And the one that I call nonfactual is the

8    one that basically said, in essence, this, *Probation in*

9    *reciting, as they always do*, *you know, the guideline sentence*

10   *and then the statutory sentence, and so on, characterized this*

11   *as Zone D*, which it is, and said *that probation is not an*

12   *option*, and you objected to that, and the response from the

13   probation department was that, *The statement was in a section*

14   *discussing the guideline view of matters*.  And as a matter of

15   guidelines, it is -- he is not eligible for probation, but

16   guidelines are not binding.  I don't take them as binding.  And

17   so I accept your point, but on that objection I overrule it,

18   because I don't think it's a legally incorrect statement to say

19   that the guidelines classify Zone D as not being eligible for

20   probation.

21             MR. PEPIN:  That's all we focused on, and that's fine

22   with me.  Thank you.

23             THE COURT:  Okay.  So now let's deal with -- before we

24   get to -- get further down the road, let me deal with the

25   objections, and move that portion of the analysis out of the

1    way.

2            What we had here, by way of guidelines, are --

3    guideline computations are not objected to, with one exception,

4    which I will identify when we get to that.

5            So, I take, with respect to the guidelines, the

6    calculations contained in the *Presentence Report*, as my

7    guideline findings with the exception of the one, and I will

8    address the one.  Those findings are Base Offense Level 7, plus

9    18 for Specific Offense Characteristics having to do with the

10   amount of money involved, plus two, for more than ten victims,

11   plus two, for sophisticated means, and the *Presentence Report*

12   concluded that there was an additional two points for

13   organizer/leader adjustment under 3B1.1(c).

14           The Government requested a four-level increase under

15   3B1.1(c), and at least a portion of the testimony that I heard

16   today was directed to that issue.  To refine the matter,

17   somewhat, if one is the organizer or a leader of criminal

18   activity that involves five or more participants, you get a

19   four-level bump, and that is not -- those facts are not present

20   in this case.  No one is contending otherwise.

21           Subsection A goes on to say, *or was otherwise*

22   *extensive*, and that's the view of the Government, as I

23   understand it.  The probation department view was that the

24   defendant was not organizer, leader -- excuse me, the defendant

25   was an organizer, leader or manager in criminal activity other

1   than as described in Subsection (a) or (b), and that's why a

2   two-point adjustment was made.

3          So what I'm being asked to do is to conclude that this

4   was otherwise extensive within the meaning of 3B1.1, Subsection

5   (a), and I am directed to the Application Note that describes

6   what that means, and that is Application Note 3.  That tells

7   me, that in assessing whether an organization is otherwise

8   extensive, all persons involved during the course of the entire

9   offense are to be considered thus -- and I am now quoting, *Thus*

10  *a fraud that involved only three participants, but used the*

11  *unknowing services of many outsiders, could be considered*

12  *extensive*.  I note the operative verb being *could be*.  And so

13  the question is, do I find on the basis of the evidence before

14  me that, in fact, this is otherwise extensive, and my answer is

15  no.  And my reason for saying that the answer is no, is this, I

16  don't think there's any dispute that the stipulated facts don't

17  establish an otherwise extensive adjustment.  Certainly no one

18  has suggested that to me.  No one has objected to the probation

19  department's conclusion that the stipulated facts did not

20  support otherwise extensive.  And what I have is that there are

21  one, two, three, four, five, six, seven, eight, nine people

22  that brought additional -- that brought investors to

23  Mr. Snisky.  In evaluating whether the fraud was extensive I

24  have no information, with respect to any meaningful aspect of

25  the role of these people.  I'm told that there was a, quote,

1    training, but whether it was training in the melody of lies

2    that were told by Mr. Snisky, I don't know.  Did he pass on to

3    these people, tell investors that, you know, the Bloomberg --

4    I'm on Bloomberg, and then some of these other things, or that

5    Mr. Greeot is actively trading?  I don't know.  I don't know

6    what he said.

7          All I know is that he had these people bring in

8    investors.  For all I know.  They brought him investors because

9    they had extra money to invest, because they said to them, *Hey,*

10   *you know Snisky has got some new idea that you ought to look*

11   *into.*  I don't know what they told these people, and so, to say

12   that their involvement in the course of a fraud -- of the fraud

13   was sufficient enough for me to say that this was an otherwise

14   extensive circumstance, I don't find the evidence to be

15   sufficient, and in that the evidence, the burden of proof, with

16   regard to the evidence, rests on the Government, I think that

17   the two-level adjustment found by probation is the appropriate

18   one.  I will not/do not interpret the guidelines and will not

19   interpret the guidelines as saying that this is simply a number

20   that, other than as pertains to participants, involves counting

21   heads, and there's some magic line where there's, you know,

22   five unknowing participants or seven unknowing participants

23   that that makes it otherwise extensive with no examination or

24   information as to their role in the fraud.

25          So, on that basis I conclude that the numbers as

1    adopted -- well, as set forth in the presentence investigation

2    are correct, that means that there is a total -- adjusted

3    offense level of 31, after reduction for acceptance of

4    responsibility, a Total Offense Level of 28, Criminal History

5    Category of I, Guideline Range 78 to 97 months, and in terms of

6    the other objections, there were no other objections by the

7    United States, with respect to Mr. Snisky's objections, as they

8    pertained to factual matters.  I will, at this juncture deny it

9    as moot, in that the *Final Presentence Report* made the

10   corrections requested by Mr. Snisky.  With respect to the final

11   and last piece of fruit on the vine, so to speak, and that

12   being the objection as to the *Zone D equals probation* statement

13   by the probation department, as I indicated, I'm overruling

14   that objection, because I take the statement as simply a

15   statement that the guidelines do not call for or quote/unquote

16   permit a probation sentence in this case, but I am, by no means

17   under any delusion that I am not -- that I do not have the

18   power to impose probation in this case.  I do.  I recognize I

19   do, and I think that probation recognizes I do.

20          So that, I think, takes care of the -- I won't say

21   preliminary matters but the more technical matters, that have

22   to be addressed during the course of this hearing.

23          Where we now are is, *All right, what are we going to*

24   *do here, by way of a sentence?*

25          Before asking the parties to argue, Ms. Rhyne, I will

1     hear from your victim.

2              *MS. RHYNE:*  Thank you, Your Honor.  Ms. Kingery if you

3     would like to come to the podium.

4              *THE COURT:*  Ma'am, I will tell you that I will listen

5     to what you have to say, you should take your time, not be

6     nervous.  Although, if I'm any judge of character, I don't

7     think I need to worry too much about that.  And you just take

8     as much time, tell me whatever it is you want to tell me.

9              *MS. KINGERY:*  Okay.  And it will really only be a few

10    minutes.  I'm going to leave out some of the details, because I

11    didn't think they needed to be publicly shared, but I did feel

12    like I needed to speak today to help influence the punishment

13    this guilty man is about to receive.

14              I don't expect him to hear any of this, because I

15    believe he doesn't feel any remorse or guilt or has any

16    understanding of the affect that his -- that his lies had on me

17    and others, and how he affected our lives.

18              So financially, we all know, that there's money that I

19    had previously saved in an IRA fund, and had I left it in an

20    average IRA fund, the money I did get back I put with American

21    Funds.  So I went through everything, and I went over the

22    five-year annual rate of return of all of those, and I

23    calculated that today, I would have, if I had put it somewhere

24    else, just average returns, 53 percent more than I had even

25    when I first invested.  Now I only have 52 percent of what I

1   had four or five years ago.

2          It will take over six years to get where I started,

3   and it will take eleven years to get where I should have been

4   today.  I thought, like many of us, we hoped to retire at age

5   65.  Now I'm probably looking at 75, but a little sarcasm.  I

6   probably won't live as long, starting at 75, nor be able to

7   enjoy the same activities, so perhaps I won't need as much

8   money to retire.

9          The cash part of my funds.  I started saving an

10  additional $300 a month and that will only take me two and a

11  half more years to get that back.

12         And frankly, the stress has taken so much years off my

13  life.  I can add to that other statement.  Health and emotional

14  effects.  I don't think I will get emotional here, but as we've

15  already spoken, the federal investigator called me late

16  January, January 28th, I literally was so angry, so upset, so

17  um ... stressed I didn't sleep for weeks, at all, months.  So I

18  actually called a friend and I was referred to a psychologist,

19  I got drugs so at least I could sleep.

20         I'm self-employed.  I lost money, because I could not

21  function.  I don't know if anyone has ever had insomnia, but

22  you don't function.  So I lost more money.  So not only was I

23  spending money on help and spending money on drugs and losing

24  my own money, it just exacerbated the entire problem that I

25  started with.

1          I had worked hard to save that money, as did others.

2    I had always relied on that money to grow and be my safety net.

3    Now it's half gone.

4          I believe that Gary Snisky has access to family funds

5    that could have easily paid us back.  And I thought he might

6    actually consider that, because I believe for them it's not

7    that much money.  For many of us it was a great deal.  Half of

8    my entire savings.

9          So anyway, I have learned that in other areas of my

10   life, that if it sounds too good to be true, it probably is.

11   Most of those -- well, and falling for Snisky's lies was one of

12   the bigger mistakes that I have made.  For other mistakes,

13   recovery time is fairly generally short.  This one, however, in

14   this game of life, I will be paying for the rest of my life.

15         I also feel horrible for his other victims.  Frankly,

16   I think it's completely appalling that you would look me in the

17   eye, say you are a Christian, say you are telling me the truth,

18   say you are going to make money for me and then steal it.

19         At least I'm at an age where I can still work and make

20   somewhat of a decent salary.  From what I understand, and I

21   don't know, but I believe a lot of the victims are not in that

22   situation.  I'm horrified by the fact that someone is retired

23   and half of their life savings have been stolen.  Half of their

24   grandkids' education fund.  Half their, you know, fun fund, to

25   enjoy the rest of their lives.

1          So I do hope that he is punished to the full extent of

2     the law, and I hope this made a difference.

3          THE COURT:  And just for the record, even though I

4     know it's on the record, you're Kate Kingery.

5          THE WITNESS:  Yes, I am, sorry.

6          THE COURT:  Okay.  Thank you, ma'am.  All right.

7     Frequently what I —— what I do is if there is a *Motion For*

8     *Departure* or *variance* that requires some separate consideration

9     from the issue of the overall sentence, I will start with that

10    and kind of go back and forth.

11         My sense in this instance is that this is really a bit

12    of a Gordian knot, and that the same things that are being said

13    to me to be departure or variance or 3553, it's a single

14    bundle, and so I'm not going to go and deal with it as

15    departure and then as variance and then as sentencing matters.

16         Ms. Rhyne, why don't you tell me where you come out on

17    this and let me hear —— the Government's position with regard

18    to sentencing.  I will hear from Mr. Pepin.  If there's

19    anything unexpected that comes up in that sequence, I will give

20    you a chance to respond.

21         MS. RHYNE:  Thank you, Your Honor.

22         The Government is asking for a 97-month sentence,

23    Your Honor.  I don't believe any downward departure or variance

24    is appropriate in this case.  This was a calculated fraud

25    scheme that went on for years.  It wasn't an aberrant behavior.

1    It wasn't some mistake Mr. Snisky made one day.  It lasted from

2    2010 -- at least 2010 through the beginning of 2013, and then

3    frankly his deception of a number of victims continued

4    throughout 2013.  So I think we have a very serious crime that

5    lasted for a number of years.

6            I also agree with Ms. Kingery, I don't see Mr. Snisky

7    expressing genuine remorse.  I think his words of consideration

8    for the victims in his various filings to the Court are

9    insincere and self-serving.  I see, instead, a much greater

10   focus on his attempts to minimize his conduct, to excuse his

11   conduct, to say *He just got carried away*.  He just, you know,

12   bragged a little bit more than he should have.  And when we

13   have the concrete nature of the lies that he told over and over

14   again, lies that were designed, calculated to get people to

15   part with their money, that's serious conduct that shouldn't be

16   minimized in the way that I think it has been.

17           I think that a 97-month sentence is important for both

18   specific deterrence to Mr. Snisky himself, for general

19   deterrence, I think if it got out to the public, that someone

20   who committed a -- a 5.2-million-dollar fraud got anything less

21   than a very significant sentence it would have a poor impact in

22   discouraging -- or a lack of deterrence for the public at large

23   for those who might be tempted to follow suit and engage in

24   similar fraudulent behavior.

25           I don't think that there are many mitigating factors

1    that warrant the Court giving him less than a 97-month

2    sentence.  I don't believe that the family circumstances that

3    he has alluded to warrant the Court's attention.  He simply is

4    saying *Wouldn't it be nice if my wife could continue to advance*

5    *her career and my kids could stay in their enrichment*

6    *activities*, and none of that is different than any average

7    family who didn't commit a crime, when they are trying to

8    juggle their responsibilities of having jobs and raising

9    children and maybe not having the money that they would like to

10   have to send their kids to enrichment programs.  So his

11   complaints along those end, again, very self-serving to me.

12            I believe for the victims in this case, anything less

13   than 97 months would not acknowledge what they have been

14   through and what Mr. Snisky put them through.  So I think --

15            *THE COURT:*  Why?  Because the guidelines put that

16   number in play?

17            *MS. RHYNE:*  Your Honor --

18            *THE COURT:*  I mean, to some extent, this is a problem,

19   and it's a recurring problem that I have with your office, and

20   I don't mean it to be an attack on you.  I don't.  But, you

21   know, the guideline numbers were 57 to 63, I know there is no

22   such guideline range, but I'm just pulling numbers out of the

23   air, you would be asking me for 63.

24            *MS. RHYNE:*  I would.

25            *THE COURT:*  If the guidelines were 120 to 137, you

1    would be asking me for 137.  I mean, I'm asking you to tell me

2    why you want 97 in a way that -- that at least speaks to that

3    being the right number for this -- in this individual case,

4    guidelines be damned.  And I know that's not -- the normal

5    approach.  I understand that.

6         *MS. RHYNE:*  Not only is it not the normal approach,

7    Your Honor, I feel somewhat constrained by the *Plea Agreement*

8    which is tethered to the guidelines in this case.  Left to my

9    own devices, I would come up with a higher number.  You know,

10   this case is one of those cases that I prepared for trial.  I

11   saw the evidence.  I saw the videos of Mr. Snisky making

12   presentations to his victims.  I know how shamelessly he lied

13   to them about very concrete things.  I think a very serious

14   term of incarceration is important, and yes, 97 may seem

15   arbitrary, but it is what the Government and Mr. Snisky

16   contemplated to be the low end of the guidelines per the Plea

17   Agreement.  I understand that's not where we are right now, as

18   a result of the Court's calculations, but that is how I come to

19   that number.  What I really am advocating for is a significant

20   sentence to punish him and deter him from similar criminal

21   conduct in the future.

22        I believe that Mr. Snisky, left to his own devices,

23   will defraud again.  I believe that's who he is and what he

24   does.  There is not a moment that I'm taken by his

25   representations that he doesn't intend to go back to the

1   financial markets.  I don't think he has any remorse for his

2   conduct in this case.  Because I am intimately involved --

3   familiar with the evidence in this case, I believe that a

4   significant punishment a required.

5          THE COURT:  All right.  But don't hide behind the Plea

6   Agreement, because it doesn't contain a word that requires you

7   to take any position at sentencing.

8          MS. RHYNE:  Perhaps I am misremembering --

9          THE COURT:  You are misremembering, because I'm

10  reading it.  One of the advantages of having a computer in

11  front of you while you talk.  But in any event, I don't want to

12  belabor the point.  I just want to engage in discussions that

13  aren't necessarily tethered to guidelines.

14          I want to ask you something different.

15          MS. RHYNE:  Okay.

16          THE COURT:  But I want to make sure I give you an

17  opportunity to say everything that you wanted to say to me

18  first.  So if you are not done, go ahead and continue, then I

19  will come back to my point.

20          MS. RHYNE:  To the extent that it -- pardon me.  Let

21  me regroup where I was.  I think I have addressed the evidence

22  in this case and the conduct in this case.  But I think it's

23  important that I do believe that Mr. Snisky is a recidivist and

24  that he does need to go to prison, both to protect the

25  community from his further criminal conduct and to teach him a

1    lesson.  With that I would ask the Court to go forward with

2    your question.

3         THE COURT:  The first question is, what is the basis

4    of the recidivism projection?

5         MS. RHYNE:  My statements?  Your Honor, Mr. Snisky was

6    investigated by DORA before he was investigated by the IRS,

7    that's one of the reasons we believe he changed the name from

8    from Colony Capital to Arete.  He was not deterred then, he

9    simply changed his fraud a little bit and then proceeded.

10        After we caught up with him in the search warrant, he

11   moved to California and began another fraud scheme.  Along

12   different lines.  A part of it was a property component and

13   part of it was he was pitching the same Ginnie Mae bond scheme.

14        THE COURT:  There is no evidence before me that what

15   occurred in California was a fraud.

16        MS. RHYNE:  Your Honor, I don't believe you allowed me

17   to present my entire --

18        THE COURT:  You can call it my fault.  You can call it

19   your fault.  You can blame it on the rain.  There's no evidence

20   before me that what happened in California was a fraud.

21        MS. RHYNE:  That's correct.

22        THE COURT:  What I wanted to ask you was this, one of

23   the factors that I have to consider is *the need to avoid*

24   *unwarranted sentencing disparity among defendants with similar*

25   *records who have been found guilty of similar conduct.*  You

1    know I'm going towards Mr. Greeot, and I am not, in any way,

2    shape or form, trying to revisit or second guess or play Monday

3    morning quarterback with the sentencing that Mr. Greeot got.

4    Frankly that's not my interest.

5            My interest is this, can you tell me what factors

6    there are that distinguish Mr. Greeot's conduct from

7    Mr. Snisky's conduct, so that when I look at what occurred in

8    Mr. Greeot's case, I can make a fair determination of the

9    extent to which I am dealing with individuals who have been

10   found guilty of similar conduct, because they're -- they are

11   both charged in this crime, although it is in two different

12   cases and two different -- that may have been an Information or

13   Indictment, I don't remember which.  You understand the

14   distinction I'm trying to draw?  I'm not trying to say that

15   sentence was too high, too low, too anything.  I just want to

16   know that to the extent that one can separate, if you would,

17   Mr. Snisky from Mr. Greeot, you are in a better position than I

18   to do that, and I am asking you to give me your interpretation

19   or impressions in that regard.

20       *MS. RHYNE:*  Absolutely.  First of all, it starts off

21   with the fact that Mr. Greeot earned a 5K1.1 motion for

22   cooperating against Mr. Snisky.  Second, he had a minimal role

23   in the offense that was right in this *Plea Agreement*, and the

24   Court, in that case, acknowledged and applied that.  Third,

25   there was great discussions at that sentencing hearing about

1   the much smaller role that Mr. Greeot played in the scheme as a

2   whole, vis-a-vis Mr. Snisky.

3         Mr. Snisky designed the fraud, he controlled the

4   fraud, Mr. Snisky controlled all of the bank accounts and the

5   money.  He profited from the fraud.  Mr. Greeot only profited

6   to the extent that he got occasional checks and in very small

7   quantities compared to the overall fraud from Mr. Snisky.  It

8   was --

9         THE COURT:  Checks for what?  One time he was an

10  employee, as I understand it, and at a later time he was called

11  an independent contractor.  Are we talking about checks for

12  those services or something additional.

13        MS. RHYNE:  For those services.  It was my

14  understanding, Your Honor, he was always an independent

15  contractor.

16        THE COURT:  All right.

17        MS. RHYNE:  And I believe the sum total that he was

18  paid was around 60,000, as compared to the 2.5 million dollars

19  that Mr. Snisky spent.  So -- and the evidence was also that

20  Mr. Greeot didn't know the full extent of the fraud until well

21  into the fraud.  And frankly, even then Mr. Snisky was keeping

22  his cards very close to his chest.  I think the evidence that

23  we learned during trial presentation -- or excuse me -- trial

24  preparation was that even people within the office didn't know

25  exactly how much money had been collected and that bonds hadn't

1    been purchased and that when they learned bonds hadn't been

2    purchased Mr. Greeot made the mistake of continuing to work

3    with Mr. Snisky, but he believed it would always be corrected.

4    Some sort of deficiency that would be corrected soon. *Soon,*

5    *soon*, is what Mr. Snisky promised. So he was never a knowing

6    participant to the same extent that Mr. Snisky was, and I think

7    Judge Brimmer -- the record in that sentencing, would reflect

8    that Judge Brimmer took that, highly, into consideration.

9           *THE COURT:* Again, I'm not trying to say what

10   Judge Brimmer took into consideration. He has the absolute

11   right to interpret the facts before him in the manner under

12   3553 and come to his decision. I just want to know, not what

13   Judge Brimmer did, but what you think are the differences

14   between Snisky and Greeott, and I understand that you answered

15   my question. I just I don't want to get -- have this drift off

16   into some, I don't know, challenge or validation or comment on

17   Judge Brimmer's sentence. I'm not commenting on it in any way,

18   shape or form. I just want to make sure that I understand your

19   view of the relative roles.

20          *MS. RHYNE:* Yes.

21          *THE COURT:* Mr. Snisky and Mr. Greeot, and then I will

22   do with it what I think is appropriate.

23          *MS. RHYNE:* And it was also the case, Your Honor, that

24   two of the victims that came in under Mr. Snisky predated

25   Mr. Greeot's involvement, and he was not accountable for the

```
 1   loss for those two victims.
 2          THE COURT:  Okay.  I'm satisfied with your answer to
 3   my question.  Thank you.
 4          MS. RHYNE:  Thank you, Your Honor.
 5          THE COURT:  Mr. Pepin.
 6          MR. PEPIN:  Thank you, Your Honor.  Do you have a
 7   question to start or -- no?
 8          Your Honor, I want to make one quick comment
 9   concerning one of counsel's statements about the focus on the
10   guidelines, and I really do not mean to sound snide, probably
11   is going to come out this way, but I think that there is a --
12   it's interesting that there would be a comment that If I
13   weren't bound by the guidelines I would go much higher, when
14   there has been a recommendation for the bottom of the
15   guidelines.  Somehow or another that just doesn't comport.
16          THE COURT:  Well, I mean, everybody is all over the
17   place.  You are asking for probation, the Government is asking
18   for 97 months, and frankly, I could go anywhere in between.  I
19   guess I can't go lower than what has been requested, but I
20   could go higher.
21          MR. PEPIN:  Well, that's --  that, of course, is true.
22          So I have asked for a sentence that would include
23   consideration of probation, and obviously that would be our
24   preference.  I really am not, frankly, expecting it.
25   Mr. Greeot received a six-month sentence, and I wouldn't expect
```

1    that you would go lower than what he would get, and so I'm not

2    expecting that.  I can understand why there would be this --

3    this view that Mr. Snisky was in a bit of a different situation

4    than Mr. Greeot.  He was more in control.  There's no question.

5           What I think I -- this becomes, I think you know, a

6    difficult set of circumstances.  Because the reality is there

7    isn't really much that Mr. Snisky can say that is going to

8    satisfy much of anyone.  If he shows remorse, it's not genuine.

9    It's, if he doesn't show remorse, he is -- he is a heartless

10   SOB.  If he looks you in the eye, then he is looking you in the

11   eye and that's horrible.  If he doesn't look you in the eye

12   then he is shiftless.  It's -- it's -- it becomes, in some

13   ways, impossible to address all of those sort of positions and

14   concerns, and so I'm not really going to try and do that.

15          I'm just going to say what we believe needs to be said

16   about this.  We have laid out, I think, tried to make it fairly

17   thorough, Mr. Snisky's life and who he has been outside of the

18   context of this case.

19          I understand counsel believes that is he going to

20   recidivate until the day he dies.  I don't see the pattern of

21   that.  At worst, if one were to say that what he did was he

22   woke up one day and decided, as a result of the Colony

23   Capital -- or to use the Colony Capital Investment program back

24   in 2010, to start defrauding people after -- so that's 2010

25   that's five years ago, he is 49 now, that means the serial

 1   recidivist started then.  His entire life does not show that.

 2   We don't have anything that suggests that, through any of

 3   his -- any time in his existence prior.  And that lends itself

 4   to a much more reasonable perspective on this.  Not that he

 5   just tripped -- we never said he just had an accident one day

 6   and committed fraud.  That's not how we have tried to describe

 7   this.

 8         We're not trying to say that Mr. Snisky didn't do

 9   things very, very wrong, but it is a much more complicated,

10   much more muddled, much more difficult set of circumstances

11   than him being one of the fraudsters one sees from, I don't

12   know, the movie Sting or from someplace else where that has

13   been his goal.  It's, in many ways, whether hapless is really

14   too strong of a word --

15         THE COURT:  It is.

16         MR. PEPIN:  But it's -- we're talking really about a

17   situation where a man had dreams and beliefs that he could get

18   from one point to another.  The reality is that him sitting

19   here today is a shock to him, and not because he just is

20   shocked that he got caught committing a fraud.  In reality

21   the -- the place he believed he would be today, a few years out

22   from having started all of this, whether it was with Colony

23   Capital or whether it was Arete, was that he would not be

24   sitting here after having read through, been the subject of all

25   of those letters, describing the pain and the hurt and the

1   loss, and sitting in a courtroom where you have got eyes

2   burning in the back of your head with hate, that you can

3   understand, but instead would be clapped on the back as a hero.

4   As a person who had actually -- was actually the focus of

5   people celebrating the fact that they had made the money he

6   believed that he could make.  And that they had -- that they

7   had been successful and enriched their retirement and made them

8   more comfortable so they could send their kids to college, and

9   been in a more comfortable situation.  Not that -- that was the

10  place that he envisioned him as being.

11        Now, whether one believes that to be delusional or

12  hopeful or entrepreneurial or whatever, to say that what he did

13  was wake up and decide he was going to commit fraud is just too

14  much, because it -- this does not -- it doesn't fit.

15        Yes, he did, he told lies.  There's no question.  He

16  said things.  He puffed --

17        *THE COURT:*  He pled guilty to more than telling lies.

18  He pled guilty to having devised and intended to devise a

19  scheme and artifice to defraud.  So to some extent I understand

20  what you are saying, to some extent I bristle a little bit,

21  because it sounds like, you know, he found himself in one spot

22  and said this untruth, and then, you know, another development

23  occurred and he said this untruth.  The fact is, there is a --

24  a -- a web of lies that exists before the investment, after the

25  investment, before the investigation, after the investigation,

1    and the crime for which he is here for is devising a scheme to

2    defraud.  At least one of the crimes he is here for is devising

3    a scheme to defraud.  So it's a little hard to reconcile this,

4    *I intended for, you know, milk and honey to flow to all of*

5    *these investors,* to reconcile that with, *I pled guilty to*

6    *having devised and intended to devise an artifice to defraud.*

7              MR. PEPIN:  Of course.  And I don't know that this is

8    the first time we have had this discussion.

9              *THE COURT:*  Probably not.  Won't be the last time

10   either.

11             MR. PEPIN:  I'm sure that that's true.

12             Because there is, of course, mixed into those -- those

13   charges, such charges, couple of different possibilities.  One,

14   literally that there's a bright line.  That on a day a person

15   woke up and said, *I'm committing fraud this morning*, and then

16   also mixed in those charges is a set -- the potential.

17   Different kind of circumstances.  Where -- where one isn't --

18   that isn't really that bold.  Isn't that nefarious.  Doesn't

19   start off that way.  But that what ends up happening is that

20   things start in motion, and people then tell bigger stories

21   about who they are and what they can do, and then other things

22   sort of happen and -- meaning that you take steps that -- that

23   are beyond sometimes -- here, completely beyond his

24   capabilities.  I mean in terms of just organizing the business,

25   and the way the whole thing was run.  Everything from the way

1    the paperwork was put together makes it look like an amateur

2    show.  And it's -- it's really just this -- this -- that mess

3    that at some point or another, because of the lies and because

4    of things that are just not right down the line, and because of

5    things that are -- become covering up and shuffling and trying

6    to figure out how you are going to stick your finger into this

7    hole to keep the dam from leaking, and how you are doing to

8    deal with this.  And then you move stuff from one place to

9    another.  All of that involves decisions that clearly have

10   fraudulent aspects to them.  There's a difference between that

11   in my estimation, and that's really where Mr. Snisky was, and

12   why the chance of him running off the rest of his life and

13   ripping people off and trying to set up some kind of scheme to

14   rip people off does not make sense to me.

15          And why it's important, as I said in my motion, that I

16   expected scoffing.  But why it's important that Jess Booth's

17   letter outlines the kind of plan.  The way this thing should

18   have been run to begin with.  The exact way it should have been

19   run; meaning; that you have a plan; that you have funding; that

20   you have lawyers looking at it; that you have experienced

21   people involved with it; you have structure; you have people

22   who are not going to be trying to figure out how in the world

23   they are going to get the operating funds, long before the

24   thing gets off the ground; and that you make sure that the

25   stuff is going to work, at least to the best of your ability,

```
 1    and you run models, and you run chances and stuff like that.
 2    Well, you know, that was nothing like what was going on here.
 3    And frankly, you know, there were a lot of players, other than
 4    Gary Snisky, who knew that it was that haphazard, and were just
 5    perfectly happy to throw, not just -- bring their own
 6    investors.  People that they worked with for years into it.
 7    For whatever reason.
 8              And so I -- I'm not trying to say, he didn't commit
 9    this fraud.  He did.  And I understand why you understand
10    that -- or you have the sense that it feels like perhaps you
11    haven't said the word but, waffling, but really it's an attempt
12    to, sort of, explain how this could happen without this -- how
13    you put together the man that everybody else, all of these
14    people, who have come in support of him, people who wrote these
15    letters and the like, who see him every day in their community,
16    see him and deal with him all the time, that person, with the
17    man who ended up doing this.  That's all I'm trying to do, and
18    I am not trying --
19              THE COURT:  And that's fair enough, and in that vein,
20    one of the things that -- okay.  You know this.  You know that
21    I do not believe for a moment that one who commits a felony,
22    for any crime in a particular area, that, you know, that person
23    is an evil person across all spectrums of life, and frankly,
24    you know, grows horns at night and runs around.
25              So it does not necessarily surprise me that people
```

1    that play -- that know him through his children, think well of

2    him.  I don't expect that a man convicted of fraud is going to

3    be, frankly, you know Damien from *The Omen* with respect to

4    the -- his children's friends' parents.  There's nothing

5    that -- there is no expectation there, but because there's no

6    expectation there, there's also not a whole lot of moving me

7    off of a conclusion that he is a garden-variety conman.

8    Because what I don't see are people who did business with him,

9    or people who were in professional relationships with him

10   speaking to his honesty and integrity.  I get this entire

11   collection of people who speak well of him, and I accept their

12   comments, in terms of their dealings with him, he has been a

13   decent human being, and I perhaps simplifying it too much.  But

14   I also look at the sort -- the nature of their relationship

15   with him.  How it's fundamentally different from the nature of

16   other people's relationships with him, and wonder, perhaps, *All*

17   *right, well, that's all interesting but he is not asking them*

18   *for money, so, why would I expect him* -- I mean let's be

19   truthful, if you are a conman and you are good at it, and if

20   you are going to get people to give you 5 million dollars you

21   have got to be good at it.  I would think that you were

22   basically a likable sort of guy.  I can't imagine people

23   investing all kinds of money with somebody who comes off as a

24   jackass, an unlikeable sort of guy.  Maybe -- maybe so.  And so

25   that's where, I mean, I see these things, but I wonder if they

 1   fit together the way you want me to see them or if they fit

 2   together at all.

 3          *MR. PEPIN:*  I see them as a component, Your Honor, and

 4   when I say that, partially I guess it's a response to the

 5   thoughts that, you know, *You got to put him away for as long as*

 6   *you can, because, you know, he is a conman.  Always has been a*

 7   *conman.  He is going to be a conman until the day he dies as a*

 8   *recidivist forever and ever*.  And when one puts together a life

 9   without any of this up to 45, which I think no small cracks,

10   it's a significant chunk of one's life, being law abiding, and

11   you look at the way people that have been with in the

12   community, see him, contributions that he has given in so many

13   ways, and you -- and take into consideration to addressing your

14   specific point, and that is, it's a good point that there's

15   nobody here from the business world.  But let's look when he

16   has been involved in the business world, really, and that has

17   been these last few years.  Because he sort of -- he came out

18   of working at a country club, you know, in Wisconsin, and came

19   here because he thought he could do this stuff and be good at

20   it.  Well, he was horrible at it and bad, lying, causing all of

21   these problems and all of this stuff.  So it's not as if he has

22   had really significant, you know, business connections that

23   haven't been in the context of this god-awful failure.

24          And so, I understand your point, but I don't -- it's

25   not like he has been in the community being a business man this

 1   way forever and ever.  You do have a letter from his cousin,

 2   who worked with him for awhile in Wisconsin.  I mean it's his

 3   cousin, it's like a brother to him, like the letter says, but

 4   you would expect what you would expect, but he is also a

 5   well-established and apparently respected business man, from

 6   everything I can tell.  So anyway in terms of -- that's my

 7   answer, if you will, to your comments.

 8            *THE COURT:*  I see the points you make.

 9            *MR. PEPIN:*  Thank you, Your Honor.  Let me see if

10   there's anything else.  I think it would be just so easy to

11   rehash and rehash and rehash, sort of, the mess that this whole

12   thing was.

13            I'm going to touch on one little example, really a big

14   one, but I mean it's, I think, fairly easily described.  This

15   whole thing got off the ground without having an operating

16   budget.  I mean money -- investor money started coming in, and

17   the crew, meaning, when I say Mr. Snisky and Mr. Sorrells, who

18   was the one bringing all of these people in, there just wasn't

19   an operating budget.  There was a projected budget.  I think I

20   touched upon this in my motion.  There was a projected budget,

21   but they weren't -- there wasn't really any money.  There was a

22   promise that some money would come, and this was from this man

23   Mr. Sorrells.

24            *MS. RHYNE:*  Your Honor, I'm going to object.  A lot of

25   this is unsupported proffer and it's not relevant to today's

 1   proceedings.

 2          *THE COURT:*  Overruled.

 3          *MR. PEPIN:*  Thank you.

 4          *THE COURT:*  Look -- go ahead.

 5          *MR. PEPIN:*  I will not go on and on about this,

 6   but...  So money was supposed to be coming in through, what I

 7   believe is, also, some sort of pyramid setup involving

 8   investment that was going on in Arizona through Mr. Sorrells.

 9   And then he -- that wasn't going to work, so what he suggested

10   was this Zeke thing, which is this online auction business, and

11   got Mr. Snisky and they got other people involved, they put

12   their own money into it, and actually had $400,000 on paper

13   that they were thinking they were going to use to fulfill this

14   operating stuff.  Well, of course, that turned out to be a

15   Ponzi scheme.  Everybody lost whatever little bit they had.

16          My only point in bringing this up is that there was

17   all this stuff going on.  I mean, there was -- without what you

18   would expect a real business plan, with exposed investors, to

19   involve.  And, you know, all of this in the context of

20   Mr. Snisky living in this community, being in Longmont, setting

21   down these hard roots there, living thoroughly there with his

22   family and being completely involved and everything, wanting

23   really to build his life there, and hoping to be successful and

24   wanting to be and then making this mess.

25          Our view is that, obviously, he is going to be

1    sentenced to something.  Should be a reasonable amount.  An

2    amount that reflects the seriousness of this, and in my view,

3    just about any amount of jail time, in light of all of this,

4    and his family, will accomplish that purpose, and that is not

5    just in terms of own personal deterrence, but in terms of the

6    world looking at it, and seeing what this has done to him and

7    what he owes across the board.

8              THE COURT:  Okay.

9              MR. PEPIN:  Thank you, Your Honor.

10             THE COURT:  Mr. Snisky, if you would -- well, I don't

11   see anything new there, Ms. Rhyne.

12             MS. RHYNE:  No, Your Honor.  Thank you.

13             THE COURT:  Okay.  Mr. Snisky, if you would join

14   Mr. Pepin at the podium, please.

15             Sir, this is your opportunity to speak to me,

16   directly, if you wish to, with regard to any aspect of any of

17   the matters that have been discussed today, or frankly, you

18   don't need to be constrained by that.  Anything that you think

19   is important that I know or hear from you, I will consider.

20   There is no time limit on you, nor is there some menu of items

21   that you need touch upon.  Anything at all that you think I

22   should consider, I will consider.

23             MR. PEPIN:  I think he intends -- could he read words

24   that he has written, Your Honor?  That would be most

25   comfortable for him.

1          *THE COURT:*  That's fine.

2          *THE DEFENDANT:*  Your Honor, I'm writing this letter --

3     I wrote a letter is what I did, to get my feelings down on

4     paper so I can follow them without finding myself drifting all

5     over the place.

6          I'm writing this letter to express my feelings of

7     total remorse for the hurt and loss I caused to all of those

8     who trusted me and have lost as a result.  I never meant for

9     any loss.  I never have had any intent on harming anyone.  I do

10    recognize and acknowledge and can almost pinpoint where I

11    failed to do the right thing through decisions I made and

12    through the decisions I did not make.  I think about how I

13    should have turned to greater professional assistance from the

14    beginning.  I think about how in the effort to the make things

15    work, there were times I said things that were not true.  I

16    think about the people who lost, and I am so angry at myself,

17    and tremendously disappointed.

18         I'm fully aware of the hurt and anguish that my

19    business failings have caused, and I take full responsibility.

20    I do understand what others are feeling from their loss, as I

21    have experienced loss from the death of my brother and other

22    immediate family members and can put myself in their shoes

23    knowing how difficult the experience of loss can be.  The fact

24    that I was at the heart of the failures that caused this loss

25    is more than I can bear.  I never wished the losses suffered

1  upon anyone.

2        Had I believed for one instance this is where we would

3  be here today, I would have never moved forward in this

4  business.  I'm ashamed for letting the promise of what we

5  wanted to achieve cloud my judgment in so many ways.

6        I hope that you, Your Honor, that everyone, will

7  understand that I'm not forgetting the people who have lost

8  because of me, when I say that I have suffered personal

9  humiliation.  I will never forget being arrested at the airport

10 as I exited the plane, my hands cuffed behind my back and

11 guided through the airport to a holding room.  It was a

12 horrible moment for me.  I suppose that the people who lost

13 money had a similar moment when they realized much of their

14 money was gone.

15       I am afraid for my family, and I am afraid of going to

16 prison.  The embarrassment of having to go home and look into

17 the eyes of my wife, my children, my family, my friends, my

18 community, my church and try to explain what has happened is

19 quite humbling.  It is with me always.  As it is knowledge that

20 there are people out there who likely hate me, I do not do -- I

21 did not do all I could, I did not make the correct decisions.

22 I did things I should not have done.  The thought that those

23 who indeed entrusted me, may no longer trust me is devastating

24 for me.

25       I'm a family man with three wonderful daughters and a

1    wife.  My wife and I are quite thoroughly involved in our

2    daughters' lives, because these are their most formidable years

3    for personal growth and direction.  I would never want to be a

4    negative influence on them or demonstrate being a bad role

5    model through my conduct.

6        I have always worked hard and I have never been in

7    trouble with the law before.  I always teach and inspire my

8    wife, my daughters and my community to achieve and further

9    exceed their goals and aspirations.  Do volunteer at St. John

10   The Baptist where my children attend school.  I assist in

11   coaching softball, volleyball, basketball and committed to

12   these coaching sports for years to come.

13       I also volunteer at the school, helping in other

14   areas, offering assistance to teachers, classroom help, school

15   activities and various school functions.  I am a member of the

16   Knights of Columbus and St. Johns, and I also serve on my

17   neighborhood -- I had served until this case on the

18   neighborhood homeowners' association, board of directors, for

19   five years, including three years as president of the board.

20       Since this situation I have spoken with and will

21   continue to speak with my parish pastor and work with a

22   therapist, and have come to a full understanding of how I can

23   assist my thought process and avoid ever trying anything like

24   this again.

25       They have assisted me in clearly understanding my deep

1   feelings of remorse, that were caused by my decision, and I

2   have been able to identify each one of these serious and

3   painful errors.  Through personal change and sacrifice I intend

4   to work diligently to replace the losses I caused.  I have

5   learned to have a clear and more defined understanding of my

6   work, my responsibilities and my expectations going forward.

7           My days of taking on the world, of trying to be more

8   than I am have been beaten out of me.  I thought great things

9   would be achieved for every individual here.  That I would make

10  things happen.  And I failed.

11          The depth of despair and shame I feel is

12  unquantifiable.  Although I personally do not know many of

13  these individuals who have suffered in the loss, I have wanted

14  to write each of them personally and let them know how sorry I

15  am.  I have been advised by counsel not to do so until now.  I

16  do not want to force myself on anyone.  And I know they are

17  hurt and angry.  I am not looking for their forgiveness, but to

18  let them know that I deeply regret the harm that I have caused.

19  I wish for nothing more than to return what has been lost to

20  every individual.

21          I did have meetings in July 5th of 2013, I also did

22  offer, to see what I could do to pay back the individuals at

23  that time, as quickly as possible and as soon as possible.  But

24  unfortunately that went on deaf ears.

25          I do not have anything else to say, other than anyone

1    to think I do not have remorse or believes I do not, doesn't

2    know me.  This is the most overwhelming situation I could ever

3    find myself in.  Anyone could.  That's all I can say at this

4    time.

5           *THE COURT:*  All right.  In fashioning a sentence here

6    today, I have considered the presentence report, all matters

7    relating to that report filed by the Defendant and the

8    Government.  Statements and arguments of counsel for the

9    parties.  And I've also considered the testimony of the special

10   agent, I have also considered the statement of Ms. Kingery.  I

11   have also considered obviously, the statement Mr. Snisky.

12          I'm mindful of the fact that I am required by law to

13   impose a sentence sufficient, but not greater than necessary,

14   to achieve the purposes of sentencing as described in 18 U.S.C.

15   Section 3553(a)(2).  In fashioning such a sentence, I have

16   considered both individually and as a whole all of the 3553(a)

17   factors which must be considered in determining a sentence,

18   specifically including those factors that have been discussed

19   and emphasized by counsel here today.

20          I will also say this, I understand that there is, in

21   fact, a heartfelt disagreement with the guideline calculation.

22   Although I strive to calculate the guideline correctly, I am

23   not bound by the guidelines and would state unequivocally, that

24   the sentence I'm going to give today would not be affected by

25   the higher guideline range.

1            With that, Mr. Snisky, here's what I do.  I basically,

2      rather than go off into this lengthy statement, which tends to

3      be technical in nature, I tell you what I'm going to do and I

4      tell you why I'm going to do it.  Sentencing is obviously not

5      easy for you, and I understand that.

6            As I indicated earlier, I have a range of things that

7      are going on here.  I have probation saying 78 months,

8      Government asking for 97, and you, through counsel, asking

9      technically for probation.  But recognizing that that may be an

10     extreme position, certainly in general, asking for something

11     below the guideline range that is appropriate in my eyes.

12            Let me start by saying, to the extent that there is

13     as -- there is a formal *Motion For Departure*, I deny the motion

14     for departure.  I do not think that the circumstances that are

15     identified in this case are such that within the realm of the

16     guidelines, which is where departure analysis occurs, there is

17     a reason to say that this is a case where family ties and

18     responsibilities should -- are so different from the ordinary

19     case that a departure is warranted.  And to the extent that I

20     may be incorrect, in terms of my consideration of the dyslectic

21     problems of your daughters, then I would decline to exercise

22     the discretion that I would have, even if this were a

23     departure-justified sentence.

24            At the end of the day, Mr. Snisky, this is where I

25     come out.  I have different people telling me different things

1    about you, and while, perhaps, not that important to you, I

2    will tell you that when I come out here, it's a little bit like

3    being on a broken elevator.  I listen and consider what

4    Ms. Rhyne says, and perhaps the elevator goes up, and I listen

5    to Mr. Pepin, and perhaps the elevator goes down, and it moves

6    around as I try and figure out what's the right sentence.  And

7    at the end of the day there are two things that are striking to

8    me, in this case, and that's what drives my sentence.

9         The first is that no matter how you slice it, at the

10   end of the day, considering all of the factors all of the

11   things that's said, I think you are a garden-variety conman.

12        The second thing is, that when I listen to you, you

13   cannot stop backtracking from real involvement in this.  When I

14   listen to, *you never intended any of this*.  *These are losses*

15   *caused by business failures*.  These are losses caused by lies

16   and deceit and fraud.  It's not losses caused by business

17   failings.  It's losses caused by the fact that when faced with

18   the choice of a business failing and lying, you chose lying,

19   embraced it and just wouldn't stop.

20        And I know that it may be -- that there are many

21   different ears in this courtroom right now.  Some will hear it

22   the way I heard it, some will hear it very differently, but on

23   the one hand, you say, *I did this and I am sorry and I am*

24   *remorseful*, and on the other hand, you get on the mountain and

25   say, too loudly, *Nobody ever intended to be hurt.  It's all a*

1    *product of business failings.  Oh, if it could be some other*

2    *way*.  It could have been some other way, had you just simply

3    not lied.  It was, in many ways, as simple as that.

4          Now, I understand when you are in the throws of

5    things, you have expectations that you will be able to climb

6    out of the hole.  It may be more complicated than I'm looking

7    at it now, but I'm trying to assess the crime.  The crime has a

8    serious impact, and that elevator lands at 48 months, that's

9    what I'm going to give you.  And in terms of the rest of it,

10   I'm going to give you the terms and conditions of supervised

11   release that are there in the presentence report.  For the

12   three-years supervised release, and that's going to be my

13   sentence.

14         Anything you want to say by way of making a record or

15   protect -- or objecting or other matters before I formally

16   impose sentence?

17         *MS. RHYNE:*  Your Honor, for the record, we would

18   object to the sentence as being below what we believe the

19   correct guideline sentence.

20         *THE COURT:*  That's not the law.  At least tell me

21   substantively unreasonable.  Don't tell me the Government

22   disagrees with me, so what.

23         *MS. RHYNE:*  I'm trying to listen to what our --

24         *THE COURT:*  They would have you say something more

25   polite than what you just said.  I hear that.

1          MS. RHYNE:  For the record, we are objecting being

2    substantively unreasonable, given the facts in the case.  I

3    understand that the Court is going to address restitution in

4    the formal reading.

5          THE COURT:  Restitution is going to be ordered.  Look,

6    everything that was in the presentence report, by way of a

7    recommendation, I intend to do.  The number that was in debate,

8    was the amount of time.  And so, that's the thing that I wanted

9    to make clear in terms of my initial comments.

10         Do you want to make -- say any other additional

11   comments?

12         MR. PEPIN:  No.

13         THE COURT:  All right, then.

14         MR. PEPIN:  You mean generally in terms -- in terms of

15   potential objection?

16         THE COURT:  Yeah.  Protecting whatever record you

17   choose to, to the extent that you can protect the record, in

18   light of the appeal waiver.  If you choose to put something on

19   the record, I give you the opportunity to to do so.

20         MR. PEPIN:  Thank you, Your Honor.  We will maintain

21   our objection, maintain our motion, believe the Court's finding

22   not that the downward departure, and that the *Motion For*

23   *Statutory Sentence* should not be granted, is substantively

24   unreasonable procedurally so, as well.  Thank you.

25         THE COURT:  And to be clear, in my mind, I have given

1    a, quote, *statutory sentence*.

2            *MR. PEPIN:*  Understood.

3            *THE COURT:*  It happens to be one within the range.

4            All right.  I previously made my findings with respect

5    to the guidelines and I needn't repeat those findings now in

6    terms of the facts.  The facts -- factual statements, in the

7    presentence report, as complimented and supplemented by my

8    findings after the presentation of testimony earlier today,

9    constitute my factual findings, the guideline recitations as

10   set forth in the presentence investigation report are adopted

11   by me, as the -- my guideline findings for purposes of

12   sentencing today.

13           I find, as indicated, that the Offense Level of 28,

14   Criminal History Category I, which results in an imprisonment

15   range of 78 to 97 months, fine range of $12,500 to $125,000,

16   supervised release range of one to three years.  I find no

17   reason to depart or vary from the advisory guideline range,

18   which does not exceed 24 months, and will impose a sentence

19   within that range.

20           Pursuant to the Sentencing Reform Act of 1984 it is

21   the judgment of the Court that the Defendant, Gary Snisky, is

22   hereby committed to the custody of the bureau of prisons to be

23   imprisoned for a term of 84 months on each count to be served

24   concurrently.

25           Upon release from imprisonment he shall be placed on

1    supervised release for a term of three years.  His term

2    consists of three years on each of Counts 2 and 14, both

3    Counts to run concurrently.

4         Within 72 hours of release from the custody of the

5    bureau of prison, the defendant shall report to the probation

6    office in the district to which the defendant is released.

7    While on supervised release the mandatory conditions of

8    supervision apply; meaning, that the defendant shall not commit

9    another federal, state or local crime, shall not possess a

10   firearm a defined in 18 U.S.C. Section 921, shall comply with

11   the standard conditions that have been adopted by this Court.

12   Because -- because this sentence includes restitution, which I

13   will to get to in a moment, it is a condition of supervision

14   that the defendant pay in accordance with the schedule payment

15   set forth in the judgment.

16        I waive mandatory drug-testing provisions, because the

17   *Presentence Report* indicates a low future risk of substance

18   abuse by the defendant.

19        Mr. Snisky shall cooperate in the collection of DNA as

20   directed by the probation officer.

21        I find that the standard conditions of supervision are

22   appropriate, and under 3553(a) and impose those as considered

23   in that context.  I also find that the following special

24   conditions of supervised release are determined to be

25   reasonably related to the factors enumerated in 18 U.S.C.

1    3553(a) and 18 U.S.C. 3553(d).

2              Further, based on the nature and circumstances of the

3    offense, and the history and characteristics of this particular

4    defendant the following conditions do not constitute a greater

5    depravation of liberty than reasonably necessary to accomplish

6    the goals of sentencing.  One, the defendant shall not incur

7    new credit charges or open additional lines of credit without

8    the approval of the probation officer, unless the defendant is

9    in compliance with his periodic payment obligations imposed

10   pursuant to the Court's judgment and sentence.  Two, as

11   directed by the probation officer, the defendant shall apply

12   any moneys received from income tax refunds, lottery winnings,

13   inheritances, judgments and any anticipated or unexpected

14   financial gains to the outstanding Court-ordered financial

15   obligations in this case.  Three, the defendant has an

16   outstanding financial obligation, and accordingly the probation

17   office may share any financial or employment documentation

18   relevant to the defendant with the Asset Recovery Division of

19   the United States Attorney's Office to assist in the collection

20   of that obligation.  Four, all employment for the defendant

21   shall be approved in advance by the supervising probation

22   officer.

23             The defendant shall not engage in any business

24   activity unless such activity is approved by the probation

25   officer.  Any approved business activity must operate under a

1    formal registered entity.  For any approved business activity,

2    the defendant shall provide the probation officer with the name

3    of all business entities and their registered agents.  The

4    defendant shall not register any new business entity foreign or

5    domestic without the approval of the probation officer.  The

6    defendant shall not cause or induce others to register business

7    entities on his behalf.

8         For any approved business activity, the defendant

9    shall maintain business records.  The defendant shall provide

10   all requested documentation and records to the probation

11   department regarding any of his business activities as

12   requested by the probation officer.  The defendant shall --

13   five, the defendant shall maintain separate personal and

14   business finances and shall not commingle personal and business

15   funds or income in any financial accounts, including but not

16   limited to bank accounts and lines of credit.

17        The defendant shall make restitution in the total

18   amount of $2,531,032.22, in the amounts indicated in the

19   presentence report.  Restitution is hereby ordered to be

20   jointly -- joint and several with Richard Greeott, case number

21   13-cr-375-PAB-1.  The joint and several aspect of the

22   restitution is to the extent of the amount of $2,179,938.76.

23        Each victim shall receive an approximate proportional

24   payment based on the victim's share of the total loss.

25        I have determined that the defendant does not have the

1    ability to pay interest, and it is the order of the Court that

2    the interest requirement is waived for purposes of the

3    restitution.

4         The defendant shall pay a Special Assessment of $200

5    which is due and payable immediately.  I find that he doesn't

6    have the ability to pay a fine, and so I waive the imposition

7    of a fine in this case.

8         It is ordered that the monetary obligation ordered by

9    this judgment shall be due as follows, the Special Assessment

10   Restitution Obligations are due and payable immediately.  Any

11   unpaid restitution balance upon release from incarceration

12   shall be paid in monthly installments during the term of

13   supervised release.  The monthly installment payments will be

14   calculated at at least 10 percent of the defendant's gross

15   monthly income.

16        Pursuant to Rule 32.2 of the Federal Rules of Criminal

17   Procedure, the defendant shall forfeit his interest in the

18   following property to the United States, money judgment in the

19   amount of $2,531,052.31 as reflected in the *Plea Agreement* in

20   Document Number 111.

21        The defendant is advised of his right to appeal the

22   sentence.  If he desires to appeal, a *Notice Of Appeal* must be

23   filed with the Clerk of the Court within 14 days after entry of

24   judgment or the right to appeal will be lost.  If the defendant

25   is unable to afford an attorney for an appeal, the Court will

1     appoint one to represent him.  If he so requests, the Clerk of

2     the Court must immediately prepare and file a *Notice Of Appeal*

3     on your behalf.

4              Mr. Snisky, as I remind you of your right to appeal

5     the sentence, I also remind you, without further comment, of

6     the terms and conditions of your *Plea Agreement*, and that it

7     may affect your appellate rights.

8              I order that the defendant's -- well, there's the

9     issue.  My understanding -- do you want to be heard on

10    surrender?

11             *MS. RHYNE:*  No, Your Honor.  We are not asking for him

12    to be remanded.  I do -- oh --

13             *THE COURT:*  Go ahead.  I'm letting my marshal go.

14             *MS. RHYNE:*  I'm not sure if you had come to wrapping

15    up other issues.  There was a preliminary order of forfeiture

16    filed by our forfeiture -- you are getting to that?

17             *THE COURT:*  No, go ahead.  I'm acknowledging that I

18    know that.

19             *MS. RHYNE:*  So it pertained to $45,000 that was

20    returned by Dawn Rasmussen, but it is my understanding that in

21    order to forfeit it they need an actual order from the Court in

22    this criminal proceeding, and I apologize I don't have the

23    docket number, but I believe it was filed in the last two

24    months.

25             *THE COURT:*  In the last what?

1          *MS. RHYNE:*  Two months.

2          *THE COURT:*  I thought I signed a preliminary order of

3     forfeiture.

4          *PROBATION:*  Your Honor, it looks like **Document 105** was

5     filed on May 6th, that it was a *Preliminary Order Of Forfeiture*

6     *For Personal Money Judgment Against Gary Snisky.  Preliminary*

7     *Order Of Forfeiture Of A Substitute Asset.*  If that is what the

8     Government is referring to.

9          *MS. RHYNE:*  It is.  I believe that has to be

10    explicitly referenced at sentencing in order for it to be

11    valid, is my limited understanding of the forfeiture.

12         *PROBATION:*  My understanding is the Government

13    actually -- Judge already ordered that in **Document 111.**

14         *THE COURT:*  That's what I thought, but to the extent

15    that there is any question, to the extent that there's an

16    additional or other amount of forfeiture contained in the

17    *Preliminary Order Of Forfeiture* that was submitted to the Court

18    at **Document 105,** I note that there has been no objection, the,

19    *Preliminary Order Of Forfeiture* I believe that I have already

20    signed an order granting the *Preliminary Order Of Forfeiture*,

21    and to the extent that the collectability of that amount or the

22    enforceability of that order is dependent upon what I say at

23    the course of this sentencing hearing, I note, accept and

24    incorporate that as an additional forfeiture that I intend as

25    part of the judgment.

1           *MS. RHYNE:*  Thank you, Your Honor.

2           *THE COURT:*  Satisfied?

3           *MS. RHYNE:*  I am.

4           *THE COURT:*  Anything further?

5           *MS. RHYNE:*  No.  Thank you.

6           *MR. PEPIN:*  Your Honor --

7           *THE COURT:*  And then let me wrap up the notion, and

8    then we will deal -- let me wrap up where I am, and then we

9    will come back to some additional touch-up matters.

10          I order that the defendant's bond is continued, and

11   that the Defendant, Gary Snisky, is ordered to surrender to the

12   institution designated by the bureau of prisons within 15 days

13   from the date of designation.

14          Now I am -- I did not ask you earlier, but if there

15   are additional recommendations you would like me to make I will

16   consider them now.

17          *MR. PEPIN:*  Could I have just a minute, please?  We

18   have been talking about this.

19          (Discussion off the record.)

20          *THE COURT:*  And obviously my 2:30 is running a little

21   late, so just bear with me.

22          *MR. PEPIN:*  Your Honor, two things, please.  It is

23   likely that Mr. Snisky's family will move back to White Plains,

24   New York.  We anticipated that might happen already, it hasn't,

25   but in light of that, would the Court designate or recommend

1    designation of a facility near White Plains, New York?

2              THE COURT:  I will and I do.  Justine, do you have

3    that?  Basically, I recommend that Mr. Snisky be designated to

4    a suitable facility in the vicinity of White Plains, New York.

5              MR. PEPIN:  Thank you, Your Honor.  And secondly,

6    between -- it appears likely that between now and the time that

7    he is required to turn himself in, Mr. Snisky will want to try

8    to move his family back to White Plains, New York.

9              Can I ask for permission now to allow him to travel to

10   do that or would you prefer that once arrangements would be

11   firmed up that I would file a motion to that --

12             THE COURT:  You can ask me, but I'm not inclined to do

13   it, because there's too much right now that I don't know.  I

14   will take a separate motion.  I will tell you that my reaction

15   to the motion may be a little bit like that dog that used to be

16   part of the RCA trademark, cocked his head listening to the

17   music coming over, because what I remember was much noise at

18   the *Change of Plea* where you asked me to continue it so he

19   could move his family, and Ms. Rhyne was going, *No, no, a*

20   *thousand times*, *no*.  Those weren't her words, but that

21   certainly was the impression.  She did not want a continuance,

22   and the reason I asked today whether your position, in terms of

23   voluntary surrender, was I remembered that as of that moment, I

24   would have predicted, based on that moment, a different answer

25   from you, and I am not saying that that would have been right

1  or wrong, it's just my comment.  And so it seemed like if we

2  got the ball pushed out to move his family, and he didn't move

3  his family, now we are trying to get the ball pushed out to

4  move his family again, I don't know what that means.  I'm not

5  saying no.  I'm not saying yes.  I am saying to you, though

6  that if he is saying, *Delay things six months*, that ain't going

7  to happen.

8          MR. PEPIN:  No.  The question really was more geared

9  toward permission to actually be out of the state as opposed

10  to --

11          THE COURT:  And we will deal with that.  We will deal

12  with that.  Frankly, when you file it, Ms. Rhyne, if you

13  respond, because I'm curious -- I will consider the

14  Government's position on this.  A lot of times on bond issues,

15  my inclination is that although the Government has a say in it,

16  it's really between the defendant and the Court.  This a

17  sentenced individual and I'm more amenable than I might

18  otherwise be to listen to the Government's position.  That's

19  all.  Whatever that means.

20          MR. PEPIN:  Thank you, Your Honor.

21          THE COURT:  All right.  Anything further on behalf of

22  either party?

23          MS. RHYNE:  No, Your Honor.  Thank you.

24          MR. PEPIN:  Nothing further.

25          THE COURT:  We will be in recess in this matter, take

1    ten minutes –– no, Tammy deserves more.  Fifteen minutes before

2    we start the other matter, and recommence at five of.  We will

3    be in recess.

4          *THE COURTROOM DEPUTY:*  All rise.  Court is in recess.

5          (Recess at 2:40 p.m.)

6                              **INDEX**

7    **Item**                                                      **Page**

8    ITEM                                                           PAGE

9       Special Agent Andersen

10            Direct Examination By Ms. Rhyne                9

11            Cross-examination By Mr. Pepin                16

12    Statement by Victim, Ms. Kingery                      25

13    Statement by Ms. Rhyne                                28

14    Statement by Mr. Pepin                                37

15    Statement by Mr. Snisky                               49

16    Imposition of Sentence by The Court                   53

17                         REPORTER'S CERTIFICATE

18

19        I certify that the foregoing is a correct transcript from
     the record of proceedings in the above–entitled matter.
20

21        Dated at Denver, Colorado, this 3rd day of September,

22    2015.

23                         s/Tammy Hoffschildt

24                         _____

                           Tammy Hoffschildt, FCRR RMR,CRR
25