EXHIBIT 1A

*EXHIBIT 1A*

# OPERATING AGREEMENT

## OF

### ARETE, LLC

A LIMITED LIABILITY COMPANY

ORGANIZED IN THE MONTH OF MAY

IN THE YEAR 2011

AND UNDER THE LAWS OF THE STATE OF COLORADO

EXHIBIT 1A

## ( Colorado Limited Liability Company) ARETE, LLC
## Operating Agreement

This Operating Agreement (this "Agreement") is entered into this 1st day of July 2011, by and among the signatories hereto.

### Explanatory Statement

The parties have agreed to organize and operate a limited liability company in accordance with the terms of, and subject to the conditions set forth in, this Agreement. It is anticipated that such limited liability company will operate as a Private Company.

NOW, THEREFORE, for good and valuable consideration, the parties, intending legally to be bound, agree as follows:

ARETE, LLC – Rev:B

EXHIBIT 1 A

## Section I - Defined Terms

The following capitalized terms shall have the meanings specified in this Section 1. Other terms are defined in the text of this Agreement; and, throughout this Agreement, those terms shall have the meanings respectively ascribed to them.

*"Act"* means the Colorado Limited Liability Company, as amended from time to time.

*"Adjusted Capital Account Deficit"* means, with respect to any Interest Holder, the deficit balance, if any, in the Interest Holder's Capital Account as of the end of the relevant taxable year, after giving effect to the following adjustments:

(i) the deficit shall be decreased by the amounts which the Interest Holder is obligated to restore pursuant to Section 4.4.2, or is deemed obligated to restore pursuant to Regulation Sections 1.704-2(g)(1) and -2(i)(5) (i.e., the Interest Holder's Share of Minimum Gain and Member Minimum Gain); and

(ii) the deficit shall be increased by the items described in Regulation Section 1.704-1(b)(2)(ii)(d)(4), (5), and (6).

*"Adjusted Capital Balance"* means, as of any day, an Interest Holder's total Capital Contributions less all amounts actually distributed to the Interest Holder pursuant to Sections 4.2.3.4.1 and 4.4 hereof. If any Interest is transferred in accordance with the terms of this Agreement, the transferee shall succeed to the Adjusted Capital Balance of the transferor to the extent the Adjusted Capital Balance relates to the Interest transferred.

*"Affiliate"* means, with respect to any Member, any Person: (i) which owns directly or indirectly more than 33% of the voting interests in the Member; or (ii) in which the Member owns directly or indirectly more than 33% of the voting interests; or (iii) in which more than 33% of the voting interests are owned directly or indirectly by a Person who has a relationship with the Member described in clause (i) or (ii) above.

"Agreement" means this Agreement, as amended from time to time.

EXHIBIT 1A

"Asset Value" means the value of all Company assets as reflected on the most recent independently prepared financial statement of the Company; provided, however, that, notwithstanding anything contained herein to the contrary, the value of the Company's accounts receivable shall be 50% of their face amount and the value of the Company's unbilled time shall be 50% of the then prevailing billing rate for the professional generating the time.

"Bankruptcy" means, with respect to any Member, the occurrence of any of the following events:

(i) the Member makes an assignment for the benefit of creditors;

(ii) the Member files a voluntary petition of bankruptcy;

(iii) the Member is adjudged bankrupt or insolvent or there is entered against the Member an order for relief in any bankruptcy or insolvency proceeding;

(iv) the Member files a petition or answer seeking for the Member any reorganization, arrangement, composition, readjustment, liquidation, dissolution, or similar relief under any statute, law, or regulation;

(v) the Member seeks, consents to, or acquiesces in the appointment of a trustee for, receiver for, or liquidation of the Member or of all or any substantial part of the Member's properties;

(vi) the Member files an answer or other pleading admitting or failing to contest the material allegations of a petition filed against the Member in any proceeding described in Subsections (i) through (v); or

(vii) any proceeding against the Member seeking reorganization, arrangement, composition, readjustment, liquidation, dissolution, or similar relief under any statute, law, or regulation, continues for one hundred twenty (120) days after the commencement thereof, or the appointment of a trustee, receiver, or liquidator for the Member or all or any substantial part of the Member's properties without the Member's agreement or acquiescence, which appointment is not vacated or stayed for one hundred twenty (120) days or, if the appointment is stayed, for one hundred twenty (120) days after the expiration of the stay during which period the appointment is not vacated.

ARETE, LLC – Rev:B

*EXHIBIT 1A*

"*Capital Account*" means the account maintained by the Company for each Interest Holder in accordance with the following provisions:

(i) an Interest Holder's Capital Account shall be credited with the Interest Holder's Capital Contributions, the amount of any Company liabilities assumed by the Interest Holder (or which are secured by Company property distributed to the Interest Holder), the Interest Holder's allocable share of Profit and any item in the nature of income or gain specially allocated to such Interest Holder pursuant to the provisions of Section IV (other than Section 4.3.3); and

(ii) an Interest Holder's Capital Account shall be debited with the amount of money and the fair market value of any Company property distributed to the Interest Holder, the Interest Holder's allocable share of Loss, and any item in the nature of expenses or losses specially allocated to the Interest Holder pursuant to the provisions of Section IV (other than Section 4.3.3).

If any Interest is transferred pursuant to the terms of this Agreement, the transferee shall succeed to the Capital Account of the transferor to the extent the Capital Account is attributable to the transferred Interest. If the book value of Company property is adjusted pursuant to Section 4.3.3, the Capital Account of each Interest Holder shall be adjusted to reflect the aggregate adjustment in the same manner as if the Company had recognized gain or loss equal to the amount of such aggregate adjustment. It is intended that the Capital Accounts of all Interest Holders shall be maintained in compliance with the provisions of Regulation Section 1.704-1(b), and all provisions of this Agreement relating to the maintenance of Capital Accounts shall be interpreted and applied in a manner consistent with that Regulation.

"*Capital Contribution*" means the total amount of cash and the fair market value of any other assets contributed (or deemed contributed under Regulation Section 1.704-1(b)(2)(iv)(d)) to the Company by a Member, net of liabilities assumed or to which the assets are subject.

"*Capital Proceeds*" means the gross receipts received by the Company from a Capital Transaction.

"*Capital Transaction*" means any transaction not in the ordinary course of business which results in the Company's receipt of cash or other consideration other than Capital Contributions, including, without limitation, proceeds of sales or exchanges or other dispositions of property not in the ordinary course of business, financings, refinancing, condemnations, recoveries of damage awards, and insurance proceeds.

EXHIBIT _1_ A

"*Cash Flow*" means all cash funds derived from operations of the Company (including interest received on reserves), without reduction for any noncash charges, but less cash funds used to pay current operating expenses and to pay or establish reasonable reserves for future expenses, debt payments, capital improvements and replacements as determined by the General Manager. Cash Flow shall not include Capital Proceeds, but shall be increased by the reduction of any reserve previously established.

"*Code*" means the Internal Revenue Code of 1986, as amended, or any corresponding provision of any succeeding law.

"*Company*" means the limited liability company formed in accordance with this Agreement.

"*CSOS*" means the Colorado Secretary of State.

"*Disability*" means, with respect to any Member, the Member's total inability for a continuous period in excess of one hundred twenty (120) days to undertake responsibilities for the Company as a result of a physical or mental illness or injury, as determined by Members holding a majority of the Interests then held by Members.

"*General Manager*" is the Person designated as such in *Section* V.

"*Interest Holder*" means any Person who holds a Membership Interest, whether as a Member or as an unadmitted assignee of a Member.

"*Involuntary Withdrawal*" means, with respect to any Member, the occurrence of any of the following events:

(i) the Member makes an assignment for the benefit of creditors;

(ii) the Member files a voluntary petition of bankruptcy;

(iii) the Member is adjudged bankrupt or insolvent or there is entered against the Member an order for relief in any bankruptcy or insolvency proceeding;

(iv) the Member files a petition seeking for the Member any reorganization, arrangement, composition, readjustment, liquidation, dissolution, or similar relief under any statute, law, or regulation;

(v) the Member seeks, consents to, or acquiesces in the appointment of a trustee for, receiver for, or liquidation of the Member or of all or any substantial part of the Member's properties;

ARETE, LLC – Rev:B

EXHIBIT 1A

(vi) the Member files an answer or other pleading admitting or failing to contest the material allegations of a petition filed against the Member in any proceeding described in Subsections (i) through (v);

(vii) any proceeding against the Member seeking reorganization, arrangement, composition, readjustment, liquidation, dissolution, or similar relief under any statute, law, or regulation, continues for one hundred twenty (120) days after the commencement thereof, or the appointment of a trustee, receiver, or liquidator for the Member or all or any substantial part of the Member's properties without the Member's agreement or acquiescence, which appointment is not vacated or stayed for one hundred twenty (120) days or, if the appointment is stayed, for one hundred twenty (120) days after the expiration of the stay during which period the appointment is not vacated;

(viii) if the Member is acting as a Member by virtue of being a trustee of a trust, the termination of the trust;

(ix) if the Member is a partnership or limited liability company, the dissolution and commencement of winding up of the partnership or limited liability company;

(x) if the Member is a corporation, the dissolution of the corporation or the revocation of its charter; or

(xi) if the Member is an estate, the distribution by the fiduciary of the estate's entire interest in the Company.

*"Member"* means each Person signing this Agreement and any Person who subsequently is admitted as a member of the Company.

*"Member Loan Nonrecourse Deductions"* means any Company deductions that would be Nonrecourse Deductions if they were not attributable to a loan made or guaranteed by a Member within the meaning of Regulation Section 1.704-2(i).

*"Member Minimum Gain"* has the meaning set forth in Regulation Section 1.704-2(i) for "partner nonrecourse debt minimum gain."

*"Membership Interest"* means a Person's share of the Profits and Losses of, and the right to receive distributions from, the Company.

EXHIBIT 1A

*"Membership Rights"* means all of the rights of a Member in the Company, including a Member's: (i) Membership Interest; (ii) right to inspect the Company's books and records; and (iii) right to vote on matters coming before the Company.

*"Minimum Gain"* has the meaning set forth in Regulation Section 1.704-2(d). Minimum Gain shall be computed separately for each Interest Holder in a manner consistent with the Regulations under Code Section 704(b).

*"Negative Capital Account"* means a Capital Account with a balance of less than zero.

*"Nonpreferred Withdrawal"* means, with respect to any Member, the first to occur of:

      (i) the conviction by a Member of a crime associated with the operation of the Company or the Member's Membership therein; or

      (ii) any breach or attempted breach by the Member of the provisions of this Agreement.

*"Nonrecourse Deductions"* has the meaning set forth in Regulation Section 1.704-2(b)(1). The amount of Nonrecourse Deductions for a taxable year of the Company equals the net increase, if any, in the amount of Minimum Gain during that taxable year, determined according to the provisions of Regulation Section 1.704-2(c).

*"Nonrecourse Liability"* has the meaning set forth in Regulation Sections 1.704-2(b)(3) and 1.752-1(a)(2).

*"Percentage"* means, as to a Member, the percentage set forth after the Member's name on Exhibit A, as amended from time to time, and as to an Interest Holder who is not a Member, the Percentage of the Member whose Membership Interest has been acquired by such Interest Holder, to the extent the Interest Holder has succeeded to that Member's Membership Interest.

*"Person"* means and includes any individual, corporation, partnership, association, limited liability company, trust, estate, or other entity.

*"Positive Capital Account"* means a Capital Account with a balance greater than zero.

EXHIBIT 1 A

*"Preferred Withdrawal"* means, with respect to any Member, the first to occur of:

(i) the death of the Member;

(ii) the Disability of the Member; or

(iii) the Retirement of the Member.

*"Profit"* and *"Loss"* means, for each taxable year of the Company (or other period for which Profit or Loss must be computed) the Company's taxable income or loss determined in accordance with Code Section 703(a), with the following adjustments:

(i) all items of income, gain, loss, deduction, or credit required to be stated separately pursuant to Code Section 703(a)(1) shall be included in computing taxable income or loss;

(ii) any tax-exempt income of the Company, not otherwise taken into account in computing Profit or Loss, shall be included in computing taxable income or loss;

(iii) any expenditures of the Company described in Code Section 705(a)(2)(B) (or treated as such pursuant to Regulation Section 1.704-1(b)(2)(iv)(i)) and not otherwise taken into account in computing Profit or Loss, shall be subtracted from taxable income or loss;

(iv) gain or loss resulting from any taxable disposition of Company property shall be computed by reference to the adjusted book value of the property disposed of, notwithstanding the fact that the adjusted book value differs from the adjusted basis of the property for federal income tax purposes;

(v) in lieu of the depreciation, amortization, or cost recovery deductions allowable in computing taxable income or loss, there shall be taken into account the depreciation computed based upon the adjusted book value of the asset; and

(vi) notwithstanding any other provision of this definition, any items which are specially allocated pursuant to Section 4.3 hereof shall not be taken into account in computing Profit or Loss.

*"Regulation"* means the income tax regulations, including any temporary regulations, from time to time promulgated under the Code.

*"Resignation"* means a Member's dissociation with the Company by means other than a Transfer, an Involuntary Withdrawal, a Preferred Withdrawal, or a Nonpreferred Withdrawal.

EXHIBIT 1A

"*Retirement*" means, with respect to any Member, the voluntary relinquishment of such Member's Membership in the Company, provided that:

(i) the Member gives the Company written notice of his or her intention to retire not less than four months prior to the date of retirement; and

(ii) the General Manager accepts the Retirement of the Member.

"*Transfer*" means, when used as a noun, any voluntary sale, hypothecation, pledge, assignment, attachment, or other transfer, and, when used as a verb, means, voluntarily to sell, hypothecate, pledge, assign, or otherwise transfer.

## Section II - Formation and Name: Office; Purpose; Term

2.1. *Organization.* The parties have organized a limited liability company pursuant to the Act and the provisions of this Agreement and, for that purpose, have caused Articles of Organization to be executed and filed for record with the Colorado Secretary of State (CSOS).

2.2. *Name of the Company.* The name of the Company shall be "ARETE, LLC." The Company may do business under that name and under any other name or names upon which the General Manager selects. If the Company does business under a name other than that set forth in its Articles of Organization, then the Company shall file a trade name certificate as required by law.

2.3. *Term.* The term of the Company shall begin upon the acceptance of the Articles of Organization by the CSOS and shall continue in existence until its existence is terminated pursuant to Section VII of this Agreement.

2.4. *Principal Office.* The principal office of the Company in the State of Colorado shall be located at 450 Main Street, Denver, Colorado, 80501, or at any other place which the General Manager selects.

2.5. *Resident Agent.* The name and address of the Company's resident agent in the State of Colorado shall be the Company.

2.6. *Members.* The name, present mailing address, and Percentage of each Member are set forth on *Exhibit* A.

EXHIBIT 1A

## Section III - Members; Capital; Capital Accounts

3.1. *Initial Capital Contributions.* Upon the execution of this Agreement, the Members shall contribute to the Company cash in the amounts respectively set forth on *Exhibit* A.

3.2. *Additional Capital Contributions.*

3.2.1. If the General Manager at any time or from time to time determines that the Company requires additional Capital Contributions, then the General Manager shall give notice to each Interest Holder of (i) the total amount of additional Capital Contributions required, (ii) the reason the additional Capital Contribution is required, (iii) each Interest Holder's proportionate share of the total additional Capital Contribution (determined in accordance with this Section), and (iv) the date each Interest Holder's additional Capital Contribution is due and payable, which date shall be no sooner than thirty (30) days after the notice has been given. An Interest Holder's proportionate share of the total additional Capital Contribution shall be equal to the product obtained by multiplying the Interest Holder's Percentage and the total additional Capital Contribution required. An Interest Holder's proportionate share shall be payable in cash or by certified check.

3.2.2. Except as provided in Section 3.2.1, no Interest Holder shall be required to contribute any additional capital to the Company, and no Member shall have any personal liability for any obligations of the Company.

3.2.3. If an Interest Holder fails to pay when due all or any portion of any Capital Contribution, the General Manager shall request the nondefaulting Interest Holders to pay the unpaid amount of the defaulting Interest Holder's Capital Contribution (the "Unpaid Contribution"). To the extent the Unpaid Contribution is contributed by any other Interest Holder, the defaulting Interest Holder's Percentage shall be reduced and the Percentage of each Interest Holder who makes up the Unpaid Contribution shall be increased, so that each Interest Holder's Percentage is equal to a fraction, the numerator of which is that Interest Holder's total Capital Contribution and the denominator of which is the total Capital Contributions of all Interest Holders. The General Manager shall amend *Exhibit* A accordingly. This remedy is in addition to any other remedies allowed by law or by this Agreement.

3.3. *No Interest on Capital Contributions.* Interest Holders shall not be paid interest on their Capital Contributions.

EXHIBIT 1A

3.4. *Return of Capital Contributions.* Except as otherwise provided in this Agreement, no Interest Holder shall have the right to receive the return of any Capital Contribution.

3.5. *Form of Return of Capital.* If an Interest Holder is entitled to receive a return of a Capital Contribution, the Interest Holder shall not have the right to receive anything other than cash in return of the Interest Holder's Capital Contribution.

3.6. *Capital Accounts.* A separate Capital Account shall be maintained for each Interest Holder.

3.7. *Loans.* Any Member may, at any time, make or cause a loan to be made to the Company in any amount and on those terms upon which the Company and the Member agree.

3.8. *Additional Members.*

3.8.1. *Admission.* A Person admitted to the Company as a Member, which shall require the vote of a majority of Member's Membership Interests and the affirmative vote of the General Manager, shall have the Percentage as determined by the General Manager in a manner consistent with this Agreement. The admission of an additional Member shall be effective as of the first day of a Company Fiscal Year.

3.8.2. *Capital Contributions.* The initial Capital Contribution of an additional Member admitted to the Company shall be an amount equal to the same percentage of the Asset Value of all Company Property that the Additional Member's Percentage is of the total Percentages owned by all Members. An initial Capital Contribution shall be paid in money in full at the time of admission unless otherwise agreed by the Company.

3.8.3. *Admission Requirements.* Each additional Member shall execute a counterpart of this Agreement and shall be bound by all provisions thereof, and shall execute any other documents that the Company may deem necessary or appropriate to effect the admission of the Person as an additional Member.

3.9. *Annual Adjustment.* At least annually, the Manager shall review the performance and contribution of each Member of the Company and may increase or decrease the Percentage held by any Member, subject to the approval by the vote of Members owning more than fifty one percent (51%) of the total Percentages then owned by all Members other than the affected Member. The increases and decreases shall be effective as of the first day following the day of the vote of the Members.

EXHIBIT 1A

## Section IV - Profit, Loss, and Distributions

4.1. *Distributions of Cash Flow and Allocations of Profit or Loss Other Than Capital Transactions.*

    4.1.1. *Profit or Loss Other Than From a Capital Transaction.* After giving effect to the special allocations set forth in Section 4.3, for any taxable year of the Company, Profit or Loss (other than Profit or Loss resulting from a Capital Transaction, which Profit or Loss shall be allocated in accordance with the provisions of Sections 4.2.1 and 4.2.2) shall be allocated to the Interest Holders in the following proportions:

        4.1.1.1.  first according to the proportions and amounts contained in Schedule B, attached to this agreement, if any;

        4.1.1.2.  then in proportion to the Percentages of the Interest Holders.

    4.1.2. *Cash Flow.* Cash Flow for each taxable year of the Company shall be distributed to the Interest Holders in proportion to their Percentages no later than seventy-five (75) days after the end of the taxable year.

4.2. *Distributions of Capital Proceeds and Allocation of Profit or Loss from Capital Transactions.*

    4.2.1. *Profit.* After giving effect to the special allocations set forth in Section 4.3, Profit from a Capital Transaction shall be allocated as follows:

        4.2.1.1. If one or more Interest Holders has a Negative Capital Account, to those Interest Holders, in proportion to their Negative Capital Accounts, until all of those Negative Capital Accounts have been reduced to zero.

        4.2.1.2. Any Profit not allocated pursuant to Section 4.2.1.1 shall be allocated to the Interest Holders in proportion to, and to the extent of, the amounts distributable to them pursuant to Sections 4.2.3.4.1 and 4.2.3.4.3.

        4.2.1.3. Any Profit in excess of the foregoing allocations shall be allocated to the Interest Holders in proportion to their Percentages.

    4.2.2. Loss. After giving effect to the special allocations set forth in Section 4.3, Loss from a Capital Transaction shall be allocated as follows:

EXHIBIT 1A

4.2.2.1. If one or more Interest Holders has a Positive Capital Account, to those Interest Holders, in proportion to their Positive Capital Accounts, until all Positive Capital Accounts have been reduced to zero.

4.2.2.2. Any Loss not allocated to reduce Positive Capital Accounts to zero pursuant to Section 4.2.2.1 shall be allocated to the Interest Holders in proportion to their Percentages.

4.2.3. *Capital Proceeds.* Capital Proceeds shall be distributed and applied by the Company in the following order and priority:

4.2.3.1. to the payment of all expenses of the Company incident to the Capital Transaction; then

4.2.3.2. to the payment of debts and liabilities of the Company then due and outstanding (including all debts due to any Interest Holder); then

4.2.3.3. to the establishment of any reserves which the General Manager deems necessary for liabilities or obligations of the Company; then

4.2.3.4. the balance shall be distributed as follows:

4.2.3.4.1. to the Interest Holders in proportion to their Adjusted Capital Balances, until their remaining Adjusted Capital Balances have been paid in full;

4.2.3.4.2. if any Interest Holder has a Positive Capital Account after the distributions made pursuant to Section 4.2.3.4.1 and before any further allocation of Profit pursuant to Section 4.2.1.3, to those Interest Holders in proportion to their Positive Capital Accounts; then

4.2.3.4.3. the balance, to the Interest Holders in proportion to their Percentages.

*EXHIBIT 1 A*

### 4.3. *Regulatory Allocations.*

4.3.1. *Qualified Income Offset.* No Interest Holder shall be allocated Losses or deductions if the allocation causes an Interest Holder to have an Adjusted Capital Account Deficit. If an Interest Holder receives (1) an allocation of Loss or deduction (or item thereof) or (2) any distribution, which causes the Interest Holder to have an Adjusted Capital Account Deficit at the end of any taxable year, then all items of income and gain of the Company (consisting of a pro rata portion of each item of Company income, including gross income and gain) for that taxable year shall be allocated to that Interest Holder, before any other allocation is made of Company items for that taxable year, in the amount and in proportions required to eliminate the excess as quickly as possible. This Section 4.3.1 is intended to comply with, and shall be interpreted consistently with, the "qualified income offset" provisions of the Regulations promulgated under Code Section 704(b).

4.3.2. *Minimum Gain Chargeback.* Except as set forth in Regulation Section 1.704-2(f)(2), (3), and (4), if, during any taxable year, there is a net decrease in Minimum Gain, each Interest Holder, prior to any other allocation pursuant to this Section IV, shall be specially allocated items of gross income and gain for such taxable year (and, if necessary, subsequent taxable years) in an amount equal to that Interest Holder's share of the net decrease of Minimum Gain, computed in accordance with Regulation Section 1.704-2(g)(2). Allocations of gross income and gain pursuant to this Section 4.3.2 shall be made first from gain recognized from the disposition of Company assets subject to nonrecourse liabilities (within the meaning of the Regulations promulgated under Code Section 752), to the extent of the Minimum Gain attributable to those assets, and thereafter, from a pro rata portion of the Company's other items of income and gain for the taxable year. It is the intent of the parties hereto that any allocation pursuant to this Section 4.3.2 shall constitute a "minimum gain chargeback" under Regulation Section 1.704-2(f).

4.3.3. *Contributed Property and Book-Ups.* In accordance with Code Section 704(c) and the Regulations thereunder, as well as Regulation Section 1.704-1(b)(2)(iv)(d)(3), income, gain, loss, and deduction with respect to any property contributed (or deemed contributed) to the Company shall, solely for tax purposes, be allocated among the Interest Holders so as to take account of any variation between the adjusted basis of the property to the Company for federal income tax purposes and its fair market value at the date of contribution (or deemed contribution). If the adjusted book value of any Company asset is adjusted as provided herein, subsequent allocations of income, gain, loss, and deduction with respect to the asset shall take account of any variation between the adjusted basis of the asset for federal income tax purposes and its adjusted book value in the manner required under Code Section 704(c) and the Regulations thereunder.

*EXHIBIT 1A*

**4.3.4.** *Code Section 754 Adjustment.* To the extent an adjustment to the tax basis of any Company asset pursuant to Code Section 734(b) or Code Section 743(b) is required, pursuant to Regulation Section 1.704-1(b)(2)(iv)(m), to be taken into account in determining Capital Accounts, the amount of the adjustment to the Capital Accounts shall be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases basis), and the gain or loss shall be specially allocated to the Interest Holders in a manner consistent with the manner in which their Capital Accounts are required to be adjusted pursuant to that Section of the Regulations.

**4.3.5.** *Nonrecourse Deductions.* Nonrecourse Deductions for a taxable year or other period shall be specially allocated among the Interest Holders in proportion to their Percentages.

**4.3.6.** *Member Loan Nonrecourse Deductions.* Any Member Loan Nonrecourse Deduction for any taxable year or other period shall be specially allocated to the Interest Holder who bears the risk of loss with respect to the loan to which the Member Loan Nonrecourse Deduction is attributable in accordance with Regulation Section 1.704-2(b).

**4.3.7.** *Guaranteed Payments.* To the extent any compensation paid to any Member by the Company, including any fees payable to any Member pursuant to Section 5.3 hereof, is determined by the Internal Revenue Service not to be a guaranteed payment under Code Section 707(c) or is not paid to the Member other than in the Person's capacity as a Member within the meaning of Code Section 707(a), the Member shall be specially allocated gross income of the Company in an amount equal to the amount of that compensation, and the Member's Capital Account shall be adjusted to reflect the payment of that compensation.

**4.3.8.** *Unrealized Receivables.* If an Interest Holder's Interest is reduced (provided the reduction does not result in a complete termination of the Interest Holder's Interest), the Interest Holder's share of the Company's "unrealized receivables" and "substantially appreciated inventory" (within the meaning of Code Section 751) shall not be reduced, so that, notwithstanding any other provision of this Agreement to the contrary, that portion of the Profit otherwise allocable upon a liquidation or dissolution of the Company pursuant to Section 4.4 hereof which is taxable as ordinary income (recaptured) for federal income tax purposes shall, to the extent possible without increasing the total gain to the Company or to any Interest Holder, be specially allocated among the Interest Holders in proportion to the deductions (or basis reductions treated as deductions) giving rise to such recapture. Any questions as to the aforesaid allocation of ordinary income (recapture), to the extent such questions cannot be resolved in the manner specified above, shall be resolved by the General Manager.

*Exhibit 1A*

4.3.9. *Withholding.* All amounts required to be withheld pursuant to Code Section 1446 or any other provision of federal, state, or local tax law shall be treated as amounts actually distributed to the affected Interest Holders for all purposes under this Agreement.

### 4.4. *Liquidation and Dissolution.*

4.4.1. If the Company is liquidated, the assets of the Company shall be distributed to the Interest Holders in accordance with the balances in their respective Capital Accounts, after taking into account the allocations of Profit or Loss pursuant to Sections 4.1 or 4.2, if any, and distributions, if any, of cash or property, if any, pursuant to Sections 4.1 and 4.2.3.

4.4.2. No Interest Holder shall be obligated to restore a Negative Capital Account.

### 4.5. *General.*

4.5.1. Except as otherwise provided in this Agreement, the timing and amount of all distributions shall be determined by the General Manager.

4.5.2. If any assets of the Company are distributed in kind to the Interest Holders, those assets shall be valued on the basis of their fair market value, and any Interest Holder entitled to any interest in those assets shall receive that interest as a tenant-in-common with all other Interest Holders so entitled. Unless the Members otherwise agree, the fair market value of the assets shall be determined by an independent appraiser who shall be selected by the General Manager. The Profit or Loss for each unsold asset shall be determined as if the asset had been sold at its fair market value, and the Profit or Loss shall be allocated as provided in Section 4.2 and shall be properly credited or charged to the Capital Accounts of the Interest Holders prior to the distribution of the assets in liquidation pursuant to Section 4.4.

4.5.3. All Profit and Loss shall be allocated, and all distributions shall be made to the Persons shown on the records of the Company to have been Interest Holders as of the last day of the taxable year for which the allocation or distribution is to be made. Notwithstanding the foregoing, unless the Company's taxable year is separated into segments, if there is a Transfer or an Involuntary Withdrawal during the taxable year, the Profit and Loss shall be allocated between the original Interest Holder and the successor on the basis of the number of days each was an Interest Holder during the taxable year; provided, however, the Company's taxable year shall be segregated into two or more segments in order to account for Profit, Loss, or proceeds attributable to a Capital Transaction or to any other extraordinary nonrecurring items of the Company.

EXHIBIT 1A

4.5.4. The General Manager is hereby authorized, upon the advice of the Company's tax counsel, to amend this Article IV to comply with the Code and the Regulations promulgated under Code Section 704(b); provided, however, that no amendment shall materially affect distributions to an Interest Holder without the Interest Holder's prior written consent.

## Section V – Management: Rights, Powers, and Duties

5.1. *Management.*

5.1.1. *General Manager.* The Company shall be managed by a General Manager, who may, but need not, be a Member. Cuil, LLC, is hereby designated to serve as the initial General Manager.

5.1.2. *General Powers.* The General Manager shall have full, exclusive, and complete discretion, power, and authority, subject in all cases to the other provisions of this Agreement and the requirements of applicable law, to manage, control, administer, and operate the business and affairs of the Company for the purposes herein stated, and to make all decisions affecting such business and affairs, including, without limitation, for Company purposes, the power to:

5.1.2.1. acquire by purchase, lease, or otherwise, any real or personal property, tangible or intangible;

5.1.2.2. construct, operate, maintain, finance, and improve, and to own, sell, convey, assign, mortgage, or lease any real estate and any personal property;

5.1.2.3. sell, dispose, trade, or exchange Company assets in the ordinary course of the Company's business;

5.1.2.4. enter into agreements and contracts and to give receipts, releases and discharges;

5.1.2.5. purchase liability and other insurance to protect the Company's properties and business;

5.1.2.6. borrow money for and on behalf of the Company, and, in connection therewith, execute and deliver instruments authorizing the confession of judgment against the Company;

*EXHIBIT 1A*

5.1.2.7. execute or modify leases with respect to any part or all of the assets of the Company;

5.1.2.8. prepay, in whole or in part, refinance, amend, modify, or extend any mortgages or deeds of trust which may affect any asset of the Company and in connection therewith to execute for and on behalf of the Company any extensions, renewals or modifications of such mortgages or deeds of trust;

5.1.2.9. execute any and all other instruments and documents which may be necessary or in the opinion of the General Manager desirable to carry out the intent and purpose of this Agreement, including, but not limited to, documents whose operation and effect extend beyond the term of the Company;

5.1.2.10. make any and all expenditures which the General Manager, in its sole discretion, deems necessary or appropriate in connection with the management of the affairs of the Company and the carrying out of its obligations and responsibilities under this Agreement, including, without limitation, all legal, accounting and other related expenses incurred in connection with the organization, financing and operation of the Company;

5.1.2.11. enter into any kind of activity necessary to, in connection with, or incidental to, the accomplishment of the purposes of the Company;

5.1.2.12. invest and reinvest Company reserves in short-term instruments or money market funds; and

5.1.2.13. delegate property management duties to a third party or parties.

5.1.3. *Extraordinary Transactions*. Notwithstanding anything to the contrary in this Agreement, the General Manager shall not undertake any of the following without the approval of the Members:

5.1.3.1. any Capital Transaction;

5.1.3.2. the Company's lending more than $100,000 of its money on any one occasion;

5.1.3.3. the admission of additional Members to the Company;

*EXHIBIT 1A*

5.1.3.4. the Company's engaging in business in any jurisdiction which does not provide for the registration of limited liability companies; and

5.1.3.5. the Company's electing to exercise any Purchase Option pursuant to Section 6.1.7.

5.1.4. *Limitation on Authority of Members.*

5.1.4.1. No Member is an agent of the Company solely by virtue of being a Member, and no Member has authority to act for the Company solely by virtue of being a Member.

5.1.4.2. Any Member who takes any action or binds the Company in violation of this Section 5.1 shall be solely responsible for any loss and expense incurred by the Company as a result of the unauthorized action and shall indemnify and hold the Company harmless with respect to the loss or expense.

5.1.5. *Election of New General Manager.* A new General Manager may be elected by those Members holding at least ninety percent (90%) of the Percentages then held by Members.

5.2. *Meetings of and Voting by Members.*

5.2.1. A meeting of the Members may be called at any time by the General Manger or by those Members holding at least thirty three percent (33%) of the Percentages then held by Members. Meetings of Members shall be held at the Company's principal place of business or at any other place designated by the Persons calling the meeting. Not less than ten (10) nor more than fifty (50) days before each meeting, the Persons calling the meeting shall give written notice of the meeting to each Member entitled to vote at the meeting. The notice shall state the time, place, and purpose of the meeting. Notwithstanding the foregoing provisions, each Member who is entitled to notice waives notice if before or after the meeting the Member signs a waiver of the notice which is filed with the records of Members' meetings, or is present at the meeting in person or by proxy and fails to object to the lack of notice. Unless this Agreement provides otherwise, at a meeting of Members, the presence in person or by proxy of Members holding more than fifty one percent (51%) of the Percentages then held by Members constitutes a quorum. A Member may vote either in person or by written proxy signed by the Member or by the Member's duly authorized attorney-in-fact.

5.2.2. Except as otherwise provided in this Agreement, the affirmative vote of Members holding more than fifty one percent (51%) of the Percentages then held by Members present at a meeting at which there is a quorum shall be required to approve any matter coming before the Members.

ARETE, LLC – Rev:B

*EXHIBIT 1A*

5.2.3. An annual meeting shall be held during the third week of each April at such time and place as the General Manager shall fix. Notice shall be given to the Members in accordance with Section 5.2.1.

### 5.3. *Personal Services*

5.3.1. No Member shall be required to perform services for the Company solely by virtue of being a Member. Unless approved by the General Manager, no Member shall perform services for the Company or be entitled to compensation for services performed for the Company.

5.3.2. Unless approved by Members holding 80% of the Percentages then held by Members, the General Manager shall not be entitled to compensation for services performed for the Company. However, upon substantiation of the amount and purpose thereof, the General Manager shall be entitled to reimbursement for expenses reasonably incurred in connection with the activities of the Company.

### 5.4. *Duties of Parties.*

5.4.1. (1) A General Manager elected pursuant to this Operating Agreement shall perform his or her duties as a manager in good faith, in a manner he or she reasonably believes to be in the best interests of the limited liability company, and with such care as an ordinarily prudent person in a like position would use under similar circumstances. A Person who so performs his duties shall not have any liability by reason of being or having been a General Manager of the Company.

(2) In performing his duties, a General Manager shall be entitled to rely on information, opinions, reports, or statements of the following persons or groups unless he has knowledge concerning the matter in question that would cause such reliance to be unwarranted:

(a) One or more employees or other agents of the Company whom the manager reasonably believes to be reliable and competent in the matters presented;

(b) Any attorney, public accountant, or other person as to matters which the General Manager reasonably believes to be within such person's professional or expert competence; or

(c) A committee upon which he does not serve, duly designated in accordance with a provision of the Articles of this Organization or this Agreement, as to matters within its designated authority, which committee the General Manager reasonably believes to merit confidence.

*EXHIBIT 1A*

5.4.2. Section 7-108-501 of the Colorado Business Corporation Act (entitled "conflicting interest transaction") shall apply to contracts or other transactions between the Company and any of its General Managers or committee members and any other entity in which any of its General Managers or committee members is a director or has a material financial interest; provided that references therein to the "corporation" shall be deemed to be to the Company, references to a "director" shall be deemed to be to the General Manager, references to "shareholders" shall be deemed to be to "Members," and references to the "board of directors" shall be to the "Management Committee," if one is appointed.

### 5.5. *Liability and Indemnification.*

5.5.1. The General Manager shall not be liable, responsible, or accountable, in damages or otherwise, to any Member or to the Company for any act performed by the General Manager within the scope of the authority conferred on the General Manager by this Agreement, except for actions or omissions constituting fraud, gross negligence, or an intentional breach of this Agreement or applicable law.

5.5.2. The Company shall indemnify the General Manager for any act performed by the General Manager within the scope of the authority conferred on the General Manager by this Agreement, except for actions or omissions constituting fraud, gross negligence, or an intentional breach of this Agreement or applicable law. The Company shall promptly notify the Members whenever the General Manager has been so indemnified by the Company.

5.6.1. *Grant of Power.* Each Member constitutes and appoints the General Manager as the Member's true and lawful attorney-in-fact ("Attorney-in-Fact"), and in the Member's name, place and stead, to make, execute, sign, acknowledge, and file:

5.6.1.1. one or more articles of organization;

5.6.1.2. all documents (including amendments to articles of organization) which the Attorney-in-Fact deems appropriate to reflect any amendment, change, or modification of this Agreement;

ARETE, LLC – Rev:B

*EXHIBIT 1A*

5.6.1.3. any and all other certificates or other instruments required to be filed by the Company under the laws of the State of Colorado or of any other state or jurisdiction, including, without limitation, any certificate or other instruments necessary in order for the Company to continue to qualify as a limited liability company under the laws of the State of Colorado;

5.6.1.4. one or more fictitious or trade name certificates; and

5.6.1.5. all documents which may be required to dissolve and terminate the Company and to cancel its articles of organization.

5.6.2. *Irrevocability.* The foregoing power of attorney is irrevocable and is coupled with an interest, and, to the extent permitted by applicable law, shall survive the death or disability of a Member. It also shall survive the Transfer of an Interest, except that if the transferee is approved for admission as a Member, this power of attorney shall survive the delivery of the assignment for the sole purpose of enabling the Attorney-in-Fact to execute, acknowledge and file any documents needed to effectuate the substitution. Each Member shall be bound by any representations made by the Attorney-in-Fact acting in good faith pursuant to this power of attorney, and each Member hereby waives any and all defenses which may be available to contest, negate or disaffirm the action of the Attorney-in-Fact taken in good faith under this power of attorney.

## Section VI - Transfer of Interests and Withdrawals of Members

6.1. *Transfers.*

6.1.1. No Person may Transfer all or any portion of or any interest or rights in the Person's Membership Rights or Membership Interest unless the following conditions ("Conditions of Transfer") are satisfied:

6.1.1.1. the Transfer will not require registration of Membership Interests or Membership Rights under any federal or state securities laws;

6.1.1.2. The transferee delivers to the Company a written agreement to be bound by the terms of Section VI of this Agreement;

6.1.1.3. the Transfer will not result in the termination of the Company pursuant to Code Section 708;

*EXHIBIT 1A*

6.1.1.4. the Transfer will not result in the Company being subject to the Investment Company Act of 1940, as amended;

6.1.1.5. the transferor or the transferee delivers the following information to the Company: (i) the transferee's taxpayer identification number, and (ii) the transferee's initial tax basis in the Transferred Interest;

6.1.1.6. the transferor complies with the provisions set forth in Section 6.1.7; and

6.1.1.7 the Transfer is approved by the General Manager.

6.1.2. If the Conditions of Transfer are satisfied, then a Member or Membership Interest Holder may Transfer all or any portion of that Person's Membership Interest. The Transfer of a Membership Interest pursuant to this *Section* 6.1 shall not result, however, in the Transfer of any of the transferor's other Membership Rights, if any, and the transferee of the Membership Interest shall have no right to become a Member or exercise any Membership Rights other than those specifically pertaining to the ownership of a Membership Interest, unless otherwise agreed by remaining Members holding a majority of Percentages and agreed by the General Manager.

6.1.3. *Nonpreferred Withdrawal.* Upon the occurrence of a Nonpreferred Withdrawal, the Company shall be continued and the Member who has withdrawn shall be entitled to receive, in liquidation of the Member's Membership Interest an amount equal to the Member's Capital Account as of the date of the Nonpreferred Withdrawal. The amount shall be paid in twelve (12) consecutive equal semiannual installments, without interest, beginning on the first day of the month following the month in which the Nonpreferred Withdrawal occurred and continuing each 6 months thereafter until fully paid.

6.1.4. *Preferred Withdrawal.* Upon the occurrence of a Preferred Withdrawal, the Company shall be continued and the successor to the Withdrawn Member shall be entitled to receive in liquidation of the Member's Membership Interest an amount equal to the Member's Capital Account (the "Withdrawal Amount"). The Withdrawal Amount shall be paid, without interest, in five (5) consecutive equal annual installments beginning on the first anniversary date of the Member's withdrawal from the Company and continuing on the same date in each year thereafter until fully paid.

6.1.5. *Income Tax Treatment.* Any amount paid pursuant to Sections 6.1.3 or 6.1.4 hereof shall be treated as a payment for the withdrawn Member's interest in Company property including goodwill.

*EXHIBIT 1A*

6.1.6. Each Member hereby acknowledges the reasonableness of the prohibition contained in this *Section* 6.1 in view of the purposes of the Company and the relationship of the Members. The Transfer of any Membership Rights or Membership Interests in violation of the prohibition contained in this *Section* 6.1 shall be deemed invalid, null and void, and of no force or effect. Any Person to whom Membership Rights are attempted to be transferred in violation of this Section shall not be entitled to vote on matters coming before the Members, participate in the management of the Company, receive distributions from the Company, or have any other rights in or with respect to the Membership Rights.

6.1.7. Right of First Offer.

6.1.7.1. If an Interest Holder (a "Transferor") desires to Transfer all or any portion of, or any interest or rights in, the Transferor's Membership Interest (the "Transferor Interest"), the Transferor shall notify the Company of that desire (the "Transfer Notice"). The Transfer Notice shall describe the Transferor Interest. The Company shall have the option (the "Purchase Option") to purchase all of the Transferor Interest for a price (the "Purchase Price") equal to the amount the Transferor would receive if the Company were liquidated and an amount equal to the Appraised Value (as determined pursuant to Section 6.4) were available for distribution to the Members pursuant to Section 4.4.

6.1.7.2. The Purchase Option shall be and remain irrevocable for a period (the "Transfer Period") ending at 11:59 P.M., local time at the Company's principal office on the thirtieth (30th) Day following the day the Transfer Notice is given to the Company.

6.1.7.3. At any time during the Transfer Period, the Company may elect to exercise the Purchase Option by giving written notice of its election to the Transferor. The Transferor shall not be deemed a Member for the purpose of voting on whether the Company shall elect to exercise the Purchase Option.

6.1.7.4. If the Company elects to exercise the Purchase Option, the Company's notice of its election shall fix a closing date (the "Transfer Closing Date") for the purchase, which shall not be earlier than five (5) days after the date of the notice of election or more than thirty (30) days after the expiration of the Transfer Period.

6.1.7.5. If the Company elects to exercise the Purchase Option, the Purchase Price shall be paid in cash on the Transfer Closing Date.

*EXHIBIT 1A*

6.1.7.6. If the Company fails to exercise the Purchase Option, the Transferor shall be permitted to offer and sell the Transferor Interest to any non-Affiliate for a period of ninety (90) days (the "Free Transfer Period") after the expiration of the Transfer Period at a price not less than the Purchase Price. If the Transferor does not Transfer the Transferor Interest within the Free Transfer Period, the Transferor's right to Transfer the Transferor Interest pursuant to this Section shall cease and terminate.

6.1.7.7. Any Transfer of the Transferor Interest made after the last day of the Free Transfer Period or without strict compliance with the terms, provisions, and conditions of this Section and other terms, provisions, and conditions of this Agreement, shall be null and void and of no force or effect.

6.2. *Resignation.* No Member shall have the right or power to Resign from the Company.

6.3. *Mandatory Buy-out in Event of Involuntary Withdrawal.*

6.3.1. If the Members elect to continue the Company after an Involuntary Withdrawal, the Members other than the withdrawn Member ("Remaining Members") shall purchase, and the withdrawn Member shall sell, all of the Membership Rights owned of record and beneficially by the withdrawn Member (the "Withdrawal Interest") for a price equal to 75% of the amount the withdrawn Member would receive if the Company were liquidated and an amount equal to the Appraised Value were available for distribution to the Members pursuant to Section 4.4 (the "Withdrawal Purchase Price"). In the absence of an agreement among the Remaining Members, each Remaining Member shall purchase the Withdrawal Interest in the proportion that his respective Percentage bears to the total Percentages of all Remaining Members agreeing to purchase the Withdrawn Interest.

6.3.2. The Remaining Members, by written notice addressed to the withdrawn Member, shall fix a closing date (the "Withdrawal Closing Date") for the purchase. The Withdrawal Closing Date shall not be earlier than ten (10) days nor later than sixty (60) days after the later of the date on which the Involuntary Withdrawal occurred or the date on which the Company received notice of the Involuntary Withdrawal.

6.3.3. The Withdrawal Purchase Price shall be paid in cash on the Withdrawal Closing Date. Simultaneously with the payment of the Withdrawal Purchase Price, the withdrawn Member shall execute and deliver to the Remaining Members those assignments and other instruments as may be reasonably required to vest in the Remaining Members all right, title, and interest in and to the Withdrawal Interest, free and clear of all liens and encumbrances.

*EXHIBIT 1 A*

**6.4.** *Appraised Value.*

6.4.1. The term "Appraised Value" means the appraised value of the equity of the Company's assets as hereinafter provided. Within fifteen (15) days after demand by either one to the other, the Company and the withdrawn Member shall each appoint an appraiser to determine the value of the equity of the Company's assets. If the two appraisers agree upon the equity value of the Company's assets, they shall jointly render a single written report stating that value. If the two appraisers cannot agree upon the equity value of Company's assets, they shall each render a separate written report and shall appoint a third appraiser, who shall appraise the Company's Assets and determine the value of the equity therein, and shall render a written report of his opinion thereon. Each party shall pay the fees and other costs of the appraiser appointed by that party, and the fees and other costs of the third appraiser shall be shared equally by both parties.

6.4.2. The equity value contained in the aforesaid joint written report or written report of the third appraiser, as the case may be, shall be the Appraised Value; provided, however, that if the value of the equity contained in the appraisal report of the third appraiser is more than the higher of the first two appraisals, the higher of the first two appraisals shall govern; and provided, further, that if the value of the equity contained in the appraisal report of the third appraiser is less than the lower of the first two appraisals, the lower of the first two appraisals shall govern.

## Section VII - Dissolution, Liquidation, and Termination of the Company

7.1. *Events of Dissolution.* the Company shall be dissolved upon the happening of any of the following events:

7.1.1. when the period fixed for its duration in Section 2.4, if any, has expired;

7.1.2. upon the unanimous written agreement of the Members; or

7.1.3. upon the death, retirement, resignation, expulsion, bankruptcy, dissolution or Withdrawal, whether Involuntary, Preferred, or Nonpreferred, of a Member or the occurrence of any other event which terminates the continued membership of a Member in the Company, unless the General Manager and a majority of the remaining Members (in voting interest), within ninety (90) days after the event or occurrence, elect to continue the business of the Company.

7.2. *Liquidating Trustee.* If the Company is dissolved, the General Manager shall act as liquidating trustee. The General Manager shall liquidate and reduce to cash the assets of the Company as promptly as

*EXHIBIT 1A*

is consistent with obtaining a fair value therefore and, unless otherwise required by law, shall apply and distribute the proceeds of liquidation, as well as any other Company assets, first, to the payment of creditors of the Company, including Interest Holders who are creditors, in satisfaction of the liabilities of the Company; then to Interest Holders in satisfaction of any distributions of Cash Flow or Capital Proceeds; and then to the Interest Holders in accordance with *Section* 4.4.

7.3. *Filing of Statement of Intent to Dissolve and Articles of Dissolution.* If the Company is dissolved pursuant to Section 7.1, the General Manager shall promptly file a Statement of Intent to Dissolve with the CSOS (if permitted). After the affairs of the Company are wound up pursuant to Section 7.2, the General Manager shall promptly execute and file Articles of Dissolution with the CSOS. If there is no General Manager, then the Articles of Cancellation shall be filed by the remaining Members; if there are no remaining Members, the Articles shall be filed by the last Person to be a Member; if there is neither a General Manager, remaining Members, or a Person who last was a Member, the Articles shall be filed by the legal or personal representatives of the Person who last was a Member.

## Section VIII - Books, Records, Accounting, and Tax Elections

8.1. *Bank Accounts.* All funds of the Company shall be deposited in a bank account or accounts maintained in the Company's name. The General Manager shall determine the institution or institutions at which the accounts will be opened and maintained, the types of accounts, and the Persons who will have authority with respect to the accounts and the funds therein.

8.2. *Books and Records.* The General Manager shall keep or cause to be kept complete and accurate books and records of the Company and supporting documentation of transactions with respect to the conduct of the Company's business. The books and records shall be maintained in accordance with sound accounting practices and shall be available at the Company's registered office for inspection and copying at the reasonable request, and at the expense, of any member during ordinary business hours. Without limiting any of the foregoing, the General Manager shall keep or cause to be kept at the registered office the following:

8.2.1. A current list of the full name and last known business, residence, or mailing address of each Member and Manager, both past and present;

8.2.2. A copy of the articles of organization and all amendments thereto, together with executed copies of any powers of attorney pursuant to which any amendment has been executed;

*EXHIBIT 1A*

8.2.3. Copies of the Company's federal, state, and local income tax returns and reports, if any, for the three most recent years;

8.2.4. Copies of any currently effective Agreement, copies of any writings regarding contributions of members or members' liability therefor, and copies of any financial statements of the Company for the three most recent years;

8.2.5. Minutes of every annual and special meeting of the Members;

8.2.6. A statement prepared and certified as accurate by the General Manager which describes:

8.2.6.1. The amount of cash and a description and statement of the agreed value of the other property or services contributed by each Member and which each Member has agreed to contribute in the future;

8.2.6.2. The times at which events on the happening of which any additional contributions agreed to be made by each Member are to be made;

8.2.6.3. The time at which or the events on the happening of which a Member may terminate his membership in the Company and the amount of, or the method of determining, the distribution to which he may be entitled respecting his membership interest and the terms and conditions of the termination and distribution; and

8.2.6.4. Any right of a Member to receive distributions which include a return of all or any part of a Member's Contribution.

8.2.7. Any written consents obtained from Members acting in lieu of a meeting pursuant to this Agreement.

8.3. *Annual Accounting Period.* The annual accounting period of the Company shall be its taxable year. The Company's taxable year shall be selected by the General Manager, subject to the requirements and limitations of the Code.

*EXHIBIT 1A*

8.4. *Reports.* Within seventy-five (75) days after the end of each taxable year of the Company, the General Manager shall cause to be sent to each Person who was a Member at any time during the taxable year then ended: (i) an annual compilation report, prepared by the Company's independent accountants in accordance with standards issued by the American Institute of Certified Public Accountants; and (ii) a report summarizing the fees and other remuneration paid by the Company to any Member, the General Manager, or any Affiliate in respect of the taxable year. In addition, within seventy-five (75) days after the end of each taxable year of the Company, the General Manager shall cause to be sent to each Person who was an Interest Holder at any time during the taxable year then ended, that tax information concerning the Company which is necessary for preparing the Interest Holder's income tax returns for that year. At the request of any Member, and at the Member's expense, the General Manager shall cause an audit of the Company's books and records to be prepared by independent accountants for the period requested by the Member.

8.5. *Tax Matters Partner.* The General Manager shall be the Company's tax matters partner ("Tax Matters Partner"). The Tax Matters Partner shall have all powers and responsibilities provided in Code Section 6221, et seq. The Tax Matters Partner shall keep all Members informed of all notices from government taxing authorities which may come to the attention of the Tax Matters Partner. The Company shall pay and be responsible for all reasonable third-party costs and expenses incurred by the Tax Matters Partner in performing those duties. A Member shall be responsible for any costs incurred by the Member with respect to any tax audit or tax-related administrative or judicial proceeding against any Member, even though it relates to the Company. The Tax Matters Partner may not compromise any dispute with the Internal Revenue Service without the approval of the Members.

8.6. *Tax Elections.* The General Manager shall have the authority to make all Company elections permitted under the Code, including, without limitation, elections of methods of depreciation and elections under Code Section 754. The decision to make or not make an election shall be at the General Manager's sole and absolute discretion.

8.7. *Title to Company Property.* All real and personal property acquired by the Company shall be held and owned, and conveyance made, by the Company in its name.

*EXHIBIT 1A*

## Section IX - General Provisions

9.1. *Assurances.* Each Member shall execute all such certificates and other documents and shall do all such filing, recording, publishing and other acts as the General Manager deems appropriate to comply with the requirements of law for the formation and operation of the Company and to comply with any laws, rules, and regulations relating to the acquisition, operation, or holding of the property of the Company.

9.2. *Notifications.* Any notice, demand, consent, election, offer, approval, request, or other communication (collectively a "notice") required or permitted under this Agreement must be in writing and either delivered personally or sent by certified or registered mail, postage prepaid, return receipt requested. Any notice to be given hereunder by the Company shall be given by the General Manager. A notice must be addressed to an Interest Holder at the Interest Holder's last known address on the records of the Company. A notice to the Company must be addressed to the Company's principal office. A notice delivered personally will be deemed given only when acknowledged in writing by the person to whom it is delivered. A notice that is sent by mail will be deemed given three (3) business days after it is mailed. Any party may designate, by notice to all of the others, substitute addresses or addressees for notices; and, thereafter, notices are to be directed to those substitute addresses or addressees.

9.3. *Specific Performance.* The parties recognize that irreparable injury will result from a breach of any provision of this Agreement and that money damages will be inadequate to fully remedy the injury. Accordingly, in the event of a breach or threatened breach of one or more of the provisions of this Agreement, any party who may be injured (in addition to any other remedies which may be available to that party) shall be entitled to one or more preliminary or permanent orders (i) restraining and enjoining any act which would constitute a breach or (ii) compelling the performance of any obligation which, if not performed, would constitute a breach.

9.4. *Complete Agreement.* This Agreement constitutes the complete and exclusive statement of the agreement among the Members. It supersedes all prior written and oral statements, agreements or understandings including any prior representation, statement, condition, or warranty. Except as expressly provided otherwise herein, this Agreement May not be amended without the written consent of all of the Members.

9.5. *Applicable Law.* All questions concerning the construction, validity, and interpretation of this agreement and the performance of the obligations imposed by this agreement shall be governed by the internal law, not the law relating to conflicts of laws, of the State of Colorado.

EXHIBIT 1A

## CERTIFICATE

The undersigned hereby agree, acknowledge and certify that the foregoing Operating Agreement, consisting of 34 pages, including the Title Page and the attached Exhibits, constitutes the Operating Agreement of ARETE, LLC, adopted by the Members of the company as of July, 2011.  In witness whereof, the parties have executed, or caused this Agreement to be executed, under seal, as of the date set forth hereinabove.

*CO-FOUNDERS & MANAGING DIRECTORS:*

Richard W. Greeott
Date: July 1, 2011

Gary C. Snisky
Date: July 1, 2011