EXHIBIT <u>1C</u> & <u>1C-i</u>

# GINNIE MAE PROSPECTUS

EXHIBIT 1C



**Offering Circular Supplement**
(To Base Offering Circular dated October 1, 2011)

## $110,014,172

### Government National Mortgage Association

### GINNIE MAE®

Guaranteed HECM MBS REMIC Pass-Through Securities and MX Securities

### Ginnie Mae REMIC Trust 2012-H13

| Class of REMIC Securities | Original Principal Balance(2) | Interest Rate | Principal Type(3) | Interest Type(3) | CUSIP Number | Final Distribution Date(4) |
|---|---|---|---|---|---|---|
| **Security Group 1** | | | | | | |
| AI(1) ......... | $41,016,222 | (5) | NTL(HPT) | HWAC/IO/DLY | 38375BSS2 | May 2062 |
| FA ............ | 41,016,222 | (5) | HPT | FLT/HWAC/HZ | 38375BST0 | May 2062 |
| **Security Group 2** | | | | | | |
| BI(1) ......... | 48,117,207 | (5) | NTL(HPT) | HWAC/IO/DLY | 38375BSU7 | May 2062 |
| FB ............ | 48,117,207 | (5) | HPT | FLT/HWAC/HZ | 38375BSV5 | May 2062 |
| **Security Group 3** | | | | | | |
| HA ........... | 20,880,743 | 2.00% | HPT | FIX/HZ | 38375BSW3 | September 2060 |
| HI ............ | 20,880,743 | (5) | NTL(HPT) | HWAC/IO/DLY | 38375BSX1 | September 2060 |
| **Residual** | | | | | | |
| RR ............ | 0 | 0.00 | NPR | NPR | 38375BSY9 | May 2062 |

(1) These Securities may be exchanged for MX Securities described in Schedule I to this Supplement.
(2) Subject to increase as described under "Increase in Size" in this Supplement. The amount shown for each Notional Class (indicated by "NTL" under Principal Type) is its original Class Notional Balance and does not represent principal that will be paid.

### The Securities

The Trust will issue the Classes of Securities listed on the front cover of this offering circular supplement.

### The Ginnie Mae Guaranty

Ginnie Mae will guarantee the timely payment of principal and interest on the securities. The Ginnie Mae Guaranty is backed by the full faith and credit of the United States of America.

# GINNIE MAE GUARANTY

EXHIBIT 1C-i

Distribution Date, the Trustee will retain all principal and interest distributions received on such Ginnie Mae Certificates in payment of the Trustee Fee.

## GINNIE MAE GUARANTY

The Government National Mortgage Association ("Ginnie Mae"), a wholly-owned corporate instrumentality of the United States of America within HUD, guarantees the timely payment of principal and interest on the Securities. The General Counsel of HUD has provided an opinion to the effect that Ginnie Mae has the authority to guarantee multiclass securities and that Ginnie Mae guaranties will constitute general obligations of the United States, for which the full faith and credit of the United States is pledged. See "Ginnie Mae Guaranty" in the Base Offering Circular.

## DESCRIPTION OF THE SECURITIES

### General

The description of the Securities contained in this Supplement is not complete and is subject to, and is qualified in its entirety by reference to, all of the provisions of the Trust Agreement. See "Description of the Securities" in the Base Offering Circular.

### Form of Securities

Each Class of Securities other than the Residual Securities initially will be issued and maintained, and may be transferred only on the Fedwire Book-Entry System. Beneficial Owners of Book-Entry Securities will ordinarily hold these Securities through one or more financial intermediaries, such as banks, brokerage firms and securities clearing organizations that are eligible to maintain book-entry accounts on the Fedwire Book-Entry System. By request accompanied by the payment of a transfer fee of $25,000 per Certificated Security to be issued, a Beneficial Owner may receive a Regular Security in certificated form.

The Residual Securities will not be issued in book-entry form but will be issued in fully registered, certificated form and may be transferred or exchanged, subject to the transfer restrictions applicable to Residual Securities set forth in the Trust Agreement, at the Corporate Trust Office of the Trustee. See "Description of the Securities — Forms of Securities; Book-Entry Procedures" in the Base Offering Circular.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Criminal Case No. 13-cr-00473-RM

UNITED STATES OF AMERICA

Plaintiff,

v.

1. GARY SNISKY,

Defendant,

---

**PLEA AGREEMENT AND STATEMENT OF FACTS
RELEVANT TO SENTENCING**

---

The United States of America, by and through Pegeen D. Rhyne, Assistant United States Attorney for the United States Attorney's Office for the District of Colorado (the "government"), and the defendant, Gary Snisky ("Snisky" or the "defendant"), personally and by counsel, Robert Pepin, submit the following Plea Agreement pursuant to D.C.COLO.LCrR 11.1.

## I.   AGREEMENT

1. The defendant agrees to plead guilty to Count 2, charging mail fraud in violation of 18 U.S.C. § 1341, and Count 14, charging engaging in monetary transactions in property derived from mail fraud in violation of 18 U.S.C. § 1957. The defendant further agrees to admit to the asset forfeiture allegations in the Indictment.

2. The defendant agrees to pay the $200 special monetary assessment

Attachment 1

applicable to these counts at or before the time of sentencing.

*[handwritten margin note: Why did gary accept this?]*

3. The defendant agrees that his sentence will include an order of restitution in an amount of approximately $2,531,032.22,[1] for a portion of which the defendant will be held jointly and severally liable with Richard Greeott. *[handwritten: No RESTITUTION HEARING / FATICO HEARING NEVER informed I had a right.]*

4. Because the defendant agrees not to contest the sentencing factors set forth below, the government agrees that the defendant shall be awarded the additional 1-level reduction for acceptance of responsibility, pursuant to Section 3E1.1(b) of the Sentencing Guidelines, despite the fact that the government had substantially prepared for trial when the defendant agreed to plead guilty.

5. The defendant reserves the right to request a variant sentence. The government anticipates opposing any such request. *[handwritten: Should never have been agreed to.]*

*[handwritten margin note: How is it that gary does not understand this]*

6. The defendant is aware that 18 U.S.C. § 3742 affords a defendant the right to appeal the sentence imposed. Understanding this, the defendant knowingly and voluntarily waives the right to appeal any matter in connection with this prosecution, conviction, or sentence unless it meets one of the following three criteria: (1) the sentence imposed is above the maximum penalty provided in the statute of conviction, (2) the Court, after determining the otherwise applicable sentencing guideline range, either departs or varies upwardly, or (3) the Court determines that the total offense level, after the 3-level reduction for acceptance of responsibility, is higher than 30 and imposes a sentence above the sentencing guideline range calculated for that total offense level.

---

[1] The loss attributed to defendant Snisky is $5,226,965.93. To date, as a result of asset forfeiture proceedings, victims have already received restitution in the amount of $2,695,913.32. The difference between these amounts is the $2,531,052.61. The government expects some additional smaller payments to be made to victims through the asset forfeiture proceedings, and defendant Snisky's restitution obligation should be offset by any such future payments.

2

*[handwritten annotations at bottom: US Bank Bank — ? J. (not) Key bank; BBVA Irrevocable Trusts → T.S M.A.; 12 Dec 2014 Loekey]*

Except as provided above, the defendant also knowingly and voluntarily waives the right to appeal the manner in which the sentence is determined on grounds set forth in 18 U.S.C. § 3742. The defendant also knowingly and voluntarily waives his right to challenge this prosecution, conviction, or sentence and/or the manner in which it was determined in any collateral attack, including but not limited to a motion brought under 28 U.S.C. § 2255. This waiver provision, however, will not prevent the defendant from seeking relief otherwise available if: (1) there is an explicitly retroactive change in the applicable guidelines or sentencing statute, (2) there is a claim that the defendant was denied the effective assistance of counsel, or (3) there is a claim of prosecutorial → *See Back of page 4"* misconduct. Additionally, if the government appeals the sentence imposed by the Court, the defendant is released from this waiver provision.

7.   Forfeiture of Assets:   The defendant agrees to forfeit to the United States immediately and voluntarily any and all assets and property, or portions thereof, subject to forfeiture as proceeds of the scheme set forth in the indictment, pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c), whether in the possession or control of the United States or in the possession or control of the defendant or defendant's nominees, or elsewhere. In addition to the assets that the defendant has already forfeited in Case No. 13 cv-00567- REB-KLM, the additional assets to be forfeited specifically include, but are not limited to: a money judgment in an amount of approximately $2,531,052.61. The defendant agrees and consents to the forfeiture of these assets pursuant to any federal criminal, civil, and/or administrative forfeiture action.

The defendant admits and agrees that the conduct described in the Factual Basis

3

Attachment 1

below provides a sufficient factual and statutory basis to establish that the requisite nexus exists between the specific property subject to forfeiture and the offenses to which defendant is pleading guilty. Pursuant to the provisions of Rule 32.2(b)(1), the United States and the defendant request that at the time of accepting this plea agreement, the Court find that the government has established the requisite nexus and enter a preliminary order of forfeiture.

The defendant agrees fully to assist the government in the recovery and return to the United States of any assets, or portions thereof, that are subject to forfeiture wherever located. The defendant agrees to make a full and complete disclosure of all assets over which defendant exercises control and those which are held or controlled by a nominee.

[handwritten margin note: "Why agree to this?"]

Except as set forth in footnote 1, forfeiture of the defendant's assets shall not be treated as satisfaction of any fine, restitution, cost of imprisonment, or any other penalty this Court may impose upon the defendant in addition to forfeiture. The United States Attorney's Office for the District of Colorado will recommend to the Attorney General that any net proceeds derived from the sale of the judicially forfeited assets be remitted or restored to eligible victims of the offense, for which the defendant has pleaded guilty, pursuant to 18 U.S.C. § 981(e), 28 C.F.R. pt. 9, and any other applicable laws. The defendant understands that the United States Attorney's Office has authority only to recommend such relief and that the final decision of whether to grant relief rests solely with the Department of Justice, which will make its decision in accordance with applicable law.

[handwritten margin note: "NO OBJECTION"]

8.   The government agrees to dismiss Counts 1, 3 through 13, and 15 through 18 at the time of sentencing.

4

9. This plea agreement is made pursuant to Rule 11(c)(1)(A) and (B) of the Federal Rules of Criminal Procedure.

## II. ELEMENTS OF THE OFFENSE

10. The parties agree that the elements of the mail fraud offense charged in Count 2 of the Indictment to which this plea is being tendered are as follows:

A. The defendant devised a scheme to defraud or to obtain money by means of false or fraudulent pretenses, representations or promises;

B. The defendant acted with specific intent to defraud or to obtain money by means of false or fraudulent pretenses, representations or promises;

C. The defendant mailed, or caused another person to mail, something through the U.S. Postal Service for the purpose of carrying out the scheme; and

D. The scheme employed false or fraudulent pretenses, representations, or promises that were material.[2]

11. The parties agree that the elements of the offense of engaging in a monetary transaction in property derived from mail fraud charged in Count 14 of the Indictment to which this plea is being tendered are as follows:

A. The defendant engaged in a monetary transaction affecting interstate commerce;

B. The monetary transaction was conducted involving criminally derived property;

---

[2] Tenth Circuit Pattern Jury Instructions (Criminal Cases), 2011, § 2.56.

   C. The value of the criminally derived property exceeded $10,000;

   D. The defendant knew the transaction involved criminally derived property; and

   E. The monetary transaction took place within the United States.[3]

### III. STATUTORY PENALTIES

12. The maximum statutory penalty for a violation of 18 U.S.C. § 1341 is: not more than 20 years of imprisonment, a fine of not more than the greater of $250,000 or twice the gain or loss from the offense, or both; not more than 3 years of supervised release; a $100 special assessment fee; plus an amount of approximately $2,531,052.61 in restitution.

The maximum statutory penalty for a violation of 18 U.S.C. § 1957 is: 10 years of imprisonment; a fine of not more than the greater of $250,000 or twice the amount of the criminally derived property, or both; 3 years supervised release, restitution, and a $100 special assessment fee.

Accordingly, the total maximum statutory penalty for both Counts 2 and 14 of the Indictment is: not more than 30 years of imprisonment; a fine of not more than the greater of $500,000 or twice the gain or loss from the offense, or both; not more than 3 years of supervised release; a $200 special assessment fee; plus an amount of approximately $2,531,052.61 in restitution.

13. If probation or supervised release is imposed, a violation of any condition of probation or supervised release may result in a separate prison sentence and additional supervision.

---

[3] In the absence of a Tenth Circuit Pattern Jury Instruction for this statute, these elements were found in Federal Jury Practice and Instructions, 6th Cir., 2013, § 11.06.

Case 1:13-cr-00473-RM   Document 156-4   Filed 05/06/16   USDC Colorado   Page 10 of 20

Case 1:13-cr-00473-RM   Document 100   Filed 02/05/15   USDC Colorado   Page 7 of 17
Appellate Case: 15-1243   Document: 01019504947   Date Filed: 10/09/2015   Page: 7
Attachment 1

### IV.   COLLATERAL CONSEQUENCES

14.   The conviction may cause the loss of civil rights, including but not limited to the rights to possess firearms, vote, hold elected office, and sit on a jury.

### V.   STIPULATION OF FACTS

15.   The parties agree that there is a factual basis for the guilty plea that the defendant will tender pursuant to this plea agreement. That basis is set forth below. Because the Court must, as part of its sentencing methodology, compute the advisory guideline range for the offense of conviction, consider relevant conduct, and consider the other factors set forth in 18 U.S.C. § 3553, additional facts may be included below which are pertinent to those considerations and computations. To the extent the parties disagree about the facts set forth below, the stipulation of facts identifies which facts are known to be in dispute at the time of the execution of the plea agreement.

*[handwritten margin note: Mitigation, where is the seperation I thought all the facts below where in dispute there is No distinction between the facts just listed...]*

16.   This stipulation of facts does not preclude either party from hereafter presenting the Court with additional facts which do not contradict facts to which the parties have stipulated and which are relevant to the Court's guideline computations, to other 18 U.S.C. § 3553 factors, or to the Court's overall sentencing decision.

17.   The parties agree that relevant conduct began in 2010.

18.   The parties agree as follows:

#### Mail Fraud

Between at least 2009 and sometime in 2011, defendant Snisky operated in Colorado a company called Colony Capital, LLC ("Colony Capital"), which purported to be a private equity firm offering investment opportunities in bonds, futures trading, and other offerings. Sometime in 2011, defendant Snisky shut down Colony Capital and formed a

*[handwritten: Term ended.]*

company in Longmont, Colorado called Arete, LLC ("Arete"), which also purported to be a private equity firm offering investment opportunities in bonds, futures trading, and other offerings.

Beginning in late 2009, as a paid independent contractor, co-conspirator Richard Greeott ("Greeott") began doing website development work for Colony Capital. From late 2009 through at least January 17, 2013, Greeott continued performing information technology work for Colony Capital and then Arete as an independent contractor. Beginning in approximately mid-2010, defendant Snisky asked Greeott to develop a fully-automated trading system for trading in the futures market. In approximately late 2010, Greeott began developing an algorithm that would be the basis for the requested fully-automated trading system. Greeott's initial efforts in developing the algorithm were not successful, and the trading system failed. By approximately mid-2011, however, Greeott believed that he had developed an algorithm for trading in the futures market that he was ready to test in a simulated environment. Greeott tested the algorithm for several months in a simulated environment. Eventually, Greeott began testing the algorithm by trading small amounts of money in small, but real, futures contracts. By the end of 2012, Greeott was still testing the algorithm by making small trades in a Trade Station account, which was closed by Trade Station in late December 2012. At all times, the algorithm was still in a developmental phase. Additionally, at no time did Greeott, defendant Snisky, or anyone else at Colony Capital or Arete trade a significant amount of money using Greeott's algorithm, nor did Colony Capital or Arete make any real profit using Greeott's algorithm or by making manual trades in the futures market.

Beginning in at least 2010, however, defendant Snisky falsely led investors,

8

Case 1:13-cr-00473-RM   Document 156-4   Filed 05/06/16   USDC Colorado   Page 12 of 20

Case 1:13-cr-00473-RM   Document 100   Filed 02/05/15   USDC Colorado   Page 9 of 17
Appellate Case: 15-1243   Document: 01019504947   Date Filed: 10/09/2015   Page: 9

Attachment 1

potential investors, and financial advisors to believe that Greeott's algorithm was being used by Colony Capital, and later Arete, to profitably trade in the futures market in order to falsely bolster Colony Capital's, and later Arete's, appearance of success and overall financial stability. Defendant Snisky believed that investors were more likely to invest in any of Colony Capital's, and later Arete's, multiple investment offerings if they believed that as a company Colony Capital, and later Arete, was more financially profitable than it truly was. Even when pitching the investment offering related to Ginnie Mae bonds described below, defendant Snisky falsely told investors, potential investors, and financial advisors that Arete made its "real money" trading futures by using Greeott's algorithm and by making strategic manual trades.

[handwritten annotations: "(4)"; "Knowingly Misrepresentation by Gov."; "True? irrelevant, never offered to them. FRAUD."]

Between at least July 2011 and January 17, 2013, defendant Snisky took investors, potential investors, and financial advisors to Greeott's work station within Colony Capital's, and later Arete's, offices to observe Greeott's trading station, which included a computer system with three monitors that displayed data that purportedly related to trading in the futures market. While these investors, potential investors, and financial advisors were at Greeott's trading station, defendant Snisky and Greeott made statements that falsely suggested that Greeott was currently trading "live" in the futures markets and that Greeott had a history of trading profitably in the futures market. In fact, as defendant Snisky knew, most of the time when these investors, potential investors and financial advisors came to Greeott's station, Greeott was trading in a simulated environment and Greeott did not have a history of profitably trading in the futures market.

[handwritten: "True?"]

In approximately July 2011, K.K., S.K., and A.W.,[4] went to Colony Capital's office

[handwritten: "↳ Because of"]

---

[4] For privacy reasons, all people other than the defendant and Greeott will be referred to

9

[handwritten at bottom: "S.K. = Shaw"]

located at 450 Main Street, Longmont, Colorado to discuss investing their money with Colony Capital for the purpose of trading in the futures market. During this meeting, defendant Snisky provided to K.K., S.K. and A.W. a document that falsely represented that Colony Capital had been trading in the futures market with a past performance of earning on its investments approximately 22% per year for the past two years. During this meeting, defendant Snisky took K.K., S.K., and A.W. to Greeott's trading station. Despite the fact that Greeott was trading in a simulated environment and did not yet believe that his algorithm was even close to working successfully, defendant Snisky and Greeott falsely led K.K., S.K., and A.W. to believe that Greeott was successfully trading "live" in the futures market. Soon after this meeting, K.K. invested $178,164.99 with Colony Capital for the purpose of trading in the futures market. In August 2011 and in October 2011, S.K. invested $25,000 and $23,912.44, respectively, with Colony Capital for the purpose of trading in the futures market. Later, when A.W.'s wife decided to invest and K.K. decided to invest more money in the futures trading program, defendant Snisky informed them that his company was now operating under the name Arete. As a result, K.K. and A.W.'s wife invested money with Arete for the purpose of trading in the futures market. Despite the fact that the futures trading program was never truly operational or profitable at Colony Capital or Arete, defendant Snisky sent to K.K., S.K., and A.W.'s wife false account statements indicating that their money was being successfully traded in the futures market and that their accounts had earned profits. Between July 2011 and March 2012, defendant Snisky received a total of $371,346.26 in investor money that was supposed to be traded in the futures market; however,

by their initials.

10

defendant Snisky returned approximately $54,000 to investor J.T., who had demanded his $50,000 principal investment back in late 2012. Defendant Snisky did not trade the vast majority of this $321,346.26 in the futures market as promised. *[handwritten: TRADESTATION Account(s)]*

Between approximately July 2011 and January 2013, defendant Snisky's primary focus was to offer investors, potential investors, and financial advisors the purported opportunity to invest money in what defendant Snisky called Arete's "proprietary value model," which was based on using the investors' money to purchase Ginnie Mae bonds *[handwritten: → How?]* (hereinafter referred to as the "Bond Program"). Defendant Snisky falsely described this investment "model" to several financial advisors, investors, and potential investors as safe because Ginnie Mae bonds were backed by the "full faith and credit of the United *[handwritten: Stated by Ginnie Mae Prospectus -]* States." Starting in approximately July 2011, defendant Snisky offered a 10-year investment model for the Bond Program, which promised the investor a 10% upfront bonus and an annual return of 7%. Under the 10-year model, an investor could not withdraw any money for the first five years; starting in the sixth year, the investor could only withdraw interest. Prior to April of 2012, defendant Snisky began offering a 5-year investment model for the Bond Program, which promised a 6% annual return on the invested money. Throughout 2012, defendant Snisky continued to make false assurances about the safety of investing in the Bond Program despite the fact that Snisky knew that he had not purchased any Ginnie Mae bonds as promised. *[handwritten margin notes: monthly statement / Dec. FL g → Back; On Dec. 12th 2012 - Loeckh called Trade Station sent the money back and then I was charged.]* When defendant Snisky met with financial advisors, investors, or potential investors regarding the Bond Program and the futures trading program, he frequently falsely described himself as an "institutional trader" who was "on Bloomberg." Defendant Snisky represented that this made him part of an elite group of people who could "make

11

markets" and who had access to lucrative opportunities to which ordinary investors did not have access. Defendant Snisky often showed financial advisors, investors, or potential investors his impressive-looking Bloomberg terminal, pulled up screen shots regarding Ginnie Mae bonds, and implied that he either had or would be purchasing the displayed bond or something similar. In fact, defendant Snisky was not an "institutional trader." Additionally, while defendant had a Bloomberg terminal simply because he paid the substantial monthly fee required obtain one, defendant Snisky never used his Bloomberg terminal to purchase or trade anything or to "make markets."

Defendant Snisky also falsely told financial advisors, investors and potential investors that he could make additional money for the Bond Program by having funds invested in the Bond Program participate in the "overnight lending program." Defendant Snisky explained to financial advisors, investors and potential investors that banks were required to have a certain amount of revenue on hand and, if they did not, they could borrow overnight the required amount from other institutions for a small interest fee. Defendant Snisky falsely stated that he had the ability to participate in this overnight lending program. In fact, at all times relevant to the Indictment, defendant Snisky never participated in the "overnight lending program" and did not have the ability to do so.

Between approximately August 2011 and January 2013, defendant Snisky received a net of approximately $4,180,540.81 in investor money that was supposed to be invested in Ginnie Mae bonds. However, defendant Snisky did not use any of this investor money to purchase Ginnie Mae bonds. In fact, defendant Snisky never purchased any Ginnie Mae bonds. Despite this, defendant Snisky caused false investment account statements to be mailed to investors in the Bond Program falsely

Attachment 1

*[handwritten right margin: Fact 6]*

showing that their money had been invested as promised and was earning a profit as promised.

On January 11, 2012, defendant mailed or caused to be mailed to G.B., an investor in the Bond Program, a Welcome letter and a false account statement entitled "Contributor Information & Data." The false account statement furthered the mail fraud scheme described above by falsely reassuring G.B. that her money had been invested as promised and was earning interest as promised.

*[handwritten left margin: Disputed Mitigate I was told not a Jury Trial]*

Defendant Snisky agrees that the loss for which he will be held accountable for purposes of relevant conduct is $5,226,965.93, which is the net loss to investors in the Bond Program and the futures trading program, including the losses to investors C.P. and J.L. who invested in an earlier bond program, but were told their money was later rolled into the Bond Program and the futures trading program.

*[handwritten right margin: Approx. if not person say cannot w/ certainty until future date. mitigate at sentence.]*

### Engaging In Monetary Transaction with Proceeds from Mail Fraud

On November 17, 2011, in Colorado, the defendant withdrew $35,426 from US Bank Acct No. 103680540996 held by Arete LLC and caused that money to be transferred to an account in the name of Jewel Properties. The entire $35,426 was proceeds from the mail fraud described above because investor deposits from the above-described mail fraud were the only sources of deposit in this account from the account's inception in August 2011 through November 28, 2011. During the entire month of November of 2011, US Bank operated in interstate commerce in that it had branches in multiple states and performed interstate transactions on behalf of its clients.

*[handwritten bottom: This ends the stipulation. No facts were put in dispute specifically because Gary thought they all were.]*

13

Attachment 1

## VI. ADVISORY GUIDELINE COMPUTATION AND 3553 ADVISEMENT

19. The parties understand that the imposition of a sentence in this matter is governed by 18 U.S.C. § 3553. In determining the particular sentence to be imposed, the Court is required to consider seven factors. One of those factors is the sentencing range computed by the Court under advisory guidelines issued by the United States Sentencing Commission. In order to aid the Court in this regard, the parties set forth below their estimate of the advisory guideline range called for by the United States Sentencing Guidelines. To the extent that the parties disagree about the guideline computations, the recitation below identifies in bold the matters which are in dispute, if any.

*[handwritten: DISPUTE]*

### Mail Fraud

A. The base guideline is § 2B1.1, with a base offense level of 7.

B. An 18-level enhancement applies because the loss was more than $2,500,000 but less than $7,000,000, resulting in an offense level of 25. §2B1.1(b)(1)(J).

C. A 2-level enhancement applies because there were more than 10 victims, resulting in an offense level of 27. §2B1.1(b)(2)(A)(i).

D. Pursuant to Section 2B1.1(b)(10), a 2-level enhancement is applied for sophisticated means, resulting in an offense level of 29.

E. Pursuant to Section 3B1.1(a), a 4-level enhancement is applied for "organizer or leader" of a criminal activity that was "otherwise extensive," resulting in an offense level of 33.

F. The adjusted offense level would be 33.

14

Case 1:13-cr-00473-RM  Document 156-4  Filed 05/06/16  USDC Colorado  Page 18 of 20

Case 1:13-cr-00473-RM  Document 100  Filed 02/05/15  USDC Colorado  Page 15 of 17
Appellate Case: 15-1243  Document: 01019504947  Date Filed: 10/09/2015  Page: 15
Attachment 1

## Monetary Transaction in Proceeds from Mail Fraud

G. Pursuant to application note 2(C) under Section 2S1.1 combined with Section 3D1.3(a), no adjustments should be made as a result of the money laundering count in this case because the mail fraud calculation with Chapter 3 enhancements results in the highest offense level of the grouped counts.

H. The defendant should receive a 3-level downward adjustment for timely acceptance of responsibility. The resulting offense level would be 30.

I. The parties understand that the defendant's criminal history computation is tentative. The criminal history category is determined by the Court based on the defendant's prior convictions. Based on information currently available to the parties, it is estimated that the defendant's criminal history category would be I.

J. The career offender/criminal livelihood/armed career criminal adjustments would not apply.

K. The advisory guideline range resulting from these calculations is 97-121 months. However, in order to be as accurate as possible, with the criminal history category undetermined at this time, the offense level(s) estimated above could conceivably result in a range from 97 months (bottom of Category I) to 210 months (top of Category VI). The guideline range would not exceed, in any case, the statutory maximum applicable to the count of conviction.

15

L. Pursuant to guideline § 5E1.2, assuming the estimated offense level above, the fine range for this offense would be $15,000 to $150,000, plus applicable interest and penalties.

M. Pursuant to guideline § 5D1.2, if the Court imposes a term of supervised release, that term is at least 1 year, but not more than 3 years.

N. Pursuant to guideline §5E1.1(a)(1), the Court shall enter a restitution order for the full amount of the victim's loss, which the parties agree will be an amount of approximately $2,531,052.61.

20. The parties understand that although the Court will consider the parties' estimate, the Court must make its own determination of the guideline range. In doing so, the Court is not bound by the position of any party.

21. No estimate by the parties regarding the guideline range precludes either party from asking the Court, within the overall context of the guidelines, to depart from that range at sentencing if that party believes that a departure is specifically authorized by the guidelines or that there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the United States Sentencing Commission in formulating the advisory guidelines. Similarly, no estimate by the parties regarding the guideline range precludes either party from asking the Court to vary entirely from the advisory guidelines and to impose a non-guideline sentence based on other 18 U.S.C. § 3553 factors.

[Handwritten margin notes: "Mitigated Evidence Allowed"; "So you could put in mitigating evidence"]

22. The parties understand that the Court is free, upon consideration and proper application of all 18 U.S.C. § 3553 factors, to impose that reasonable sentence

16

Attachment 1

which it deems appropriate in the exercise of its discretion and that such sentence may be less than that called for by the advisory guidelines (in length or form), within the advisory guideline range, or above the advisory guideline range up to and including imprisonment for the statutory maximum term, regardless of any computation or position of any party on any 18 U.S.C. § 3553 factor.

## VII.   ENTIRE AGREEMENT

23.   This document states the parties' entire agreement. There are no other promises, agreements (or "side agreements"), terms, conditions, understandings, or assurances, express or implied. In entering this agreement, neither the government nor the defendant has relied, or is relying, on any terms, promises, conditions, or assurances not expressly stated in this agreement.

| 2-5-15 | |
|---|---|
| Date | GARY SNISKY<br>Defendant |
| 2-5-15 | |
| Date | Robert Pepin<br>Attorney for Defendant |
| 2/5/15 | |
| Date | Pegeen D. Rhyne<br>Assistant U.S. Attorney |

17